**PERKINS COIE LLP**

Abdul Kallon (*pro hac vice*)
AKallon@perkinscoie.com
Ryan Spear (*pro hac vice*)
RSpear@perkinscoie.com
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Telephone: 206.359.8000
Facsimile:  206.359.9000

Sunita Bali, Bar No. 274108
SBali@perkinscoie.com
Danielle Sivalingam, Bar No. 294369
DSivalingam@perkinscoie.com
Angie Kim, Bar No. 270503
AngieKim@perkinscoie.com
605 Howard Street, Suite 1000
San Francisco, CA 94105
Telephone: 415.344.7000
Facsimile:  415.344.7050

Michael R. Huston (*pro hac vice*)
MHuston@perkinscoie.com
700 13th St NW
Washington, DC 20005
Telephone: 202.654.6200
Facsimile:  202.654.621

*Attorneys for Defendant Google LLC*
*(erroneously sued as Google Inc.)*

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| REPUBLICAN NATIONAL COMMITTEE,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>GOOGLE INC.,<br><br>　　　　　Defendant. | Case No. 2:22-cv-01904-TLN-JDP<br><br>**DEFENDANT GOOGLE LLC'S MOTION TO DISMISS REPUBLICAN NATIONAL COMMITTEE'S VERIFIED COMPLAINT**<br><br>Date:　　　April 20, 2023<br>Time:　　　2:00 p.m.<br>Dept:　　　Courtroom 2, 15th Floor<br>Judge:　　Hon. Troy L. Nunley |

1

**TO THE COURT, ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

2

**PLEASE TAKE NOTICE** that on April 20, 2023, at 2:00 p.m. in Courtroom 2,

3 15th Floor, of the United States District Court for the Eastern District of California, located at

4 501 I Street, Suite 4-200, Sacramento, California 95814, Defendant Google LLC (erroneously

5 sued as "Google Inc.") (hereinafter "Google") will, and hereby does, move, pursuant to Federal

6 Rule of Civil Procedure 12(b)(6), for an Order dismissing all claims against it, with prejudice.

7

This Motion is based on this Notice of Motion and Motion, the attached Memorandum of

8 Points and Authorities, the Declaration of Sunita Bali in Support of Motion to Dismiss

9 Republican National Committee's Verified Complaint, Defendant Google LLC's Request for

10 Judicial Notice in Support of Motion to Dismiss, all pleadings and papers on file in this action,

11 and such other and further matters as the Court may consider.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................ 1

II.    BACKGROUND ................................................................................. 3

    A.    Gmail and Gmail's Spam Filters ............................................ 3

    B.    The FEC's Rejection of the RNC's Discrimination Theory ................ 4

    C.    The FEC Pilot Program ........................................................ 5

    D.    The RNC's Claims Against Google ........................................ 5

III.    LEGAL STANDARD ......................................................................... 6

IV.    ARGUMENT .................................................................................... 6

    A.    The RNC's Telecommunications Act Claim Is Barred by Binding
        Precedent ............................................................................ 6

    B.    The RNC Cannot State a Claim Under California's Common Carrier Law .......... 7

        1.    The RNC Cannot Allege Discriminatory Treatment ............... 7

        2.    Gmail Is Not a Common Carrier under California Law ........... 9

        3.    The RNC Is Not Entitled to Damages .......................... 12

        4.    Treating Gmail as a Common Carrier Would Lead to Absurd
            Results ........................................................... 13

    C.    The RNC Cannot State a Claim Under the Unruh Act Because It Cannot
        Allege that Google Intentionally Engaged in Any Covered Discrimination ....... 13

    D.    The RNC Fails to State a Claim Under California's Unfair Competition
        Law .................................................................................. 15

        1.    The RNC Has Failed to Plead Any Fraudulent, Unfair, or Unlawful
            Conduct .......................................................... 15

            a.    The RNC Has Not Alleged Any Fraudulent Conduct ............... 15

            b.    The RNC Has Not Alleged Any Unfair Conduct ....................... 16

            c.    The RNC Has Not Alleged Any Unlawful Conduct ................... 17

        2.    The RNC Has Not Alleged the Causation Required for UCL
            Standing ............................................................ 17

    E.    The RNC Fails to Plead Any Elements of Intentional Interference with
        Prospective Economic Relations ........................................... 19

**TABLE OF CONTENTS (continued)**

Page

F.    The RNC Likewise Fails to Plead Any Elements of Negligent Interference with Prospective Economic Relations ................................................. 21

G.    The RNC's Negligence Claim Fails Because Google Does Not Owe a Duty of Care to the RNC ............................................................................. 22

H.    Google Is Immune to the RNC's Claims under Section 230 of the Federal Communications Decency Act............................................................. 23

      1.    The RNC's Claims are Barred by Section 230(c)(2) ............................ 24

            a.    Section 230(c)(2)(B) Bars the RNC's Claims............................. 25

            b.    Section 230(c)(2)(A) Bars the RNC's Claims ........................... 26

      2.    The RNC's Claims are Barred by Section 230(c)(1) ............................ 27

V.    CONCLUSION ........................................................................................... 29

1

**TABLE OF AUTHORITIES**

2

**Page(s)**

3

C<small>ASES</small>

4

*Al-Ahmed v. Twitter, Inc.*,

5

   No. 21-cv-08017-EMC, 2022 WL 1605673 (N.D. Cal. May 20, 2022)................................29

6

*Ashcroft v. Iqbal*,

   556 U.S. 662 (2009)......................................................................................................6, 7, 8

7

*Asurvio LP v. Malwarebytes Inc.*,

8

   No. 5:18-CV-05409-EJD, 2020 WL 1478345 (N.D. Cal. Mar. 26, 2020) ...........................25

9

*Barnes v. Yahoo!, Inc.*,

   570 F.3d 1096 (9th Cir. 2009) ...........................................................................................28

10

*Bell Atl. Corp. v. Twombly*,

11

   550 U.S. 544 (2007)....................................................................................................6, 7, 17

12

*Carafano v. Metrosplash.com, Inc.*,

13

   339 F.3d 1119 (9th Cir. 2003) ...........................................................................................23

14

*Coit v. W. Union Tel. Co.*,

15

   130 Cal. 657, 660 (1900)...................................................................................................23

16

*Daniels v. Alphabet Inc.*,

   No. 20-cv-04687-VKD, 2021 WL 1222166 (N.D. Cal. Mar. 31, 2021) ...............................27

17

*Della Penna v. Toyota Motor Sales, U.S.A., Inc.*,

18

   11 Cal. 4th 376 (1995) ......................................................................................................20

19

*Divino Grp. LLC v. Google LLC*,

   No. 19-cv-04749-VKD, 2022 WL 4625076, at *18 (N.D. Cal. Sept. 30, 2022)....................25

20

*Domen v. Vimeo, Inc.*,

21

   433 F. Supp. 3d 592 (S.D.N.Y. 2020)..................................................................................27

22

*Dyroff v. Ultimate Software Grp., Inc.*,

23

   934 F.3d 1093 (9th Cir. 2019) ......................................................................................24, 29

24

*e360Insight, LLC v. Comcast Corp.*,

   546 F. Supp. 2d 605 (N.D. Ill. 2008) ............................................................................26, 27

25

*Earll v. eBay, Inc.*,

26

   No. 5:11-cv-00262-JF (HRL), 2011 WL 3955485 (N.D. Cal. Sept. 7, 2011) ......................15

27

*Ebeid v. Facebook, Inc.*,

28

   No. 18-cv-07030-PJH, 2019 WL 2059662 (N.D. Cal. May 9, 2019)...................................29

-iii-

1

**TABLE OF AUTHORITIES (continued)**

2

**Page(s)**

3

*Enigma Software Grp. USA, LLC v. Malwarebytes, Inc.*,

4

    946 F.3d 1040 (9th Cir. 2019) ...................................................................24, 26, 27

*Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*,

5

    521 F.3d 1157 (9th Cir. 2008) ...................................................................... 24

6

*FCC v. Midwest Video Corp.*,

7

    440 U.S. 689 (1979) ........................................................................................ 11

8

*Fields v. Twitter, Inc.*,

9

    200 F. Supp. 3d 964 (N.D. Cal. 2016) ......................................................... 29

10

*Force v. Facebook, Inc.*,

    934 F.3d 53 (2d Cir. 2019) ...................................................................24, 28, 29

11

*Golden v. Sound Inpatient Physicians Med. Grp., Inc.*,

12

    93 F. Supp. 3d 1171 (E.D. Cal. 2015) .......................................................... 15

13

*Gomez v. Superior Ct.*,

    35 Cal. 4th 1125 (2005) ................................................................................ 12

14

*Gordon v. Virtumundo, Inc.*,

15

    575 F.3d 1040 (9th Cir. 2009) ...................................................................... 20

16

*Greater L.A. Agency on Deafness, Inc. v. Cable News Network, Inc.*,

17

    742 F.3d 414 (9th Cir. 2014) ........................................................................ 14

18

*Harris v. Cap. Growth Invs. XIV*,

19

    52 Cal. 3d 1142 (1991) .................................................................................. 14

*Harris v. LSP Prods. Grp., Inc.*,

20

    No. 2:18-cv-02973-TLN-KJN, 2021 WL 2682045 (E.D. Cal. June 30, 2021) ............... 16, 17

21

*Hart v. W. Union Tel. Co.*,

22

    66 Cal. 579 (1885) ........................................................................................ 12

23

*Holomaxx Techs. v. Microsoft Corp.*,

    783 F. Supp. 2d 1097 (N.D. Cal. 2011) .........................................................17, 25, 26, 27

24

*Howard v. America Online Inc.*,

25

    208 F.3d 741 (9th Cir. 2000) ........................................................................ 10

26

*Huber v. Biden*,

27

    No. 21-cv-06580-EMC, 2022 WL 827248 (N.D. Cal. Mar. 18, 2022) ................. 14

28

2:22-CV-01904-TLN-JDP
GOOGLE LLC'S MOTION TO DISMISS

1

**TABLE OF AUTHORITIES (continued)**

2

**Page(s)**

3

*in Munson v. Del Taco, Inc.*,

4

   46 Cal. 4th 661 (2009) .......................................................................................... 14

5

*In re Cox*,
   3 Cal. 3d 205 (1970) ............................................................................................. 14

6

*In re iPhone Application Litig.*,

7

   6 F. Supp. 3d 1004 (N.D. Cal. 2013) .................................................................... 18

8

*In re Turner*,

9

   859 F.3d 1145 (9th Cir. 2017) ............................................................................... 18

10

*Jones v. Dirty World Ent. Recordings LLC*,
   755 F.3d 398 (6th Cir. 2014) ................................................................................. 28

11

*Keen v. Am. Home Mortg. Servicing, Inc.*,

12

   664 F. Supp. 2d 1086 (E.D. Cal. 2009) ................................................................ 17

13

*Kenney v. City of San Diego*,
   No. 13cv248-WQH-DHB, 2013 WL 5346813 (S.D. Cal. Sept. 20, 2013) ........... 14

14

15

*Kinderstart.com LLC v. Google, Inc.*,
   No. C 06-2057 JF (RS), 2006 WL 3246596 (N.D. Cal. July 13, 2006) ............... 10

16

*Koebke v. Bernardo Heights Country Club*,

17

   36 Cal. 4th 824 (2005) .......................................................................................... 15

18

*Kwikset Corp. v. Superior Ct.*,
   51 Cal. 4th 310 (2011) .......................................................................................... 17

19

20

*Marcus v. Apple, Inc.*,
   No. C 14-03824 WHA, 2015 WL 151489 (N.D. Cal. Jan. 8, 2015) ..................... 17

21

*Marina Point, Ltd. v. Wolfson*,

22

   30 Cal. 3d 721 (1982) ........................................................................................... 14

23

*NetChoice, LLC v. Att'y Gen.* (*NetChoice I*),
   34 F.4th 1196 (11th Cir. 2022) ............................................................................. 10

24

*NetChoice, LLC v. Paxton* (*NetChoice II*),

25

   49 F.4th 439 (5th Cir. 2022) .................................................................................. 10

26

*O'Connor v. Uber Techs., Inc.*,

27

   58 F. Supp. 3d 989 (N.D. Cal. 2014) .................................................................... 18

28

**TABLE OF AUTHORITIES (continued)**

**Page(s)**

*Prager Univ. v. Google LLC,*
   85 Cal. App. 5th 1022, 301 Cal. Rptr. 3d 836 (2022)........................................... 29

*Roy Allan Slurry Seal, Inc. v. Am. Asphalt S., Inc.,*
   2 Cal. 5th 505 (2017) ........................................................................................... 19

*Samuelson v. Pub. Utils. Comm'n of State,*
   36 Cal. 2d 722 (1951) .......................................................................................... 10

*Sandoval v. Cal-W. Reconveyance Corp.,*
   No. CV 13-00114 GAF, 2013 WL 12128818 (C.D. Cal. June 4, 2013)............... 18

*Sikhs for Just. "SFJ", Inc. v. Facebook, Inc.,*
   144 F. Supp. 3d 1088 (N.D. Cal. 2015) ............................................................... 28

*Silicon Knights, Inc. v. Crystal Dynamics, Inc.,*
   983 F. Supp. 1303 (N.D. Cal. 1997) ............................................................... 20, 21

*Software Design & Application, Ltd. v. Hoefer & Arnett, Inc.,*
   49 Cal. App. 4th 472 (1996)................................................................................. 22

*Soil Retention Prods., Inc. v. Brentwood Indus., Inc.,*
   521 F. Supp. 3d 929 (S.D. Cal. 2021)........................................................19, 20, 21

*Squaw Valley Ski Corp. v. Superior Ct.,*
   2 Cal. App. 4th 1499 (1992)..........................................................................10, 11, 12

*Swipe & Bite, Inc. v. Chow,*
   147 F. Supp. 3d 924 (N.D. Cal. 2015) ................................................................. 20

*Sybersound Recs., Inc. v. UAV Corp.,*
   517 F.3d 1137 (9th Cir. 2008)............................................................................... 21

*Tovar v. Sessions,*
   882 F.3d 895 (9th Cir. 2018)................................................................................. 13

*Turner v. Ass'n of Am. Med. Colls.,*
   167 Cal. App. 4th 1401 (2008).............................................................................. 15

*UMG Recordings, Inc. v. Glob. Eagle Ent., Inc.,*
   117 F. Supp. 3d 1092 (C.D. Cal. 2015) ........................................................... 19, 21

*United States v. Councilman,*
   418 F.3d 67 (1st Cir. 2005) ................................................................................... 11

**TABLE OF AUTHORITIES (continued)**

**Page(s)**

*Universal Grading Serv. v. Ebay, Inc.*,
No. C-09-2755 RMW, 2012 WL 70644 (N.D. Cal. Jan. 9, 2012) ........................................ 20

*Vascular Imaging Pros., Inc. v. Digirad Corp.*,
401 F. Supp. 3d 1005 (S.D. Cal. 2019) .............................................................. 21

*Vess v. Ciba-Geigy Corp. USA*,
317 F.3d 1097 (9th Cir. 2003) ........................................................................ 16

*Westside Ctr. Assocs. v. Safeway Stores 23, Inc.*,
42 Cal. App. 4th 507 (1996) ........................................................................... 19

*Williams v. City of Bakersfield*,
No. 1:14-cv-01955 JLT, 2015 WL 1916327 (E.D. Cal. Apr. 27, 2015) ......................... 14

*ZL Techs., Inc. v. Gartner, Inc.*,
No. CV 09-02393 JF (RS), 2009 WL 3706821 (N.D. Cal. Nov. 4, 2009) ....................... 19

**STATUTES**

15 U.S.C. § 7701(a) ...................................................................................... 3, 17

47 U.S.C. § 201 ............................................................................................. 7

47 U.S.C. § 202(a) .......................................................................................... 7

47 U.S.C. § 230(c)(1) ........................................................................... 23, 27, 28, 29

47 U.S.C. § 230(c)(2)(A) ........................................................................ 24, 26, 27

47 U.S.C. § 230(c)(2)(B) ..................................................................... 3, 24, 25, 26

47 U.S.C. § 230(f)(2) ...................................................................................... 25

Cal. Bus. & Prof. Code § 17200 ........................................................................ 15

Cal. Bus. & Prof. Code § 17204 .................................................................... 15, 17

Cal. Bus. & Prof. Code § 17529(a) ...................................................................... 3

Cal. Civ. Code § 51 ........................................................................................ 14

Cal. Civ. Code § 2162 ................................................................................. 2, 23

Cal. Civ. Code § 2168 ............................................................................. 7, 10, 12

Cal. Civ. Code § 2208 ..................................................................................... 13

1

**TABLE OF AUTHORITIES (continued)**

2

**Page(s)**

3

Cal. Civ. Code § 2209..................................................................................................... 12, 13

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

Nobody likes spam. That is why Google uses sophisticated spam-filtering technologies to protect users of its free email service, Gmail, from unwanted and potentially dangerous emails. Contrary to the claims of the Republican National Committee ("RNC"), Google designs its spam-filtering technology to make its product better for users—not for any political or partisan purposes. Indeed, effective spam filtering is a key feature of Gmail, and one of the main reasons why Gmail is so popular. *See* Verified Complaint for Injunctive Relief, Declaratory Judgment, and Damages ("Compl.") ¶ 14 (Dkt. 1) (alleging that Gmail is "the leading email service provider used by 41.9% of Americans").

The RNC is not a Gmail user, but it sends millions of emails to Gmail users each month for "political messaging," fundraising, and similar purposes. Compl. ¶ 1. According to the RNC, Gmail labels some of the RNC's emails as spam, and delivers those emails to users' spam folders, "[a]t approximately the same time at the end of each month." *Id.* ¶ 2. From that unremarkable fact, the RNC infers an elaborate, politically-motivated plot by Google "to secretly suppress[] the political speech and income of one major political party." *Id.* ¶ 98.

The RNC is wrong. Gmail's spam filtering policies apply equally to emails from all senders, whether they are politically affiliated or not. Indeed, the Federal Election Commission ("FEC") has already rejected the RNC's political-discrimination theory, finding that Gmail filters spam "to enhance the value of the Gmail product," not "to influence any election for federal office." Exhibit A to the Declaration of Sunita Bali ("Bali Decl.") (Jan. 11, 2023 FEC Letter) at 13. Nor does anything in the Complaint suggest otherwise. In fact, as explained below, the Complaint's allegations *undermine* the RNC's claims of partisan animus.

Ironically, the RNC could have participated in a pilot program during the 2022 midterm elections that would have allowed its emails to avoid otherwise-applicable forms of spam detection. Many other politically-affiliated entities chose to participate in that program, which was approved by the FEC. The RNC chose not to do so. Instead, it now seeks to blame Google based on a theory of political bias that is both illogical and contrary to the facts alleged in its own

Complaint. And even if the RNC could somehow plausibly allege such a theory—which it has not done and could not do—its claims should be dismissed for a variety of independent reasons.

**First,** the RNC's sole federal claim alleges that Google violated the Telecommunications Act. *See* Compl. ¶¶ 102-07. But that law applies only to "common carriers," and binding authority makes clear that email services like Gmail are not common carriers under federal law. Thus, as the RNC admits, "this claim is foreclosed" and must be dismissed. *Id.* ¶ 107.

**Second,** the RNC claims that Google violated California's common carrier law. *See id.* ¶¶ 59-67. That novel theory fails for several reasons, including because the RNC cannot allege that Gmail "carries" its emails.

**Third,** the RNC alleges that Google violated California's Unruh Civil Rights Act (the "Unruh Act") by discriminating against the RNC based on its "political affiliation[s]," to which Google is supposedly "antagonistic." *Id.* ¶ 72. But again, nothing in the Complaint suggests that the RNC's political affiliations or views—which the RNC does not define or describe—played any role in Google's spam-filtering decisions. In any case, the Unruh Act does not extend to differential treatment based on political viewpoints.

**Fourth,** the RNC alleges that Google violated California's Unfair Competition Law (the "UCL"). *See id.* ¶¶ 75-81. That claim fails for many reasons, including because the RNC does not allege any fraudulent, unfair, or unlawful conduct, and because the RNC does not allege the causation required for UCL standing.

**Fifth,** the RNC alleges intentional and negligent interference with prospective economic relations under the common law. *See id.* ¶¶ 82-101. But the RNC has not adequately alleged facts to support any element of either claim.

**Sixth,** the RNC alleges negligence under California Civil Code § 2162. *See id.* ¶¶ 108-14. That statute, however, applies only to telegraph companies. Google is not a telegraph company, and Gmail is not a telegraph service.

**Seventh,** even if the RNC could overcome the obstacles above, it would not matter. Its claims are categorically barred by Section 230 of the Communications Decency Act, which immunizes Google for precisely the sort of conduct alleged in the Complaint. All the RNC's

1    claims should be dismissed for that reason, as well.

2    **II.     BACKGROUND**

3         **A.     Gmail and Gmail's Spam Filters**

4             This case focuses on Gmail, a free web-based email service offered by Google.

5    Consumers who agree to Google's Terms of Service can create a Gmail account and use Gmail to

6    compose, view, and store emails. *See id.* ¶ 8.

7             Roughly half of all email traffic consists of unwanted spam. *See* Controlling the Assault of

8    Non-Solicited Pornography and Marketing Act of 2003 ("CAN-SPAM Act"), 15 U.S.C.

9    § 7701(a)(2) ("Unsolicited commercial electronic mail is currently estimated to account for over

10   half of all electronic mail traffic . . . ."); *see also* Cal. Bus. & Prof. Code § 17529(a) (noting that

11   roughly 40% of all email traffic in the United States is spam). Spam is not only irritating and

12   distracting; it is also potentially dangerous. Spam may contain malware, phishing attacks, and

13   other content that could harm users and their devices. *See, e.g.*, *Zango, Inc. v. Kaspersky Lab,*

14   *Inc.*, 568 F.3d 1169, 1174 (9th Cir. 2009) ("Malware may . . . expose users to . . . links to

15   pornographic websites, or to software that can compromise the user's privacy, computer security,

16   or identity."). Thus, like virtually every email service, Gmail uses spam filters to make Gmail

17   safer, more useful, and more efficient. *See* Bali Decl., Ex. B at 2 (Google Workspace Blog).[1]

18           As Google has publicly explained, and as the RNC does not contest, Gmail's spam filters

19   "look at a variety of signals, including characteristics of the IP address, domains/subdomains,

20   whether bulk senders are authenticated, and user input." *Id.* Crucially, "[u]ser feedback, such as

21   when a user marks a certain email as spam or signals they want a sender's emails in their inbox, is

22

---

23           [1] Lawmakers have long recognized the threat spam poses to the utility and safety of
     email. Nearly 20 years ago, Congress enacted the federal CAN-SPAM Act to combat the
24   proliferation of spam, recognizing that spam "creates a risk that wanted electronic mail . . . will be
     lost, overlooked, or discarded amidst the larger volume of unwanted messages, thus reducing the
25   reliability and usefulness of electronic mail to the recipient." 15 U.S.C. § 7701(a)(4). Congress
     also observed that spam may inflict harms and costs on email users. *See id.* § 7701(a)(3). In
26   addition, Congress has consistently sought to encourage "[t]he development and adoption of
     technological approaches" by private parties to combat the spam problem. *Id.* § 7701(a)(12). For
27   example, and as discussed below, *see infra* at 23-26, Section 230 of the federal Communications
     Decency Act broadly bars all claims against companies based on their voluntary efforts to
28   develop and provide the "technical means" for restricting spam. 47 U.S.C. § 230(c)(2)(B).

1  key to this filtering process, and [Gmail's] filters learn from user actions." *Id.* In other words,

2  users' actions "teach" Gmail how best to sort incoming email based on user preferences. While

3  some of the details of this process must necessarily remain confidential to avoid exploitation by

4  bad actors, they are all aimed at the same goals: protecting users from unwanted and potentially

5  dangerous emails and providing users with the best overall experience. Indeed, the effectiveness

6  of Gmail's spam filters is one of the main reasons that Gmail is, as the RNC alleges, one of the

7  world's most popular email services. *See* Compl. ¶¶ 8, 14, 27.

8          Google also works hard to help entities that send a high volume of emails to Gmail users,

9  like the RNC, understand how to maximize their "inboxing rate." (The "inboxing rate" is the rate

10 at which emails are placed in users' inboxes rather than in their spam folders. *See* Compl. ¶¶ 23,

11 36-37.) For example, Google publishes guidelines and help center articles that explain how these

12 "bulk" senders can prevent their emails from being blocked or sent to spam. *See* Bali Decl., Ex. C

13 at 1 (Google Gmail Help). Google also offers free tools that bulk senders can use to access data

14 and diagnostics regarding their email campaigns, so they can better understand how to reach their

15 intended recipients. *See* Compl. ¶¶ 36-37; *see also* Bali Decl., Ex. D (Postmaster Tools by

16 Gmail), Ex. E at 1 (Gmail Help Center). Many senders also retain vendors to assist in designing

17 and evaluating email campaigns, as the RNC allegedly did here. *See* Compl. ¶ 24.

18      **B.      The FEC's Rejection of the RNC's Discrimination Theory**

19          This is not the first time the RNC has accused Google of discriminatory spam filtering.

20 In April 2022, the RNC filed a complaint before the FEC making very similar allegations. *See*

21 Bali Decl., Ex. F (April 26, 2022 Letter from RNC to FEC). The RNC's FEC complaint alleged

22 that "Google's biased email filtering mechanism wrongly diverted untold numbers of emails from

23 Republican candidates into recipients' spam folders . . . ". *Id.* at 2 (footnote omitted). Based on

24 that alleged "disproportionate suppression of Republican candidate emails," the RNC urged the

25 FEC to find that Google had violated the Federal Election Campaign Act by making illegal,

26 corporate in-kind contributions to Democratic campaigns. *See id.* at 2, 5-6.

27          The FEC rejected that request. *See* Bali Decl., Ex. A at 2. Contrary to the RNC's

28 arguments, the FEC found that Gmail's "spam filter is in place for commercial, rather than

1  electoral purposes," and is "applied to enhance the value of the Gmail product." *See id.* at 12, 13.

2  The FEC thus held there was "no reason to believe" Google violated federal election law and

3  "closed its file" in the matter. *Id.* at 1, 15.

4           C.       **The FEC Pilot Program**

5           In August 2022, and at Google's request, the FEC authorized a pilot program for bulk

6  emails sent to Gmail users by authorized candidate committees, political party committees, and

7  leadership political action committees registered with the FEC (the "Pilot Program"). *See* Bali

8  Decl., Ex. G at 1 (August 11, 2022 FEC Advisory Opinion). The Pilot Program was made

9  available to all eligible participants on a non-partisan basis and was "not intended to favor or

10  disfavor any particular candidate, party or speaker, nor intended to influence the outcome of any

11  election." Bali Decl., Ex. H at 2 (July 1, 2022 Letter from Google to FEC). Rather, the purpose of

12  the Pilot Program is to help ensure Gmail users receive the emails they want to receive. *See* Bali

13  Decl., Ex. G at 4-5. The Pilot Program is scheduled to run through January 31, 2023. *Id.* at 4.

14           Under the Pilot Program, emails sent by program participants are not subject to forms of

15  spam detection to which they would otherwise be subject. *See* Ex. G at 3. Instead, so long as

16  participants' emails do not contain material prohibited by Gmail's terms and policies (such as

17  phishing attacks, malware, or illegal content) and comply with other program requirements, the

18  placement of those emails into users' inbox folders or spam folders relies on direct feedback from

19  users who receive the emails. *See id*. at 3-4. Users may provide this feedback upon receiving the

20  first or a subsequent email from the sender. *See id*. at 4. Additionally, participants receive

21  information about their inboxing rate, i.e., the rate at which their emails are delivered into users'

22  inboxes as opposed to spam folders. *See id*

23           As the Complaint makes clear, the RNC has chosen not to participate in Google's FEC-

24  approved Pilot Program.

25           D.       **The RNC's Claims Against Google**

26           The RNC's claims in this case arise from the RNC's practice of sending bulk emails to

27  Gmail users for "election fundraising," "community building," and other purposes. Compl. ¶ 2.

28  Crucially, the RNC concedes that Gmail has delivered "nearly all" of the RNC's bulk emails to

1    users' inboxes for "most of each month." *Id.* Since December 2021, however, the RNC alleges

2    that Gmail has delivered many of its emails to users' spam folders for a brief period "at the end of

3    each month." *Id.* As a result, the RNC contends, it has lost revenue and its ability to communicate

4    with supporters during "critical" times each month. *Id.* ¶ 3.

5            The Complaint identifies several potential explanations for the alleged fluctuations in the

6    RNC's inboxing rate, most of them mundane. For example, Google allegedly informed the RNC

7    that the fluctuations could be addressed by "reduc[ing] the frequency of emails that [the RNC]

8    sends at the end of each month." *Id.* ¶ 31. (The RNC does not say whether it heeded that advice,

9    suggesting that it did not.) Nevertheless, according to the RNC, the "only reasonable inference" is

10   that "Google is intentionally sending critical RNC emails to spam folder[s] because it's the RNC

11   sending them." *Id.* ¶ 3. In other words, the RNC claims Google "suppress[es]" the RNC's emails

12   at the end of each month because Google disagrees with the RNC's political views. *See id.* The

13   Complaint does not explain why, if Google harbored such deep-seated animus toward the RNC

14   and its political beliefs, Google would target the RNC's emails only at the end of each month.

15   Undeterred by that and other gaping holes in its theory, the RNC alleges no fewer than seven

16   claims against Google. Every claim fails for the reasons below.

17   **III.    LEGAL STANDARD**

18           To survive dismissal under Federal Rule of Civil Procedure ("Rule") 12(b)(6), a plaintiff

19   must allege "enough facts to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*,

20   556 U.S. 662, 697 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

21   Plausibility requires "factual content that allows the court to draw the reasonable inference that

22   the defendant is liable for the misconduct alleged." *Id.* at 678. A complaint should be dismissed

23   when the allegations support an "obvious alternative explanation," or when the allegations

24   amount to nothing more than "labels and conclusions." *Twombly*, 550 U.S. at 555, 567.

25   **IV.    ARGUMENT**

26           **A.    The RNC's Telecommunications Act Claim is Barred by Binding Precedent**

27           The RNC's sole federal-law claim alleges that Gmail's spam filtering violates the

28   Telecommunications Act, 47 U.S.C. § 201, *et seq.* (the "Act"). *See* Compl. ¶¶ 102-07. But the

Act's nondiscrimination obligations apply only to "common carriers." 47 U.S.C. § 202(a). And, as the RNC admits, "binding precedent" holds that "email providers," like Gmail, are not "common carriers" under the Act. *Id.* ¶¶ 106, 107. This claim must therefore be dismissed.

### B.  The RNC Cannot State a Claim Under California's Common Carrier Law

The RNC also alleges that Gmail's spam filtering violates California's common carrier law, Cal. Civ. Code § 2168, *et seq. See* Compl. ¶¶ 66-67. That claim fails for at least four reasons.

### 1.  The RNC Cannot Allege Discriminatory Treatment

The gravamen of the RNC's claim is that Gmail filtered the RNC's emails differently, and in a way that disadvantaged the RNC, because Google disagrees with the RNC's political affiliations and views. But nothing in the Complaint supports that far-fetched theory. To the contrary, the facts alleged in the Complaint strongly support "obvious alternative explanation[s]" for the alleged fluctuations in the RNC's inboxing rate. *Twombly*, 550 U.S. at 567. In fact, the Complaint offers at least *six* alternative explanations for those alleged fluctuations, all based on mundane aspects of bulk email management and automatic spam filtering technology:

1. "[T]he frequency of emails that [the RNC] sends at the end of each month";

2. A "high number of user complaints" about the RNC's emails;

3. "[I]rregularities" with the RNC's email service provider;

4. The high volume of the "RNC's press releases";

5. "[T]hat the RNC's domain authentication (a system ensuring an email comes from the purported sender) was possibly at fault"; and

6. "[T]hat the issue could be a result of Google's algorithmic spamming system," which "collects spam reports over the course of the month and eventually causes a sender's email to be diverted to Gmail users' spam folders."

Compl. ¶¶ 31, 36, 42, 44. Google respectfully submits that all those explanations, individually and collectively, are far more plausible than the dark conspiracy to "secretly suppress the political speech and income of one major political party" posited by the RNC. *See Iqbal*, 556 U.S. at 682 ("As between that obvious alternative explanation for the [defendant's alleged conduct], and the purposeful, invidious discrimination respondent asks us to infer, discrimination is not a plausible

1  conclusion.") (cleaned up); *see also id.* at 679 (assessing plausibility is "a context-specific task

2  that requires the reviewing court to draw on its judicial experience and common sense").

3        Other facts alleged (and not alleged) further undermine the RNC's discrimination theory.

4  For example, the RNC concedes that Gmail has inboxed the RNC's emails—in other words, has

5  *not* routed them to spam folders—at "rates consistently above 90%" for most of each relevant

6  month. Compl. ¶ 28. The RNC offers no plausible explanation for why Google would inbox the

7  RNC's emails at such a high rate for the vast majority of the relevant time period if Google's true

8  goal was to "suppress[] the [RNC's] political speech and income." *Id.* ¶ 98. Similarly, the RNC

9  offers no plausible explanation for why, if Google meant to discriminate against the RNC, Google

10  nevertheless gave the RNC multiple "suggestions" that had a "significantly positive impact" on

11  the "performance" of the RNC's emails. *Id.* ¶ 48. The RNC also fails to explain why, if Google so

12  fervently wished to target the RNC "secretly," Google would do so by depressing the RNC's

13  inboxing rate, like clockwork, to the same degree and at the same time each month. *Id.*

14        Instead, in an effort to support its discrimination theory, the RNC relies heavily on an

15  "A/B test" that it purportedly conducted. *See* Compl. ¶ 33. According to the RNC, that test

16  involved sending two substantively identical emails—Version *A* and Version *B*—to two separate

17  groups of Gmail users. The emails differed only in their "links to different variants of an RNC

18  donation page." *Id.* The RNC claims that Gmail inboxed Version *A* "at the normal rate," while

19  "Version *B* went entirely to spam." *Id.*

20        Even if true, however, nothing about those alleged results supports the RNC's theory.

21  In fact, the opposite is true. As the RNC admits, the A/B test "suggests that Google is *not*

22  suppressing RNC emails based on their communicative content," i.e., based on the political

23  positions expressed by the RNC. *Id.* (emphasis added). That is obviously correct, and it is

24  devastating to the plausibility of the RNC's discrimination theory. After all, if Google is not

25  suppressing the RNC's emails based on the emails' "communicative content," then it is hard to

26  see how the RNC (or this Court) could reasonably infer that Google is discriminating against the

27  RNC based on its "political affiliation" or its political "views." Compl. ¶ 4. Further, because both

28  Version *A* and Version *B* admittedly pointed to "an RNC donation page," *id.* ¶ 33, the A/B test

1  also strongly suggests that Gmail does not treat the RNC's emails any differently based on the

2  fact that they are sent *by the RNC*.

3       In short, the alleged A/B test does nothing to support the RNC's discrimination theory.

4  To the contrary, the more plausible and obvious inference to be drawn from the test is that the

5  RNC's inboxing rates have varied over time based on decisions and choices by the RNC,

6  including technical decisions about how its bulk emails are constructed and sent.

7       The RNC also leans heavily on an academic study performed by researchers at North

8  Carolina State University (the "NCSU Study"), which, according to the RNC, concluded that

9  "Gmail labels significantly more campaign emails from Republican political candidates as spam

10 than campaign emails from Democratic political candidates." *Id.* ¶ 54; *see also* Bali Decl., Ex. I

11 (NCSU Study). Those allegations do not help the RNC, either. The RNC fails to mention that the

12 researchers responsible for the NCSU Study have since expressly refuted claims that the study

13 reveals the sort of political bias alleged by the RNC, stating that "Gmail isn't biased like the way

14 it's being portrayed." Bali Decl., Ex. J, at 3 (May 25, 2022 Washington Post article). In particular,

15 the researchers have noted that they did not take into account how user feedback impacts Gmail's

16 spam filtering and that "the biases in Gmail almost disappeared" once they accounted for that

17 issue. *Id.* 2.[2]

18      Equally important, the NCSU Study simply does not address, let alone analyze, the factual

19 scenario described in the RNC's Complaint—i.e., repeated end-of-month drops in inboxing rates.

20 For that reason, as well, the Study adds no plausibility to the RNC's theory.

21      The bottom line is that the RNC's discrimination theory lacks any plausible factual basis,

22 and it should be rejected.

23            **2.    Gmail is Not a Common Carrier under California Law**

24      Even if the RNC could plausibly allege its discrimination theory, its claim under

25 California's common carrier law would still fail. Like the federal Telecommunications Act,

26

27 [2] For that reason, and because of other "factors affect[ing] the significance" of the NCSU Study's results, the FEC concluded that the study did not support the RNC's claims that Google violated the Federal Election Campaign Act by discriminating against emails from Republican

28 candidates. *See* Bali Decl., Ex. A at 3-8, 11-13.

-9-

1   California's law applies only to "common carriers." Cal. Civ. Code § 2168. And just as Gmail is

2   not a common carrier under federal law, it is not a common carrier under California law.

3        "[A] common carrier [under California law] is any entity which [1] holds itself out to the

4   public generally and indifferently [2] to transport goods or persons from place to place [3] for

5   profit." *Squaw Valley Ski Corp. v. Superior Ct.*, 2 Cal. App. 4th 1499, 1508 (1992), *as modified*

6   (Feb. 25, 1992) (citation omitted). Gmail meets none of those criteria.

7        For starters, the RNC cannot allege that Gmail is offered to the public "generally and

8   indifferently." *Squaw Valley*, 2 Cal. App. 4th at 1508. Only entities that "voluntarily devote[]

9   their . . . facilities to the *indiscriminate use* of the public" meet that requirement. *Samuelson v.*

10   *Pub. Utils. Comm'n of State*, 36 Cal. 2d 722, 729 (1951) (en banc) (emphasis added) (citation

11   omitted). Gmail is not offered to the public indifferently or indiscriminately. Rather, only those

12   who agree to Google's Terms of Service and Google's Gmail Program Policies (collectively, the

13   "Terms") may use Gmail. *See* Compl. ¶ 8. That distinction alone defeats the RNC's novel theory.

14   The Eleventh Circuit Court of Appeals has recognized, for example, that social media platforms

15   are not common carriers as a matter of law because "they require users, as preconditions of

16   access, to accept their terms of service and abide by their community standards, and thus do not

17   hold [themselves] out to serve the public indiscriminately." *NetChoice, LLC v. Att'y Gen.*

18   (*NetChoice I*), 34 F.4th 1196, 1220-21 (11th Cir. 2022) (cleaned up).[3] The same is true for Gmail.

19        Further, "in the communications context," common carriers are entities that "make a

20   public offering to provide communications facilities whereby all members of the public who

21   choose to employ such facilities *may communicate or transmit intelligence of their own design*

22

23       [3] The Fifth Circuit has criticized the Eleventh Circuit's analysis. *See NetChoice, LLC v.*
    *Paxton* (*NetChoice II*), 49 F.4th 439, 469-79 (5th Cir. 2022), *petition for cert. docketed*, No. 22-

24   555 (U.S. Dec. 19, 2022). But the Fifth Circuit did not even address, let alone rebut, the many
    cases holding that online service providers do not qualify as common carriers under federal and

25   state law. *See, e.g., Howard v. America Online Inc.*, 208 F.3d 741, 752 (9th Cir. 2000) (upholding
    FCC's determination that "enhanced" service providers, like email providers, are not common

26   carriers under federal law); *Kinderstart.com LLC v. Google, Inc.*, No. C 06-2057 JF (RS), 2006
    WL 3246596, at *10 (N.D. Cal. July 13, 2006) (dismissing claim that Google Search should be

27   treated as a common carrier). And the Fifth Circuit's decision does not establish that *email*
    *services*, like Gmail, qualify as common carriers under federal or state law. The Fifth Circuit's

28   decision is therefore both unpersuasive and irrelevant.

1   *and choosing.*" *FCC v. Midwest Video Corp.*, 440 U.S. 689, 701 (1979) (emphasis added)

2   (cleaned up). Here again, that is not how Gmail works. Gmail does not give users—much less

3   non-users, like the RNC—complete control over how emails are organized and displayed in

4   Gmail accounts. Rather, Google necessarily makes decisions as to "whether and on what terms"

5   to display emails in Gmail accounts. *Id.* As Google discloses in its Terms of Service, and as the

6   RNC acknowledges throughout the Complaint, Google may choose to place emails in users' spam

7   folders or even refuse to provide access to emails altogether (e.g., because they contain

8   malware).[4] In other words, Gmail does not allow users or non-users to "communicate or transmit

9   intelligence of their own design and choosing" (*id.* at 701) if they violate Gmail's terms by, for

10  example, using Gmail to transmit malware.

11        Even more fundamentally, the RNC does not allege that Gmail "transport[ed]" the RNC's

12  emails to Gmail users, as Gmail would need to do in order to qualify as a "common carrier."

13  *Squaw Valley*, 2 Cal. App. 4th at 1508. The RNC alleges that it sends emails to Gmail users from

14  "outside" of Gmail using a non-Gmail address. *See, e.g.*, Compl. ¶ 22. But emails sent to users

15  from outside Gmail cannot be "carried" or "transported" by Gmail. Instead, those emails are

16  necessarily *transported by the Internet* from the RNC to the Gmail user, where they may be

17  accessed using the Gmail service. *See, e.g.*, *United States v. Councilman*, 418 F.3d 67, 69-70 (1st

18  Cir. 2005) (en banc) (explaining how an email "journey[s] from sender to recipient" via "a

19  network of interconnected computers," after which it may be accessed "in an e-mail client

20  program," such as Gmail). Thus, contrary to the RNC's hyperbole, the facts alleged do not

21  suggest Gmail acted as a "carrier" of the RNC's emails at all.

22

23        [4] *See* Bali Decl., Ex. K at 3, 13 (Google Terms of Service) (explaining that Google "use[s]
    artificial intelligence and machine learning . . . to better detect and block spam and malware," and
24  "reserves the right to suspend or terminate [users'] access to the services or delete [users'] Google
    Account if . . . [users] materially or repeatedly breach these terms [or] service-specific additional
25  terms or policies [or if users'] conduct causes harm or liability to a user, third party, or Google");
    *see also id.* Ex. L at 2 (Gmail Program Policies) ("Don't use Gmail to distribute spam or
26  unsolicited commercial email. . . . When Gmail users mark emails as spam, it increases the
    likelihood that future messages you send will also be classified as spam by our anti-abuse
27  systems."). The Court may consider Google's Terms of Service and Program Policies, as well as
    other documents cited throughout this brief, for reasons explained in Google's concurrently filed
28  Request for Judicial Notice.

Finally, even if the RNC could somehow allege that Gmail "carries" the RNC's email messages, Google certainly does not do so "for profit." *Squaw Valley*, 2 Cal. App. 4th at 1508. The RNC does not allege that Google charges the RNC or anyone else to send emails to Gmail users, because it does not. The RNC also admits, as it must, that "Google does not charge a user monetary fees to use Gmail." Compl. ¶ 15. Hoping to plead around those inconvenient facts, the RNC claims that Google collects "personal information" about Gmail users, then "uses" or "sells" that data. *Id.* ¶ 16. But even assuming those allegations are true, and even putting aside their impermissible vagueness, the RNC does not suggest that Gmail makes money *from the transporting of emails*—as it would need to do to qualify as a "common carrier." *Squaw Valley*, 2 Cal. 4th at 1508 (to be a common carrier, the company must "transport goods or persons from place to place for profit").

Ultimately, Gmail cannot be treated as a common carrier under California law because Gmail has none of the attributes of a common carrier. Nor is that a controversial conclusion. Google is not aware of a single court applying California's common carrier law to email services.[5]

### 3.    The RNC Is Not Entitled to Damages

Even if the RNC could show that California's common carrier law extends to Gmail, it still could not show that it is entitled to damages. The RNC cites California Civil Code § 2209, under which "[e]very person whose message is refused or postponed . . . is entitled to recover . . . actual damages, and fifty dollars in addition thereto." *See* Compl. ¶ 67. But here, it is undisputed that the RNC's emails were successfully delivered to recipients without delay. *See, e.g., id.* ¶¶ 27-

---

[5] The RNC's claims would still fail as a matter of law even if the RNC could allege some basis for treating Google as a common carrier. Google strongly denies that it treated the RNC's emails differently based on the RNC's political affiliations and views. But true or not, it is irrelevant because California's common carrier law was not enacted to address alleged "viewpoint" discrimination. Rather, it was meant to address physical injuries to stagecoach passengers and physical damage to their belongings—a common phenomenon in the late 1800s. *See Gomez v. Superior Ct.*, 35 Cal. 4th 1125, 1129 (2005). Google is aware of no evidence that Section 2168 was enacted to prohibit viewpoint discrimination by telegraph operators, which the RNC characterizes as forerunners of modern email services. *See* Compl. ¶ 8. To the contrary: In 1874, the legislature amended Section 2168 to *exempt* telegraph companies from common-carrier obligations. *See Hart v. W. Union Tel. Co.*, 66 Cal. 579, 581-82 (1885) ("By statute, therefore, a telegraph company in this state is not a common carrier . . . .").

29. Whether some of the RNC's emails were delivered to users' spam folders rather than users' inboxes is irrelevant under the plain language of Section 2209. Users can access emails in their spam folders at their convenience. In addition, users can move emails from their spam folders to their inboxes, mark emails as "not spam," and instruct Google to deliver future emails from identified senders to their inboxes. *See* Bali Decl., Ex. M at 1-2 (Gmail Help Center). Stated simply, the RNC cannot allege that its emails were "refused" or "postponed" in any sense, and it therefore cannot seek damages under California law.

### 4.   Treating Gmail as a Common Carrier Would Lead to Absurd Results

Finally, interpreting California's common carrier law to apply to email services like Gmail would lead to absurd results—an outcome this Court must avoid. *See, e.g.*, *Tovar v. Sessions*, 882 F.3d 895, 904 (9th Cir. 2018) ("[I]nterpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available.") (citation omitted). For example, California's common carrier law requires covered entities to "always give priority" to "messages from agents of the United States or of this State, on public business[.]" Cal. Civ. Code § 2208. Google could not reasonably comply with such a requirement for a variety of reasons, including because it would be impossible to identify (let alone "priorit[ize]") all messages composed by the countless federal, state, and local governmental actors who send emails to Gmail recipients.

In sum, Gmail is not a common carrier under California law, and this Court should decline the RNC's request to reach that novel conclusion.

### C.   The RNC Cannot State a Claim Under the Unruh Act Because It Cannot Allege that Google Intentionally Engaged in Any Covered Discrimination

The RNC's Unruh Act claim fails for two independent reasons.

**First**, the Unruh Act does not prohibit the type of alleged discrimination at issue here, i.e., "political affiliation" discrimination. Compl. ¶ 69. Rather, by its terms, the Unruh Act prohibits a "business establishment" from discriminating against any person based on "their sex, race, color, religion, ancestry, national origin, disability, medical condition, genetic information, marital status, or sexual orientation[.]" Cal. Civ. Code § 51. "Political affiliation" is not among the

-13-

1  enumerated classifications. And while some "courts have applied the Act to arbitrary

2  discrimination beyond the listed categories," *see Harris v. Cap. Growth Invs. XIV*, 52 Cal. 3d

3  1142, 1161 (1991) (en banc), *superseded on other grounds by statute*, Unruh Civil Rights Act,

4  *codified as amended at* Cal. Civ. Code § 51, *as recognized in Munson v. Del Taco, Inc.*, 46 Cal.

5  4th 661 (2009), it has not been applied to political discrimination. To the contrary, several courts

6  have held that "the Unruh Civil Rights Act does not protect against discrimination based upon

7  political affiliation or the exercise of constitutional rights." *Williams v. City of Bakersfield*, No.

8  1:14-cv-01955 JLT, 2015 WL 1916327, at *5 (E.D. Cal. Apr. 27, 2015) (Thurston, J.); *see also*

9  *Huber v. Biden*, No. 21-cv-06580-EMC, 2022 WL 827248, at *10 (N.D. Cal. Mar. 18, 2022)

10  ("The Unruh Act has not been held to protect persons based on their viewpoints."), *aff'd*, No. 22-

11  15443, 2022 WL 17818543 (9th Cir. Dec. 20, 2022); *Kenney v. City of San Diego*, No. 13cv248-

12  WQH-DHB, 2013 WL 5346813, at *3 (S.D. Cal. Sept. 20, 2013) (same).[6]

13       **Second,** even if the Unruh Act extended to "political affiliation" discrimination, it only

14  prohibits *intentional* discrimination. *See, e.g.*, *Greater L.A. Agency on Deafness, Inc. v. Cable*

15  *News Network, Inc.*, 742 F.3d 414, 425 (9th Cir. 2014) (Unruh Act "contemplates willful,

16  affirmative misconduct on the part of those who violate the Act" (citation omitted)). An alleged

17  disparate impact is not sufficient to sustain a claim under the Unruh Act. *See Koebke v. Bernardo*

18  *Heights Country Club*, 36 Cal. 4th 824, 854 (2005) ("A disparate impact analysis or test does not

19  apply to Unruh Act claims") (citation omitted); *see also Turner v. Ass'n of Am. Med. Colls.*, 167

20  Cal. App. 4th 1401, 1408 (2008), *as modified on denial of reh'g* (Nov. 25, 2008). And as

21

22  _____

       [6] The cases cited by the RNC—which all pre-date the authorities cited above—do not
compel a different result. *Marina Point, Ltd. v. Wolfson*, 30 Cal. 3d 721 (1982), addressed family
23  status, not political affiliation. *Id.* at 724. *Harris* also did not address political views, but rather
refused to extend Unruh Act protections to income-based discrimination. *See* 52 Cal. 3d at 1156.
24  *In re Cox*, 3 Cal. 3d 205 (1970) (en banc), *as modified* (Oct. 28, 1970), likewise did not involve
political-affiliation bias. To the extent the *Cox* court favored extending the Unruh Act to
25  unenumerated classifications such as individuals "who wear long hair or unconventional dress,"
*id.* at 218, the California Supreme Court subsequently rejected such an overbroad interpretation of
26  the statute in *Harris*, 52 Cal. 3d at 1156 ("[A]ny presumption in favor of legislative acquiescence
in the broad concept of 'arbitrary discrimination' is weakened by two factors: (1) the specific
27  facts of our prior cases which, unlike their broad language, are confined to discrimination based
on personal characteristics similar to the statutory classifications of race, sex, religion, etc.; and
28  (2) evidence of subsequent legislative action emphasizing the continued importance of those
classifications.").

explained above, nothing in the RNC's Complaint suggests that Google engaged in intentional discrimination. *See supra* at 7-9. To the contrary, the facts alleged in the Complaint actively undermine any such inference. *See Earll v. eBay, Inc.*, No. 5:11-cv-00262-JF (HRL), 2011 WL 3955485, at *3 (N.D. Cal. Sept. 7, 2011) (denying motion to amend complaint to add discrimination-based claim where plaintiff's allegations regarding discrimination were "offset" by other allegations that supported more plausible alternative explanations).

**D.   The RNC Fails to State a Claim Under California's Unfair Competition Law**

The RNC's UCL claim should be dismissed because the RNC fails to allege (1) that Google engaged in any "unlawful, unfair, or fraudulent business . . . practice," Cal. Bus. & Prof. Code § 17200, or (2) that any purported economic injury was "a result of the unfair competition" as required for UCL standing. Cal. Bus. & Prof. Code § 17204.

**1.   The RNC Has Failed to Plead Any Fraudulent, Unfair, or Unlawful Conduct**

The RNC attempts to allege claims under all three prongs of the UCL—fraudulent, unfair, and unlawful—but it has failed to state a claim under any theory.

**a.   The RNC Has Not Alleged Any Fraudulent Conduct**

The RNC's claim under the UCL's fraud-prong appears to be premised on the theory that Google misrepresented how Gmail works. *See* Compl. ¶ 79 ("Google's conduct is fraudulent because its users relied on Google as an email service that would allow them to send and receive emails, not knowing that Google would engage in partisan or arbitrary manipulation to prevent certain emails from reaching their inbox."). But the RNC does not allege a single fraudulent statement by Google, much less with the particularity required by Rule 9(b). *See Golden v. Sound Inpatient Physicians Med. Grp., Inc.*, 93 F. Supp. 3d 1171, 1180 (E.D. Cal. 2015) (Nunley, J.). The RNC fails to specify "who" at Google said "what" to whom "when" and "where" or "how." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) (citation omitted). And for good reason: Google has never represented that every email sent by the RNC or any other sender will appear in users' inboxes. To the contrary, Google transparently informs both users and senders that it applies spam filtering to emails. Indeed, all Gmail accounts have a clearly marked

"spam" folder, and Google instructs users how to mark or unmark emails as spam and stop messages from particular senders from being sent to spam folders. *See, e.g.*, Bali Decl., Ex. K at 3 ("[W]e use artificial intelligence and machine learning . . . to better detect and block spam and malware."); Ex. L (Gmail Program Policies) (similar). Similarly, Google instructs bulk senders on best practices to avoid emails being sent to spam. *See* Bali Decl., Ex. N at 1 (Gmail Help Center). Thus, there is nothing fraudulent about Google's description of Gmail or its use of spam filtering to benefit users.

### b.      The RNC Has Not Alleged Any Unfair Conduct

A plaintiff may bring a UCL claim under the unfair-conduct prong by alleging conduct that is: "(1) tethered to some legislatively declared policy; or (2) is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers; or (3) cause[s] unforeseeable injuries to consumers that are not outweighed by countervailing benefits." *Harris v. LSP Prods. Grp., Inc.*, No. 2:18-cv-02973-TLN-KJN, 2021 WL 2682045, at *13 (E.D. Cal. June 30, 2021) (Nunley, J.) (citation omitted).

The RNC claims that, by presenting Gmail as a service "that delivers emails in a fair and good faith manner," but nonetheless directing some of the RNC's emails to users' spam folders, Google has engaged in conduct that is "immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers," resulting in harm to the RNC and "its community" that "far outweighs any 'reasons, justifications [or] motives' Google could have for its conduct." Compl. ¶ 78 (citations omitted). Like the RNC's claim under the fraud prong, its claim under the unfair prong appears to be premised on some purported misrepresentation by Google about how Gmail works. But again, the RNC does not allege a single misrepresentation. Instead, it merely parrots the definition of unfair conduct under the UCL. The RNC cannot, however, state a claim for relief with "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555; *see also, e.g.*, *Marcus v. Apple, Inc.*, No. C 14-03824 WHA, 2015 WL 151489, at *4 (N.D. Cal. Jan. 8, 2015) (dismissing UCL unfair claim where "[t]he complaint does not state what public policy is offended, or why Apple's acts were unethical, oppressive, or unscrupulous" and only "baldly state[s] that the 'gravity of Defendant's alleged wrongful conduct outweighs any purported

1   benefits attributable to such conduct'"). To the extent the RNC is attempting to rely on its theory

2   of political affiliation or viewpoint discrimination to show unfair conduct, for the reasons

3   discussed above, it has not alleged any facts to support an inference of viewpoint discrimination.

4   *See supra* at 7-9. At most, the allegations show that Google applied its standard spam filtering

5   technologies to the RNC's emails, and there is strong public policy favoring the benefits of spam

6   filtering to consumers. *See, e.g.*, 15 U.S.C. § 7701(a)(12) (recognizing the many problems

7   associated with spam and the need for the "development and adoption of technological

8   approaches" to combat spam).

9                    **c.      The RNC Has Not Alleged Any Unlawful Conduct**

10          Because the RNC's claim under the UCL's unlawful-conduct prong is based on the

11  RNC's other claims, *see* Compl. ¶ 77, dismissal of those claims also requires dismissal of this

12  claim. *See Holomaxx Techs. v. Microsoft Corp.*, 783 F. Supp. 2d 1097, 1108 (N.D. Cal. 2011)

13  (dismissing UCL claim because plaintiff failed "to state a viable claim for any actionable

14  wrongdoing"); *Keen v. Am. Home Mortg. Servicing, Inc.*, 664 F. Supp. 2d 1086, 1102 (E.D. Cal.

15  2009) (similar); *Harris*, 2021 WL 2682045, at *13 (dismissing UCL unlawful claim because

16  plaintiff failed to state a claim under California statutes).

17                  **2.      The RNC Has Not Alleged the Causation Required for UCL Standing**

18          Even if the Court finds that the RNC has alleged some fraudulent, unfair, or unlawful

19  conduct, it has not alleged facts sufficient to establish UCL standing. To have standing under the

20  UCL, a plaintiff must have suffered economic injury "as a result of the unfair competition." Cal.

21  Bus. & Prof. Code § 17204. Courts have interpreted this to require a "causal connection" between

22  the alleged harm and the unfair competition. *See Kwikset Corp. v. Superior Ct.*, 51 Cal. 4th 310,

23  326 (2011) (quoting *Hall v. Time Inc.*, 158 Cal. App. 4th 847, 855 (2008), *as modified* (Jan. 28,

24  2008)). "A plaintiff fails to satisfy [the UCL's] causation requirement if he or she would have

25  suffered 'the same harm whether or not a defendant complied with the law.'" *In re Turner*, 859

26  F.3d 1145, 1151 (9th Cir. 2017) (quoting *Daro v. Superior Ct.*, 151 Cal. App. 4th 1079, 1099

27  (2007), *as modified on denial of reh'g* (July 3, 2007)).

28          Here, the RNC cannot show that it would have received additional donations had it not

-17-

1   been for Google's spam filtering. Remarkably, the RNC alleges that Google's conduct "prevented

2   [Gmail] users from participating in the RNC's fundraising campaigns," Compl. ¶ 80, but that

3   allegation is simply not plausible given that the RNC can contact supporters through numerous

4   channels, and supporters can make donations in a variety of ways, including on the RNC's

5   website, without involving Gmail. *See* Bali Decl., Ex. O at 1 (RNC, *2022 RNC Membership*).

6   Further, the Complaint is devoid of any facts showing that the RNC, in fact, lost a single donation

7   because Google directed some of the RNC's emails to spam folders. *See Sandoval v. Cal-W.*

8   *Reconveyance Corp.*, No. CV 13-00114 GAF (SHx), 2013 WL 12128818, at *9 (C.D. Cal. June

9   4, 2013) (plaintiff failed to plead causation required for UCL standing where he did not allege

10  facts showing that defendant's conduct "had any impact" on alleged harm).

11          The deficiencies in the RNC's allegations are even more obvious with respect to its fraud-

12  based claims, which require the RNC to plead "actual reliance." *In re iPhone Application Litig.*, 6

13  F. Supp. 3d 1004, 1013 (N.D. Cal. 2013) (actual reliance required whenever UCL claim is

14  predicated on misrepresentations). As discussed above, the RNC's claims under both the

15  fraudulent and unfair prongs appear to be premised on Google's alleged misrepresentations about

16  how Gmail works. *See* Compl. ¶¶ 78-79. Aside from the fact that the RNC has not alleged any

17  misrepresentations by Google, the RNC fails to plead that *the RNC*, rather than Gmail users,

18  relied on any misrepresentations, which is fatal to its claims. *See, e.g.*, Compl. ¶ 79 ("[Google's]

19  users relied on Google as an email service that would allow them to send and receive emails" and

20  "Google's users could have elected to use a different email service if they knew that Google

21  would effectively censor the RNC").

22          The RNC cannot premise its own standing on the alleged reliance of others. *See O'Connor*

23  *v. Uber Techs., Inc.*, 58 F. Supp. 3d 989, 1002 (N.D. Cal. 2014) ("UCL fraud plaintiffs must

24  allege their *own* reliance—not the reliance of third parties—to have standing under the UCL.");

25  *ZL Techs., Inc. v. Gartner, Inc.*, No. CV 09-02393 JF (RS), 2009 WL 3706821, at *11 (N.D. Cal.

26  Nov. 4, 2009) (dismissing UCL claim for lack of standing where plaintiff "alleges not its own

27  reliance . . . but that of third parties").

28

1

2

**E.**     **The RNC Fails to Plead Any Elements of Intentional Interference with Prospective Economic Relations**

3

To plead this claim, a plaintiff must allege: "(1) the existence, between the plaintiff and

4

some third party, of an economic relationship that contains the probability of future economic

5

benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentionally

6

wrongful acts designed to disrupt the relationship; (4) actual disruption of the relationship; and

7

(5) economic harm proximately caused by the defendant's action." *Roy Allan Slurry Seal, Inc. v.*

8

*Am. Asphalt S., Inc.*, 2 Cal. 5th 505, 512 (2017) (citation omitted). The RNC has failed to plead

any of these elements.

9

**First,** the RNC has failed to plead "the existence of a *specific* economic relationship" with

10

the "*probability*" of future economic benefit to the RNC. *Westside Ctr. Assocs. v. Safeway Stores*

11

*23, Inc.*, 42 Cal. App. 4th 507, 522, 525 (1996) (citations omitted). The RNC vaguely alleges a

12

relationship with "supporters who are past, current, and future donors," Compl. ¶ 88, but "vague

13

allegations regarding a relationship with an 'as yet unidentified' customer" do not suffice. *Soil*

14

*Retention Prods., Inc. v. Brentwood Indus., Inc.*, 521 F. Supp. 3d 929, 961 (S.D. Cal. 2021)

15

(quoting *Weintraub Fin. Servs., Inc. v. Boeing Co.*, No. CV 20-3484-MWF (GJSx), 2020 WL

16

6162801, at *8 (C.D. Cal. Aug. 7, 2020)); *see also UMG Recordings, Inc. v. Glob. Eagle Ent.,*

17

*Inc.*, 117 F. Supp. 3d 1092, 1117–18 (C.D. Cal. 2015) (plaintiffs must allege a "relationship with

18

a particular individual") (citations omitted).

19

Relatedly, the RNC fails to show that it was "reasonably probable that the prospective

20

economic advantage would have been realized but for defendant's interference." *Westside Ctr.*

21

*Assocs.*, 42 Cal. App. 4th at 522 (quoting *Youst v. Longo*, 43 Cal. 3d 64, 71 (1987)). There are no

22

allegations about specific donors, their relationship with the RNC including their donation

23

history, or any other facts suggesting that it is "reasonably probable" that they would have made

24

further donations had specific RNC emails been delivered to their inboxes rather than their spam

25

folders. "[A] hope of future transactions is insufficient to support a claim of tortious

26

interference." *Soil Retention Prods.*, 521 F. Supp. 3d at 961–62 (rejecting claim where

27

manufacturer "never allege[d] which entities, if any, it was negotiating with, what the terms were,

28

1    when the contracts were being negotiated" and "how much money, if any, Plaintiff lost as a

2    result"); *Silicon Knights, Inc. v. Crystal Dynamics, Inc.*, 983 F. Supp. 1303, 1312 (N.D. Cal.

3    1997) (dismissing claim where complaint did not allege that plaintiff "was in the midst of

4    negotiations with 3DO, Microsoft, or any other publisher, and that the third party pulled out of the

5    negotiations or awarded business to another because of the alleged acts by Defendants").

6         **Second,** because the RNC fails to plead specific relationships with named individuals, it

7    also necessarily fails to allege that Google had any knowledge of those relationships. *See Soil*

8    *Retention Prods.*, 521 F. Supp. 3d at 962 (plaintiff failed to sufficiently allege knowledge where

9    there was no "specified third party"); *Swipe & Bite, Inc. v. Chow*, 147 F. Supp. 3d 924, 935 (N.D.

10   Cal. 2015).

11        **Third,** the RNC fails to allege that Google "engaged in conduct that was wrongful by

12   some legal measure other than the fact of interference itself." *Della Penna v. Toyota Motor Sales,*

13   *U.S.A., Inc.*, 11 Cal. 4th 376, 393 (1995). The RNC has not alleged any independently wrongful

14   conduct, such as "violations of federal or state law or unethical business practices, *e.g.*, violence,

15   misrepresentation, unfounded litigation, defamation, trade libel or trade mark infringement." *Soil*

16   *Retention Prods.*, 521 F. Supp. 3d at 961 (citation omitted). Instead, at most, the RNC alleges that

17   Google improperly diverted some of its emails to Gmail users' spam folders. *See* Compl. ¶ 87.

18   But spam filtering, even if overinclusive, is not independently wrongful. *See Gordon v.*

19   *Virtumundo, Inc.*, 575 F.3d 1040, 1054 (9th Cir. 2009) (interpreting the CAN-SPAM Act and

20   finding that service providers are expected to "take reasonable precautions, such as implementing

21   spam filters, as part of [their] normal operations").

22        To the extent the RNC relies on its other claims to establish independently wrongful

23   conduct, dismissal of those claims dooms this claim as well. *See Universal Grading Serv. v.*

24   *Ebay, Inc.*, No. C-09-2755 RMW, 2012 WL 70644, at *11 (N.D. Cal. Jan. 9, 2012) (alleged

25   conduct "cannot serve as the basis for plaintiffs' tort claims" where "it does not run afoul of

26   federal or state law"), *aff'd*, 563 F. App'x 571 (9th Cir. 2014); *Vascular Imaging Pros., Inc. v.*

27   *Digirad Corp.*, 401 F. Supp. 3d 1005, 1013 (S.D. Cal. 2019) (dismissing intentional interference

28   claim where complaint did not "identify the wrongful conduct engaged in by the Defendants

-20-

1    separate from the breach of contract itself").

2        **Fourth,** the RNC's assertion of "actual disruption of the RNC's existing . . .

3    relationship[s] with supporters," Compl. ¶ 88, offers "nothing more than conclusory allegations,

4    unsupported by facts, that the plaintiff's economic relationship was disrupted." *Soil Retention*

5    *Prods.*, 521 F. Supp. 3d at 963; *see also Sybersound Recs., Inc. v. UAV Corp.*, 517 F.3d 1137,

6    1151 (9th Cir. 2008) (dismissing claim where plaintiff did "not allege for example, that it lost a

7    contract nor that a negotiation with a Customer failed"). That is not enough.

8        **Fifth,** the RNC fails to plead economic harm proximately caused by Google's actions.

9    The RNC simply asserts that, "[o]n information and belief, Google has caused hundreds of

10   thousands of dollars, if not more, in damages to the RNC to date, and the long-term consequential

11   losses likely total in the millions of dollars." Compl. ¶ 89. But such conclusory allegations cannot

12   withstand a motion to dismiss. *See Soil Retention Prods.*, 521 F. Supp. 3d at 963 (dismissing

13   claim where plaintiff alleged that it "has incurred and will continue to incur harm in the form of

14   losses, costs, damages, and expenses" but failed "to allege what these losses are, such as whether

15   there are losses identifiable to a specific contract loss").

16       F.    **The RNC Likewise Fails to Plead Any Elements of Negligent Interference
              with Prospective Economic Relations**

17

18       This claim fails for many of the same reasons as the RNC's intentional interference claim,

19   as it "has many of the same elements." *UMG Recordings, Inc.*, 117 F. Supp. 3d at 1118. But

20   instead of requiring intentional conduct, negligent interference "arises only when the defendant

     owes the plaintiff a duty of care." *Silicon Knights, Inc.*, 983 F. Supp. at 1313 (citation omitted).

21

22       To establish a duty of care, the RNC urges this Court to apply the following factors from

23   *Biakanja v. Irving*, 49 Cal. 2d 647 (1958): (1) "the extent to which the transaction was intended to

24   affect the plaintiff"; (2) "the foreseeability of harm to plaintiff"; (3) "the degree of certainty that

25   the plaintiff suffered injury"; (4) "the closeness of the connection between the defendant's

26   conduct and the injury suffered"; (5) "the moral blame attached to the defendant's conduct"; and

27   (6) "the policy of preventing future harm." Compl. ¶ 95 (citing *J'Aire Corp. v. Gregory*, 24 Cal.

28   3d 799, 804 (1979) (quoting *Biakanja*, 49 Cal. 2d at 650)). But applying these factors only makes

clear that Google owes no duty to the RNC: (1) Google filters spam as a benefit and service to its users; the RNC has not alleged and cannot allege any facts showing that Google's standard spam filtering was intended to affect the RNC; (2) the RNC has not alleged facts showing that any harm was foreseeable to the RNC because Google has no knowledge of the relationship between the RNC and specific Gmail users, including whether specific users had previously donated to the RNC; (3) the RNC's alleged injuries are speculative, as the RNC has failed to allege any facts showing that a specific Gmail user did not donate to the RNC because an RNC email was sent to a spam folder rather than an inbox; (4) for the same reason, the RNC has not alleged any connection between spam filtering and speculative lost donations; (5) Google's spam filtering is not morally blameworthy, but rather a service provided for the benefit of its users; and (6) the policy in favor of spam filtering is well established, and far outweighs the policy of preventing speculative future harm resulting from lost hypothetical donations.

Nonetheless, the RNC baldly asserts that "Google owed the RNC a duty to not falsely or arbitrarily label the RNC's emails to its supporters as spam." Compl. ¶ 98. The RNC cites no authority for that proposition, nor does it try to explain why Google would owe such a duty to the RNC as a third-party bulk sender of emails to Gmail users. *See Cyber Promotions, Inc. v. Am. Online, Inc.*, 948 F. Supp. 456, 462 (E.D. Pa. 1996) (no right for online marketer to "bombard[] AOL's servers with up to 1.9 million e-mail advertisements per day"); *see also Software Design & Application, Ltd. v. Hoefer & Arnett, Inc.*, 49 Cal. App. 4th 472, 479 (1996) (no duty of care owed to noncustomers).

### G.   The RNC's Negligence Claim Fails Because Google Does Not Owe a Duty of Care to the RNC

The RNC's negligence claim fails for the same reason as its negligent interference claim: Google does not owe the RNC any duty of care. *See supra* at 21-22. The RNC tries to assert a duty of care under California Civil Code § 2162, reasoning that "Google has a duty to the public to receive" all messages and "to transmit them upon reasonable terms." Compl. ¶ 109. That theory is incorrect as a matter of law.

Section 2162 does not apply to Google. Enacted in 1872, Section 2162 states that "[a]

1  carrier of message for reward, must use great care and diligence in the transmission and delivery

2  of messages." Cal. Civ. Code § 2162. As discussed above, Google is not a "carrier of message for

3  reward." *See supra* at 10-12. Indeed, Section 2162 has traditionally been applied to telegraph

4  companies like Western Union that charge for transmitting messages. *See, e.g.*, *Coit v. W. Union*

5  *Tel. Co.*, 130 Cal. 657, 660 (1900) (applying provision to telegraph company); 59 Cal. Jur. 3d

6  Telegraphs and Telephones § 34 (2022) ("This provision is applicable to telegraph companies.").

7  The RNC fails to cite any authority extending this provision to a non-telegraph company, much

8  less a free email service provider like Google. Further, even if the RNC could allege that Google

9  is "a carrier of message for reward" giving rise to some duty (which it cannot), such duty would

10  not be owed to the RNC as a third-party sender. If any duty exists, it would be owed only to

11  Gmail users.

12  **H.     Google Is Immune to the RNC's Claims under Section 230 of the Federal
             Communications Decency Act**

13

14       Even if the RNC could overcome the obstacles above, Google is categorically immune to

15  the RNC's claims under Section 230 of the federal Communications Decency Act ("Section

16  230"). The RNC's claims must be dismissed for that additional and independent reason.

17       Congress enacted Section 230 "to promote the free exchange of information and ideas

18  over the Internet and to encourage voluntary monitoring for offensive or obscene material."

19  *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1122 (9th Cir. 2003). The statute

20  accomplishes those goals in two distinct but overlapping ways. Section 230(c)(1) grants online

21  service providers (like Google) "robust" immunity against claims based on how they disseminate,

22  select, and organize content created by others (like the RNC). *Id.* at 1123–24; *see also* 47 U.S.C.

23  § 230(c)(1). In addition, under Section 230(c)(2), providers like Google may not be held liable for

24  "restrict[ing]" content that providers or users deem "objectionable," or for providing the

25  "technical means" for restricting such content. 47 U.S.C. § 230(c)(2)(A), (B).

26       "[T]he Circuits are in general agreement that [Section 230] should be construed broadly in

27  favor of immunity." *Force v. Facebook, Inc.*, 934 F.3d 53, 64 (2d Cir. 2019). Further, as the

28  Ninth Circuit has made clear, Section 230 must be construed to protect defendants "not merely

-23-

1   from ultimate liability, but from having to fight costly and protracted legal battles." *Fair Hous.*

2   *Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1175 (9th Cir. 2008)

3   (en banc). Thus, "[w]hen a plaintiff cannot allege enough facts to overcome Section 230

4   immunity, a plaintiff's claims should be dismissed." *Dyroff v. Ultimate Software Grp., Inc.*, 934

5   F.3d 1093, 1097 (9th Cir. 2019). And "close cases . . . must be resolved in favor of immunity."

6   *Roommates.com*, 521 F.3d at 1174.

7        Here, the RNC's claims are barred by multiple provisions of Section 230, and must

8   therefore be dismissed.

9           **1.**       **The RNC's Claims are Barred by Section 230(c)(2)**

10        Congress enacted Section 230(c)(2) to "encourage[] the development of more

11   sophisticated methods of online filtration." *Enigma Software Grp. USA, LLC v. Malwarebytes,*

12   *Inc.*, 946 F.3d 1040, 1047 (9th Cir. 2019). Section 230(c)(2) incentivizes that conduct by

13   immunizing providers of "interactive computer services," like Google, against claims based on

14   "blocking and screening of offensive material." *Zango*, 568 F.3d at 1173. As the Ninth Circuit has

15   explained, Section 230(c)(2) grants two related types of immunity. Section 230(c)(2)(A)

16   "immuniz[es] internet-service providers from liability for any action taken to block" content that

17   providers or their users deem objectionable, while Section 230(c)(2)(B) immunizes providers

18   from liability for "help[ing] users block offensive and objectionable online content," including by

19   providing software that filters "[s]pam, malware, and adware." *Malwarebytes*, 946 F.3d at 1047,

20   1052, *amended* (Dec. 31, 2019). Here, the RNC's claims against Google are barred by both types

21   of Section 230(c)(2) immunity.[7]

22

23        [7] As a threshold matter, Google plainly qualifies as the provider of an "interactive
      computer service" under Section 230, including when it provides the Gmail service. *See*

24   *Holomaxx*, 783 F. Supp. 2d at 1104 (noting multiple decisions holding that "email services
      properly are characterized as 'interactive computer service' providers" under Section 230(c)(2)).

25   More precisely, in this context, the RNC's Complaint demonstrates that Google is an "interactive
      computer service" both because (1) Gmail is an "information service" that "provides or enables

26   computer access by multiple users to a computer server," 47 U.S.C. § 230(f)(2), and because (2)
      Google is an "access software provider" that provides to users, as part of the Gmail service,

27   "software" and "enabling tools" that "filter" and "screen" "content," *id.* § 230(f)(4)). Section
      230(c)(2) immunity applies whether Google is treated as an information service, as an access

28   software provider, or both. *See id.* § 230(c)(2), (f)(2), (4).

1

a.        **Section 230(c)(2)(B) Bars the RNC's Claims**

2      Under Section 230(c)(2)(B), Google is immune to claims based on "any action" taken to

3   "enable or make available [to others] the technical means to restrict access" to material that

4   Google, or its users, deem "harassing" or "otherwise objectionable." 47 U.S.C. § 230(c)(2)(B).

5   The RNC's claims fit comfortably within that provision's broad language.

6      The RNC alleges, correctly, that spam filtering is an essential part of the Gmail service.

7   *See, e.g.*, Compl. ¶ 27 (Google has incorporated spam filtering into Gmail "[a]s a service to its

8   users"); *see also, e.g.*, Bali Decl., Ex. K at 3 ("We're constantly developing new technologies and

9   features to improve our services. For example, we use artificial intelligence and machine learning

10  to . . . better detect and block spam and malware."). Further, the RNC does not deny that Gmail's

11  spam filters incorporate user feedback, such as when a user marks a certain email as spam or,

12  conversely, indicates that a sender's emails are not spam. *See, e.g.*, Compl. ¶¶ 36, 44. It follows

13  that, in providing and operating the Gmail service, Google "enable[s] or make[s] available" to

14  Gmail users "the technical means to restrict access" to material—namely, spam—that Google and

15  Gmail users consider objectionable. 47 U.S.C. § 230(c)(2)(B). Google is therefore immune to the

16  RNC's claims under the plain language of Section 230(c)(2)(B). *See Zango*, 568 F.3d at 1175,

17  1176 (Section 230(c)(2) immunity extends to "companies that provide access to tools or

18  mechanisms for filtering content," even if those companies ultimately make the filtering

19  decisions); *Divino Grp. LLC v. Google LLC*, No. 19-cv-04749-VKD, 2022 WL 4625076, at *18

20  (N.D. Cal. Sept. 30, 2022) (Section 230(c)(2)(B) barred Unruh Act and UCL claims based on

21  YouTube's use of algorithms to filter user content), *reconsideration denied*, No. 19-cv-04749-

22  VKD, 2023 WL 218966 (N.D. Cal. Jan. 17, 2023); *Asurvio LP v. Malwarebytes Inc.*, No. 5:18-

23  CV-05409-EJD, 2020 WL 1478345, at *5 (N.D. Cal. Mar. 26, 2020) (Section 230(c)(2)(B) barred

24  claims based on provider's allegedly faulty filtering).

25      In response, the RNC may argue that the spam filtering at issue here falls outside the

26  scope of Section 230(c)(2)(B) because it was politically motivated. *Cf. Malwarebytes*, 946 F.3d at

27  1047 (filtering decisions "driven by anticompetitive animus" are not "entitled to immunity"). But

28  as explained above, nothing in the Complaint shows or even suggests that Google's spam-

-25-

1   filtering decisions were motivated by political animus or any other illegitimate motive. *See supra*

2   at 7-9. And, in any case, the Ninth Circuit has not held that spam-filtering decisions motivated by

3   factors that could be construed as "political" fall outside the scope of Section 230(c)(2)(B).

4             **b.      Section 230(c)(2)(A) Bars the RNC's Claims**

5             The RNC's claims are also barred by Section 230(c)(2)(A), which immunizes Google

6   against claims based on "any action" taken "in good faith" to "restrict access to or availability of"

7   material that Google, or its users, deem "harassing" or "objectionable." 47 U.S.C.

8   § 230(c)(2)(A).

9             The gist of the RNC's claims is that Gmail's spam filters incorrectly labeled some of the

10  RNC's emails as spam. *See, e.g.*, Compl. ¶¶ 11, 16, 28, 29. But Congress enacted Section

11  230(c)(2)(A) specifically to bar such claims. *See* 47 U.S.C. § 230(c)(2)(A) (immunizing "*any*

12  action" taken to "restrict access to or availability of" objectionable material) (emphasis added);

13  *see also e360Insight, LLC v. Comcast Corp.*, 546 F. Supp. 2d 605, 607 (N.D. Ill. 2008) (Congress

14  enacted Section 230(c)(2) to shield defendants from liability "for blocking too much, or even too

15  little"). Accordingly, courts routinely reject claims under Section 230(c)(2)(A) where, as here,

16  plaintiffs allege that spam-filtering systems produce incorrect results. *See, e.g.*, *Holomaxx*, 783 F.

17  Supp. 2d at 1105 (holding that Section 230(c)(2)(A) barred claims based on Microsoft's allegedly

18  "faulty [email] filtering technology and techniques," and that Microsoft "reasonably could

19  conclude" that the plaintiff's bulk marketing emails were "harassing" and "otherwise

20  objectionable" under Section 230(c)(2)(A)); *e360Insight*, 546 F. Supp. 2d at 609 ("Under [Section

21  230(c)(2)], a mistaken choice to block [emails], if made in good faith, cannot be the basis for

22  liability under federal or state law."). This Court should do the same.

23            Nor does it matter if the RNC does not understand, or simply disagrees with, Gmail's

24  spam filters. As the Ninth Circuit has made clear, Section 230(c)(2) "establishes a subjective

25  standard whereby" interactive computer service providers, including Google, "decide what online

26  material is objectionable." *Malwarebytes*, 946 F.3d at 1044; *see also, e.g.*, *Domen v. Vimeo, Inc.*,

27  433 F. Supp. 3d 592, 603 (S.D.N.Y. 2020) ("Section 230(c)(2) is focused upon the provider's

28  subjective intent of what is . . . ['] harassing, or otherwise objectionable.'" (quoting 47 U.S.C. §

230(c)(2))), *aff'd*, 991 F.3d 66 (2d Cir. 2021), *reh'g granted and opinion vacated*, 2 F.4th 1002 (2d Cir. 2021), and *amended and aff'd on reh'g*, 6 F.4th 245 (2d Cir. 2021), *opinion withdrawn*, No. 20-616-CV, 2021 WL 4399692 (2d Cir. Sept. 23, 2021), and *amended and aff'd on reh'g*, No. 20-616-CV, 2021 WL 4352312 (2d Cir. Sept. 24, 2021). To hold otherwise—i.e., "[t]o force a provider like [Google] to litigate the question of whether what it blocked was or was not spam"—would "render § 230(c)(2) nearly meaningless." *e360Insight*, 546 F. Supp. 2d at 609.

The RNC likely will argue that Google's spam-filtering activities were not undertaken in "good faith" because they were motivated by political bias. 47 U.S.C. 230(c)(2)(A). But again, the RNC's Complaint does not plausibly allege that Google targeted the RNC's emails at all, let alone for improper reasons. *See supra* at 7-9. The RNC therefore has not met its burden of alleging the "absence of good faith," and its claims are barred. *e360Insight*, 546 F. Supp. 2d at 609; *see also, e.g.*, *Daniels v. Alphabet Inc.*, No. 20-cv-04687-VKD, 2021 WL 1222166, at *12 (N.D. Cal. Mar. 31, 2021) (rejecting "conclusory assertions" that YouTube's filtering decisions were politically motivated and hence not in good faith).[8]

### 2.    The RNC's Claims are Barred by Section 230(c)(1)

The RNC's claims should also be dismissed because they are barred by the separate and independent immunity provided by Section 230(c)(1).

Section 230(c)(1) states that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). And, under Section 230(e)(3), "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with" that clear command. *Id.* § 230(e)(3). "At its core," Section 230(c)(1) "bars 'lawsuits seeking to

---

[8] Further, requiring providers to litigate their spam-filtering decisions on a case-by-case basis would force providers to reveal sensitive information about how their spam-filtering systems work, making it easier for bad actors to exploit those systems—precisely the opposite of what Congress intended. *See Holomaxx*, 783 F. Supp. 2d at 1105 (forcing providers to explain "in detail" their filtering decisions "would be inconsistent with the intent of Congress to 'remove disincentives for the development and utilization of blocking and filtering technologies'") (quoting 47 U.S.C. § 230(b)(4)). For that reason, too, the Court should reject the RNC's thinly disguised attempt to "look under the hood" of Google's spam-filtering systems to gain a strategic advantage over its political opponents.

-27-

1  hold a service provider liable for its exercise of a publisher's traditional editorial functions—such

2  as deciding whether to publish, withdraw, postpone or alter content.'" *Jones v. Dirty World Ent.*

3  *Recordings LLC*, 755 F.3d 398, 407 (6th Cir. 2014) (citation omitted). And as many courts have

4  made clear, curating content with automated tools, like spam filters, is a core editorial function.

5  *See, e.g.*, *Force*, 934 F.3d at 70 (using algorithms to "arrang[e] and display[] others' content" to

6  make it more "'usable'" is "an essential part" of publishing).

7           Here, Google is entitled to Section 230(c)(1) immunity if (1) Gmail is an "interactive

8  computer service," (2) the RNC's claims seek to treat Google as a "publisher or speaker," and

9  (3) the content at issue was "provided by another information content provider" (i.e., not Google).

10  47 U.S.C. § 230(c)(1); *accord Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1101 (9th Cir. 2009), *as*

11  *amended* (Sept. 28, 2009). All those requirements are met.

12           As explained above, Google is a provider of an "interactive computer service" (namely,

13  Gmail) under Section 230. *See supra* at n.7. And it is undisputed that the bulk emails at issue

14  were created by the RNC, not by Google. Thus, the first and third requirements for Section

15  230(c)(1) immunity are easily met. The only remaining question is whether the second

16  requirement—treatment as a "publisher"—is also met.

17           The answer is "yes" because the RNC plainly seeks to hold Google liable based on its

18  "exercise of a publisher's traditional editorial functions." *Jones*, 755 F.3d at 407. All the RNC's

19  claims boil down to the same idea: that Google improperly routed the RNC's emails to users'

20  spam folders. But deciding how to organize and display content created by others is one of the

21  most essential "editorial functions" of all. *Id.*; *see also, e.g.*, *Sikhs for Just. "SFJ", Inc. v.*

22  *Facebook, Inc.*, 144 F. Supp. 3d 1088, 1095 (N.D. Cal. 2015) (Koh, J.) (Section 230(c)(1) barred

23  claims based on Facebook's allegedly discriminatory decision to restrict access to plaintiff's

24  Facebook's page), *aff'd sub nom. Sikhs for Just., Inc. v. Facebook, Inc.*, 697 F. App'x 526 (9th

25  Cir. 2017). Accordingly, the Ninth Circuit has held that Section 230(c)(1) bars claims based on

26  providers' choices about how to curate content, including when those choices are made via

27  automated systems like spam filters. *See Dyroff*, 934 F.3d at 1098 (Section 230(c)(1) barred

28  claims based on use of automated "features and functions," including "algorithms," to organize

1  and display content). So, too, have many other courts. [9] This Court should do the same.

2  **V.    CONCLUSION**

3         For the foregoing reasons, Google respectfully requests that this Court grant its Motion to

4  Dismiss and dismiss the RNC's Complaint with prejudice.

5

6  Dated:  January 23, 2023                    **PERKINS COIE LLP**

7

8

9

   By: _____
10       Sunita Bali, Bar No. 274108
         Danielle Sivalingam, Bar No. 294369
11       Angie Young Kim, Bar No. 270503
         Abdul Kallon, Bar No. (*pro hac vice*)
12       Ryan M. Spear, Bar No. (*pro hac vice*)
         Michael Robert Huston, Bar No. (*pro hac vice*)
13       *vice*)

14

15       *Attorneys for Defendant Google LLC*
         *(erroneously sued as Google Inc.)*

16

17

18

19

20

21  _____

22  [9] *See, e.g.*, *Force*, 934 F.3d at 70 (describing use of "algorithms" to organize and display content as an "essential" aspect of publishing that is immunized by Section 230(c)(1)); *Al-Ahmed v. Twitter, Inc.*, No. 21-cv-08017-EMC, 2022 WL 1605673, at *18 (N.D. Cal. May 20, 2022)
23  (Section 230(c)(1) "contemplates the ability of services like Twitter to employ filtering processes" for users' content), *appeal dismissed*, No. 22-15914, 2022 WL 4352712 (9th Cir. July
24  7, 2022); *Ebeid v. Facebook, Inc.*, No. 18-cv-07030-PJH, 2019 WL 2059662, at *5 (N.D. Cal. May 9, 2019) (Section 230(c)(1) barred claims based on Facebook's alleged "on-and-off again
25  restriction of plaintiff's use of and ability to post on the Facebook platform"); *Fields v. Twitter, Inc.*, 200 F. Supp. 3d 964, 975 (N.D. Cal. 2016) (holding that "the private nature of [Twitter's]
26  Direct Messaging [service] does not remove the transmission of such messages from the scope of publishing activity under section 230(c)(1)"); *Prager Univ. v. Google LLC*, 85 Cal. App. 5th
27  1022, 301 Cal. Rptr. 3d 836, 848 (2022) (Section 230(c)(1) barred claims based on YouTube's use of algorithms to filter user videos because "algorithmic restriction of user content [falls]
28  squarely within the letter and spirit of section 230's promotion of content moderation").

1

<u>**CERTIFICATE OF SERVICE**</u>

2

This is to certify that a true and correct copy of the above and foregoing has been served

3

upon all counsel of record, via the Court's CM/ECF system on January 23, 2023, as follows:

4

5

6

7

8

Harmeet K. Dhillon (harmeet@dhillonlaw.com)
Michael A. Columbo (mcolumbo@dhillonlaw.com)
Jeremiah D. Graham (jgraham@dhillonlaw.com)
Anthony J. Fusaro, Jr. (afusaro@dhillonlaw.com)
DHILLON LAW GROUP INC.
177 Post Street, Suite 700
San Francisco, California 94108
Telephone: (415) 433-1700

9

10

Counsel for Plaintiff
Republican National Committee

11

12

13

14

15

Thomas R. McCarthy (tom@consovoymccarthy.com)
Thomas S. Vaseliou (tvaseliou@consovoymccarthy.com)
Conor D. Woodfin (conor@consovoymccarthy.com)
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Suite 700
Arlington, VA 22209
Telephone: (703) 243-9423

16

Counsel for Plaintiff
Republican National Committee

17

18

19

*/s/ Sunita Bali*
Sunita Bali

20

21

22

23

24

25

26

27

28