# Exhibit G



FEDERAL ELECTION COMMISSION
Washington, DC  20463

August 11, 2022

ADVISORY OPINION 2022-14

Claire Rajan, Esq.
Allen & Overy LLP
1101 New York Avenue, NW
Washington, DC 20005

Dear Ms. Rajan:

We are responding to your advisory opinion request on behalf of Google LLC ("Google") concerning the application of the Federal Election Campaign Act, 52 U.S.C. §§ 30101-45 (the "Act"), and Commission regulations to Google's proposal to offer a pilot program to test new Gmail design features at no cost on a nonpartisan basis to authorized candidate committees, political party committees, and leadership PACs.  The Commission concludes that the proposed pilot program would be permissible under the Act and Commission regulations and would not result in the making of a prohibited in-kind contribution.

*Background*

The facts presented in this advisory opinion request are based on your letter received on July 1, 2022 and your email dated August 10, 2022.

Google is a subsidiary of Alphabet, Inc., a publicly traded company that is incorporated in Delaware with its principal place of business in Mountain View, California.[1]  A core product of Google's is Gmail, an email platform provided to all users (including both political and non-political, individuals and organizations, and senders and receivers of email) at no cost.[2]  As explained in the request and further below, Google is

---

[1]       Advisory Opinion Request ("AOR") at AOR002.

[2]       You explain that "[p]aid advertising and other sponsored content on certain Google platforms help Google provide many products for anyone to use for free, including its Gmail service."  AOR003.  In addition, you indicate that "Gmail is also a foundational component of the 'Google Workspace' product, which bundles a set of secure collaboration and productivity apps created for businesses of all sizes and which can be purchased for a fee."  *Id*.

planning to launch a pilot program to test new features in its spam filtering regarding emails from bulk senders to Gmail addresses.

I.  **Spam Filtering Under Current Program**

According to the request, "[r]oughly half of all email traffic across the Internet consists of unwanted spam"[3] and, without spam filtering, "the volume of spam reaching inboxes would be overwhelming."[4]  Therefore, Gmail employs spam filters with the stated purpose of enabling users "to be more secure and efficient in their use of the product."[5]  Spam filtering allows spam to be placed automatically into a user's spam folder, as opposed to directly into the user's inbox.

Google's terms of service and policies — including Gmail's spam filter policies — apply to emails from all senders regardless of political affiliation.[6]  Under these policies, Gmail employs "a number of filters" to determine whether an email is classified as spam,[7] and "[o]ne of the most important factors" is user preference because users' actions "teach Gmail how best to sort the received email based on preferences."[8]  For example, if a user moves a message to the spam folder, future emails from the sender generally are filtered to that user's spam folder, and if a user adds a sender to their contact list, future messages from that email address generally are placed in the user's inbox.[9]

Moreover, Google provides information to bulk senders on how to maximize deliverability,[10] both publicly available in the form of Bulk Sender Guidelines establishing steps bulk senders may take to improve their deliverability, and privately through Postmaster Tools, an account associated with a particular sender's domain which any bulk sender may create to access data and diagnostics regarding their email campaign.[11]  Information provided in Postmaster Tools includes data and diagnostics regarding the reputation of a sender's domain and IP address, as well as the rate at which

---

[3]     AOR003-4.

[4]     AOR004.

[5]     AOR002.

[6]     AOR004.

[7]     *Id*.  These filters "look at a variety of signals, including characteristics of the IP address, domains/subdomains, whether bulk senders are authenticated, and user input."  *Id*.

[8]     AOR005.

[9]     *Id*.  You state that users flag emails as spam for a variety of reasons, which may include not wanting to be subscribed to an email list, the amount and frequency of emails, or "simply cleaning up a cluttered inbox."  *Id*.

[10]    *Id*.

[11]    *Id*.

a sender's emails pass various authentication standards.[12]  As with the email platform, Gmail provides this information at no cost.

## II. Spam Filtering Under Pilot Program

As explained below, Google proposes to create a pilot program for registered authorized candidate committees, political party committees, and leadership PACs ("Eligible Participants") that send bulk emails to Gmail addresses and that choose to be part of the pilot.[13]

Eligible Participants may become aware of the availability of the pilot program through announcements on Google's website, Postmaster Tools, and social media; Google also plans to directly reach out to "multiple party committees" to inform them of the program and encourage the party committees to disseminate the information to affiliated candidate committees.[14]  To be part of the pilot, Eligible Participants would be required to seek participation by contacting Google for identification purposes using their FEC-registered email address and providing their FEC ID number.[15]  Google will, in turn, verify that the sender represents the committee it purports to represent by ensuring that the email was sent by the email listed on the committee's Statement of Organization, which Google will retrieve with the FEC ID number.[16]  Google will then ensure that Eligible Participants satisfy certain objective criteria to establish that their emails are "legitimate, securely configured, and authenticated."[17]  Eligible Participants would be included in the program on a nonpartisan basis and free of charge.[18]  Eligible Participants who are included in the pilot ("Pilot Participants") would be used to test two new features of Gmail's spam filtering.

First, Pilot Participants would be used to test a feature whereby bulk emails sent by the Pilot Participants to Gmail users would not be detected by Gmail's spam detection algorithms; instead, whether bulk emails are classified as spam would be determined

---

[12]  *Id*.

[13]  AOR001, 7.

[14]  AOR009.

[15]  AOR007.

[16]  *Id*.

[17]  *Id*.  Google's request lays out these eligibility criteria in considerable detail, explaining that the aim of these criteria is to "exclude senders who might use the additional capabilities provided under the pilot to reach Gmail users with harmful content" and "prevent imposters or fraudsters from posing as a candidate or a political party to solicit fraudulent contributions."  *Id*.  For example, you state that Eligible Participants would be required to provide "one-click" unsubscribe in their messages, approve and follow unsubscribe requests within 24 hours of the user's choice, and ensure that all links in the message can be scanned by Google for phishing and malware protection.  AOR008.

[18]  AOR011.

based on direct feedback from the user.[19]  Specifically, the first email from each sender to a particular user would display a "prominent notification" placed by Gmail asking the user whether the user wished to continue receiving messages from the sender, and if the user opted out in that message or a subsequent message — which would not contain the original prominent notification but would be subject to a requirement on the sender to allow "one-click unsubscribe" in the sender's emails — future emails from that sender to a particular user would be placed in the spam folder.[20]  Unless a user opted out in the first message or any subsequent messages from a particular sender, the user would continue receiving messages from that sender.  Moreover, Gmail users would be able to express their preferences at any time and affect future delivery by marking a sender's message as either spam or not spam.

Second, Pilot Participants would receive "the Inboxing Rate associated with their emails, expressed as a percentage."[21]  Accordingly, a Pilot Participant "could view in Postmaster Tools information about the volume of messages that land in Gmail users' inboxes vs. the spam folder."[22]  Google would gather feedback from both senders and users on the "efficacy and ease of use to consider whether the features tested in the pilot are commercially feasible, either for this group or other groups of senders."[23]

Based on the feedback received from users in the program — which would begin running only after the Commission issued a favorable advisory opinion and go through January 2023 unless the pilot proved unsuccessful earlier than that date — Google may or may not continue, discontinue, or expand the features tested in the pilot.[24]  Moreover, Google may consider expanding the features to other bulk senders, such as government agencies, entities related to government agencies or involved in providing government services, senders of class-action notices, and non-profit organizations, depending on user feedback.[25]

You state that the "pilot program achieves a number of commercial goals,"[26] particularly that the "purpose of the pilot is to test whether the features employed in the pilot enable users to receive more wanted email from bulk senders without degrading the

---

[19]     *Id*.

[20]     AOR008.

[21]     Advisory Opinion Request Supplement (Aug. 10, 2022).

[22]     AOR009.

[23]     *Id*.

[24]     AOR009.

[25]     AOR006, 11.

[26]     AOR006.

user experience."[27]  Improving the user experience, in turn, "enhances the Google brand."[28]  You further explain that Google proposes to start the pilot program with Eligible Participants rather than other industries for testing because it is able to verify entities registered with the Commission; the upcoming election season and its expected increase and sustained engagement by an identifiable group of bulk senders; the bulk senders' strong incentive to keep users engaged for a long period; and the ease of participant feedback for this group of senders because of the concentrated group of email vendors.[29]

*Question Presented*

*May Google launch a free and non-partisan pilot program to test Gmail design features, which will be open to Eligible Participants, where spam detection as applied to messages from a Pilot Participant will rely predominately on direct feedback from the user rather than standard spam detection, and each Pilot Participant will receive information regarding the rate of emails delivered into Gmail users' inboxes, as long as the Pilot Participant is in compliance with the program's requirements?*

*Legal Analysis*

Yes, Google may offer the proposed pilot program to Eligible Participants because Google would offer the program at the usual and normal charge and in the ordinary course of its business.

The Act and Commission regulations prohibit corporations from making contributions to federal candidates, political party organizations, and political committees that make contributions to federal candidates and political party committees.[30]  A "contribution" includes any "direct or indirect payment, distribution, loan, advance, deposit, or gift of money, or any services, or anything of value . . . in connection with any [federal] election . . . ."[31]  "[T]he provision of any goods or services without charge or at a charge that is less than the usual and normal charge" is an "in-kind" contribution.[32]

---

[27]    AOR008.

[28]    AOR006.

[29]    AOR011.

[30]    52 U.S.C. §§ 30118(a), (b)(2); 11 C.F.R. § 114.2(b).  Corporations may, however, make contributions to nonconnected political committees that make only independent expenditures, *see, e.g.*, Advisory Opinion 2011-11 (Colbert); *Citizens United v. FEC*, 558 U.S. 310 (2010); *SpeechNow.org v. FEC*, 599 F.3d 686 (D.C. Cir. 2010) (*en banc*), and to non-contribution accounts of hybrid political committees, *see* Press Release, FEC Statement on *Carey v. FEC*: Reporting Guidance for Political Committees that Maintain a Non-Contribution Account (Oct. 5, 2011), https://www.fec.gov/updates/fec-statement-on-carey-fec/.

[31]    52 U.S.C. § 30118(b)(2); *see also* 52 U.S.C. § 30101(8)(A)(i); 11 C.F.R. §§ 114.2(b), 100.52(a).

[32]    11 C.F.R. § 100.52(d)(1).

The value or "amount of the in-kind contribution is the difference between the usual and normal charge for the goods or services at the time of the contribution and the amount charged the political committee."[33] The "usual and normal charge" for services is the commercially reasonable rate prevailing at the time the services were rendered."[34]

In Advisory Opinion 2004-06 (Meetup), the Commission considered a proposal by a corporation that offered its users a web-based platform for arranging local gatherings. The corporation offered a free basic service to all users and a premium service for a fee. The Commission concluded that a corporation may provide its basic service free of charge to federal candidates and political committees because the corporation would provide the service in the ordinary course of its business and on the same terms and conditions on which it was offered to all similarly situated persons in the general public.[35] Significantly, the corporation in that advisory opinion provided the free service to all users "without any obligation to purchase other services."[36] The Commission concluded that, in such circumstances, the usual and normal charge for a service "is always zero," and thus no contribution would result when providing the service for free to candidates and political committees.[37] In reaching this conclusion, the Commission distinguished Advisory Opinion 1996-02 (CompuServe), in which the services provided by an incorporated electronic bulletin board service provider were normally offered for a fee and were only offered without charge to a select group, and therefore resulted in in-kind contributions when provided to political committees.[38]

Google provides Gmail services — including any feature related to spam filtering — for free to all of its users, including bulk senders, without any obligation on the user to purchase other services, even as part of the proposed pilot program.[39] Although the spam

---

[33] *Id*.

[34] 11 C.F.R. § 100.52(d)(2).

[35] Advisory Opinion 2004-06 (Meetup) at 4.

[36] *Id*.

[37] *Id*.; *see also* Advisory Opinion 1996-11 (National Right to Life Conventions) (concluding that corporate membership organization may provide candidate speakers with free audio and video tapes of their own speeches because tapes would be provided to all speakers, including candidates); Advisory Opinion 1978-60 (Sawyer) (concluding that television network may provide to the candidate copy of videotape segment in which candidate appeared, so long as company's policy was to provide videotape copy free of charge to any member of the public appearing in a newscast).

[38] Advisory Opinion 2004-06 (Meetup) at 4 (distinguishing Advisory Opinion 1996-02 (CompuServe)).

[39] Gmail is a "foundational component" of the fee-based "Google Workspace" product, which bundles certain collaboration and productivity apps for business. AOR003. As part of that service, however, Gmail is not separately charged for, nor is there any obligation for any user to purchase Google Workspace to enable the user to use Gmail. Moreover, you explain that, while "1.5 billion" people use Gmail, 5 million are customers of the paid Google Workspace product.

filter functionality would be modified for the Pilot Participants — namely, they would have their bulk emails filtered for spam by the new "user preference" mechanism, as opposed to algorithms applying additional filters, and receive more detailed information about their Inboxing rate — these would all be mere modifications to Google's free spam filtering service that Google provides to all users, rather than a service that customarily has a separate charge.  Google does not offer a premium spam filtering service, akin to the premium electronic bulletin board services in Advisory Opinion 1996-02 (CompuServe), nor would the Pilot Participants — or any other Gmail users — be obligated to purchase any additional service from Google because of the pilot program.  Further, Google states that it has a "regular business practice of providing similar resources at no cost and working to enhance the experience of its users."[40]  The modifications of spam filtering services for the Pilot Participants would thus appear to be in keeping with Google's ordinary business practices.  Google's proposal, therefore, resembles the services ordinarily provided at no charge in Advisory Opinion 2004-06 (Meetup),[41] as opposed to Advisory Opinion 1996-02 (CompuServe), where services that were normally provided for a fee were being provided for free to a select group.[42]

Further, although Google would be modifying its service only for certain political committees and would not include other entities in the pilot program, Google would be doing so for commercial, as opposed to political, reasons.  This would be consistent with prior Commission advisory opinions concluding that a particular corporation acts in its ordinary course when it provides different goods or services to political committees than it does non-political committees, or charges political committees less than non-political committees.[43]  For example, in Advisory Opinion 2018-11 (Microsoft Corporation), the Commission concluded that Microsoft may offer political committees a program of enhanced online security at no charge, because doing so would protect its brand

---

[40]      AOR015.

[41]      *See also* Advisory Opinion 2019-12 (Area 1 Security) at 1 (concluding that corporation could offer federal candidates and political committees a "low to no cost" pricing tier "in the ordinary course of its business and on the same terms and conditions as offered to similarly situated non-political clients").

[42]      In reaching this conclusion, the Commission assumes that Google will not be charging for any spam filters in the future, and that if Google does offer this service to any entity for a charge, Google would be required to offer the service to political committees on the same terms and conditions.  For example, if Google charged other bulk senders for certain spam filter upgrades, Google would not be able to rely on this advisory opinion.

[43]      *See* Advisory Opinion 2018-11 (Microsoft Corporation) at 5 (concluding that no in-kind contribution results from offering political committees, and not the general public, enhanced services at no charge if done "based on commercial and not political considerations, in the ordinary course of its business and not merely for promotional consideration or to generate goodwill"); Advisory Opinion 2018-05 (CaringCent) (concluding that corporation "may charge different fees to political committee clients than it charges to non-political clients," with no in-kind contribution resulting, as long as "any variation in fees will be based on business considerations and will not be based on political considerations"); Advisory Opinion 2012-31 (AT&T) at 4 (explaining that corporations may charge lower rates to political committees as long as rate structure "reflects commercial considerations and does not reflect considerations outside of a business relationship").

reputation and allow it to obtain valuable data on security threats. In that advisory opinion, the Commission stressed that the program would be offered to political committees on a non-partisan basis, Microsoft faced a particularly high threat of damage to its brand reputation given the "public scrutiny" on their political clients in the "upcoming elections," and that Microsoft would provide the service to all similarly situated entities, including political committees and "election sensitive" non-profit organizations and vendors.[44] Here, too, the modifications available to Pilot Participants would serve Google's commercial interests in protecting its brand reputation and obtaining valuable data on how to enhance its product.[45] As in Advisory Opinion 2018-11 (Microsoft Corporation), the pilot program would be provided on a non-partisan basis to Pilot Participants that pose unique threats and opportunities compared with other entities. Specifically, Pilot Participants are particularly ripe for testing[46] and, similarly to Advisory Opinion 2018-11 (Microsoft Corporation), raise unique issues regarding Google's brand reputation given the upcoming elections and public scrutiny on Pilot Participants. Moreover, based on the results of the feedback of users in the program, Google may extend the program to other entities, including government agencies, entities related to government agencies or involved in providing government services, senders of class-action notices, and non-profit organizations.[47] Thus, Google would appear to be offering the pilot program to all similarly situated entities for commercial and not political reasons and, as the Commission has previously decided, these reasons reflect the ordinary course of business.

For the reasons explained above, the Commission concludes that the proposed pilot program would be permissible under the Act and Commission regulations and would not result in the making of a prohibited in-kind contribution.

This response constitutes an advisory opinion concerning the application of the Act and Commission regulations to the specific transaction or activity set forth in your request.[48] The Commission emphasizes that, if there is a change in any of the facts or assumptions presented, and such facts or assumptions are material to a conclusion

---

[44] Advisory Opinion 2018-11 (Microsoft Corporation) at 2, 5.

[45] *C.f.*, Advisory Opinion 2019-12 (Area 1 Security) at 3 (noting that corporation providing "low to no cost" pricing tier to federal candidates and political committees was doing so because such entities "provide a significant opportunity for research and development," and concluding that no in-kind contribution resulted because offer being made on same terms and conditions as those offered to non-political clients).

[46] You explain that that Google proposes to start the pilot program with Eligible Participants rather than other industries for testing because it is able to verify entities registered with the Commission; the upcoming election season and its expected increase and sustained engagement by an identifiable group of bulk senders; the bulk senders' strong incentive to keep users engaged for a long period; and the ease of participant feedback for this group of senders because of the concentrated group of email vendors. AOR011.

[47] AOR006, 11.

[48] *See* 52 U.S.C. § 30108.

presented in this advisory opinion, then the requestor may not rely on that conclusion as support for its proposed activity.  Any person involved in any specific transaction or activity that is indistinguishable in all its material aspects from the transaction or activity with respect to which this advisory opinion is rendered may rely on this advisory opinion.[49]  Please note that the analysis or conclusions in this advisory opinion may be affected by subsequent developments in the law including, but not limited to, statutes, regulations, advisory opinions, and case law.  Any advisory opinions cited herein are available on the Commission's website.

On behalf of the Commission,

Allen J. Dickerson
Chairman

---

[49]   *See id.* § 30108(c)(1)(B).