HARMEET K. DHILLON (SBN: 207873)
harmeet@dhillonlaw.com
MICHAEL A. COLUMBO (SBN: 271283)
mcolumbo@dhillonlaw.com
JEREMIAH D. GRAHAM (SBN: 313206)
jgraham@dhillonlaw.com
ANTHONY J. FUSARO, JR. (SBN: 345017)
afusaro@dhillonlaw.com
DHILLON LAW GROUP INC.
177 Post Street, Suite 700
San Francisco, California 94108
Telephone: (415) 433-1700
Facsimile: (415) 520-6593
*Counsel of Record for Plaintiff Republican National Committee*

THOMAS R. MCCARTHY (pro hac vice)
tom@consovoymccarthy.com
THOMAS S. VASELIOU (pro hac vice)
tvaseliou@consovoymccarthy.com
CONOR D. WOODFIN (pro hac vice)
conor@consovoymccarthy.com
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Suite 700
Arlington, VA 22209
(703) 243-9423
*Counsel for Plaintiff Republican National Committee*

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| REPUBLICAN NATIONAL COMMITTEE,<br><br>       Plaintiff,<br><br>v.<br><br>GOOGLE INC.<br><br>       Defendant. | Case Number: 2:22-cv-01904-TLN-JDP<br><br>**PLAINTIFF REPUBLICAN NATIONAL COMMITTEE'S RESPONSE IN OPPOSITION TO DEFENDANT GOOGLE LLC'S MOTION TO DISMISS**<br><br>Date:   April 20, 2023<br>Time:   2:00 p.m.<br>Dept:   Courtroom 2, 15th Floor<br>Judge:  Hon. Troy L. Nunley |

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 2

   A.   Email is indispensable to the RNC and other Americans. ................................. 2

   B.   For about nine months, Google relegated nearly all RNC emails to spam during critical times of the month. ...................................................................................................... 2

ARGUMENT ...................................................................................................................... 3

I.   The RNC has stated a common-carrier claim under California law. ...................... 4

   A.   Google, through its Gmail service, is a common carrier of messages. ............ 4

   B.   Google violated its common-carrier obligations. ............................................. 9

      1.   Google violated its duty of care in transmitting and delivering the emails. ............... 9

      2.   Google "refused" or "postponed" RNC emails by sending them to spam. ........... 10

II.   The RNC has stated a claim under the Unruh Civil Rights Act. ......................... 11

   A.   Political affiliation is a personal characteristic protected by Unruh. .............. 12

   B.   Google's suppression is intentional discrimination based on a personal characteristic. ............. 15

III.   The RNC has stated a claim under California's unfair competition law. ............ 18

   A.   Google's conduct is unlawful and unfair. ...................................................... 18

   B.   Google's conduct caused the RNC economic damage. .................................. 19

IV.   The RNC has stated a claim for intentional interference with prospective economic relations. 19

V.   The RNC has stated a negligent-interference-with-prospective-economic-relations claim. ........... 22

VI.   Google's last resort to 47 U.S.C. §230 fails. ..................................................... 23

   A.   Section 230(c)(2) does not immunize Google. ............................................... 24

      1.   Section 230(c)(2) does not bar the RNC's claims for damages or prospective relief. ............... 24

a.   Subparagraph (A) does not shield Google's conduct. ..............................................26

b.   Subparagraph (B) also does not shield Google's conduct. ......................................26

c.   Four other considerations defeat Google's broad immunity arguments. ..............................28

2.   Regardless, §230(c)(2) does not bar the RNC's claims for prospective relief. ........................29

B.   Section 230(c)(1) does not preempt the RNC's claims. ..................................................30

CONCLUSION .......................................................................................................................30

**TABLE OF AUTHORITIES**

C<small>ASES</small>

*Am. Sugar-Ref. Co. v. State of Louisiana*, 179 U.S. 89 (1900) ............................................. 13

*Anderson News, LLC v. Am. Media, Inc.*, 680 F.3d 162 (2d Cir. 2012) ................................. 17

*Apple Inc. v. Superior Ct.*, 292 P.3d 883 (Cal. 2013) ............................................................ 8

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ................................................................................. 4

*Bartenwerfer v. Buckley*, 598 U.S. __ (2023) ...................................................................... 10

*Biden v. Knight First Amend. Inst. at Columbia Univ.*, 141 S. Ct. 1220 (2021) .................. 29

*Brown v. Davenport*, 142 S. Ct. 1510 (2022) ................................................................. 24, 26

*Candelore v. Tinder, Inc.*, 228 Cal. Rptr. 3d 336 (Ct. App. 2018) ...................................... 12

*Cavallaro v. Texas & P. Ry. Co.*, 42 P. 918 (Cal. 1895) ........................................................ 7

*Cel-Tech Comm'ns, Inc. v. L.A. Cellular Tel. Co.*, 973 P.2d 527 (Cal. 1999) ..................... 18

*Champagne v. Hamburger & Sons*, 147 P. 954 (Cal. 1915) ................................................... 8

*Code Rebel, LLC v. Aqua Connect, Inc.*, 2013 WL 5405706 (C.D. Cal. Sept. 24) ............... 20

*Cyber Promotions, Inc. v. Am. Online, Inc.*, 948 F. Supp. 456 (E.D. Pa. 1996) ................. 23

*Della Penna v. Toyota Motor Sales, USA, Inc.*, 902 P.2d 740 (Cal. 1995) ......................... 21

*Divino Group LLC v. Google LLC*, 2022 WL 4625076 (N.D. Cal. Sept. 30) ........................ 12

*Doe v. Columbia Univ.*, 831 F.3d 46 (2d Cir. 2016) ............................................................ 17

*Doe v. CVS Pharmacy, Inc.*, 982 F.3d 1204 (9th Cir. 2020) ........................................... 18, 19

*Doe v. Uber Techs., Inc.*, 184 F. Supp. 3d 774 (N.D. Cal. 2016) ......................................... 5

*Doe v. Uber Techs., Inc.*, 2019 WL 6251189 (N.D. Cal. Nov. 22) ....................................... 5

*Dresbach v. California Pac. R. Co.*, 57 Cal. 462 (1881) ....................................................... 9

*Dyroff v. Ultimate Software Grp.*, 934 F.3d 1093, 1096 (9th Cir. 2019) ............................. 4

*e360Insight, LLC v. Comcast Corp.*, 546 F. Supp. 2d 605 (N.D. Ill. 2008) ........................ 26

*Elrod v. Burns*, 427 U.S. 347 (1976) .................................................................................. 13

*Enhanced Athlete Inc. v. Google LLC*, 479 F. Supp. 3d 824 (N.D. Cal. 2020) ................... 26

*Enigma Software Grp. USA, LLC v. Malwarebytes, Inc.*, 946 F.3d 1040 (9th Cir. 2019) ......... 25, 26, 27, 28

1  *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612 (2018) ............................................................... 25

2  *Eu v. San Francisco Cnty. Democratic Cent. Comm.*, 489 U.S. 214 (1989) ........................... 13

3  *e-ventures Worldwide, LLC v. Google, Inc.*, 188 F. Supp. 3d 1265 (M.D. Fla. 2016) ........... 26

4  *Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157 (9th Cir. 2008) ....... 23, 24, 28

5  *FCC v. Midwest Video Corp.*, 440 U.S. 689 (1979) ................................................................ 6

6  *Gomez v. Superior Ct.*, 113 P.3d 41 (Cal. 2005) ................................................................. 8, 9

7  *Gonzalez v. Google LLC*, 2 F.4th 871 (9th Cir. 2021), *cert. granted*, 143 S. Ct. 80 (2022) ................................. 23

8  *Gordon v. Virtumundo, Inc.*, 575 F.3d 1040 (9th Cir. 2009) ............................................. 19

9  *Grundy v. Walmart Inc.*, 2018 WL 5880914 (C.D. Cal. June 22) ...................................... 16

10  *Hal roach Studios, Inc. v. Richard Feiner and Co., Inc.*, 896 F.2d 1542 (9th Cir. 1989) ............................................. 4

11  *Harris v. Cap. Growth Invs. XIV*, 805 P.2d 873 (Cal. 1991) ................................ 12, 13, 14, 16

12  *Hart v. W.U. Tel. Co.*, 4 P. 657 (Cal. 1884) ....................................................................... 10

13  *Henderson v. Source for Pub. Data, L.P.*, 53 F.4th 110 (4th Cir. 2022) ......................... 24, 30

14  *HomeAway.com, Inc. v. City of Santa Monica*, 918 F.3d 676 (9th Cir. 2019) ..................... 30

15  *Huang v. The Bicycle Casino, Inc.*, 208 Cal. Rptr. 3d 591 (Ct. App. 2016) ......................... 8

16  *Huber v. Biden*, 2022 WL 827248 (N.D. Cal. Mar. 18) ...................................................... 14

17  *In re Adobe Sys., Inc. Privacy Litig.*, 66 F. Supp. 3d 1197 (N.D. Cal. 2014) ..................... 18

18  *In re Cox*, 474 P.2d 992 (Cal. 1970) ................................................................................. 12

19  *In re Google Digital Advert. Antitrust Litig.*, 2022 WL 4226932 (S.D.N.Y. Sept. 13) ........... 7

20  *In re Google Inc.*, 2013 WL 5423918 (N.D. Cal. Sept. 26) .................................................. 8

21  *In re Zoom Video Commc'ns Inc. Priv. Litig.*, 525 F. Supp. 3d 1017 (N.D. Cal. 2021) ............... 18, 19

22  *J'Aire Corp. v. Gregory*, 598 P.2d 60 (Cal. 1979) ............................................................. 22

23  *Kenney v. City of San Diego*, 2013 WL 5346813 (S.D. Cal. Sept. 20) ................................. 14

24  *Koebke v. Bernardo Heights Country Club*, 115 P.3d 1212 (Cal. 2005) ....................... 12, 13, 16

25  *Koirala v. Thai Airways Int'l, Ltd.*, 126 F.3d 1205 (9th Cir. 1997) ..................................... 25

26  *Lee v. City of Los Angeles*, 250 F.3d 668 (9th Cir. 2001) ...................................................... 4

27  *Lemmon v. Snap, Inc.*, 995 F.3d 1085 (9th Cir. 2021) ....................................................... 4, 30

28  *Logistick, Inc. v. AB Airbags, Inc.*, 543 F. Supp. 3d 881 (S.D. Cal. 2021) ........................ 20, 22

1   *Lunney v. Prodigy Servs. Co.*, 94 N.Y.2d 242 (1999) ............................................................. 6

2   *Malwarebytes, Inc. v. Enigma Software Grp. USA, LLC*, 141 S. Ct. 13 (2020) ...................... 28

3   *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1024 (9th Cir. 2008) ......................... 4

4   *Marina Point, Ltd. v. Wolfson*, 640 P.2d 115 (Cal. 1982) ..................................................... 12

5   *Menaker v. Hofstra Univ.*, 935 F.3d 20 (2d Cir. 2019) .......................................................... 17

6   *Milton H. Greene Archives, Inc. v. Marilyn Monroe LLC*, 692 F.3d 983 (9th Cir. 2012) ....................... 30

7   *Muniz v. United Parcel Serv., Inc.*, 738 F.3d 214 (9th Cir. 2013) .......................................... 13

8   *NetChoice, LLC v. Att'y Gen.*, 34 F.4th 1196 (11th Cir. 2022) ............................................... 7

9   *NetChoice, LLC v. Paxton*, 49 F.4th 439 (5th Cir. 2022) ....................................... 5, 6, 7, 25

10  *Neubauer v. Disneyland, Inc.*, 875 F. Supp. 672 (C.D. Cal. 1995) .......................................... 8

11  *Nia v. Bank of Am., N.A.*, 603 F. Supp. 3d 894 (S.D. Cal. 2022) ........................................... 16

12  *OSU Student All. v. Ray*, 699 F.3d 1053 (9th Cir. 2012) ...................................................... 17

13  *People v. Duntley*, 17 P.2d 715 (Cal. 1932) ......................................................................... 5

14  *Roy Allan Slurry Seal, Inc. v. Am. Asphalt S., Inc.*, 388 P.3d 800 (Cal. 2017) ........................ 20

15  *Rutan v. Republican Party of Ill.*, 497 U.S. 62 (1990) ......................................................... 13

16  *Song fi Inc. v. Google, Inc.*, 108 F. Supp. 3d 876 (N.D. Cal. 2015) .................................. 25, 28

17  *Squaw Valley Ski Corp. v. Superior Court*, 3 Cal. Rptr. 2d 897 (Ct. App. 1992) ..................... 5, 9

18  *Starr v. Baca*, 652 F.3d 1212 (9th Cir. 2011) ................................................................. 4, 17

19  *State v. Google LLC*, 2022 WL 1818648 (Ohio Com. Pl. May 24) ...................................... 7, 8

20  *Trammell v. W. Union Tel. Co.*, 129 Cal. Rptr. 361 (Ct. App. 1976) ....................................... 7

21  *Union Const. Co. v. Western Union Telegraph Co.*, 125 P. 242 (Cal. 1912) ............................. 9

22  *United States v. Bowker*, 372 F.3d 365 (6th Cir. 2004) ....................................................... 24

23  *United States v. Eckhardt*, 466 F.3d 938 (11th Cir. 2006) .................................................. 24

24  *United States v. Juncaj*, 2023 WL 1447354 (D. Nev. Jan. 31) .............................................. 24

25  *United States v. Lampley*, 573 F.2d 783 (3d Cir. 1978) ...................................................... 24

26  *W.U. Tel. Co. v. Brown*, 253 U.S. 101 (1920) ................................................................... 7

27  *West v. Shea*, 500 F. Supp. 3d 1079 (C.D. Cal. 2020) ....................................................... 28

28  *Westside Center Assocs. v. Safeway Stores 23, Inc.*, 49 Cal. Rptr. 2d 793 (Ct. App. 1996) .............................. 20, 21

*Williams v. City of Bakersfield*, 2015 WL 1916327 (E.D. Cal. Apr. 27) .................................................. 14

*Yates v. United States*, 574 U.S. 528 (2015) ...................................................................................... 25

*Yellen v. Confederated Tribes of Chehalis Rsrv.*, 141 S. Ct. 2434 (2021) ........................................ 29

*Zadvydas v. Davis*, 533 U.S. 678 (2001) ............................................................................................. 29

*Zango, Inc. v. Kaspersky Lab, Inc.*, 568 F.3d 1169 (9th Cir. 2009) .............................................. 26, 27

STATUTES

15 U.S.C. §7701(1) ................................................................................................................................ 19

47 U.S.C. §202 .......................................................................................................................................... 4

47 U.S.C. §223 ........................................................................................................................................ 24

47 U.S.C. §230 .................................................................................................................................... 4, 23

47 U.S.C. §230(a)(3) ............................................................................................................................. 28

47 U.S.C. §230(c)(1) ......................................................................................................................... 24, 30

47 U.S.C. §230(c)(2) ......................................................................................................................... 24, 29

47 U.S.C. §230(c)(2)(A) ........................................................................................................................ 26

47 U.S.C. §230(c)(2)(B) .................................................................................................................... 26, 27

47 U.S.C. §230(e) .................................................................................................................................... 29

Cal. Bus. & Prof. Code §17200 ............................................................................................................ 18

Cal. Civ. Code §2161 .......................................................................................................................... 9, 10

Cal. Civ. Code §2162 .......................................................................................................................... 9, 10

Cal. Civ. Code §2168 .............................................................................................................................. 5

Cal. Civ. Code §2208 ............................................................................................................................ 11

Cal. Civ. Code §2209 ............................................................................................................................ 10

Cal. Civ. Code §2210 .............................................................................................................................. 9

Cal. Civ. Code. §2089 ............................................................................................................................. 9

Cal. Civ. Code. §2090 ............................................................................................................................. 9

Cal. Civ. Code. §2169 ...................................................................................................................... 10, 11

1

**OTHER AUTHORITIES**

2
A. Candeub & E. Volokh, *Interpreting 47 U.S.C. §230(c)(2)*, 1 J. Free Speech L. 175 (2021) ............. 25, 27, 28

3
A. Candeub, *Reading Section 230 As Written*, 1 J. Free Speech L. 139 (2021).....................................29

4
Black's Law Dictionary (11th ed. 2019)........................................................................... 24, 28, 29

5
E. Volokh, *Bans on Political Discrimination in Places of Public Accommodation and Housing*, 15 N.Y.U. J.L. & Liberty

6
    490 (2022) ................................................................................................................. 13

7
P. Hamburger, *The Constitution Can Crack Section 230*, Wall St. J. (Jan. 29, 2021) ...........................29

8
Webster's Complete Dictionary of the English Language (1886)....................................................11

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**INTRODUCTION**

This case is about the market-dominant communications firm unlawfully preventing one of the two major national political parties from communicating its political and fundraising messaging to millions of Americans, all of whom requested the messages. Email is an indispensable means of communication. The RNC relies on this crucial conduit to engage in its core mission of conducting political activity in support of the Republican Party. This includes communicating political messaging and important voting information to supporters, as well as maintaining relationships with individuals who financially support the RNC. The RNC ensures that every email from the domain name in question it sends is to someone who requested it, and it uses industry standard tools and contracts with a leading company in this field to optimize its email deliverability. As a result, the RNC has a high email reputation and a high inboxing rate. In other words, when the RNC emails users of major email service providers, the requested emails consistently reach the users' inbox, not their spam folders.

Except on Google's Gmail. Google has improperly relegated millions of RNC emails *en masse* to potential donors' and supporters' spam folders. Google has repeatedly done so during key periods of election fundraising and community outreach. It has done so even though the emails were sent only to people who requested them. And it has done so despite the RNC's best efforts to work with Google to resolve the issue over the nine months before this suit.

As plausibly alleged, Google's conduct violates California law. It violates the common-carrier laws because by hiding the RNC's emails in Gmail users' spam folders, Google refused to properly transmit the emails or failed to use great care and diligence in delivering the emails. It violates the Unruh Civil Rights Act because Unruh bars discrimination based on political affiliation and Google's pattern of purported spam filtering along with, *inter alia*, its refuted explanations for its conduct plausibly establish that the discrimination is intentional. It violates the unfair competition law because of the violations the RNC stated in its other claims or, at the very least, because Google's conduct is comparable to actual violations of California law. And it violates tortious-interference law because Google unlawfully interfered with the RNC's relationship with its supporters, relationships Google obviously knew about.

Google's motion to dismiss fails. It fails at the outset because it relies on materials and disputed facts outside the complaint to contest the factual allegations in the complaint, even though such materials

1  are irrelevant at the pleading stage. And it fails on the merits in any event because (even with those improper

2  materials) Google cannot overcome the well-pleaded allegations of the complaint. This Court should reject

3  Google's attempt to transform 12(b)(6)'s plausibility standard into a post-discovery, post-trial

4  preponderance-of-the-evidence standard. And it should deny Google's motion to dismiss as to Counts 1

5  through 5 and 7.

6  **BACKGROUND**

7      **A.  Email is indispensable to the RNC and other Americans.**

8         The RNC is "the national committee of the Republican Party." Compl. (ECF 1) ¶13. The RNC

9  "manages the business of the Republican Party," including: "developing and promoting the party's national

10  platform"; "supporting Republican candidates for public office"; "educating, assisting, and mobilizing

11  voters"; and "raising funds to support the party's operations and candidates." *Id.* It uses email to fund

12  campaigns and build a community, especially in California. *See id.* ¶¶19-21.

13         To effectively reach and grow its community, the RNC relies heavily on email. It takes great pains

14  to ensure that every email at issue is sent to someone who requested it and to optimize its email

15  deliverability. *Id.* ¶¶22-24.[1] It ensures that only those that request emails get them by "maintain[ing] a list of

16  people who have requested to receive emails from the RNC" and sending only to people on the list. *Id.* ¶22.

17  Many on the list are Gmail users. *Id.* ¶20. The RNC also analyzes several metrics, including "inboxing rate."

18  The inboxing rate is how often a sender's emails reach a user's inbox. *Id.* ¶23. It is "a critical metric to

19  diagnose and fix issues that cause emails to go to spam." *Id.* The RNC "strives to keep its inboxing rate

20  high." *Id.* And one way it does this is through "a leading company in the field [of email deliverability] called

21  Validity." *Id.* ¶24. With Validity's platform, the RNC "can essentially monitor" its inboxing rate. *Id.*

22      **B.  For about nine months, Google relegated nearly all RNC emails to spam during critical**

23          **times of the month.**

24         Google's most serious suppression of RNC emails began in at least February 2022. *Id.* ¶28. That

25  month the RNC "began working on matters related to the 2022 mid-term election," and it "detected that

26

---

27  [1] The RNC sends almost all its emails from the domain name campaigns.rnchq.com, and it is from this domain name that the
RNC sends every email exclusively to those who request them. *See* Compl. ¶¶22, 42. Google was aware of this domain name and
aware that the RNC had other far less consequential domain names. *See id.* ¶42. Thus, when this brief refers to "nearly all RNC
28  emails" (and similar phrases), it is referring to emails sent from the campaigns.rnchq.com domain name.

1    its Gmail 'inboxing' rate suddenly dropped from rates consistently above 90% to nearly 0% on certain days"

2    towards the end of the month. *Id.* "This inboxing rate of nearly 0% means that Gmail hid nearly every

3    campaign email sent by the RNC from the Gmail users on whom the RNC financially relies." *Id.*

4          The RNC immediately began investigating the issue and contacted Google. Google then provided

5    the first of many excuses for why nearly every email was relegated to spam. For example, Google initially

6    "responded that the monthly crashing of the RNC's inboxing rate was due to a high number of user

7    complaints." *Id.* ¶36. But as the RNC told Google, this was not true. The RNC had been monitoring its

8    industry standard tools, and "these tools showed that there were no reputational issues" at all (let alone

9    from user complaints) and that there were "no [other] irregularities causing the issue." *Id.*

10         Towards the end of the next month, Google again relegated nearly all RNC emails to spam. *Id.* ¶37.

11   Once again, the RNC checked the industry standard tools to try to assess the cause. But all the tools

12   suggested that it was not the RNC or Gmail-user complaints causing the problem. *Id.* Unsurprisingly, no

13   other major email service provider suddenly suppressed nearly all RNC emails for particular time periods.

14   *See, e.g., id.*, Fig. 3, ¶53 (graphing the inboxing rates for RNC emails sent to four major email service

15   providers). The RNC again contacted Google. And eventually Google agreed to meet with the RNC. They

16   met twice, and neither time did Google provide a concrete plan of action to remedy the *en masse* relegation

17   of RNC emails to spam during critical periods of the month. *Id.* ¶40.

18         The problems with Gmail continued. Each time the RNC contacted Google, it explained how the

19   RNC was following Google's "Best Practices" and submitted reports showing that it had a high email

20   reputation and that user complaints could not be the problem. *E.g., id.* ¶¶41-48. Eventually Google stopped

21   responding to the RNC's good-faith efforts to resolve the issue. *E.g., id.* ¶¶49-50.

22         In short, the RNC spent nine months trying to work with Google to stop the financial and political

23   harm that it was inflicting on the RNC and its community. *Id.* ¶¶30-52. Google could not explain its actions.

24   *Id.* ¶¶49-51, 57-58. And after providing shifting explanations that were each debunked, Google fell silent

25   (and has remained so), leading the RNC to believe that this pattern is intentional. *Id.* ¶¶27-56. Whether

26   intentional, in bad faith, or negligent, Google's conduct is unlawful.

27                                              **ARGUMENT**

28         "The Court must accept all factual allegations in the complaint as true and construe the pleadings

in the light most favorable to the nonmoving party." *Dyroff v. Ultimate Software Grp.*, 934 F.3d 1093, 1096 (9th Cir. 2019) (cleaned up). The "complaint will survive at this stage if it states a plausible claim for relief, *i.e.*, if it permits the reasonable inference that the defendant is liable for the misconduct alleged." *Lemmon v. Snap, Inc.*, 995 F.3d 1085, 1090 (9th Cir. 2021) (cleaned up). The plausibility standard "does not require detailed factual allegations," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), or "impose a probability requirement at the pleading stage," *Starr v. Baca*, 652 F.3d 1212, 1213 (9th Cir. 2011). And the Court may "consider only allegations contained in the pleadings, exhibits attached to the complaint, and matters properly subject to judicial notice." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1024, 1030-31 (9th Cir. 2008); *see Hal roach Studios, Inc. v. Richard Feiner and Co., Inc.*, 896 F.2d 1542, 1555 n.19 (9th Cir. 1989). "Indeed, factual challenges to plaintiff's complaint have no bearing on the legal sufficiency of the allegations under Rule 12(b)(6)." *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001).

As explained in the RNC's motion to strike (filed contemporaneously), Google's motion teems with factual contentions that are beyond the allegations in the complaint and often conflict with the complaint's allegations, including: that Google applies spam-filtering equally, Mot. (ECF 30) 1, that spam-filtering improves Gmail for users, *id.*, that Google uses sophisticated spam-filtering technologies to protect Gmail users from unwanted and potentially dangerous emails, Mot. 3-4, the substance of a federal agency's decision, Mot. 1, and that the RNC could have participated in a pilot program that Google was offering when it began hiding the RNC's emails, *id.* The Court should not consider any of the extra factual assertions in Google's motion to dismiss, including those based on Exhibits A-H and J-O.[2]

Regardless, the RNC has stated a claim under California's common-carrier laws, California's Unruh Civil Rights Act, California's unfair practice law, California intentional tortious interference, and California negligent interference.[3] And none of the claims are barred by 47 U.S.C. §230.

## I. The RNC has stated a common-carrier claim under California law.

### A. Google, through its Gmail service, is a common carrier of messages.

Under California law, "[e]very one who offers to the public to carry persons, property, or messages,

---

[2] The RNC does not oppose the Request for Judicial Notice as to Exhibit I.

[3] The RNC preserves a claim under 47 U.S.C. §202 of the Telecommunication Act, but as noted in the complaint, the claim is foreclosed by currently binding Supreme Court precedent. *See* Compl. ¶¶102-07 (Count VI).

1    excepting only telegraphic messages, is a common carrier of whatever he thus offers to carry." Cal. Civ.

2    Code §2168. Google argues that it's not a common carrier because (1) Gmail is not "offered to the public

3    'generally and indifferently,'" (2) Google does not carry or transport "the RNC's emails to Gmail users,"

4    and (3) Google does not carry the messages "'for profit.'" Mot. 9-12. Google is wrong at every step.

5        **1.** Google "offers to the public." "The distinctive characteristic of a common carrier is that [it]

6    undertakes to carry for all people indifferently." *People v. Duntley*, 17 P.2d 715, 720 (Cal. 1932). In other

7    words, "the entity merely must be of the character that members of the general public may, if they choose,

8    avail themselves of it." *Squaw Valley Ski Corp. v. Superior Court*, 3 Cal. Rptr. 2d 897, 901 (Ct. App. 1992).

9    That's Google. Google insists that it doesn't offer services to the public because it's only willing to do

10   business with users who agree to its terms of service. Mot. 10-11. But a California court long ago rejected

11   that argument. In *Squaw Valley*, a ski resort operating a ski lift argued that its service was "not offered for

12   use by the general public" because it "restricted" its chair lift "to persons who (1) wear skis, and (2) who

13   purport to possess the ability to ski." 3 Cal. Rptr. 2d at 901 (cleaned up). Put differently, the resort argued

14   that because it had "conditions" for using the lift, it could not be a common carrier. *Id.* The court, however,

15   concluded otherwise. That is because the resort "offers the chair lift to carry any members of the general

16   public who wish to avail themselves of this service *by complying with the conditions*." *Id.* (emphasis added).

17       Courts in the Ninth Circuit have also rejected that terms of service negate common-carrier status

18   under California law. *See Doe v. Uber Techs., Inc.*, 2019 WL 6251189, at *6 (N.D. Cal. Nov. 22) (rejecting

19   argument that Uber "is not a common carrier because of conditions that are placed on who can use and be

20   connected with drivers via the app"); *Doe v. Uber Techs., Inc.*, 184 F. Supp. 3d 774, 786 (N.D. Cal. 2016).

21       These courts' conclusions make sense. "The relevant inquiry isn't whether a company has terms

22   and conditions; it's whether it offers the same terms and conditions to [the relevant] groups." *NetChoice,*

23   *LLC v. Paxton*, 49 F.4th 439, 474 (5th Cir. 2022) (opinion of Oldham, J.) (cleaned up). Because Google

24   "permit[s] any adult to make an account and transmit expression after agreeing to the same boilerplate terms

25   of service," Google has "represented a willingness to carry anyone on the same terms and conditions." *Id.*

26   (cleaned up); *see* Compl. ¶¶14-16. And unsurprisingly, Google's terms of service resemble practices by other

27

28

1    common carriers to prevent abuse of their services. *See NetChoice*, 49 F.4th at 474 (providing examples).[4]

2        **2.** Google "offers … to carry" emails. All agree that the terms "carry" and "transport" include

3    "transmitting," "communicating," and accepting electronic messages through data processing. *See* Mot. 11

4    (agreeing at a minimum that the "Internet" carries or transports (emphasis omitted)). Google nonetheless

5    argues that "emails sent to users from outside Gmail cannot be 'carried' or 'transported' by Gmail" but "are

6    necessarily transported by the Internet from the RNC to the Gmail user where they may be accessed using

7    the Gmail service." *Id.* (emphasis omitted). This argument fails for two independent reasons.

8        **a.** The statutory language centers on what Google "*offers*," not what Google as a matter of

9    technological complexity itself "*does*." Put differently, the statute's focus is on what Google offers the

10   consumer public, not on the precise technical details of how email works. And that focus makes sense

11   because the public doesn't care how email is sent or received but who is purporting to take responsibility

12   to make it happen. Tellingly, Google never quotes the actual language of California's provision, so it misses

13   the key textual clues.

14       Google is offering the public the service of sending and receiving electronic messages, which

15   necessarily includes "carrying" those messages. Google's own improperly submitted documents, for

16   example, prove the point: Google provides instructions for non-users and users on sending and receiving

17   emails, including how to "multi-send for email marketing, newsletters, and announcement." *See, e.g.*, Ex. C

18   (ECF 30-4) at 3. And Google offers to receive emails from non-Gmail users and deliver them in the Gmail

19   user's inbox. Email service providers like Gmail thus offer themselves to the public as merely conduits for

20   sending and receiving messages just like the telephone. *See Lunney v. Prodigy Servs. Co.*, 94 N.Y.2d 242, 249

21   (1999) (viewing the "role in transmitting e-mail [to be] akin to that of a telephone company, which one

22   neither wants nor expects to superintend the content of its subscribers' conversations"); *id.* at 248 ("E-mail

23   is the day's evolutionary hybrid of traditional telephone line communications and regular postal service

24

25

---

26   [4] Google relies on *FCC v. Midwest Video Corp.*, 440 U.S. 689 (1979), Mot. 10-11, but that case *supports* holding that Google is a common carrier. As the Court explained, what matters is whether the company "make[s] individualized decisions, in particular

27   cases, whether and on what terms to deal." *FCC*, 440 U.S. at 701 (cleaned up). But Google is not making individualized *decisions*; it is making one indifferent decision to the public just like the ski resort in *Squaw Valley*. Regardless, *FCC* involves only federal

28   common-carrier law, which has crucially different language and precedent than California law.

---

mail."). "In that sense, [Google is] no different than Verizon or AT&T." *NetChoice*, 49 F.4th at 474.[5]

Contrary to Google's contention, it doesn't matter that the RNC is a non-Gmail user emailing a Gmail user. Google's offer to carry messages extends beyond those who have Gmail accounts. People using email service providers other than Gmail may still send messages to Gmail addresses. Indeed, Gmail welcomes such emails, as it welcomes all email users that agree to its terms of service.

**b.** Just because Google does not transport the email the entire way does not absolve it from common-carrier liability. Common carriers have typically transmitted a message using several companies. For example, a telegraph was typically sent using multiple different telegraph company lines. *See, e.g.*, *W.U. Tel. Co. v. Brown*, 253 U.S. 101, 107-08 (1920) (telegraph would travel from Oakland, California, to Wabuska, Nevada, on Western Union lines and from Wabuska to Yerington, Nevada on another company's lines). Telegraph services could be divided further into transmission and delivery, both of which were regulated as a common carrier. The message's transmission would be done across the lines while the actual physical message would be delivered by a courier to the addressee. *See, e.g.*, *Trammell v. W. Union Tel. Co.*, 129 Cal. Rptr. 361 (Ct. App. 1976). Google's liability, even if it is just the final company handling email delivery, mirrors the treatment of a common carrier's delivery of goods using multiple vendors, where the company that carries the goods to their destination is liable for a mis-delivery. *See Cavallaro v. Texas & P. Ry. Co.*, 42 P. 918, 920 (Cal. 1895) (The "last duty required of the common carrier is that of delivery…. He must not only deliver goods intrusted to him to carry, but becomes also responsible for their proper delivery.").

**3.** Google offers its Gmail service for a profit. The RNC has plausibly "alleged that in lieu of charging a fee directly to its users, Google collects each user's data, which is then monetized by," for example, selling the information to advertisers or "targeted ad space." *State v. Google LLC*, 2022 WL 1818648, at *4 (Ohio Com. Pl. May 24); *see* Compl. ¶¶15-16; *see also In re Google Digital Advert. Antitrust Litig.*, 2022 WL 4226932 (S.D.N.Y. Sept. 13). Unsurprisingly, platforms like Google "earn almost all their revenue

---

[5] Google tries to discount the Fifth Circuit's *NetChoice* opinion. *See* Mot. 10 n.3. It claims that *NetChoice*'s reasoning is irrelevant because the case involved social media, not "email services, like Gmail." *Id.* (emphasis omitted). But *NetChoice*'s reasoning applies squarely here. If anything, the common-carrier question for email is *easier* than social media. Google also relies on the Eleventh Circuit's *NetChoice, LLC v. Att'y Gen.*, 34 F.4th 1196 (11th Cir. 2022). That decision's "circular" reasoning is wrong for the reasons explained by the Fifth Circuit. *See* 49 F.4th at 493-94 (responding to Eleventh Circuit's common-carrier analysis). But at any rate, the Eleventh Circuit was not addressing California's particular statutory provisions or California precedent, which rejects the Eleventh Circuit's terms-and-conditions distinction. Plus, here, unlike in *NetChoice*, Google does not claim it is exercising "editorial discretion" or that the First Amendment protects such editorial discretion. So unlike in *NetChoice*, no First Amendment issue muddies the common-carrier analysis.

1   through advertising." *NetChoice*, 49 F.4th at 476.

2     Google does not deny that it profits off Gmail; instead, it argues that only a *direct monetary fee*

3   exchanged for the service suffices. Mot. 12. That argument fails for three reasons. First, it has no support

4   in the text of California's common-carrier provision or precedent. In fact, California courts—including its

5   Supreme Court—have rejected this argument and made clear that *indirect* profit counts. *See, e.g., Champagne*

6   *v. Hamburger & Sons*, 147 P. 954, 958 (Cal. 1915) (holding that elevators in department stores were common

7   carriers and rejecting argument stores did not transport the passengers on the elevator for "reward," because

8   the elevators "would increase [the store's] patronage and necessarily its profits in business"); *Huang v. The*

9   *Bicycle Casino, Inc.*, 208 Cal. Rptr. 3d 591, 599 (Ct. App. 2016) (explaining that the "reward contemplated by

10  the [common-carrier] scheme need not be a fee charged for the transportation service" because the profit

11  "may be … generated indirectly" (cleaned up)). Second, a direct-fee requirement would turn common-

12  carrier law on its head. "Elevators, escalators, hotel and airport shuttles, and air ambulances are examples

13  of common carriers for which the user is not required to pay a direct fee to the operator to use the service."

14  *State*, 2022 WL 1818648, at *4. Finally, Google does charge a direct fee: the user's data. It can't be that

15  common carriers can skirt its obligations by charging gold (or valuable user data) rather than U.S. dollars.

16    The crux of all of Google's complaints is that California's common-carrier statute can't apply to

17  technology or corporate structures more advanced than the telegraph and the telephone. But the California

18  Supreme Court applies California statutes to new technologies:

19     In construing statutes that predate their possible applicability to new technology, courts
20     have not relied on wooden construction of their terms. Fidelity to legislative intent does not
       make it impossible to apply a legal text to technologies that did not exist when the text was
21     created. Drafters of every era know that technological advances will proceed apace and that
       the rules they create will one day apply to all sorts of circumstances they could not possibly
22     envision.

23  *Apple Inc. v. Superior Ct.*, 292 P.3d 883, 887 (Cal. 2013) (cleaned up). Indeed, California *courts* have a history

24  of "updating obsolete statutes in light of emerging technologies." *In re Google Inc.*, 2013 WL 5423918, at *21

25  (N.D. Cal. Sept. 26). The common-carrier provisions are no exception. "[T]he California statutory common

26  carrier definition is very broad." *Neubauer v. Disneyland, Inc.*, 875 F. Supp. 672, 673 (C.D. Cal. 1995); *see Gomez*

27  *v. Superior Ct.*, 113 P.3d 41, 44 (Cal. 2005) ("section 2168 defines a 'common carrier' in expansive terms").

28    Moreover, when the State of California wanted to modify the general common-carrier rules to

1   exempt a new technology, it did so explicitly. Google concedes as much. It highlights that California's

2   legislature amended the provisions "to exempt telegraph companies from common-carrier obligations."

3   Mot. 12.[6] But the amendment shows that the statute's plain terms applied to new technology, like the

4   telegraph, and it was up to *the California legislature* to scale it back case-by-case. There are other examples.

5   California, for instance, enacted provisions providing immunity to space flights. *See* Cal. Civ. Code §§2210-

6   12. If the state legislature thought that its common-carrier provisions did not apply to newer technologies,

7   then there would have been no need to amend the scheme. Thus, California's common-carrier obligations

8   are the default rule for new technology, and California has not deviated from that default for email.

9   **B.  Google violated its common-carrier obligations.**

10   The RNC has stated a common-carrier violation in two ways: (1) even if Google delivered the emails

11   by (un)intentionally consigning them to spam, Google violated its duty to care; and (2) Google "refused"

12   or "postponed" transmitting the RNC's emails when it relegated them *en masse* to the spam folder.

13   **1.  Google violated its duty of care in transmitting and delivering the emails.**

14   **a.** All carriers owe at least an ordinary duty of care. *See* Cal. Civ. Code. §§2089-90. Here, however,

15   Google owes a higher duty. "A carrier of messages for reward … must deliver them at the place to which

16   they are addressed, or to the person for whom they are intended." *Id.* §2161. Such a carrier "must use great

17   care and diligence in the transmission and delivery of messages." *Id.* §2162. Google is a carrier of messages

18   for reward for the same reasons it is a common carrier. *See, e.g.*, *Squaw Valley*, 3 Cal. Rptr. 2d at 899; *Gomez*,

19   113 P.3d at 43. It thus had to "use great care and diligence" in transmitting and delivering the RNC's emails.

20   Under either standard, Google violated its duty. When a common carrier does not deliver an item

21   to the proper location (here, the user's inbox, not his spam folder), then the carrier violates its duty. *See*

22   *Dresbach v. California Pac. R. Co.*, 57 Cal. 462, 462 (1881) ("[I]t is negligence in a common carrier of goods to

23   deliver the consigned goods by merely placing them on the bank of a river at the point of destination, in

24   the absence of the consignee, and not under the care of the agents of the carrier, the latter having agents at

25   that point for the purpose of receiving and delivering goods."). Likewise, Google arbitrarily delivering the

26

---

27   [6] California exempted telegraphic messages from the common-carrier definition because carriage laws at that time established
the standard of care for telegraph message carriers, Cal. Civ. Code §2162, and they were still subject to common-carrier damages

28   for failure to timely deliver a message, *id.* §2209; *see Union Const. Co. v. Western Union Telegraph Co.*, 125 P. 242, 249 (Cal. 1912).

1   RNC's messages to its supporters' spam folders without notifying those Gmail users does not fulfill its

2   common-carrier duties. Because the RNC uses industry standard tools and contracts with a leading

3   company in this field to optimize its email deliverability and because it ensures that every email it sends

4   from the domain name at issue is to someone who requested it, it has a high email reputation and inboxing

5   rate. Compl. ¶¶22-25. Yet Google relegated these emails *en masse* to the spam folder around the same time

6   each month. *Id.* ¶¶27-40. No other major email service provider comes close to suppressing nearly all  RNC

7   emails at once, as Google does. *See id.*, Fig. 3, ¶53. Over the nine months leading up to this suit, the RNC

8   made good-faith efforts to cooperate with Google to resolve the issue. *Id.* ¶¶36-56. Yet Google merely

9   provided a series of shifting excuses that do not withstand scrutiny. *Id.* This does not amount to "great care

10  and diligence" or "ordinary care." Far from it. It amounts to bad faith and unlawful discrimination based

11  on political affiliation. *See infra* 15-18.

12       **b.** Google argues that it owes no duty to the RNC for three reasons, but they all fail. First, Google

13  argues that it's not a carrier for reward for the same reasons Google asserts it's not a common carrier. Mot.

14  23. But as explained, Google is wrong. *See supra* 4-9. Second, Google asserts that only telegraph companies

15  can be carriers of messages for reward. Mot. 23. The statute says otherwise: "A carrier of messages for

16  reward, *other than by telegraph* or telephone, must deliver them at the place to which they are addressed." Cal.

17  Civ. Code §2161 (emphasis added). Third, Google argues that it would not owe a duty "to the RNC as a

18  third-party sender" but "only to Gmail users." Mot. 23. But Google provides no law or logic for the idea

19  that the carrier owes no duty to the sender. The statute says Google must "use great care and diligence"

20  without limiting the duty to the receiver—that is, the provision is "broad" and the California legislature was

21  "agnostic" to whom the duty was owed. Cal. Civ. Code §2162; *Bartenwerfer v. Buckley*, 598 U.S. __, __ (2023).

22  And in the telegraph context, California courts have found a duty to the sender. *See, e.g.*, *Hart v. W.U. Tel.

23  Co.*, 4 P. 657, 660 (Cal. 1884). Moreover, Google offered itself to the public as a carrier of messages *to* Gmail

24  accounts as part of its highly lucrative business. An email sender who directly relies on Google's service,

25  based on the function it holds itself out to the public to perform, is hardly a "third party" to Google.

26       **2.   Google "refused" or "postponed" RNC emails by sending them to spam.**

27       As a common carrier, Google must, "if able to do so, accept and carry" any email messages offered

28  to it "at a reasonable time and place." Cal. Civ. Code. §2169. "Every person whose message is refused or

---

1    postponed, contrary to the provisions of this Chapter, is entitled to recover from the carrier his actual

2    damages, and fifty dollars in addition thereto." *Id.* §2209. Google violated the common-carrier provisions

3    because Google refuses to accept—or at least postpones—the RNC's messages each time Google relegates

4    the emails *en masse* to spam. Google does not notify users that the email is in the spam folder; nor do users

5    regularly (if ever) check the spam folder, particularly without prompting.

6          Google makes two arguments, but neither is persuasive. First, Google argues that it did send the

7    emails and thus did not "refuse[]" or "postpone[]" the emails "in any sense." Mot. 12-13. This argument

8    fails. To determine whether a message was "refused" or "postponed," one must look at *what is offered*. If

9    Google offers to place all emails properly received to the user's inbox, then doing something else (*e.g.*, hiding

10   the email in spam) is effectively a refusal to transmit or accept the message. At the very least, it's a

11   postponement because Google deprioritized messages and consigned them to spam, particularly where, as

12   here, they are not spam. Delivery is delayed; messages are not truly delivered unless the user moves them

13   to the inbox. *See Postpone*, Webster's Complete Dictionary of the English Language 1018 (1886) ("1. To

14   defer to a future or later time; to put off; to delay"; "2. To set below something else in value or importance").

15         Second, Google argues that common-carrier status would lead to an absurd result because it could

16   not prioritize federal and California state government messages. Mot. 13. But even assuming the factual

17   question whether Google could prioritize, the statute likely does not require it to. The provision requires

18   performance only that a common carrier is "able to do." Cal. Civ. Code §2169. Also, when emails are sent

19   to a Gmail user's inbox, Google might conduct a "simultaneous transmission of messages," which the

20   statute expressly permits. *Id.* §2208. In any event, government emails are generally sent from addresses with

21   a .gov extension. It's thus doubtful that an entity as sophisticated as Google cannot ensure that all emails

22   sent to Gmail users from accounts with a .gov extension are not downgraded to spam folders.

23   **II.   The RNC has stated a claim under the Unruh Civil Rights Act.**

24         The RNC has stated an Unruh claim because it has plausibly alleged that Google intentionally

25   discriminated against the RNC when it periodically relegated nearly all its emails to spam. Google asserts

26   otherwise in conclusory fashion, claiming that (A) political affiliation is not a protected class and (B) the

27   RNC failed to plausibly allege intentional discrimination. Google is wrong on both scores.

28

**A. Political affiliation is a personal characteristic protected by Unruh.**

As Google concedes, Mot. 14, the California Supreme Court has held that Unruh's list of protected classes is merely illustrative and thus non-exhaustive. *See, e.g.*, *In re Cox*, 474 P.2d 992, 995 (Cal. 1970).[7] There is a "three-part analytic framework" to recognizing an unenumerated class under Unruh. *Id.* at 1219. First, the category must be based on "personal characteristics" rather than "economic characteristics." *Harris v. Cap. Growth Invs. XIV*, 805 P.2d 873, 883 (Cal. 1991). Second, no "legitimate business interest" outweighs recognizing the right. *Koebke v. Bernardo Heights Country Club*, 115 P.3d 1212, 1220 (Cal. 2005). Third, "the potential consequences of allowing [the] claims" must not outweigh recognizing the claims. *Id.*[8] Political affiliation easily meets all three parts, which is undoubtedly why the California Supreme Court has at least suggested (if not recognized) that political affiliation is protected no less than three times.

**1.** The unenumerated category of political affiliation is based on "personal characteristics" rather than "economic characteristics." *Harris*, 805 P.2d at 883. The California Supreme Court has explained that personal characteristics include "a person's geographical origin, physical attributes, and *personal beliefs*." *Id.* (emphasis added). Personal characteristics "are not defined by immutability"; rather, "they represent traits, conditions, decisions, or choices fundamental to a person's identity, beliefs and self-definition." *Candelore v. Tinder, Inc.*, 228 Cal. Rptr. 3d 336, 342 (Ct. App. 2018) (cleaned up).

As Google admits, Mot. 14 n.6, the California Supreme Court has at least three times stated that political affiliation is protected. *See Marina Point, Ltd. v. Wolfson*, 640 P.2d 115, 117 (Cal. 1982) ("Whether the exclusionary policy rests on the alleged undesirable propensities of those of a particular race, nationality, occupation, *political affiliation*, or age, in this context the Unruh Act protects individuals from such arbitrary discrimination." (emphasis added)); *Cox*, 474 P.2d at 1000 ("The shopping center may no more exclude individuals … who are black, *who are members of the John Birch Society, or who belong to the American Civil Liberties Union*, merely because of these characteristics or associations, than may the City of San Rafael." (emphasis

---

[7] Google also concedes that Unruh applies to its online services. *See* Mot. 12-15 (not contesting the point). This is not the first time it has. *See Divino Group LLC v. Google LLC*, 2022 WL 4625076, at *8 (N.D. Cal. Sept. 30) ("The parties do not dispute that the Unruh Act applies to a website that hosts videos posted by members of the public."). Google's concession is unsurprising given that California courts have repeatedly extended Unruh to online services like Gmail. *See, e.g.*, Compl. ¶9 (collecting cases).

[8] In the RNC's view, the better reading of *Harris* and *Koebke* is that the second and third parts of the framework matter only if the class is economic, not personal. *See, e.g.*, *Harris*, 805 P.2d at 886 ("The Consequences of Allowing Claims for *Economic* Discrimination." (emphasis added)). But even assuming the latter parts are relevant, Google has forfeited any contrary argument. Regardless, the RNC still plausibly alleges that both parts support protection.

added)); *Harris*, 805 P.2d at 884 n.10. In fact, in the seminal California Supreme Court decision laying out the framework, the court concluded that political affiliation is a personal characteristic: "Again, the examples [from other States] relate almost exclusively to personal, as opposed to economic, characteristics and attributes such as personal appearance, sexual orientation, family responsibilities, residence, and *political affiliation.*" *Id.* (emphasis added). And for good reason: One's political affiliation is substantially intertwined with one's "deeply held personal beliefs and core values." *Koebke*, 115 P.3d at 1221. This alone dooms Google's argument. *See Muniz v. United Parcel Serv., Inc.*, 738 F.3d 214, 219 (9th Cir. 2013) ("Decisions of the California Supreme Court, *including reasoned dicta*, are binding on us as to California law." (emphasis added)).

Right-of-association precedent further confirms that political affiliation is a personal characteristic. Unruh, like other civil rights acts, often extends fundamental rights that protect against actions by the government to also protect against actions by private businesses. *Cf. Harris*, 805 P.2d at 883 n.9. Here, Unruh extended the right to associate against private businesses. And it's an age-old principle that the government can't discriminate against a person's political affiliation. *See, e.g.*, *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 75 (1990) ("[P]romotions, transfers, and recalls after layoffs based on political affiliation or support are an impermissible infringement on the First Amendment rights of public employees.").[9] And many States have protected against political-affiliation discrimination. *See generally* E. Volokh, *Bans on Political Discrimination in Places of Public Accommodation and Housing*, 15 N.Y.U. J.L. & Liberty 490 (2022).

**2.** There is no legitimate business interest for an email provider to subordinate politically affiliated emails. "[T]he particular business interests of the [establishment] in maintaining order, complying with legal requirements, and protecting a business reputation or investment" are generally the type of interests "sufficient to justify distinctions among its customers." *Harris*, 805 P.2d at 884. No such interest exists here, and there is no "business interest"—especially not from *the* market-dominant communications firm—in systematically choking off one major national political party's ability to communicate with the millions of Gmail users who requested the emails.[10] Nor is Google legally required to send the RNC's emails to spam.

---

[9] *See also, e.g.*, *Eu v. San Francisco Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 224 (1989); *Elrod v. Burns*, 427 U.S. 347, 359 (1976); *Am. Sugar-Ref. Co. v. State of Louisiana*, 179 U.S. 89, 92 (1900).

[10] It is no answer to say that Google has a legitimate interest in filtering spam. The point is that Google is not filtering based on the economic criteria of "spam filtering is good for business"; the point is that Google is intentionally discriminating based on the personal characteristic of "political affiliation." There is no legitimate business interest in targeting this personal characteristic.

1   Nor does political-affiliation discrimination help business reputation or investment. Whether the RNC's

2   email is in the requestor's inbox or spam folder, Google still gets "full and timely payment for the … services

3   [it] provides," *i.e.*, the user's data, which Google uses to make money. *Harris*, 805 P.2d at 884; *see supra* 7-8.

4   Thus, there is no legitimate business reason for Google's discriminatory practice.

5      **3.** The consequences for allowing Unruh suits for political-affiliation discrimination are outweighed

6   by Unruh's purpose. Any consequence is justified because allowing these claims outweighs preventing them.

7   Discrimination based on political affiliation is harmful; it's discrimination based on a personal characteristic

8   fundamental to a person's identity, and there is a reason why other States have barred such discrimination

9   by private businesses. *See supra* 12-13.[11] Recognizing claims against political-affiliation discrimination

10  compensates victims of such discrimination and deters future discrimination. Allowing these claims would

11  not require courts to make "microeconomic decisions [that they] are ill equipped to make." *Harris*, 805 P.2d

12  at 887. Nor is this a scenario where the establishment was encouraged to adopt a "neutral criteria … to

13  avoid invidious discrimination in fact as well as in appearance." *Id.* at 889. At best, Google has adopted a

14  *vague standard* that requires discretionary choices in the application of that standard. Such a system increases

15  the risk of invidious discrimination, especially because Google generally censors without explanation.

16      Google makes no structured argument that political affiliation does not meet each part. Instead,

17  Google points to three irrelevant federal district-court opinions. Mot. 14. First, *Williams v. City of Bakersfield*,

18  2015 WL 1916327 (E.D. Cal. Apr. 27), concluded that "the Unruh Act protections are limited to the

19  characteristics identified in" the statute, even though that sharply conflicts with longstanding California

20  precedent. *Id.* at *6. And *Huber v. Biden*, 2022 WL 827248 (N.D. Cal. Mar. 18), merely noted that the plaintiff

21  cited no "authority holding the Unruh Act applies to discrimination on the basis of viewpoints or content

22  of speech," even though the Unruh claim here involves political-affiliation discrimination and the RNC has

23  backed up its claim. *Id.* at *10. Finally, *Kenney v. City of San Diego*, 2013 WL 5346813 (S.D. Cal. Sept. 20),

24

25  *Cf. Candelore*, 228 Cal. Rptr. 3d at 348 ("[W]hile our Supreme Court recognized in *Harris* that vendors may pursue legitimate
    business interests by making *economic* distinctions among customers, it held such distinctions were permissible because they
26  employed criteria that could conceivably be met by any customer, regardless of the customer's personal characteristics.").

27  [11] The nature and scope of Google's discrimination, as plausibly alleged by the RNC, is simply unprecedented. So it's hard to
    imagine what "potential consequences" could be worse than Google discriminating against one of the two major political parties
28  in a way that demonstrably hindered it from communicating with millions of Americans during key periods of election fundraising
    and community building.

does not even address the issue because both parties "conceded" no Unruh claim was stated. *Id.* at *3.

**B.  Google's suppression is intentional discrimination based on a personal characteristic.**

**1.** The events over the nine months before this suit plausibly show that Google is intentionally discriminating based on political affiliation. At approximately the same time each month, Google consigned nearly all the RNC's emails to the Gmail user's spam folder. Compl. ¶¶30-52. From the beginning, the RNC has used its best efforts to work with Google to resolve the problem. *Id.* Since long before the email blocking, as now, the RNC takes great pains to ensure that every email it sends is to someone who requested it. *See id.* ¶¶22-24. Yet Google has still relegated millions of RNC emails *en masse* to donors' and supporters' spam folders during pivotal points in election fundraising and community building.

The RNC has also contracted with an email-deliverability platform that allows it to optimize its email inboxing by ensuring that the RNC follows best practices. *Id.* ¶24. And the RNC has run many internal tests to assess what could be causing Google to relegate nearly all its emails to spam. *See, e.g., id.* ¶¶33, 36. For example, Google at one point claimed that it was the RNC's increase in recipient complaints. The RNC checked whether this was true using an industry standard tool. It wasn't: That tool revealed there was in fact "no increase in user complaints preceding periods when its inboxing rate fell to nearly 0%." *Id.* ¶36. The RNC had also "submitted information to Google, such as the email address from which its emails were sent, the displayed name of the sender, the subject line, and preview text using a Google form designed to collect this information to avoid mislabeling a sender's email as spam." *Id.* ¶37. Nothing worked—not even following Google's "training on 'Email Best Practices.'" *Id.* ¶¶46-47.

Plus, the same type of *en masse* relegation to spam does not happen with other popular email platforms, such as Yahoo! Mail and Microsoft's Outlook Mail. "Although those platforms have an identical interest to Google in limiting 'spam' to their users, they did not conceal all (or nearly all) of the RNC's emails from its supporters at any point." *Id.* ¶53. In fact, "the inboxing rates on these platforms did not reflect *any* dramatic decrease in inboxing rates, let alone the inboxing rate of nearly 0%." *Id.*

Google was aware that the emails being consigned to spam were "expected to be top-performers" and during key election fundraising times. *E.g., id.* ¶¶39, 48. It didn't matter whether the emails were about donating, voting, or community outreach. And it didn't matter that the emails were sent to Gmail users who requested them. *See id.* ¶¶22-24. Nor did it matter that the RNC has done its best to cooperate with

1    Google. Indeed, throughout 2022, the RNC engaged with Google month after month to obtain an

2    explanation and a solution. But every explanation has been wrong, and every solution has failed. *See, e.g., id.*

3    ¶¶49-51, 57-58. Google continued to hide the RNC's emails in spam, and then Google fell silent, refusing

4    even to discuss the issue. *E.g., id.* ¶¶49-50.

5        From the well-pleaded allegations, the most reasonable inference from Google's pattern of conduct

6    is that Google is intentionally relegating critical RNC emails to the spam folder because it's the RNC sending

7    them. *See Grundy v. Walmart Inc.*, 2018 WL 5880914, at *4 (C.D. Cal. June 22) ("[C]ourts routinely consider

8    patterns of conduct in drawing plausible inferences of intentional racial discrimination."). The RNC need

9    only "include some factual context that gives rise to a plausible inference of discriminatory intent." *Nia v.*

10   *Bank of Am., N.A.*, 603 F. Supp. 3d 894, 906 (S.D. Cal. 2022) (cleaned up). And it has done far more.

11       Evidence of disparate impact also "may be probative of intentional discrimination." *Harris*, 805 P.2d

12   at 893; *see Koebke*, 115 P.3d at 1229. This is one of those cases; there's plenty of evidence of disparity. For

13   example, "a recent study by researchers at North Carolina State University … found that Google's Gmail

14   labels *significantly* more campaign emails from Republican political candidates as spam than campaign emails

15   from Democratic political candidates." Compl. ¶54.[12] And the study found no similar disparity in other

16   major email providers. *E.g.*, Ex. I at 1. This reinforces that Google is intentionally relegating RNC emails

17   to spam because it's the RNC sending them.

18       **2.** Google tries to undercut the above plausible allegations. But each criticism falls short.

19       **a.** Google's main response is that there might be other reasons for Google's apparent

20   discrimination. Never mind that the RNC has run tests refuting those other reasons. And never mind that

21   the RNC hired a leading email-deliverability platform and used industry-standard tools. *E.g., id.* ¶¶24-25.

22   And never mind that the RNC followed Google's own suggestions and best practices. *E.g., id.* ¶¶36-38. The

23   RNC "respectfully submits" that the "far more plausible" inference from Google's refuted explanations

24   and its failed suggested solutions is that Google is intentionally relegating critical RNC emails to the spam

25   folder because it's the RNC sending them. Mot. 7. But at the very least, the inference is *plausible*—which is

26

27   ───────────────
     [12] With information outside the complaint, Google tries to discount the study because "the researchers have noted that they did
     not take into account how user feedback impacts Gmail's spam filtering," Mot. 9, but the censored emails at issue in this case
     were all sent to users who requested them, *e.g.*, Compl. ¶¶1, 22. It's a reasonable inference that user feedback should not matter.

28   And at this phase, doubts must be resolved in the RNC's favor.

1   all that is required at the motion-to-dismiss phase. *See, e.g., Anderson News, LLC v. Am. Media, Inc.*, 680 F.3d

2   162, 190 (2d Cir. 2012) ("But on a Rule 12(b)(6) motion it is not the province of the court to dismiss the

3   complaint on the basis of the court's choice among plausible alternatives.").[13] This is all the more true

4   because the court must accept all the "factual allegations of the complaint as true and construe them in the

5   light most favorable to" the RNC. *OSU Student All. v. Ray*, 699 F.3d 1053, 1061 (9th Cir. 2012).

6   **b.** Google repeatedly claims that the "Complaint does not explain why … Google would target the

7   RNC's emails only at the end of each month." Mot. 6; *see* Mot. 8. Except the complaint does several times:

8   "[T]his end of the month period is historically when the RNC's fundraising is most successful." Compl. ¶2;

9   *see, e.g., id.* ¶¶28, 70. And it's widely known within the online fundraising industry that end-of-month

10   messaging is particularly effective.

11   **c.** Google insists the A/B test undermines the RNC's plausible allegations of intentional

12   discrimination. Mot. 8-9. Specifically, Google claims that "the RNC admits[] the A/B test 'suggests that

13   Google is not suppressing RNC emails based on their communicative content,' *i.e.*, based on the political

14   positions expressed by the RNC." Mot. 8. To begin, the RNC's emails involve a broad swath of information

15   including "donating, voting, or community outreach," Compl. ¶2, so the "communicative content" of the

16   censored emails is not always (or even often) "political positions expressed by the RNC." So contrary to

17   Google's contention, "political positions" are not the censored emails' common denominator. Rather, the

18   common denominator for every email is *political affiliation—i.e.*, the RNC is sending them. Given that and

19   that the Court must take all inferences in the RNC's favor, the A/B test supports intentional discrimination.

20   Google also suggests that "because both Version *A* and Version *B* admittedly pointed to an RNC

21   donation page, the A/B test also strongly suggests that Gmail does not treat the RNC's emails any

22   differently based on the fact that they are sent *by the RNC*." Mot. 8-9 (cleaned up). It's unclear how Google

23   justifies the inference, let alone how the opposite inference is unreasonable. An internal test revealed an

24   unexplainable reason for some emails going to spam while other materially identical emails did not. Compl.

[13] *See also, e.g., Starr*, 652 F.3d at 1216 ("If there are two alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6). Plaintiff's complaint may be dismissed only when defendant's plausible alternative explanation is so convincing that plaintiff's explanation is implausible." (cleaned up)); *Doe v. Columbia Univ.*, 831 F.3d 46, 57 (2d Cir. 2016) ("*Iqbal* does not require that the inference of discriminatory intent supported by the pleaded facts be the *most plausible* explanation of the defendant's conduct. It is sufficient if the inference of discriminatory intent is plausible."); *Menaker v. Hofstra Univ.*, 935 F.3d 20, 32 n.38 (2d Cir. 2019).

1  ¶¶33-34. It's not the RNC's burden at the motion-to-dismiss phase to fathom the precise method by which

2  Google is intentionally discriminating against the RNC. Given everything that happened over the eight

3  months following the test, a reasonable inference from the test is that the common denominator—the fact

4  that the RNC is sending the email—is a plausible explanation.

5       **d.** To suggest that it's implausible that Google is intentionally discriminating against the RNC,

6  Google points out that it "gave the RNC multiple 'suggestions'" to improve the RNC's inboxing rate and

7  that at other times of the month, the RNC's inboxing rate is high. Mot. 8. But pointing out that Google

8  could've discriminated more often and more invidiously is hardly a strong defense to the many allegations

9  at the motion-to-dismiss phase indicating intentional discrimination based on political affiliation. That's

10  especially true because nothing Google suggested actually worked, and then it stopped communicating. *E.g.*,

11  Compl. ¶¶46-47.

12  **III.  The RNC has stated a claim under California's unfair competition law.**

13       California's unfair competition law ("UCL") prohibits "any unlawful, unfair or fraudulent business

14  act or practice." Cal. Bus. & Prof. Code §17200. The RNC has plausibly alleged the first two.

15       **A.  Google's conduct is unlawful and unfair.**

16       **1.** Google agrees that if the RNC has stated its other claims, the RNC plausibly alleges unlawfulness.

17  *See* Mot. 17; *see also supra* 4-11 (common carrier), *supra* 11-18 (Unruh); *infra* 19-23 (tortious interference).

18       **2.** Alternatively, Google's conduct is unfair. "Unfair" conduct is framed broadly "to enable judicial

19  tribunals to deal with the innumerable new schemes which the fertility of man's invention would contrive."

20  *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 973 P.2d 527, 540 (Cal. 1999) (cleaned up). That's why a

21  business practice may be unfair without being "proscribed by some other law." *In re Adobe Sys., Inc. Privacy*

22  *Litig.*, 66 F. Supp. 3d 1197, 1226 (N.D. Cal. 2014) (cleaned up); *see In re Zoom Video Commc'ns Inc. Priv. Litig.*,

23  525 F. Supp. 3d 1017, 1047 (N.D. Cal. 2021). California courts have stated three tests:

24       (1) "whether the challenged conduct is tethered to any underlying constitutional, statutory
25       or regulatory provision, or that it threatens an incipient violation of an antitrust law, or
         violates the policy or spirit of an antitrust law";

26       (2) "whether the practice is immoral, unethical, oppressive, unscrupulous or substantially
         injurious to consumers"; or

27       (3) "whether the practice's impact on the victim outweighs the reasons, justifications and
         motives of the alleged wrongdoer."

28

1   *Doe v. CVS Pharmacy, Inc.*, 982 F.3d 1204, 1214-15 (9th Cir. 2020).

2          Under the first test, "[p]laintiffs need merely to show that the effects of [Google]'s conduct are

3   comparable to or the same as a violation of the law." *Zoom*, 525 F. Supp. 3d at 1047 (cleaned up). Google's

4   conduct is at least "comparable" to violations of the other asserted laws. The second and third tests are also

5   satisfied. For substantially the same reasons, Google's practice challenged here is "immoral, unethical,

6   oppressive, unscrupulous or substantially injurious to consumers." *Doe*, 982 F.3d at 1214 (cleaned up). The

7   danger of permitting corporate interference in the communications of political organizations cannot be

8   overstated. And the harm caused by Google's business practices to the RNC, its community, and the public

9   far outweighs any "reasons, justifications [or] motives" Google could have for its conduct. *Id.* at 1215.

10          **B.  Google's conduct caused the RNC economic damage.**

11          The RNC plausibly alleges that Google relegated critical RNC emails to spam during pivotal periods

12   of donation. *See, e.g.*, Compl. ¶¶ 2, 5, 8, 16-17, 21, 39. As plausibly alleged, the loss of donations would not

13   have occurred without the *en masse* relegation. *Id.*

14          Google's main argument against the RNC's UCL claims that do not rely on fraud is that the RNC

15   could've avoided the harm by trying to "contact [its] supporters through [other] channels" and that

16   "supporters can make donations in a variety of ways, including on the RNC's website, without involving

17   Gmail." Mot. 17-18. "The Internet is a unique medium that offers legitimate businesses a low-cost means

18   to promote themselves and their wares and in turn fosters competition in the marketplace. Both consumers

19   and Congress have come to view e-mail, when fairly employed, as an established and worthwhile device in

20   the toolbox of accepted marketing practices." *Gordon v. Virtumundo, Inc.*, 575 F.3d 1040, 1045 (9th Cir. 2009);

21   *see, e.g.*, 15 U.S.C. §7701(1) (congressional finding). As alleged, "[t]he ability of the RNC to reach its

22   supporters through email is indispensable to its basic operations…. [F]or many RNC supporters, the means

23   of communication through which the RNC can engage with them, and can solicit their support, is Gmail."

24   Compl. ¶19; *e.g., id.* ¶¶20-22, 57-58. The only reasonable inference is that email campaigns are effective ways

25   to get donations, just like emailing for commercial businesses are effective ways to increase sales.

26          **IV.  The RNC has stated a claim for intentional interference with prospective economic
            relations.**

27

28          The RNC has plausibly alleged all five elements of intentional tortious interference: (1) an economic

---

1   relationship between the plaintiff and a third party that has a probability of future economic benefit to the

2   plaintiff; (2) the defendant's knowledge of the relationship; (3) intentionally wrongful acts designed to

3   disrupt the relationship; (4) the actual disruption of the relationship; and (5) economic harm proximately

4   caused by the defendant's acts. *Roy Allan Slurry Seal, Inc. v. Am. Asphalt S., Inc.*, 388 P.3d 800, 803 (Cal. 2017).

5   **A.** The RNC has plausibly alleged an existing economic relationship with its supporters, who

6   subscribe to the RNC's email communications, and that those relationships carry a probability of future

7   economic benefit to the RNC. Compl. ¶¶1, 19-22, 85. These are existing supporters and donors who had

8   requested the RNC to send them emails. *Id.* ¶¶1, 21-22.

9       Contra Google's contention, Mot. 19, the RNC need not name specific individuals with whom it

10   had relationships; it only needs to allege an ascertainable relationship. *See, e.g.*, *Code Rebel, LLC v. Aqua

11   Connect, Inc.*, 2013 WL 5405706, at *6 (C.D. Cal. Sept. 24) ("Although Plaintiff does not specifically identify

12   existing third parties with whom there was an existing economic or business relationship, Plaintiff's

13   allegation of interference with 'actual and potential customers' is sufficient to satisfy federal pleading

14   requirements."). At this stage, there need only be "specific facts putting the defendant on notice that a third-

15   party, indeed, existed." *Logistick, Inc. v. AB Airbags, Inc.*, 543 F. Supp. 3d 881, 890 (S.D. Cal. 2021). Given

16   that Google routinely relegates to spam nearly all emails the RNC sends its Gmail-user supporters (and who

17   even solicited RNC emails), the RNC has an ascertainable relationship with identifiable supporters.

18       Google cites *Westside Center Assocs. v. Safeway Stores 23, Inc.*, 49 Cal. Rptr. 2d 793 (Ct. App. 1996),

19   Mot. 19, and other cases that reject "an expansive view of the tort" that the RNC does not rely on. While

20   attacking a strawman, Google ignores the court's conclusion in *Westside Center* that the tort "protects the

21   expectation that the relationship eventually will yield the desired benefit, not necessarily the more

22   speculative expectation that a potentially beneficial relationship will eventually arise." 49 Cal. Rptr. 2d at

23   804. The RNC's complaint alleges "an existing relationship with an identifiable buyer" in the many

24   thousands of existing supporters who have asked to receive the RNC's emails. *Id.* at 806. The RNC is not

25   merely hoping for future relationships; it is trying to protect the relationships it has already built. Those

26   relationships must be "identifi*able*," but nothing in *Westside Center* or any other case Google cites requires

27   the RNC to disclose the names of its subscribers in public filings, let alone at the motion-to-dismiss phase.

28   *Id.* (emphasis added). Moreover, the claim extends even to speculative expectancies when important public

1    policies such as "favoring fair elections" are implicated, as they are here. *Id.* at 804.

2            Finally, the RNC's present relationships with its email subscribers indisputably create a high

3    probability of future benefit. The RNC has alleged that Google's discrimination "caused the RNC to lose

4    valuable revenue in California and the rest of the county." Compl. ¶3. But for Google diverting the RNC's

5    emails, some of the RNC's many subscribers would have interacted with the emails, as they do every month,

6    including by donating to the RNC's cause.

7        **B.** The RNC has plausibly alleged that Google knew about the RNC's relationship with its email

8    subscribers. Google does not dispute that it knew about the email consigning. Nor could it, as the RNC

9    repeatedly urged Google to stop interfering with the RNC's relationship with its supporters, and Google

10    responded multiple times. *E.g.*, *id.* ¶¶3, 30-32, 48-49. Instead, Google illogically insists that it didn't know

11    of the relationships because they don't exist. *See* Mot. 20. But the RNC's frequent communications with

12    Google only underscore that Google's actions were disrupting real relationships with real people.

13        **C.** The RNC has alleged "a showing of wrongfulness" by disrupting the relationship between the

14    RNC and its supporters who use Gmail. *Della Penna v. Toyota Motor Sales, USA, Inc.*, 902 P.2d 740, 741 (Cal.

15    1995). The RNC need not allege that Google's "conduct amounted to an independently tortious act, or was

16    a species of anticompetitive behavior proscribed by positive law, or was motivated by unalloyed malice."

17    *Id.* The RNC alleges that Google intentionally diverted RNC emails to suppress its political messaging

18    during an election season and key fundraising periods. *See supra* 9-10, 14-18. That is independently wrongful

19    for at least three reasons: (1) it is political discrimination against the RNC, (2) it is dishonest to Google's

20    users and the public, and (3) Google repeatedly lied about it. Compl. ¶29, 36, 55, 98.

21        **D.** The RNC has plausibly alleged actual disruption of the relationship between it and its email

22    subscribers. Google argues that a single excerpted portion of paragraph 88 of the complaint is a conclusory

23    allegation that does not support actual disruption. Mot. 21. Even if that were correct, Google ignores the

24    rest of the complaint, which alleges the RNC's relationships with supporters and donors were disrupted

25    when Google hid the RNC's emails for months on end. *E.g.*, Compl. ¶¶32, 35-36, 41, 43, 45, 47, 51-52. It

26    alleged that the diversions were intentional and politically motivated. *See, e.g.*, *supra* 9-10, 15-18. It alleged

27    that the diversions disrupted the relationships in several ways, including lost ability to communicate voting

28    information and other political messaging during the midterm elections, injury to the RNC's relationship

1  with its community, impeding efforts to engage voters and support campaigns, and loss of communication

2  about community outreach, getting out to vote and the election, and economic damage. *E.g.*, Compl. ¶¶2-

3  3, 11, 21, 57-58. It also alleged that these disruptions occurred during "the most effective and important

4  period for these transactions between the RNC and its supporters," and at "a time when they are particularly

5  attuned to politics and expect the RNC to be communicating with them." *Id.* ¶¶28, 58.

6  **E.** Finally, the RNC has plausibly alleged economic harm caused by Google's conduct. Google's

7  wrongful acts directly and proximately caused the actual disruption of the RNC's relationships with its

8  donors and supporters. *See supra* 19 (arguing economic damages for UCL).

9  **V.   The RNC has stated a negligent-interference-with-prospective-economic-relations claim.**

10  Google agrees that the only issue that does not overlap with intentional interference is whether the

11  RNC has plausibly alleged that Google owed the RNC a duty of care. *See* Mot. 21. The RNC has done that.

12  When, as here, a claim involves an out-of-privity third party, California courts assess whether the defendant

13  owed the plaintiff a duty by applying six factors: "(1) the extent to which the transaction was intended to

14  affect the plaintiff, (2) the foreseeability of harm to the plaintiff, (3) the degree of certainty that the plaintiff

15  suffered injury, (4) the closeness of the connection between the defendant's conduct and the injury suffered,

16  (5) the moral blame attached to the defendant's conduct and (6) the policy of preventing future harm."

17  *J'Aire Corp. v. Gregory*, 598 P.2d 60, 63 (Cal. 1979). All six factors favor finding a duty.

18  The first factor (how much the transaction was intended to affect the plaintiff) strongly favors

19  finding a duty because the RNC has plausibly alleged that Google is either intentionally discriminating

20  against the RNC based on its political affiliation or consigning the RNC's emails to spam in bad faith. *See*

21  *supra* 9-10, 15-18. Google counters that spam filtering is "a benefit and service to its users." Mot. 22. That

22  misses the point. The conduct at issue was intended to harm the RNC. Regardless, the RNC's emails are

23  not spam; the Gmail users requested them. So whatever benefit Google claims is irrelevant.

24  Likewise, the second factor (foreseeability of harm) favors a duty. At the pleading stage, there need

25  only be "specific facts putting the defendant on notice that a third-party, indeed, existed." *Logistick*, 543 F.

26  Supp. 3d at 889. The RNC repeatedly told Google that Google's spam filtering was harming its relationship

27  with its email subscribers, *e.g.*, Compl. ¶¶30-32, 48-49, putting Google on notice that it needed to exercise

28  due care. Yet Google continued to downgrade the RNC's emails. Google was aware of what it was doing

to the RNC every month. Google disputes that allegation, but at this stage the Court must accept it as true.

The third factor (the certainty of the harm) also favors a duty. The RNC has alleged financial harm, including a loss of revenue and a drop in donations. *See* Compl. ¶¶2, 5, 8, 16-17, 21. The RNC has also alleged a disruption of its relationship with its subscribers. *Id.* ¶¶2-3, 5, 8, 16-17. And the RNC has alleged that virtually all its emails, at crucial times, were diverted away from its subscribers' inboxes. *See id.* ¶¶28-40.

The fourth, fifth, and sixth factors favor a duty, too. Google's conduct is directly connected to the loss of funds from RNC supporters because Google prevented crucial RNC emails from reaching inboxes. Next, Google's diversion of the RNC's emails is morally blameworthy because it unjustifiably blocked the RNC's speech based on political affiliation or in bad faith. *See supra* 9-10, 15-18 (common carrier and Unruh); *supra* 18-19 (UCL). Finally, public policy strongly supports the prevention of Google's arbitrary interference in the economic and political relationships of its users and groups like the RNC because of, *inter alia*, Google's dominance of the email market, the national interest in promoting political expression and association, and the need for Americans to stay informed and provide financial support for parties and candidates of their preferred political ideology.

The other cases Google cites are also inapplicable. Mot. 22. The RNC is not a simple online marketer, as described in *Cyber Promotions, Inc. v. Am. Online, Inc.*, 948 F. Supp. 456, 462 (E.D. Pa. 1996). Nor are its communications email advertisements meant to bombard Google's servers. They are political communications to individuals who asked to receive them. *See* Compl. ¶¶19-26. Google's actions affected, and were intended to affect, the RNC. *See supra* 9-10, 15-18.

## VI.   Google's last resort to 47 U.S.C. §230 fails.[14]

Google clings to §230 to avoid liability for its discrimination and bad-faith conduct. But this case does not involve conduct that Congress intended to immunize or that §230's ordinary meaning in fact immunizes. Section 230 "was not meant to create a lawless no-man's-land on the Internet." *Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1164 (9th Cir. 2008) (en banc). It merely "provides internet platforms with limited legal protections." *Henderson v. Source for Pub. Data, L.P.*, 53 F.4th

---

[14] The Supreme Court currently has a §230 case before it. *See Gonzalez v. Google LLC*, 2 F.4th 871 (9th Cir. 2021), *cert. granted*, 143 S. Ct. 80 (2022). The RNC preserves arguments on the proper understanding of §230's scope.

110, 119 (4th Cir. 2022). Google has failed to meet its burden of showing its §230 affirmative defense.[15]

**A. Section 230(c)(2) does not immunize Google.**

    **1. Section 230(c)(2) does not bar the RNC's claims for damages or prospective relief.**

Google says both subparagraphs (A) and (B) immunize its conduct. Google is wrong.

Both subparagraphs in §230(c)(2) turn on the proper understanding of the listed "materials" and the objectionable-materials clause—*i.e.*, "obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable." Google claims shelter only under the terms "harassing[]" and "otherwise objectionable." Mot. 25, 26. The RNC's censored emails are neither.

*"Harassment."* The RNC's emails—which the RNC sends only to people who request to receive them—are obviously not harassing. The term "harass" refers to the same harassment that the telephone-harassment statute prohibits. *See* 47 U.S.C. §223. But "the thrust of [that] statute is to prohibit communications intended to instill fear in the victim, not to provoke a discussion about political issues of the day." *United States v. Bowker*, 372 F.3d 365, 379 (6th Cir. 2004); *accord United States v. Lampley*, 573 F.2d 783, 787 (3d Cir. 1978); *United States v. Eckhardt*, 466 F.3d 938, 944 (11th Cir. 2006); *United States v. Juncaj*, 2023 WL 1447354, at *11 (D. Nev. Jan. 31). Indeed, the legal meaning of "harassment" is what "annoys, alarms, or causes substantial emotional distress to that person and serves no legitimate purpose." Black's Law Dictionary (11th ed. 2019). Google doesn't even try to meet those standards. It merely asserts that "Google, or its users, deem [the emails] 'harassing' or 'otherwise objectionable.'" Mot. 25. But the users—all of whom requested to receive the emails—did not consider them harassing, and Google knew as much. *See* Compl. ¶¶19-26; *supra* 9-10, 15-18. And if Google thinks the emails constitute "harassment," it must provide evidence—or at least *argument*—that the emails meet the legal standard. Google did not do so at the time or any time. And nor could it.

*"Otherwise Objectionable."* The emails also were not "otherwise objectionable." The Ninth Circuit has "not … determine[d] the precise relationship between the term 'otherwise objectionable' and

---

[15] Google suggests that doubt must be resolved in favor of immunity. *See* Mot. 24. But its suggestion is deceptive. Google wrenches a statement from *Roommates.com* directed solely to §230(c)(1) and, more specifically, to claims based on "promot[ing] or encourag[ing] … [a third parties'] illegality" and tries to transmogrify the statement into one supporting a broad proposition about all §230 cases. 521 F.3d at 1174. But it's never a fair reading of precedent to "comb [opinions] for stray comments and stretch them beyond their context." *Brown v. Davenport*, 142 S. Ct. 1510, 1528 (2022). Yet that is precisely what Google does. Section 230 is an affirmative defense, which is generally the *defendant's* burden to establish.

1   the seven categories that precede it." *Enigma Software Grp. USA, LLC v. Malwarebytes, Inc.*, 946 F.3d 1040,

2   1052 (9th Cir. 2019). But it's "clear" that "providers do not have unfettered discretion to declare online

3   content 'objectionable.'" *Id.* at 1047. The canon of *ejusdem generis* reveals the phrase's narrow scope. When

4   "a more general term follows more specific terms in a list, the general term is usually understood to embrace

5   only objects similar in nature to those objects enumerated by the preceding specific words." *Epic Sys. Corp.*

6   *v. Lewis*, 138 S. Ct. 1612, 1625 (2018). Here, each listed category "refer[s] to speech that was regulated by

7   the rest of the CDA [Communications Decency Act]." A. Candeub & E. Volokh, *Interpreting 47 U.S.C.*

8   *§230(c)(2)*, 1 J. Free Speech L. 175, 176 (2021). So under "the *ejusdem generis* canon, 'otherwise objectionable'

9   should be read as limited to material that is likewise covered by the CDA." *Id.* The surplusage canon

10  confirms this reading because Google's "unbounded reading of ['otherwise objectionable'] would render

11  [the preceding] words misleading surplusage." *Yates v. United States*, 574 U.S. 528, 546 (2015). Thus,

12  "'otherwise objectionable' [does] not cover speech that is objectionable based on its political content [or

13  affiliation], which Congress didn't view in 1996 as more subject to telecommunications regulation, and

14  didn't try to regulate elsewhere in the CDA." Candeub & Volokh, *supra*, at 184; *see NetChoice*, 49 F.4th at

15  468 (Section 230(c)(2) "says nothing about viewpoint-based … censorship."). Nor does it cover "materials

16  [that simply] pose a problem" for, or are "undesirable to," the platform. *Song fi Inc. v. Google, Inc.*, 108 F.

17  Supp. 3d 876, 883 (N.D. Cal. 2015) (cleaned up).

18          Google argues that §230(c)(2) "'establishes a subjective standard,'" under which Google "'decide[s]

19  what online material is objectionable.'" Mot. 26 (quoting *Malwarebytes*, 946 F.3d at 104). There are at least

20  two problems with that argument. First, Google's argument does not answer the relevant legal question—

21  it raises a factual one. If Google blocked the emails because it found them "otherwise objectionable," it

22  must provide evidence that at the time it considered it as much. After all, a bald assertion that one meets

23  the standard doesn't satisfy a subjective standard. *Cf. Koirala v. Thai Airways Int'l, Ltd.*, 126 F.3d 1205, 1211

24  (9th Cir. 1997) (explaining that "subjective standards are nearly always satisfied by circumstantial proof,"

25  not the party's mere say-so (cleaned up)). But Google provides no evidence or argument that the emails

26  were objectionable. By contrast, the RNC provides many plausible allegations that Google did not consider

27

28

1    the emails objectionable. Second, even assuming "otherwise objectionable" were a subjective standard,[16]

2    *Malwarebytes* expressly left open "the precise relationship between the term 'otherwise objectionable' and

3    the seven categories that precede it." 946 F.3d at 1052. The *ejusdem generis* canon limits the phrase's scope.

4    This limited scope does not cover the RNC's benign emails.

5                        **a.   Subparagraph (A) does not shield Google's conduct.**

6           Google agrees that if the RNC plausibly alleged that Google did not "in good faith … consider[]"

7    the RNC's emails to be "harassing[] or otherwise objectionable," §230(c)(2)(A), then subparagraph (A) does

8    not bar the RNC's claims, *see* Mot. 27. The RNC met its undemanding burden at the motion-to-dismiss

9    phase, especially under the proper understanding of the otherwise-objectionable clause. The emails are

10   plainly not spam because they are only sent to Gmail users who requested them. And the email's content

11   comes nowhere close to anything "offensive," let alone similar to "obscene, lewd, lascivious, filthy,

12   excessively violent, [or] harassing" materials; the content was benign. So it's unsurprising that Google

13   doesn't even claim that the RNC's emails are objectionable. As plausibly alleged, there is no good-faith

14   explanation for finding the emails to be "spam." At this stage, the Court must accept that. Google complains

15   about the ramification of having to "litigate their spam-filtering decisions on a case-by-case basis." Mot. 27

16   n.8. But this is not a case about "a mistaken choice to block" a few marginal emails. *e360Insight, LLC v.

17   Comcast Corp.*, 546 F. Supp. 2d 605, 609 (N.D. Ill. 2008). Rather, this case is about Google's consistent

18   blocking of millions of emails from the same sender. When, as here, the plaintiff adequately alleges bad

19   faith, "the Court cannot dismiss [the claims] on the basis of Section 230(c)(2)" at the pleading stage. *Enhanced

20   Athlete Inc. v. Google LLC*, 479 F. Supp. 3d 824, 831 (N.D. Cal. 2020); *see e-ventures Worldwide, LLC v. Google,

21   Inc.*, 188 F. Supp. 3d 1265, 1273 (M.D. Fla. 2016) (same); *supra* 9-10, 15-18 (bad faith and discriminatory).

22                        **b.   Subparagraph (B) also does not shield Google's conduct.**

23          Section 230(c)(2)(B) does not bar the RNC's claims for at least three reasons.

24          **i.** For subparagraph (B) to apply, the material restricted must actually be "harassing[] or otherwise

25   objectionable." *See Zango, Inc. v. Kaspersky Lab, Inc.*, 568 F.3d 1169, 1176 (9th Cir. 2009) ("Kaspersky satisfies

26

27   [16] *Malwarebytes* did not actually establish a "subjective" standard for "otherwise objectionable" material. The phrase was used in
     passing, the court did not reason through that issue, and it expressly left open interpretation of the phrase "otherwise
     objectionable." The Supreme Court "has long stressed that the language of an opinion is not always to be parsed as though we

28   were dealing with the language of a statute." *Davenport*, 142 S. Ct. at 1528 (cleaned up).

1   the requirements of subsection (B) *so long as* the blocked items are objectionable material under

2   §230(c)(2)(A)." (emphasis added)). As alleged, the RNC's emails are not. *See supra* 24-26; Compl. ¶¶19-26.

3       **ii.** While subparagraph (A) protects good-faith censorship by the platform, subparagraph (B)

4   protects handing the censorship tools over to *users*. Here, however, Google is the one unilaterally consigning

5   the emails to spam, not its users. Though Google notes that "a user [can] mark[] a certain email as spam,"

6   Mot. 25, the RNC is not contesting Google's "technical means" that "enable" users to mark emails as spam,

7   §230(c)(2)(B), so the argument is misplaced. Rather, the complaint focuses on Google's unilateral blocking

8   of emails that users asked to receive. Google relies on *Zango*, but the Ninth Circuit did not confront this

9   interpretation of subparagraph (B). Instead, the panel accepted that, at least "[t]heoretically …, the user of

10  the … software then has the option whether to allow or reject the download of the potential malware-

11  carrying program." *Zango*, 568 F.3d at 1171. Google, by contrast, does not give the user the option to view

12  the email before it is marked as spam. Google is thus not taking actions "to enable or make available to

13  [users] the technical means to restrict access to material." §230(c)(2)(B). Google itself is restricting access.

14      **iii.** Section 230(c)(2) at most "immuniz[es] Internet companies' enforcement of private rules

15  analogous to restrictions on 'obscene, lewd, lascivious, filthy, excessively violent, [or] harassing'

16  communications—not of completely different rules that the companies might make up." Candeub &

17  Volokh, *supra*, at 183. The text makes clear that the provided "technical means" must be *for the purpose of*

18  restricting access to subparagraph (A) materials. The word "to" between "the technical means" and "restrict

19  access" equals the phrase "in order to." That phrase, in turn, is synonymous with the phrase "for purposes

20  of." Thus, the text requires the platform to provide tools for a specific purpose—"restrict[ing] access to

21  [subparagraph (A)] material"—and not some other illegitimate purpose. The term "consider" also does not

22  provide unbridled discretion. The provider cannot create a new category of materials to restrict access to.

23  Reading the term "consider" to allow *carte blanche* "block[ing] [of] online content for improper reasons"—

24  *i.e.*, reasons not in the objectionable-materials clause—would render the objectionable-materials clause

25  meaningless. *Malwarebytes*, 946 F.3d at 1049.

26      *Malwarebytes* is consistent with this reading of §230(c)(2). There, the Ninth Circuit held that

27  "§230[(c)(2)] does not provide immunity for blocking a competitor's program for anticompetitive reasons."

28  *Id.* at 1052. If without user input the provider is restricting access to materials under the "guise [of]

1   anticompetitive animus" rather than because they are covered by the objectionable-materials clause, then

2   (1) the technical means were not "enable[d] or ma[d]e available" for the statutorily protected purpose and

3   (2) neither the user nor the provider actually "consider[ed]" the materials to be "harassing[] or otherwise

4   objectionable" but a new category of material (*e.g.*, competition). Thus, the provider is not enforcing a

5   private rule like restrictions to "harassing" material but enforcing a made-up rule—anticompetition.

6        Here, the RNC plausibly alleges that the tool has an impermissibly discriminatory or bad-faith

7   purpose and that neither Google nor the relevant users actually "consider[ed]" the censored emails to be

8   "harassing[] or otherwise objectionable." *See supra* 9-10 (bad faith), 15-18 (intentional), 24-26 (not

9   considered harassing or objectionable). If "allegations of anticompetitive animus are sufficient to withstand

10   dismissal," then plausible allegations of bad-faith conduct, including political-affiliation discrimination, are.

11   *Malwarebytes*, 946 F.3d at 1045; *see West v. Shea*, 500 F. Supp. 3d 1079, 1088 (C.D. Cal. 2020) (rejecting that

12   "Congress intended CDA immunity to immunize viewpoint discrimination").

13          **c.  Four other considerations defeat Google's broad immunity arguments.**

14        **i.** Congress found that "[t]he Internet and other interactive computer services offer a forum for a

15   true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for

16   intellectual activity." 47 U.S.C. §230(a)(3). That finding supports denying immunity to "filtering of 'political

17   or religious content.'" Candeub & Volokh, *supra*, at 185.

18        **ii.** Section 230(c)'s title reinforces this reading. The "section is titled 'Protection for '*good samaritan*'

19   blocking and screening of *offensive* material' and … the substance of section 230(c) can and should be

20   interpreted consistent with its caption." *Roommates.com*, 521 F.3d at 1163-64 (emphases added). This is "yet

21   another indication that Congress was focused on potentially offensive materials, not simply any materials

22   undesirable to a content provider or user." *Song fi*, 108 F. Supp. 3d at 883. Plus, the crux of the RNC's

23   claims is that Google isn't using a neutral tool and that the censoring is not "accidental damage caused by

24   a good-faith attempt to protect another." *Good-Samaritan Law*, Black's Law Dictionary (11th ed. 2019).

25        **iii.** "Extending §230 immunity beyond the natural reading of the text can have serious

26   consequences." *Malwarebytes, Inc. v. Enigma Software Grp. USA, LLC*, 141 S. Ct. 13, 18 (2020) (statement of

27   Thomas, J.). Under Google's logic, §230 would protect companies who racially discriminate in removing

28   content. *Cf. id.* at 17, 18 (noting the concern). The Court should reject this "highly counterintuitive result."

1    *Yellen v. Confederated Tribes of Chehalis Rsrv.*, 141 S. Ct. 2434, 2448 (2021).

2        **iv.** Finally, the constitutional-doubt canon solidifies the RNC's reading. Many arguments raise

3    serious constitutional questions for Google's broad reading of §230. *See, e.g.*, P. Hamburger, *The Constitution*

4    *Can Crack Section 230*, Wall St. J. (Jan. 29, 2021), perma.cc/D455-HD5K (explaining that a broad reading of

5    §230 raises serious Commerce Clause and First Amendment issues); A. Candeub, *Reading Section 230 As*

6    *Written*, 1 J. Free Speech L. 139, 160-72 (2021); *Biden v. Knight First Amend. Inst. at Columbia Univ.*, 141 S. Ct.

7    1220, 1227 n.5 (2021) (Thomas, J., concurring) ("[S]ome commentators have suggested that immunity

8    provisions like §230 could potentially violate the First Amendment …."). When one interpretation "raise[s]

9    a serious doubt as to [the statute's] constitutionality," the court should adopt a "fairly possible"

10   interpretation that avoids the problem. *Zadvydas v. Davis*, 533 U.S. 678, 689 (2001) (cleaned up). The RNC's

11   reading is fairly possible and avoids many constitutional issues, so the Court should adopt it.

12               **2.   Regardless, §230(c)(2) does not bar the RNC's claims for prospective relief.**

13        In all events, §230(c)(2) doesn't bar claims for declaratory and injunctive relief. Under the

14   subheading "Civil liability," §230(c)(2) states: "No provider or user of an interactive computer service shall

15   be held *liable* on account of" §230(c)(2)(A), (B). In context, "liable" protects against only damages claims.

16        In civil suits, there are two distinct issues. One, a court must determine whether the defendant has

17   violated his legal duty or someone else's right and is thus legally responsible. Two, the court must decide

18   on a remedy, which can include damages, an injunction, etc. Devoid of context, §230(c)(2)'s "liable" can

19   refer to either issue. *Compare Civil Liability*, Black's Law Dictionary ("being legally obligated for *civil damages*"

20   (emphasis added)), *with Liability*, *id.* ("1.… being legally obligated …; legal responsibility to another …,

21   enforceable by civil remedy or criminal punishment … 2. (often pl.) A financial or pecuniary obligation.").

22        Context, however, reveals that "liable" is best read as referring only to damages. To begin, the

23   statute uses the past tense "held" when referring to liability. That indicates that "liable" is directed to

24   retrospective obligations (relief for past harm). Claims for injunctive relief involve *future/continuing*

25   obligations. Next, §230(e) distinguishes between a "cause of action" and "liability": "No *cause of action* may

26   be brought and no *liability* may be imposed under any State or local law that is inconsistent with this section."

27   (Emphases added.) When §230(c)(2) protects against being "held liable," it does not generally protect

28   against "cause[s] of action." This reading is confirmed by the constitutional-doubt canon. *See supra* 29.

**B.   Section 230(c)(1) does not preempt the RNC's claims.**

The RNC does not try "to treat [Google], under a state law cause of action, as a publisher or speaker." *Lemmon*, 995 F.3d at 1091 (cleaned up). For "[a] claim [to] treat[] the defendant as the publisher or speaker of any information," the claim must "seek[] to impose liability based on [the published] information's improper content." *Henderson*, 53 F.4th at 120-21. "In other words, to hold someone liable as a publisher at common law was to hold them responsible for the content's improper character." *Id.* at 122.[17] Google fails to meet the improper-content requirement. None of the RNC's claims seek to fault Google for the content of the censored emails, and none of the legal duties Google violated "turn on the content of" the RNC's emails. *Lemmon*, 995 F.3d at 1094 (cleaned up). And "[e]ven if [Google's] decision to not provide the [RNC's emails] could be described as a publisher's decision," §230(c)(1) still does not preempt the RNC's claims because the RNC's emails are "proper and lawful content." *Henderson*, 53 F.4th at 125. Section 230(c)(1) "applies only when the claim depends on the content's *impropriety*." *Id.* (emphasis added).

Concluding that §230(c)(1) does not bar the claims here fits with the Ninth Circuit "consistently eschew[ing] an expansive reading of the statute that would render unlawful conduct magically lawful when conducted online." *HomeAway.com, Inc. v. City of Santa Monica*, 918 F.3d 676, 683 (9th Cir. 2019) (cleaned up). For example, unlawful discrimination or bad-faith delivery (or refusal to deliver) of messages should not magically be immune because it occurs via the internet. *See* Oral Arg. Tr. 140:9-18 in *Gonzalez v. Google LLC*, No. 21-1333 (Feb. 21, 2023) (Q: "[W]hat about [the] dating hypothetical? The discrimination [that the company is] not going to match black people and white people, et cetera, what about that? Is that given 230's shield?" Google's Counsel: "Absolutely not, because any disparate treatment claim or race discrimination is saying you're treating people different regardless of the content."). The RNC's claims are holding Google responsible for its own conduct and thus are not barred by §230(c)(1).

## CONCLUSION

For these reasons, the RNC respectfully asks that this Court deny Google's motion to dismiss as to Counts 1 through 5 and 7. Alternatively, the RNC should be given leave to amend to cure any defect.

---

[17] *See* Oral Arg. Tr. 144:22-145:8 in *Gonzalez v. Google LLC*, No. 21-1333 (Feb. 21, 2023) (Q: "[Y]ou're happy with the *Henderson* test, the Fourth Circuit test?" Google's Counsel: "Yes…. [The *Henderson*] test is correct, and it's also the Ninth Circuit's test."); *cf. Milton H. Greene Archives, Inc. v. Marilyn Monroe LLC*, 692 F.3d 983, 993 (9th Cir. 2012) ("Judicial estoppel, generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument." (cleaned up)).

Date: February 27, 2023                    **DHILLON LAW GROUP INC.**

                             By:   /s/ *Harmeet K. Dhillon*
                                   Harmeet K. Dhillon
                                   Michael A. Columbo
                                   Jeremiah D. Graham
                                   Anthony J. Fusaro, Jr.
                                   DHILLON LAW GROUP INC.
                                   177 Post Street, Suite 700
                                   San Francisco, California 94108
                                   Telephone: (415) 433-1700
                                   *Counsel of Record for Plaintiff Republican National Committee*

                                   **CONSOVOY MCCARTHY PLLC**

                                   Thomas R. McCarthy (pro hac vice)
                                   Thomas S. Vaseliou (pro hac vice)
                                   Conor D. Woodfin (pro hac vice)
                                   CONSOVOY MCCARTHY PLLC
                                   1600 Wilson Blvd., Suite 700
                                   Arlington, VA 22209
                                   (703) 243-9423
                                   *Counsel for Plaintiff Republican National Committee*

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the above and foregoing has been served on all counsel of record, via the Court's CM/ECF system on February 27, 2023:

**PERKINS COIE LLP**

Abdul Kallon (pro hac vice)
AKallon@perkinscoie.com
Ryan Spear (pro hac vice)
RSpear@perkinscoie.com
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Telephone: 206.359.8000
Facsimile: 206.359.9000

Sunita Bali, Bar No. 274108
SBali@perkinscoie.com
Danielle Sivalingam, Bar No. 294369
DSivalingam@perkinscoie.com
Angie Kim, Bar No. 270503
AngieKim@perkinscoie.com
605 Howard Street, Suite 1000
San Francisco, CA 94105
Telephone: 415.344.7000
Facsimile: 415.344.7050

Michael R. Huston (pro hac vice)
MHuston@perkinscoie.com
700 13th St NW
Washington, DC 20005
Telephone: 202.654.6200
Facsimile: 202.654.621

*Counsel for Defendant Google LLC*

/s/ Harmeet K. Dhillon
Harmeet K. Dhillon