1

2

3

4

5

6

7

8                              UNITED STATES DISTRICT COURT

9                              EASTERN DISTRICT OF CALIFORNIA

10

11   REPUBLICAN NATIONAL                    No. 2:22-cv-01904-DJC-JBP
     COMMITTEE,
12
                    Plaintiffs,
13                                           ORDER
              v.
14
     GOOGLE, INC.,
15
                    Defendants.
16

17

18          Plaintiff the Republican National Committee ("RNC") brings this suit alleging

19   that Defendant Google, LLC ("Google")[1] has been intentionally misdirecting the RNC's

20   emails to Gmail users' spam folders at the end of each month "to secretly suppress[]

21   the political speech and income of one major political party."  (Compl. (ECF No. 1)

22   ¶ 98.)   According to the RNC, "[w]hether Google is characterized as a common

23   carrier, public accommodation, or a business providing a service, California law

24   prohibits Google's spam filtration of RNC emails based on political affiliation and

25   views."  (*Id*. ¶ 10.)  Plaintiff seeks recovery for donations it allegedly lost as a result of

26   its emails not being delivered to its supporters' inboxes.

27   _____

28   [1] While the Complaint names Google, Inc. as a Defendant, the corporation's correct legal name is
     Google, LLC.  (ECF No. 12.)

                                                1

1   Defendant has moved to dismiss Plaintiff's Complaint on the basis that Plaintiff

2   has failed to plausibly allege its claims, and that section 230 of the Communications

3   Decency Act, 47 U.S.C. § 230, compels the case be dismissed regardless.  While it is a

4   close case, the Court concludes that under the pleading standards set forth in *Bell*

5   *Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662

6   (2009), the RNC has not sufficiently pled that Google acted in bad faith in filtering the

7   RNC's messages into Gmail users' spam folders, and that doing so was protected by

8   section 230.  On the merits, the Court concludes that each of the RNC's claims fail as a

9   matter of law for the reasons described below.  Accordingly, the Court will GRANT

10   Defendant's Motion to Dismiss, with partial leave to amend.

11   **I.    Background**

12   **A.  Factual Background**

13   Plaintiff is the national committee of the Republican Party and manages the

14   party's political operations.  (Compl. ¶ 13.)  In furtherance of its political fundraising

15   efforts, the RNC regularly sends bulk emails to its supporters who have signed up to

16   receive these emails.  (*Id.*  ¶¶ 1, 13, 19, 22.)  The RNC has historically received funding

17   from its supporters through this email outreach, and the fundraising efforts are most

18   successful at the end of every month.  (*Id.* ¶¶ 1–2.)

19   Defendant Google, LLC is an internet service provider which maintains a free

20   email service called Gmail, in addition to other web-based products and services.  (*Id.*

21   ¶¶ 14–16.)  Any person can sign up for and utilize Google's Gmail service.  Plaintiff

22   alleges that, in return for the service, Google collects data from its users which it sells

23   to third parties, and also profits from selling advertising space in users' accounts.  (*Id.*)

24   Plaintiff is not a Gmail user and instead utilizes a different email service provider to

25   send emails to its mailing list, which includes Gmail users.  (*See id.* ¶¶ 22, 36.)

26   While messages received by users are ordinarily placed in an inbox folder, as

27   part of its service Google intercepts messages that are unwanted or potentially

28   harmful to users and places them in a spam folder.  (*Id.* ¶ 27.)  The RNC alleges that

2

towards the end of every month, Google has been diverting nearly all of its end-of-month emails to users' spam folders without warrant. (*Id.* ¶¶ 2, 27–29.) Google does not provide data about whether messages reach a user's inbox, but the RNC engages a third-party email marketing firm to independently track its messages' "inboxing" rate (the rate at which emails are placed in recipients' inbox folders). (*Id.* ¶ 24.) Beginning in December 2021, the RNC observed a drop off of its messages' inboxing rate at the end of the month, a pattern that repeated in every subsequent month in 2022. (*Id.* ¶ 28–29, 31.) Compared to other large email providers, Google allegedly diverts a larger percentage of the RNC's emails to spam at the end of every month, and with more consistency. (*Id.* ¶ 53.)

The RNC alerted Google to this trend in December 2021, and Google agreed to stay in communication to address the issue. (*Id.* ¶ 31.) Google told the RNC that the drop in the inboxing rate was likely due to a high number of user complaints and provided a list of best practices to avoid having its emails sent to spam. (*Id.* ¶ 36.) The RNC's email service provider confirmed that there were "no irregulates" which would be causing the issue, and the RNC's email marketing firm reported no increase in user complaints at the time the inboxing rate fell. (*Id.*)

On March 29, 2022 the RNC met with Google to discuss the inboxing issue. (*Id.* ¶ 38–40.) Google did not provide any additional suggestions for troubleshooting the issue, but agreed to have additional follow up calls with the RNC. (*Id.* ¶ 40.) On June 28 and 29, 2023 Google provided additional potential explanations for the drop in inboxing: (1) the frequency of emails due to the RNC's press releases, (2) a fault in the RNC's domain authentication, and (3) Google's spam filtering algorithm which collects user spam reports over the course of the month and causes emails to be diverted to spam folders. (*Id.* ¶¶ 42, 44.) The RNC's email service provider and email marketing firm refuted these explanations, confirming that the authenticator was functioning, and that there had been no increase in user spam reports detected. (*Id.* ¶ 44.) In addition, the press releases were from a different email account and comprised only 0.3% of

the RNC's total email volume so ostensibly should not have impacted the inboxing rate of their marketing emails.  (*Id.* ¶ 42.)

On August 11, 2022, Google held a training for the RNC on "Email Best Practices."  (*Id.* ¶ 46.)  The RNC followed these best practices, which did improve the overall performance of the RNC's emails, but did not impact the monthly drop in inboxing rating.  (*Id.* ¶¶ 47–48.)  The RNC alerted Google to the ineffectiveness of the suggested practices on September 29, 2022 and did not receive a response.  (*Id.* ¶¶ 48–50.)

The RNC alleges that Google is either purposefully or negligently diverting its emails to spam.  (*Id.* ¶ 57; *see also* ¶¶ 3, 11.)  The RNC internally tested its theory that Google was intentionally discriminating against it wherein it sent two sets of emails – identical in content and sender, with the only difference being that they contained different links to variants of the RNC's donation page – to two sets of user groups.  (*Id.* ¶ 33.)  One version of the email inboxed at a "normal" rate, while the other was diverted almost entirely to spam.  (*Id.*)  The RNC concedes that this test suggests emails are not being filtered by Defendant based on their communicative content. (*Id.*)  The RNC also cites to a study[2] that found Google's Gmail labels emails from Republican candidates and Republican organizations as spam at a higher rate than their democratic counterparts, though the study does not involve the RNC.  (*Id.* ¶¶ 54–56.)

Plaintiff brought this suit alleging violations of California's common carrier law, the Unruh Civil Rights Act, the California Unfair Competition Law, and the Federal Telecommunications Act, as well as claims alleging intentional and negligent interference with prospective economic relations, and negligence under California

---

[2] It is unclear if paragraph 55 relates to a second study, given the same rate of labeling Republican campaign emails as spam (8x the rate).  (Compl. ¶ 55.)  The link included in footnote 4 is an article from the website Mashable entitled "Gmail isn't biased against Republicans. They're just bad at sending emails" that cites the same study referenced in Paragraph 54 and note 3, indicating just one study.  (*See* Compl. ¶¶ 54, 55 n.3.)

1  Civil Code § 2162.  (*See Id.* at 17–25.)  The RNC alleges that Defendant's mislabeling

2  of its emails has caused it to lose hundreds of thousands of dollars in potential

3  donations and has harmed its relationships with its supporters.  (*Id.* ¶¶ 57–58.)

4        Defendant filed the instant Motion to Dismiss on January 23, 2023, which

5  Plaintiff opposes.  (Mot. (ECF No. 30); Opp'n. (ECF No. 35).)  Separately, Defendant

6  filed a Request for Judicial Notice of documents submitted in support of its Motion to

7  Dismiss on January 23, 2023 (ECF No. 31), and Plaintiff filed a Motion to Strike

8  Plaintiff's request for Judicial Notice (ECF No. 34), which Defendant opposes (ECF No.

9  39).

10        The Court held oral argument on both motions on July 17, 2023 with Michael A.

11  Columbo and Thomas S. McCarthy appearing for Plaintiff, and Michael R. Huston and

12  Sunita Bali appearing for Defendant.

13  **II.       Legal Standard for Motion to Dismiss**

14        A party may move to dismiss for "failure to state a claim upon which relief can

15  be granted."  Fed. R. Civ. P. 12(b)(6).  The motion may be granted if the complaint

16  lacks a "cognizable legal theory" or if its factual allegations do not support a

17  cognizable legal theory.  *Godecke v. Kinetic Concepts, Inc.*, 937 F.3d 1201, 1208 (9th

18  Cir. 2019) (quoting *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988)).

19  The court assumes all factual allegations are true and construes them "in the light

20  most favorable to the nonmoving party."  *Steinle v. City & County of San Francisco*, 919

21  F.3d 1154, 1160 (9th Cir. 2019) (quoting *Parks Sch. of Bus., Inc. v. Symington*, 51 F.3d

22  1480, 1484 (9th Cir. 1995)).  If the complaint's allegations do not "plausibly give rise to

23  an entitlement to relief," the motion must be granted.  *Ashcroft v. Iqbal*, 556 U.S. 662,

24  679 (2009).

25        A complaint need contain only a "short and plain statement of the claim

26  showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), not "detailed

27  factual allegations," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  But this rule

28  demands more than unadorned accusations; "sufficient factual matter" must make the

1   claim at least plausible.  *Iqbal*, 556 U.S. at 678.  In the same vein, conclusory or

2   formulaic recitations of elements do not alone suffice.  *Id.* (citing *Twombly*, 550 U.S. at

3   555).  This evaluation of plausibility is a context-specific task drawing on "judicial

4   experience and common sense."  *Id.* at 679.

5   **III.    Discussion**

6   **A.  Section 230 Immunity**

7       At the outset, Plaintiff's suit is barred because Google is entitled to immunity

8   from suit under section 230 of the Communications Decency Act, 47 U.S.C. § 230.

9   Section 230 affords interactive computer service providers immunity from liability for

10   decisions related to blocking and screening of offensive material, or for providing

11   others with the technical means to do so.  47 U.S.C. § 230(c)(2).  "To assert an

12   affirmative defense under section 230(c)(2)(A), a moving party must qualify as an

13   'interactive computer service,' that voluntarily blocked or filtered material it considers

14   'to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise

15   objectionable,' and did so in 'good faith.'"  *Holomaxx Techs. v. Microsoft Corp.*, 783 F.

16   Supp. 2d 1097, 1104 (N.D. Cal. 2011) (quoting 47 U.S.C. § 230(c)(2)(A)).  Section 230

17   must be construed to protect defendants "not merely from ultimate liability, but from

18   having to fight costly and protracted legal battles."  *Fair Hous. Council of San*

19   *Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1175 (9th Cir. 2008) (en

20   banc); *see also Dyroff v. Ultimate Software Grp., Inc.*, 934 F.3d 1093, 1097 (9th Cir.

21   2019).  In "close cases" section 230 claims "must be resolved in favor of immunity."

22   *Roommates.com*, 521 F.3d at 1174.

23                                                   1

24       Google, and specifically Google's Gmail, is an interactive computer service.  An

25   interactive computer service is "any information service, system, or access software

26   provider that provides or enables computer access by multiple users to a computer

27   server . . . ."  42 U.S.C. § 230(f)(2); *see Holomaxx*, 783 F. Supp. 2d at 1104 (finding that

28   Microsoft's email service was an interactive computer service).  Plaintiff does not

1     dispute this classification.  (Opp'n. at 28.)

2     2

3        Turning to the second requirement for a section 230 defense, Google's filtering

4     of spam constitutes filtering "material that the provider or user considers to be

5     obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise

6     objectionable," 47 U.S.C. § 230(c)(2)(A).  In *Enigma Software Group USA, LLC v.*

7     *Malwarebytes, Inc*, the Ninth Circuit took up the issue of what kind of material would

8     fall within the catchall of "otherwise objectionable."  946 F.3d 1040, 1044 (9th Cir.

9     2019).  The court rejected an interpretation of section 230 in its prior decision in

10     *Zango, Inc. v. Kaspersky Lab, Inc.*, 568 F.3d 1169, 1174 (9th Cir. 2009) that gave

11     unfettered discretion to a provider to determine what is "objectionable."  *Enigma*

12     *Software Group*, 946 F.3d at 1050.  Specifically, the Ninth Circuit concluded that

13     blocking and filtering decisions that are driven by anticompetitive animus do not

14     concern "objectional material," particularly in light of Congress's codified intent that

15     section 230 "preserve the vibrant and competitive free market that presently exists for

16     the Internet and other interactive computer services . . . ."  *Id*. at 1050–51 (quoting 47

17     U.S.C. § 230(b)(2)–(3)).

18        At the same time, the Ninth Circuit rejected a narrow view of what constituted

19     "objectional" material, noting the "breadth" of that term.  *Id*. at 1051.  The court called

20     into question cases interpreting "objectionable" in light of the other terms in section

21     230 on the principle of *ejusdem generis* (Latin for "of the same kind or class"), noting

22     that the specific terms in section 230 "vary greatly."  *Id*.  And while it did not expressly

23     adopt their reasoning, the Ninth Circuit appeared to approve decisions holding that

24     "unsolicited marketing emails" are "objectionable" for purposes of section 230.  *Id*. at

25     1052 (citing *Holomaxx*, 783 F. Supp. 2d at 1104; *e360Insight, LLC v. Comcast Corp.*,

26     546 F. Supp. 2d 605, 608–610 (N.D. Ill. 2008)).

27        This Court likewise holds that a provider such as Google can filter spam,

28     including marketing emails, as "objectionable" material under section 230.  Congress

7

1  itself has recognized the harm spam can cause in enacting the Controlling the Assault

2  of Non–Solicited Pornography and Marketing ("CAN–SPAM") Act of 2003. *See* 15

3  U.S.C. § 7701(a)(2) (noting the "extremely rapid growth in the volume of unsolicited

4  commercial electronic mail"); § 7701(a)(4) (observing that "the receipt of a large

5  number of unwanted messages can decrease the convenience of electronic mail");

6  *see also Gordon v. Virtumundo, Inc.*, 575 F.3d at 1044–45 (9th Cir. 2009).  Given the

7  near-universal use of spam filters by providers (Compl. ¶ 53,) the Court agrees with

8  the weight of authority that, *generally speaking*, a "content provider or user could

9  easily conclude that spam emails are 'harassing' within the meaning of the Act or are

10 similar enough to harassment as to fall within the catchall 'otherwise objectionable.'"

11 *Song fi Inc. v. Google, Inc*., 108 F. Supp. 3d 876, 884 n. 3 (N.D. Cal. 2015) (citing

12 *Holomaxx*, 783 F. Supp. 2d at 1104, and *e360Insight*, 546 F. Supp. 2d at 607–08).

13         The fact that the RNC sent emails to individuals who requested them *at some*

14 *point in time* does not undermine this conclusion.  In its Complaint, the RNC alleges

15 that it maintains a "list of people who have requested to receive emails from the RNC"

16 and that its campaign emails "are only sent to people on this list." (Compl. ¶ 22.)  The

17 RNC further alleges that it removes individuals from this list who no longer wish to

18 subscribe to the RNC's emails, and that the emails it sends are "solicited." (*Id.*)  As a

19 result, the RNC concludes that the emails "are plainly not spam because they are only

20 sent to Gmail users who requested them" and that therefore they are not "offensive."

21 (Opp'n. at 34.)  However, just because the RNC complies with the CAN-SPAM Act

22 does not preclude that Google may reasonably consider multiple marketing emails to

23 be "objectionable."  First, "compliance with CAN–SPAM, Congress decreed, does not

24 evict the right of the provider to make its own good faith judgment to block mailings."

25 *e360Insight*, 546 F. Supp. 2d at 609 (citing 15 U.S.C. § 7707(c)).  Second, just because

26 a user interacts with a company at one point in time does not mean that the user

27 "solicits" each and every email sent by the entity.  Most individuals who use email are

28 likely familiar with having engaged with an entity one time (such as by purchasing a

1    particular product) only to have that entity send numerous other emails, many or all of

2    which are no longer relevant or wanted.  While a user may be generally able to opt

3    out of those emails, an email provider such as Google may reasonably segregate

4    those sorts of mass mailings (even though they were originally requested by the user

5    in the legal sense, *see* 15 U.S.C. § 7704) in order to ensure that "wanted electronic

6    mail messages" will not be "lost, overlooked, or discarded amidst the larger volume of

7    unwanted messages," 15 U.S.C. § 7701(a)(4).

8         It is clear from the Complaint that the RNC sends out a significant number of

9    emails to individuals on its list.  (*See* Compl. ¶ 21 (noting the RNC emails supporters

10    about events, such as the 349 that occurred within the Eastern District from February

11    to October 2022); ¶ 39 (noting "multiple emails sent over the weekend"); ¶ 42 (noting

12    that RNC's press releases were "just 0.3% of the email volume as the RNC's main

13    marketing domain").)  While it may be that some, perhaps many, users specifically

14    wanted each and every one of those emails, Google could reasonably consider these

15    mass mailings to be objectionable, just as it can for other email senders.  *See*

16    *generally Holomaxx*, 783 F. Supp. 2d at 1101, 1104 (concluding emails were

17    objectionable despite the fact that users "elected voluntarily to receive such

18    correspondence or [] have 'opted-in'").

19                                   3

20         Application of section 230 in this case, then, turns on whether the RNC has

21    sufficiently pled that Google did not act in "good faith" when filtering the RNC's

22    emails.  While it is a relatively close case, the Court concludes Plaintiff has not

23    sufficiently pled facts to establish that Google has acted without good faith.

24         In *Bell Atlantic Corporation v. Twombly*, the Supreme Court concluded that a

25    plaintiff must provide more than a "formulaic recitation of the elements of a cause of

26    action" and that "[f]actual allegations must be enough to raise a right to relief above

27    the speculative level."  550 U.S. at 555.  Moreover, the claim has to be "plausible on

28    its face," a requirement that is met when "the plaintiff pleads factual content that

1    allows the court to draw the reasonable inference that the defendant is liable for the

2    misconduct alleged." *Iqbal*, 556 U.S. at 678.

3          In this case, the RNC's allegation that Google acted in "bad faith" does not rise

4    above the speculative level.  At bottom, the RNC's allegation is that Google diverted

5    emails to spam at the end of the month which had been, coincidentally, a historically

6    successful fundraising time for the RNC, and that the reasons Google gave for the low

7    "inboxing" rate were – in the RNC's view – not true.  Plaintiff argues that the only

8    reasonable inference for why its emails were labelled as spam is Google's alleged

9    political animus toward the RNC.  (Compl. ¶ 3.)  This is pure speculation, lacking facts

10   from which the Court could infer animus or an absence of good faith.  The only

11   affirmative allegation that includes any facts from which the Court could draw a

12   conclusion of the absence of good faith is Paragraph 54 of the Complaint, which cites

13   a North Carolina State University study that is alleged to have "found that Google's

14   Gmail labels *significantly* more campaign emails from Republican political candidates

15   as spam than campaign emails from Democratic political candidates.  Specifically, the

16   study found that Gmail labeled only 8.2% of Democratic emails as spam, as compared

17   with 67.6% of Republican campaign emails."

18         While this study does provide some evidence that Google could be acting

19   without good faith, the Court finds that this study is insufficient, standing alone, to

20   meet the pleading requirements as described in *Twombly* and *Iqbal*.  First, the study

21   itself does not attribute any motive to Google, with the study authors noting "we have

22   no reason to believe there were deliberate attempts from these email services to

23   create these biases to influence the voters. . . ."  (ECF No. 30-10 at 9.)  Second, the

24   study indicates that all three email programs considered – Google, Outlook, and

25   Yahoo – had a political bias, although Google's left-leaning bias was greater than

26   Outlook or Yahoo's right-leaning biases.  (*Id.*)  Third, the study indicates that Google's

27   spam filter "responded significantly more rapidly to user interactions compared to

28   Outlook and Yahoo" (*id.*), suggesting that a more plausible reason for the left-leaning

1    bias was user input, not bad faith efforts on the part of Google.

2          Other allegations in the Complaint undermine the RNC's reliance on the North

3    Carolina study and render the RNC's allegation that Google acted without good faith

4    implausible.  The RNC alleges that "for nearly a year" Google engaged with the RNC

5    over its concerns.  (Compl. ¶ 30.)  Google suggested that the RNC "reduce the

6    frequency of emails that it sends at the end of each month," (*id*. ¶ 31,) informed the

7    RNC that "the monthly crashing of the RNC's inboxing rate was due to a high number

8    of complaints," (*id*. ¶ 36,) met with the RNC on March 29, 2022 (*id*. ¶ 40,) and offered

9    the RNC a training on August 11, 2022 (*id*. ¶ 46).  In the Complaint, the RNC recounts

10   that adopting Google's suggestions had a "significantly positive impact on [email]

11   performance," though they did not resolve the end-of-month issue.  (*Id*. ¶ 48.)  While

12   the RNC may disagree with Google regarding what caused the drop in inboxing, the

13   fact that Google engaged with the RNC for nearly a year and made suggestions that

14   improved email performance is inconsistent with a lack of good faith.  Indeed, district

15   courts in this circuit rely on the extent to which a computer service engages with a

16   content creator to determine why its material is being diverted to spam or removed in

17   determining whether there is an absence of good faith.  *Compare Divino Group LLC v.*

18   *Google LLC*, No. 19-cv-04749-VKD, 2022 WL 462507 (N.D. Cal. Sept. 30, 2022)

19   (detailing ways in which defendant worked with content creators), *with Enhanced*

20   *Athlete Inc. v. Google LLC, et al.*, 479 F. Supp. 3d 824, 831 (N.D. Cal. 2020) (noting

21   defendants refused to assist plaintiff when it sought guidance and refused to provide

22   plaintiff with an explanation as to why its videos were being removed).

23         Finally, the A/B test cited in Paragraph 33 of the Complaint undermines the

24   RNC's claim of bad faith discrimination on the basis of political affiliation.  If Google

25   were discriminating against RNC emails due to their political affiliation, then neither

26   set of emails should have gotten through Google's spam filter.  The fact that one

27   version did indicates it was not the substantive content or sender of the email, but

28   rather some other factor, such as the different links contained with the email or some

11

1   other technical feature of the email, that was triggering application of the spam filter.

2   At oral argument, counsel for the Plaintiff conceded that the A/B test does not support

3   a finding that emails are being filtered because the RNC is sending them or because

4   the emails contain political content.

5          In short, the only fact alleged by the RNC to support its conclusory allegation

6   that "Google's interception and diversion of the RNC's emails, and the harm it is

7   causing to the RNC, is intentional, deliberate, and in bad faith," (Compl. ¶ 56), is the

8   North Carolina State University study that expressly states there is no reason to believe

9   Google was acting in bad faith, and the remainder of the allegations in the Complaint

10  are inconsistent with such a conclusion.  In light of the multiple reasonable

11  explanations for why the RNC's emails were filtered as set forth in the Complaint, the

12  Court does not find the RNC's allegation that Google was knowingly and purposefully

13  harming the RNC because of political animus to be a "reasonable inference."

14  Accordingly, the Court concludes that the RNC has not sufficiently pled that Google

15  acted without good faith, and the protection of section 230 applies.

16         This result is consistent with the Congress's stated policy goals in enacting the

17  Communications Decency Act, one of which was "to encourage voluntary monitoring

18  for offensive or obscene material."  *Carafano v. Metrosplash.com, Inc.*, 339 F. 3d 1119,

19  1123 (9th Cir. 2003).  Specifically, Congress enacted section 230 to:

20         encourage the development of technologies which
       maximize user control over what information is received by

21     individuals, families, and schools who use the Internet and
       other interactive computer services; [and]

22

23         to remove disincentives for the development and utilization
       of blocking and filtering technologies that empower
       parents to restrict their children's access to objectionable or

24     inappropriate online material

25  47 U.S.C. § 230(b)(3)–(4).  Section 230 also addresses Congress's concern with the

26  growth of unsolicited commercial electronic mail, and the fact that the volume of such

27  mail can make email in general less usable as articulated in the CAN-SPAM Act.  *See*

28  15 U.S.C. § 7701(a)(4), (6).  Permitting suits to go forward against a service provider

1  based on the over-filtering of mass marketing emails would discourage providers

2  from offering spam filters or significantly decrease the number of emails segregated.

3  It would also place courts in the business of micromanaging content providers'

4  filtering systems in contravention of Congress's directive that it be the provider or user

5  that determines what is objectionable (subject to a provider acting in bad faith).  *See*

6  47 U.S.C. § 230(c)(2)(A) (providing no civil liability for "any action voluntarily taken in

7  good faith to restrict access to . . . material *that the provide or user considers to be . . .*

8  objectionable" (emphasis added)).  This concern is exemplified by the fact that the

9  study on which the RNC relies to show bad faith states that each of the three email

10  systems had some sort of right- or left- leaning bias.  (ECF No. 30-10 at 9 ("all [spam

11  filtering algorithms] exhibited political biases in the months leading up to the 2020 US

12  elections").)  While Google's bias was greater than that of Yahoo or Outlook, the RNC

13  offers no limiting principle as to how much "bias" is permissible, if any.  Moreover, the

14  study authors note that reducing the filters' political biases "is not an easy problem to

15  solve.  Attempts to reduce the biases of [spam filtering algorithms] may inadvertently

16  affect their efficacy."  (*Id.*)  This is precisely the impact Congress desired to avoid in

17  enacting the Communications Decency Act, and reinforces the conclusion that section

18  230 bars this suit.

19                                         4

20       The RNC argues in the alternative that section 230(c)(2) provides only immunity

21  from financial liability, and not immunity from injunctive relief.  (Opp'n. at 37.)  As an

22  initial matter, the word "liable" has a broader definition than Plaintiff suggests and can

23  include being held to account even through injunctive relief.  For example, *Black's Law*

24  *Dictionary* (11th ed. 2019) defines liable as "responsible or answerable in law; legally

25  obligated," which would include a legal obligation to comply with an injunctive order

26  just as it would a monetary judgement.  Moreover, courts have rejected such a theory

27  as it applies to liability under section 230(c)(1), and have questioned whether the

28  theory would be viable as to section 230(c)(2).  *See Ben Ezra, Weinstein, & Co., Inc. v.*

13

1  *Am. Online Inc.*, 206 F.3d 980, 986 (10th Cir. 2000); *Smith v. Intercosmos Media Grp.,*

2  *Inc.*, No. CIV. A. 02-1964, 2002 WL 31844907, at *4–5 (E.D. La. Dec. 17, 2002); *Noah v.*

3  *AOL Time Warner, Inc.*, 261 F. Supp. 2d 532, 539–40 (E.D. Va. 2003), *aff'd*, No. 03-

4  1770, 2004 WL 602711 (4th Cir. Mar. 24, 2004); *Kathleen R. v. City of Livermore*, 87

5  Cal. App. 4th 684, 698 (2001).  Only one case – *Mainstream Loudoun v. Board of*

6  *Trustees of the Loudoun County Library*, 2 F. Supp. 2d 783, 790 (E.D. Va. 1998) – has

7  suggested that claims for injunctive relief would not be barred under section

8  230(c)(2).  However, the *Loudoun* decision was premised primarily on the fact that the

9  defendant was a state actor: "§ 230 was enacted to minimize state regulation of

10  Internet speech by encouraging private content providers to self-regulate against

11  offensive material; § 230 was not enacted to insulate government regulation of

12  Internet speech from judicial review."  2 F. Supp. 2d at 790.  In dicta, the court noted it

13  was not clear whether section 230 would bar claims for injunctive relief if the statute

14  did apply to a government actor.  *See id.*

15       Subsequent cases have rejected the dicta in the *Loudoun* decision.  In *Kathleen*

16  *R.*, the California Appellate Court found that while the word "liable" in section

17  230(c)(2) "may arguably refer only to damage claims" section 230 elsewhere provides

18  a broad immunity from suit: "[n]o cause of action may be brought *and* no liability may

19  be imposed under any State or local law that is inconsistent with this section." *Kathleen*

20  *R.*, 87 Cal. App. 4th at 698 (emphasis in original) (quoting 47 U.S.C. § 230(e)(3)).  As

21  the court in *Kathleen R.* recognized, "even if for purposes of section 230[(c)(2)]

22  'liability' means only an award of damages (*Loudoun I*, supra, 2 F. Supp. 2d at p. 790),

23  the statute by its terms also precludes other causes of action for other forms of relief."

24  *Id.*

25       Further, courts have recognized that the dicta in *Loundoun* is inconsistent with

26  the purpose of section 230.  In *Noah v. AOL*, the Eastern District of Virginia recognized

27  that allowing suits for injunctive relief to move forward would contravene the purpose

28  of section 230 immunity because "in some circumstances injunctive relief will be at

14

1    least as burdensome to the service provider as damages, and is typically more

2    intrusive."  261 F. Supp. 2d at 540.  Moreover, the burden of complying with a

3    potential injunction and the burden of litigation itself would thwart the stated goal of

4    section 230 "to remove disincentives for the development and utilization of blocking

5    and filtering technologies," 47 U.S.C. § 230(b)(4), and undermine the Ninth Circuit's

6    characterization of section 230 as an immunity *from suit*.  *Roomates.com*, 521 F.3d at

7    1175.  In addition to considering the costs of litigating the action in terms of attorneys'

8    fees and costs, discovery in this action would likely be burdensome and contentious.

9    Accordingly, the Court rejects Plaintiff's theory that its claim for injunctive relief is not

10   barred by section 230.

11          Finally, the Court notes that if the RNC were to amend its Complaint to seek

12   injunctive relief only, the Court would likely dismiss the entire action for lack of subject

13   matter jurisdiction.  As Plaintiff has conceded, its only federal claim is not viable,

14   (Compl. ¶ 107), and if Plaintiff proceeded only on its claims for injunctive relief, the

15   monetary hook required for diversity jurisdiction would not be met.  *See* 28 U.S.C.

16   § 1332(a).  In that event, the state law claims would be subject to dismissal.  *See*

17   *Morrison v. Am. Online, Inc.*, 153 F. Supp. 2d 930, 935 (N.D. Ind. 2001); *see also*

18   *United Mine Works of Am. v. Gibbs,* 383 U.S. 715, 726 (1996) ("[I]f the federal claims

19   are dismissed before trial . . . the state claims should be dismissed as well."); 28 U.S.C.

20   § 1367(c)(3).

21          The Court GRANTS Defendant's Motion to Dismiss in full on the ground that it is

22   immune from suit on these facts under section 230 with leave to amend to establish a

23   lack of good faith.

24          **B.  Plaintiff's Claims**

25          Even if Google were not entitled to section 230 immunity, each of Plaintiff's

26   claims would still be subject to dismissal because they are either not a claim upon

27   which relief can be granted, or because Plaintiff has failed to establish it is entitled to

28   relief.

### i. Common Carrier Regulations

Plaintiff's first and sixth claims center on applying common carrier requirements to Google's Gmail service.  While the RNC concedes that its claim under the Federal Telecommunications Act is precluded by binding precedent, (Compl. ¶ 107), it asks this Court to extend the California common carrier law – which requires common carriers to indiscriminately provide their services – to Google.  *See* Cal. Civ. Code § 2168, *et seq*.  However, no court, much less a court interpreting California's common carrier law, has found an email service provider to be a common carrier.  This Court declines to be the first.

1

"Whether a party is a common carrier within the meaning of Civil Code section 2168 is a matter of law . . . ."  *Squaw Valley Ski Corp. v. Superior Ct.*, 2 Cal. App. 4th 1499, 1506 (1992), *reh'g denied and opinion modified* (Feb. 25, 1992).  Not every business which holds itself out to the public is a common carrier; only those "who offer[] to the public to carry persons, property, or messages, excepting only telegraphic messages, [are] a common carrier of whatever [they] thus offer[] to carry."  Cal. Civ. Code § 2168.  Historically, common carriers have been those businesses providing physical means of transportation for goods or people.  *See Gomez v. Superior Ct.*, 35 Cal. 4th 1125, 1131–32 (2005) (surveying the expansion of common carrier application from stagecoaches to busses, cabs, and rollercoasters).  The Supreme Court of California has extended the common carrier law to companies providing telephone services.  *Goldin v. Pub. Utilities Comm'n*, 23 Cal. 3d 638, 662 (1979).

In order to meet the definition of a common carrier, the RNC must establish that Google (1) holds itself out to the public generally and indifferently; (2) to transport persons, property or messages from place to place; (3) for a profit.  *Squaw Valley*, 2 Cal. App. 4th at 1508.  The RNC has pled sufficient facts to meet the first prong of this test.  As alleged in the Complaint, "[a]ny person can get a Gmail account if they meet

16

the age requirement to create a Google Account and agree to Google's terms of services." (Compl. ¶ 15.)  Google argues that the requirement that a user agree to and abide by its terms of service means that its services are not offered to the public indiscriminately.  However, requiring a user to agree to terms and conditions that describe what the service may be used for does not exclude the service from being a common carrier where the service is nonetheless offered indiscriminately to anyone who *does* agree to use the service according to the terms.  "One may be a common carrier though the nature of the service rendered is sufficiently specialized as to be of possible use to only a fraction of the population."  *Squaw Valley*, 2 Cal. App. 4th at 1409 (quoting *Nat. Ass'n. of Regulatory Utility Com'rs v. F.C.C.*, 525 F.2d 630, 641 (D.C. Cir. 1976).  Under the Terms of Service referenced in the Complaint (Compl. ¶ 15 n. 2,) Google prohibits certain types of email.  This is no different than a mail carrier refusing to carry a dangerous or explosive device.

The Complaint also sufficiently alleges that Google provides its service for a profit.  (Compl. ¶ 15.)  In its Motion to Dismiss, Google argues that it does not charge for its email service (Mot. at 12), but that is not what the statute requires.  As the court observed in *Squaw Valley*, stores that use elevators and escalators to move patrons within a store are considered common carriers, even though they do not charge for the specific use of those devices.  2 Cal. App. 4th at 1508.  It is simply enough that the stores profit "from the utilization of these devices to assist customers in shopping at the store." *Id.*  So too here, it is sufficient that Google profits off the email services it provides to its users.

The RNC does not, however, establish that Google "transport[s] . . . messages from place to place."  Significantly, the RNC does not allege it is a user of Gmail, but rather, alleges that its email service provider is Salesforce, and that it uses a separate email-delivery platform, Everest.  (Compl. ¶¶ 22, 24, 36.)  As with other similar services, their email provider transforms the email into "packets" that are sent through the internet via computers on the network, and periodically reassembled and

17

1    repacketized by intermediate computers on the network.  *See U.S. v. Councilman*, 418

2    F.3d 67, 69–70 (1st Cir. 2005).  Based on the address indicated in the email, the

3    packets that constitute the email are delivered to the recipient's email server, which

4    are then reconstituted to form the email which is displayed the next time the recipient

5    uses their email program.  *Id.* (explaining how an email "journey[s] from sender to

6    recipient" via "a network of interconnected computers," after which it may be

7    accessed "in an e-mail client program. . . .").  It is thus not Google that transports the

8    messages, but rather the various computers that comprise the network.  *See id.*; *see*

9    *also Biden v. Knight First Amend. Inst. At Columbia Univ.*, 141 S. Ct. 1220, 1224 (2021)

10   (Thomas, J., concurring) (referring to the email protocol as a "decentralized digital

11   sphere[]" and noting that "[n]o small group of people controls e-mail").  Unlike a

12   traditional mail service, email services, like Google's Gmail, do not "carry" messages;

13   they receive and store messages, and make them available for retrieval by the user

14   after the message has been shuttled through the email protocol.  *See Councilman*,

15   418 F.3d at 69–70.

16        The Federal Telecommunications Act does not treat email providers such as

17   Google as common carriers for similar reasons.  The Federal Telecommunications Act

18   distinguishes between "telecommunications service" providers and "information

19   service" providers, affording common carrier status only to the former.  *United States*

20   *Telecom Ass'n v. Federal Commc'ns Comm'n*, 825 F.3d 674, 691 (D.D.C. 2016).  A

21   telecommunications service provider is one which provides a "basic" service, merely

22   transporting information, "without computer processing or storage of the message."

23   *Nat'l Cable & Telecommunications Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 988

24   (2005); *see also United States Telecom Ass'n*, 825 F.3d at 691.  The FCC has applied

25   this label to services like a digital subscriber line ("DSL") that carries information via

26   phone lines.  *United States Telecom Ass'n*, 825 F.3d at 691–92.  In contrast, an

27   information service offers a "capability for generating, acquiring, storing,

28   transforming, processing, retrieving, utilizing, or making available information via

                                         18

telecommunications." 47 U.S.C. § 153(24).  In *Brand X*, the Supreme Court agreed with the Federal Communications Commission ("FCC") that an internet service provider which provides a suite of services including access to the internet, email, and web pages – services which necessarily require further processing of information – provided more than a "transparent" transmission of information and was fairly excluded from common carrier obligations.  545 U.S. at 993.  In *Howard v. America Online Inc.*, the Ninth Circuit found that "e-mail fits the definition of an enhanced service – the message is stored by AOL and is accessed by subscribers; AOL does not act as a mere conduit for information."  208 F.3d 741, 753 (9th Cir. 2000).  The upshot is that services which transport information without additional processing are akin to a historical carrier service which shuttles goods and persons from point A to point B, whereas a provider of more extensive services, like Google's Gmail, does not provide a primarily "carrier" service.

In support of their positions, the Parties cite to recent cases involving efforts by state legislatures (Florida and Texas, respectively) to regulate social media platforms such as Facebook and Twitter as common carriers.  *See NetChoice, LLC v. Att'y Gen., Fla.* (*NetChoice I*), 34 F. 4th 1196, 1220 (11th Cir. 2022) and *NetChoice, L.L.C. v. Paxton* (*NetChoice II*), 49 F. 4th 439, 469 (5th Cir. 2022).  While the Eleventh Circuit concluded that social media platforms were *not* common carriers, the Fifth Circuit disagreed.  Both cases are informative, but there are crucial differences between each decision and the case before the Court that make neither decision particularly illuminating.

In finding that social media platforms were not common carriers in *NetChoice I*, the Eleventh Circuit reasoned that while social media companies (like Google here) generally hold themselves open to all members of the public, social media companies do not transmit all messages that are sent by users, but rather make "'individualized' content- and viewpoint-based decisions about whether to publish particular messages or users."  *NetChoice I*, 34 F. 4th at 1220.  Moreover, the Eleventh Circuit reasoned

that social media companies were more like cable operators, which the Supreme

Court has concluded are similar to "publishers, pamphleteers, and bookstore owners

traditionally protected by the First Amendment." *Ibid* (quoting *U.S. Telecom Ass'n v.*

*FCC*, 855 F.3d 381, 428 (D.C. Cir. 2017) (Kavanaugh, J., dissenting) and citing *Turner*

*Broadcasting System, Inc. v. Federal Commc'ns Comm'n*, 512 U.S. 622, 639 (1994)).

Finally, like this Court the Eleventh Circuit analogized to the Telecommunications Act

of 1996, which according to the Eleventh Circuit "explicitly differentiates 'interactive

computer services' – like social-media platforms – from 'common carriers or

telecommunications services.'" *NetChoice I*, 34 F. 4th at 1220–21.  The Eleventh

Circuit further concluded that section 230 reflects a federal policy to not impose

common carrier obligations on internet companies and would preempt any state law

to the contrary.

  While the Eleventh Circuit's decision is consistent with Google's position, there

are key differences.  Cutting against Google's position, Google appears to exert less

editorial control than the social media companies at issue in *NetChoice I*.  There is no

allegation that Google declines to deliver emails, but rather that it chooses how to

characterize them, e.g., as "spam."  On the other hand, in *NetChoice I* the authors and

recipients of the messages were all users of the same platform, which is not the case

here.  In addition, the Eleventh Circuit relied in part on First Amendment caselaw,

which has not been put at issue here.  On balance, while *NetChoice I* supports

Google's position, it is not dispositive.

  In *NetChoice II*, the Fifth Circuit Court addressed the constitutionality of Texas's

law which classified platforms with "more than 50 million monthly active users" as

common carriers subject to regulations limiting censorship based on viewpoint.  49 F.

4th at 445–46.  While the case primarily addressed the First Amendment issues raised

by the platforms, to reinforce its constitutional decision the Fifth Circuit found that the

platforms could be regulated as common carriers, which have historically been

subject to non-discrimination regulation.  *Id.* at 469.

1    This decision is not particularly instructive.  In the Fifth Circuit's analysis, the

2    court relied on an amorphous definition of common carrier: whether the platforms

3    hold themselves out to the public and are "affected with a public interest."  *See id*. at

4    469–73.  Notably absent from the discussion is whether the social media platforms

5    actually carry or transport anything as required by *California* law.  The court instead

6    labeled social media companies "communications firm[s]," and assumed that all such

7    entities are carriers.  *Id*. at 473–74.  This conclusion is, in part, based on analogizing

8    social media companies to telegraph carriers, *id*., which the California law explicitly

9    exempts.  *See* Cal. Civ. Code § 2168.  The key distinction between *NetChoice II* and

10   the present case, however, is imperative: in *NetChoice II* the legislature explicitly

11   defined social media platforms as common carriers, whereas the California legislature

12   has not.

13   At bottom, Google does not "carry" messages.  It rather receives messages

14   from other email platforms that are carried by a decentralized computer network and

15   displays those messages to users in the Gmail platform.  It is thus not a common

16   carrier under California Civil Code section 2168.

17   Further supporting this conclusion, the Court notes that the RNC has not cited

18   any authority to establish that an email provider such as Google is a common carrier,

19   and the Court is unaware of any.  Perhaps most significantly, a contrary conclusion

20   would dramatically alter the manner in which email providers conduct their business.

21   As noted by the Plaintiff, many major email providers, including Google, have an

22   interest in limiting spam being delivered to users.  (*See* Compl. ¶ 27 ("As a service to

23   its users, and to increase its own profits, Google intercepts certain messages intended

24   for its users that comprise unsolicited and unwanted bulk-emailed messages and

25   place them in a separate folder, called a spam folder."); *see also id*. ¶ 53).   As the

26   Ninth Circuit has noted:

27                  While ignored by most and reviled by some, spam is largely
                    considered a nuisance and a source of frustration to e-mail
28                  users who, at times, must wade through inboxes clogged

21

1
2
3

> with messages peddling assorted, and often unwanted, products and services. The rising tide of spam poses an even greater problem to businesses, institutions, and other entities through network slowdowns, server crashes, and increased costs.

*Gordon*, 575 F.3d at 1044–45.  While Congress has attempted to address this problem through the CAN-SPAM Act, 15 U.S.C. § 7701 *et seq.*, the use of spam filters such as those employed by Google remain popular.  *Cf. Gordon*, 575 F.3d at 1054 (suggesting that spam filters are part of "normal operations" for an email provider).

Yet, if email providers are common carriers, they would have an obligation to deliver each of the messages that were entrusted to them, as Plaintiffs themselves allege.  (Compl. ¶ 62 (citing Cal. Civ. Code §§ 2170, 2208).)  Email providers such as Google, Yahoo, MSN and others would likely be prohibited from filtering spam or other messages and would instead be required to simply dump all emails into a user's inbox, first come, first served.  While it is true that California courts have not hesitated to interpret statutes in light of new technologies, this Court declines to accept the RNC's invitation to interpret California's common carrier law in such a way as to require email providers to deliver spam to the millions of Americans who use their services.[3]

Finally, even if Google were a common carrier, the RNC did not avail itself of Google's services, and Google owes no duty to it.  *See Grotheer v. Escape Adventures, Inc.*, 14 Cal. App. 5th 1283, 1294 (2017) ("[A] common carrier necessarily entails great responsibility, requiring common carriers to exercise a high duty of care *towards their customers*." (emphasis added) (quoting *Squaw Valley*, 2 Cal. App. 4th at 1507)); *cf. infra* Section III.B.v.

*////*

*////*

---

[3] The Court observes that the California Legislature is fully capable of operating in this area.  *Cf.* California Internet Consumer Protection and Net Neutrality Act of 2018 ("SB-822"); 2018 Cal. Stat. ch. 976.

***

For the foregoing reasons, Defendant's Motion to Dismiss Count One is GRANTED without leave to amend because Plaintiff cannot establish this claim as a matter of law.

Further, because there is no legal basis to hold Google accountable to the federal common carrier regulations under the Telecommunications Act, as conceded by Plaintiff, that claim must also be dismissed. Accordingly, Defendant's Motion to Dismiss Count Six is GRANTED without leave to amend.

### ii. Negligence Under Civil Code Section 2162

Plaintiff's seventh claim for negligence, premised on a duty of care for "carrier[s] of messages for reward," Cal. Civ. Code § 2162, also fails. This code section has yet to be extended to any message carrier beyond a telegraph company, much less to an email service provider. *See* 59 Cal. Jur. 3d *Telegraphs and Telephones* § 34 (2023).

Moreover, "the liability of the company for any mistake or delay in the transmission or delivery of a message shall not extend beyond the sum received for sending it . . . ." *Redington v. Pac. Postal Tel. Cable Co.*, 107 Cal. 317, 323 (1895); *see also Hart v. W. Union Tel. Co.*, 66 Cal. 579, 584 (1885). Here, the RNC has not paid Google any sum to transmit messages, and therefore would not be entitled to damages for ordinary negligence.

Accordingly, Defendant's Motion to Dismiss is GRANTED as to Count Seven without leave to amend because Defendant cannot be liable under this statute as a matter of law.

### iii. Unruh Civil Rights Act

Plaintiff's second claim is that Google has violated the California Unruh Civil Rights Act. The Unruh Civil Rights Act provides that all persons are entitled to equal use of public accommodations and businesses regardless of "sex, race, color, religion, ancestry, national origin, disability, medical condition, genetic information, marital status, sexual orientation, citizenship, primary language, or immigration status." Cal.

Civ. Code § 51.  The RNC alleges that Google has violated this law by intentionally

discriminating against it on the basis of political affiliation.

1

As an initial matter, "political affiliation" is not one of the enumerated classes

under the Unruh Act.  The RNC is correct that the California Supreme Court has

broadly interpreted the Unruh Act and held that the "identification of particular bases

of discrimination . . . is illustrative rather than restrictive." *In re Cox*, 3 Cal. 3d 205, 216

(1970).  The Supreme Court in *Cox* further stated that "its language and its history

compel the conclusion that the Legislature intended to prohibit all arbitrary

discrimination by business establishments." *Id.*  The *Cox* court found that a shopping

center's exclusion of a "young man[] who wore long hair and dressed in an

unconventional manner," was potentially in violation of the Unruh Act, saying the

shopping center may not exclude "individuals who wear long hair or unconventional

dress, who are black, who are members of the John Birch Society, or who belong to

the American Civil Liberties Union, merely because of these characteristics or

associations." *Id.* at 210, 218.

California courts, however, have not interpreted the Unruh Act as broadly as

these statements in *Cox* might suggest.  Indeed, in *Harris v. Capital Growth* the

California Supreme Court retreated from this broad language in light of the

Legislature's subsequent actions of adding specific categories to section 51.  The

*Harris* court determined that such actions indicated a legislative intent that section 51

be cabined to specific groups rather than relying on the judicial construction that

suggested all "arbitrary distinctions" violated section 51.  *See Harris v. Capital Growth*,

52 Cal. 3d 1142, 1158 (1991) ("Notwithstanding our language about 'arbitrary

discrimination' and 'stereotypes' the Legislature has continued to pay close attention

to the specified categories of discrimination in the Unruh Act.") (*superseded by

statute*, Cal. Civ. Code § 51(f), *as recognized in Munson v. Del Taco, Inc*., 46 Cal. 4th

661 (2009)).  *Harris* "made it clear *future expansion* of prohibited categories should be

24

1  carefully weighted to ensure a result consistent with legislative intent." *Beaty v. Truck*

2  *Ins. Exchange*, 6 Cal. App. 4th 1455, 1462 (1992).  Notably, this Court is not aware of

3  any California state court decision after 1984 that judicially expanded the list of

4  protected classifications.  *See Hessians Motorcycle Club v. J.C. Flanagans*, 86 Cal.

5  App. 4th 833, 836 (2001) (collecting cases).  Although the California Supreme Court in

6  dicta has suggested that political affiliation is covered by the Unruh Act, see *Marina*

7  *Point Ltd. v. Wolfson*, 30 Cal. 3d 721, 726 (1982), *Cox*, 3 Cal. 3d at 218, these decisions

8  pre-date *Harris*.  And while *Harris* mentions political affiliation in a footnote, 52 Cal. 3d

9  at 1161 n. 10, it would be surprising if the Court intended to expand the list of

10  categories protected in the Unruh Act in the very decision cautioning against doing

11  so.  With these cases in mind, this Court declines to effectively add "political affiliation"

12  to the long list of characteristics protected by the Unruh Act.

13       In addition, the Ralph Civil Rights Act of 1976, codified at Civil Code section

14  51.7, supports the conclusion that political affiliation is not covered by the Unruh Act.

15  In interpreting the Unruh Act, California courts have applied the interpretive cannon of

16  *ejusdem generis* to conclude that the common element of protected characteristics

17  was "personal as opposed to economic characteristics – a person's geographical

18  origin, physical attributes, and personal beliefs."  *Harris*, 52 Cal. 3d at 1160.  While

19  "personal beliefs" might be read to include political affiliation, the Ralph Civil Rights

20  Act, which is contained in the same part and division of the California Civil Code as the

21  Unruh Act, suggests otherwise.  California Civil Code section 51.7 provides that "[a]ll

22  persons within the jurisdiction of this state have the right to be free from any violence,

23  or intimidation by threat of violence, committed against their persons or property

24  *because of political affiliation*, or on account of any characteristic listed or defined in

25  subdivision (b) or (e) of Section 51."  Cal. Civ. Code § 51.7(b)(1) (emphasis added).

26  First, this section makes clear that the Legislature is well aware of how to specify that a

27  civil rights act applies to "political affiliation."  Second, if the Unruh Act covered

28  political affiliation, the Legislature would have had no need to specify political

1    affiliation in the Ralph Act, as the citation to the Unruh Act (that is, subdivision (b) of

2    Section 51) would have included political affiliation.

3           Also counseling against adding "political discrimination" to the Unruh Act is the

4    fact that the Legislature has maintained an active role in amending and adding to the

5    Unruh Act.  *See* 1992 Cal. Legis. Serv. Ch. 913 (A.B. 1077) (adding "disability" to the

6    list of protected categories); 2000 Cal. Legis. Serv. Ch. 1049 (A.B. 2222) (revising

7    definitions of mental and physical disability and medical condition); 2005 Cal. Legis.

8    Serv. Ch. 420 (A.B. 1400) (adding marital status and sexual orientation to the list of

9    protected categories); 2011 Cal. Legis. Serv. Ch. 261 (S.B. 559) (prohibiting

10   discrimination on the basis of genetic information); 2011 Cal. Legis. Serv. Ch. 719

11   (A.B. 887) (amending the definition of gender to include gender identity and

12   expression); 2015 Cal. Legis. Serv. Ch. 282 (S.B. 600) (prohibiting discrimination on

13   the basis of citizenship, primary language, and immigration status).  Had the California

14   Legislature intended to give broader protections to individuals on the basis of their

15   political affiliation than what is present in the Ralph Act, it would have done so.[4]

16          The Court declines the invitation to usurp a legislative function by adding a new

17   protected class to the Unruh Act.  This is in keeping with the California courts' modern

18   approach of giving deference to the Legislature.  It is also consistent with the few

19   cases to address this issue, all of which have reached the same conclusion that "the

20   Unruh Civil Rights Act does not protect against discrimination based upon political

21   affiliation or the exercise of constitutional rights."  *Williams v. City of Bakersfield*, No.

22   1:14-cv-01955-JLT, 2015 WL 19161327 at *5 (E.D. Cal. Apr. 27, 2015), citing *Kenney v.*

23

---

24   [4] Some California courts have embraced a tri-partite test to determine whether to add a protected
     classification to section 51 which consists of analyzing "(1) the language of the statute, (2) the legitimate
25   business interests of the defendants, and (3) the consequences of allowing the new discrimination
     claim."  *See Scripps Clinic v. Superior Court*, 108 Cal. App. 4th 917, 933 (2003) (quoting *Hessians*, 86
26   Cal. App. 4th at 836).  Given the text of section 51, the clear indication of legislative intent to exclude
     political affiliation from section 51's protections evidenced by section 51.7, and the fact that no court
27   has found this test to be met in the twenty years since its inception, the Court declines to engage in an
     inquiry regarding "legitimate business interests" and "the consequences of allowing the new
28   discrimination claim," which are inquires best left to the California Legislature.

1    *City of San Diego*, 13-cv-248-WQH-DHB, 2013 WL 5346813 (S.D. Cal. Sept. 20, 2013).

2                                               2

3            Even if political discrimination were actionable, application of the Unruh Act is

4    "confined to discriminations against recipients of the 'business establishment's . . .

5    goods, services or facilities.' [Unruh Act] claims are thus 'appropriate where the

6    plaintiff was in a relationship with the offending organization similar to that of the

7    customer in the customer-proprietor relationship.'" *Thurston v. Omni Hotels Mgmt.*

8    *Corp.*, 69 Cal. App. 5th 299, 306 (2021), *review denied* (Dec. 22, 2021) (quoting *Smith*

9    *v. BP Lubricants USA Inc.*, 64 Cal. App. 5th 138, 149 (2021)).  Where the plaintiff is not

10   an actual customer or patron of a business, the plaintiff must still have a similar

11   relationship with the business or must have attempted to utilize the business's services

12   or accommodations in a similar way to a customer in order to have standing to sue

13   under the Unruh Act.  *Id.*

14           The RNC does not allege that it had such a relationship with Google or that it

15   attempted to use Google's services as a typical customer.  The Complaint provides a

16   description of the typical customer-proprietor relationship that Google has with Gmail

17   users.  First it states that "[a]ny person can get a Gmail account if they meet the age

18   requirement to create a Google Account and agree to Google's terms of services."

19   (Compl. ¶ 15.)  Second, "[i]n return for its service, Google collects key information

20   from the user . . . then uses that data or sells it to third parties to use.  Google also sells

21   to third parties the ability to post or send a targeted, personalized advertisement in

22   the user's inbox."  (Compl. ¶ 16.)  The RNC cannot show that it is a Gmail user or uses

23   Gmail as a typical user.  Rather, the RNC merely sends emails to Gmail users.

24   Accordingly, RNC lacks a relationship with Google sufficient to give it standing to raise

25   a complaint under the Unruh Act.

26           Alternatively, a plaintiff may allege that they "possess[ed] a bona fide intent to

27   sign up for or use [the business's] services," and "encounter[ed] terms or conditions

28   that exclude[d] the person from full and equal access to its services."  *Thurston*, 69 Cal.

                                              27

App. 5th at 307–08 (quoting *White v. Square*, 7 Cal. 5th 1019, 1032 (2019)).  In

*Thurston v. Omni Hotels Management Corporation*, the court found that the plaintiff

had standing to sue under the Unruh Act because she alleged that she had the intent

to and attempted to book a hotel room as a typical customer.  69 Cal. App. 5th at 306.

Similarly in *White v. Square*, the plaintiff had standing to sue under the Unruh act

where he intended to enter into a business relationship with Square by signing up for

its services, but encountered a discriminatory policy that prevented him from doing

so.  7 Cal. 5th at 1031.  Here, the RNC makes no such allegation that it intended to

sign up for and use Google's services as a typical user.

***

Plaintiff cannot plausibly allege a claim under the Unruh Civil Rights Act as it

does not protect against discrimination on the basis of political affiliation, and

because Plaintiff lacks standing under state law.  Defendant's Motion to Dismiss is

therefore GRANTED as to Count Two without leave to amend.

### iv.   Intentional Interference with Prospective Economic Relations

Plaintiff's fourth cause of action is the tort of intentional interference with

prospective economic relations arising under California state law.  "[A] plaintiff

seeking to recover for an alleged interference with prospective contractual or

economic relations must plead and prove as part of its case-in-chief that the

defendant not only knowingly interfered with the plaintiff's expectancy, but engaged

in conduct that was wrongful by some legal measure other than the fact of

interference itself."  *Della Penna v. Toyota Motor Sales, U.S.A., Inc.*, 11 Cal. 4th 376,

393 (1995).  "[A]n act is independently wrongful if it is unlawful, that is, if it is

proscribed by some constitutional, statutory, regulatory, common law, or other

determinable legal standard."  *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th

1134, 1159 (2003).  The RNC has failed to properly plead this cause of action because

it has not plead that Google's conduct is independently wrongful.

In its Opposition, Plaintiff asserts that under the California Supreme Court's

1  decision in *Della Penna* it need not allege "conduct [which] amounted to an

2  independently tortious act, or was a species of anticompetitive behavior proscribed

3  by positive law, or was motivated by unalloyed malice." (Opp'n. at 29 (quoting *Della*

4  *Penna*, 11 Cal. 4th at 378).) However, Plaintiff misrepresents this language from *Della*

5  *Penna*. In context, it is clear that the court specifically declined to consider whether

6  those items were required to prove a wrongful act:

7          We do not in this case, however, go beyond approving the
           requirement of a showing of wrongfulness as part of the
8          plaintiff's case; the case, if any, to be made for adopting
           refinements to that element of the tort—requiring the plaintiff
9          to prove, for example, that the defendant's conduct
           amounted to an independently tortious act, or was a species
10         of anticompetitive behavior proscribed by positive law, or
           was motivated by unalloyed malice—can be considered on
11         another day, and in another case.

12  *Della Penna*, 11 Cal. 4th at 378.

13          Indeed, the court did later consider that precise issue in *Korea Supply* finding

14  that such a showing is required to allege the predicate wrongful act. *Korea Supply*, 29

15  Cal. 4th at 1159. The *Korea Supply* court determined that "the act of interference with

16  prospective economic advantage is not tortious in and of itself," and necessitated that

17  the alleged conduct be "independently wrongful." *Id.*; *see also Della Penna*, 11 Cal.

18  4th at 393 (the alleged conduct must be "wrongful by some legal measure other than

19  the fact of interference itself.") An act is independently wrongful if it is proscribed by

20  some "determinable legal standard" and is independently actionable or "provide[s]

21  for, or give[s] rise to, a sanction or means of enforcement for a violation." *Stevenson*

22  *Real Est. Servs., Inc. v. CB Richard Ellis Real Est. Servs., Inc.*, 138 Cal. App. 4th 1215,

23  1223 (2006) (finding that "well-defined, established rules or standards of a trade,

24  association or profession . . . may constitute 'a determinable legal standard'" if there is

25  a means of enforcement such as right of arbitration). That a defendant's conduct may

26  be "unethical" or may have violated industry standards is insufficient. *Gemini*

27  *Aluminum Corp. v. California Custom Shapes, Inc.*, 95 Cal. App. 4th 1249, 1259 (2002).

28          The RNC argues that Google's conduct was independently wrongful because

1  "(1) it is political discrimination against the RNC, (2) it is dishonest to Google's users

2  and the public, and (3) Google repeatedly lied about it."  (Opp'n. at 29.)  As

3  established above, political discrimination is not prohibited by California anti-

4  discrimination laws and so Google's alleged discrimination would not be unlawful.

5  The latter two reasons do not provide a "determinable legal standard" under which

6  the Court could find the conduct wrongful; they rest on a "nebulous" theory of

7  wrongfulness which other courts have rejected.  *See, e.g.*, *Gemini*, 95 Cal. App. 4th at

8  1259 (plaintiff could not establish a wrongful act by arguing that the defendant's act of

9  soliciting the account of a company it was doing business with was "unethical," "really

10 bad business," and not "customary in the industry"); *Parlour Enterprises, Inc. v. Kirin

11 Grp., Inc.*, 152 Cal. App. 4th 281, 295 (2007)  (questioning whether defendant's

12 "numerous misrepresentations" and "acts that fell below the 'established standard' of

13 care for a reasonable franchisor" were sufficient to establish independently wrongful

14 conduct).  Neither has the RNC sufficiently pled its other causes of action that could

15 have been a predicate offense.

16      Because Plaintiff has failed to establish that Defendant's alleged interference

17 constituted a separate, independently "wrongful act" that would be an appropriate

18 predicate offense, this claim has not been sufficiently alleged.  Defendant's Motion to

19 Dismiss is GRANTED as to Count Four.  Plaintiff will be granted leave to amend this

20 claim to establish that Defendant's conduct was unlawful by some legal measure.

21      **v.  Negligent Interference with Prospective Economic Relations**

22      Plaintiff's fifth cause of action is for negligent interference with prospective

23 economic relations.  This cause of action requires that "(1) an economic relationship

24 existed between the plaintiff and a third party which contained a reasonably probable

25 future economic benefit or advantage to plaintiff; (2) the defendant knew of the

26 existence of the relationship and was aware or should have been aware that if it did

27 not act with due care its actions would interfere with this relationship and cause

28 plaintiff to lose in whole or in part the probable future economic benefit or advantage

1    of the relationship; (3) the defendant was negligent; and (4) such negligence caused

2    damage to plaintiff in that the relationship was actually interfered with or disrupted

3    and plaintiff lost in whole or in part the economic benefits or advantage reasonably

4    expected from the relationship." *N. Am. Chem. Co. v. Superior Ct.*, 59 Cal. App. 4th

5    764, 786 (1997).

6        As a threshold matter, however, even if Google could be found negligent,

7    "[l]iability for negligent conduct may only be imposed where there is a duty of care

8    owed by the defendant to the plaintiff. . . ." *J'Aire Corp. v. Gregory*, 598 P.2d 60, 63

9    (Cal. 1979). Generally, a party does not owe a duty of care to avoid economic injury.

10    Restatement (Third) of Torts: Liab. for Econ. Harm § 1 (Am. L. Inst. 2020). However,

11    California has recognized a duty to avoid economic injury where there is a "special

12    relationship" between the parties. *Ott v. Alfa-Laval Agri, Inc.*, 31 Cal. App. 4th 1439,

13    1448 (1995). This can be established by a contractual relationship, or a relationship

14    "akin to privity" such that, as a matter of policy, a court can impose a duty. *J'Aire

15    Corp.*, 598 P.2d at 63; *Bily v. Arthur Young & Co.*, 3 Cal. 4th 370, 384 (1992), *as

16    modified* (Nov. 12, 1992) (citing *Ultramares Corp. v. Touche*, 255 N.Y. 170, 175 (1931)).

17        The RNC does not allege a contractual relationship between it and Plaintiff, so

18    the Court turns to whether there is a relationship "akin to privity." In making this

19    determination, courts will consider "[(1)] the extent to which the transaction was

20    intended to affect the plaintiff, [(2)] the foreseeability of harm to him, [(3)] the degree

21    of certainty that the plaintiff suffered injury, [(4)] the closeness of the connection

22    between the defendant's conduct and the injury suffered, [(5)] the moral blame

23    attached to the defendant's conduct, and [(6)] the policy of preventing future harm."

24    *Biakanja v. Irving*, 49 Cal. 2d 647, 650 (1958). The Court addresses each of these six

25    factors in turn.

26        ***Whether the transaction was intended to affect the plaintiff***

27        First, a transaction must be "intended to affect" the third-party plaintiff, not

28    merely have an incidental effect on the plaintiff. In the seminal case *Glanzer v.*

1   *Shepard*, the court held that a bean weigher who had contracted with a bean seller

2   owed a duty to the purchaser of the beans to weigh the beans accurately, despite no

3   privity of contract between the two.  233 N.Y. 236, 238–39 (1922).  The court reasoned

4   that the sale of the appropriate amount of beans to the purchaser "was the end and

5   aim of the transaction" between the weigher and the seller.  *Id.*  This conclusion was

6   supported by the fact that the purchaser was explicitly contemplated in the original

7   transaction, and the weigher even provided a copy of the weight certificate to the

8   purchaser.  *Id.*  Similarly, in *Biakanja*, the plaintiff was the beneficiary of a will which

9   was drafted for the purpose of bestowing the deceased's entire estate to the plaintiff.

10   *Biakanja*, 49 Cal. 2d at 650.  The plaintiff's benefit was explicitly contemplated in the

11   original transaction between the deceased and the attorney, and the attorney

12   therefore owed a duty of care to the beneficiary.  *Id.*

13         Courts have been hesitant to extend a duty of care too far for fear of

14   encompassing a "faceless or unresolved class of persons."  *White v. Guarente*, 43 N.Y.

15   2d 356, 361 (1977); *see also Bily*, 3 Cal. 4th 370 at 406–07.  To avoid this outcome,

16   there must be some indication that the particular plaintiff or a narrow class of plaintiffs

17   was contemplated by the contracting parties when entering into a relationship.  *See,*

18   *e.g.*, *White*, 43 N.Y. 2d at 361–62 (accountant owed a duty to the associates of a

19   limited partnership for whom it prepared audit reports because the associates were a

20   "fixed, definable and contemplated group"); *Bily*, 3 Cal. 4th 370 at 406–07 (auditor

21   owed duty to "[s]uch persons [who] are specifically intended beneficiaries of the audit

22   report who are known to the auditor and for whose benefit it renders the audit

23   report.")

24         Here the privity of contract is between Google and the Gmail users.  The

25   purpose of their transaction is to allow the Gmail user to send and receive emails. This

26   includes receiving emails from the RNC, but not necessarily for the purpose of

27   benefitting the RNC through facilitating monetary donations.  The RNC is one of many

28   third parties that sends bulk emails to Gmail users, and it is unlikely that a Gmail user

1    would create an account for the purpose of donating to the RNC, or that Google

2    would be aware of that purpose.[5]  Plaintiff alleges that its supporters have requested

3    emails from the RNC (Compl. ¶ 22), but this is not enough to show that Google and

4    the Gmail users specifically contemplated the RNC's benefit when entering into their

5    relationship.  The fact that the RNC can effectively solicit donations through Gmail is

6    merely incidental to the relationship between Google and Gmail users.

7         ***Foreseeability of harm***

8         The second factor, foreseeability, is Plaintiff's strongest argument in favor of

9    imposing a duty on Defendant, primarily because the RNC made Google aware of the

10   potential harm.  (Compl. ¶¶ 30–32.)  However, the Supreme Court of California has

11   looked in disfavor on premising a duty based primarily on foreseeably, saying "there

12   are clear judicial days on which a court can foresee forever and thus determine liability

13   but none on which that foresight alone provides a socially and judicially acceptable

14   limit on recovery of damages for [an] injury."  *Thing v. La Chusa*, 48 Cal. 3d 644, 668

15   (1989).  This is especially true when the case involves economic loss.  *Bily*, 3 Cal. 4th at

16   398–400.  "[E]conomic losses 'proliferate more easily than losses of other kinds' and

17   'are not self-limiting' in the same way."  *S. California Gas Leak Cases*, 7 Cal. 5th 391,

18   407 (2019) (quoting Restatement (Third) of Torts: Liability for Economic Harm, Tent.

19   Draft. No. 1 (Am. L. Inst., Apr. 4, 2012)).  Moreover, a duty cannot be created merely

20   because a plaintiff has told a defendant they may be harmed.  Nevertheless, this factor

21   weights in favor of the RNC.

22        ***Certainty of the injury and the connection to the defendant's conduct***

23        Looking to the third and fourth factors in determining whether Google owed a

24   duty to the RNC, Plaintiff has alleged sufficient facts to show some degree of certainty

25   that they suffered injury because of Defendant's conduct.  The RNC has a history of

26

27   [5] The RNC maintains its own website that is accessible to the public, and through which supporters can donate to the RNC.  (Compl. ¶ 33.)  Because this is available, and because email users use their accounts to send and receive many different emails, it is unlikely that donating to the RNC would be the

28   purpose of setting up a Gmail account.

soliciting donations from supporters through Gmail, and, as it alleges, the end of the month is when the RNC historically receives most of its donations.  (Compl. ¶¶ 2, 19.)  The RNC alleges that it experienced a "measurable decrease" in end-of-month donations around the same time that its emails were being filtered at the highest rate.  (Compl. ¶¶ 2, 88.)  The RNC is not certain about whether and how much harm it suffered due to the spam filtering, but estimates the harm is over $75,000.  (Compl. ¶ 66.)  That the RNC likely lost donations as a result of Google's spam filter weighs in favor of imposing a duty.

### *Moral blameworthiness of the conduct*

Fifth, the alleged conduct, negligently mislabeling emails, is not morally blameworthy.  As one of the largest email providers in the United States, Google must filter an untold number of emails daily.  (*See* Compl. ¶ 8.)  The RNC concedes that the primary purpose of the spam filter is to conceal unsolicited and unwanted bulk-emailed messages as a service to its users.  (Compl. ¶ 27.)  Its alleged negligence in not accurately filtering every email is not a moral issue.[6]

While it is concerning that Gmail's spam filter has a disparate impact on the emails of one political party, and that Google is aware of and has not yet been able to correct this bias, other large email providers have exhibited some sort of political bias.  (*See* ECF 30-10 at 9.)  On the other hand, if Google did not filter spam, then it would create another, different harm to a different class of people, namely its users which it has an established relationship with, by subjecting the users to harmful malware or harassing messages.  On the whole, Google's spam filter, though in this instance imperfect, is not morally blameworthy.

////

////

---

[6] As this cause of action is related to negligence, any allegation of *intentional* discrimination would not be relevant to this cause of action or form a basis for determining that Google's conduct was morally blameworthy.

34

1       ***Policy of preventing future harm***

2       Sixth, in light of the comparative harms there is not strong policy in favor of

3 imposing liability on Google to prevent future harm to Plaintiff.  Instead, the policy lies

4 in favor of Google continuing to utilize its spam filter to prevent potential harms to its

5 users.  *See Bily*, 3 Cal. 4th at 404–05 (recognizing that increasing liability might deter

6 socially beneficial behavior).  While no spam filter is perfect, it would not be sound

7 policy to disincentivize the use of spam filters by imposing liability for negligent

8 filtering.  In addition, the onus of preventing the harm does not rest solely on Google.

9 The RNC is free to solicit funds through different channels, to pay for advertising

10 space within Gmail, or to work towards crafting emails which are not recognized as

11 spam.

12       ***Summary of the six factors***

13       Looking at "'the sum total' of the policy considerations at play," *S. California Gas*

14 *Leak Cases*, 7 Cal. 5th at 399, the Court ultimately concludes that imposing liability on

15 Google for the loss of potential financial opportunity suffered by a third-party bulk

16 email sender is not sound policy.  If the Court adopted the theory of liability that

17 Plaintiff requests, it would mean that any email provider could be liable to any of the

18 third-party advertisers or solicitors to whom an email user may donate or purchase

19 from (or possibly only those who make the email providers aware of their solicitation).

20 Either way, such a large and unwieldy group of potential plaintiffs is quite unlike the

21 "fixed, definable and contemplated group[s]" to which a duty of care has been

22 extended.  The Court finds no compelling policy justification for such a broad rule of

23 liability.

24       Defendant's Motion to Dismiss is GRANTED as to Count Five without leave to

25 amend because Defendant owed no duty to Plaintiff regardless of whether Plaintiff

26 can establish that Defendant was negligent.

27 ////

28 ////

### vi.   California Unfair Competition Law

Plaintiff's third claim arises under California's Unfair Competition Law ("UCL") which prohibits "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Pro. Code §17200, *et seq.* The RNC argues that Google's conduct is fraudulent because Google misrepresented that it would deliver emails in good faith and failed to, is unfair for the same reason, and is unlawful because it violates other laws as alleged in the Complaint.

1

Beginning with the claim under the fraud prong, UCL claims which are premised on fraud require the plaintiff to show reliance on the misrepresentation at issue. *See O'Connor v. Uber Techs., Inc.*, 58 F. Supp. 3d 989, 1003 (N.D. Cal. 2014) (citing Cal. Bus. & Prof. Code § 17204; *Morgan v. AT & T Wireless Servs., Inc.*, 177 Cal. App. 4th 1235 (2009)).  The RNC has not plead that it relied on any representations made by Google, but that "[Gmail] users relied on Google as an email service that would allow them to send and receive emails." (Compl. ¶ 79.)  As such the RNC, which is not a Gmail user, does not have standing to bring a claim under the UCL premised on fraud.

2

For the same reason, Plaintiff's claim premised on the "unfair" prong also fails. Plaintiff alleges that the conduct is unfair "because Google presents Gmail as an email service provider that delivers emails in a fair and good faith manner . . . [a]nd yet, Google is surreptitiously preventing the RNC's messages from reaching its supporters' Gmail inboxes." (Compl. ¶ 78.)  Effectively, the claim is that Google misrepresented how it would deliver emails.

While this claim does not explicitly plead fraud, it sounds in fraud such that the RNC would still be required to plead reliance.   Wherever a plaintiff is "proceeding on a claim of misrepresentation as the basis of his or her UCL action [plaintiff] must demonstrate actual reliance." *In re Tobacco II Cases*, 46 Cal. 4th 298, 306 (2009).

36

1    Other courts have found that allegations of misrepresentation under the "unlawful"

2    prong of the UCL trigger the same showing of reliance regardless of whether the

3    plaintiff explicitly alleges it is fraud.  The reason underlying this requirement is to not

4    allow plaintiffs to "sidestep the basic pleading requirements."  *See, Swearingen v. Pac.*

5    *Foods of Oregon, Inc.*, No. 13-CV-04157-JD, 2014 WL 3767052, at *2 (N.D. Cal. July

6    31, 2014); *O'Connor*, 58 F. Supp. 3d at 1003; *Durell v. Sharp Healthcare*, 183 Cal. App.

7    4th 1350, 1355 (2010).  This same principle is equally applicable under the "unfair"

8    prong as well.  *See Perkins v. LinkedIn Corporation*, 53 F. Supp. 3d 1190, 1219–1220

9    (N.D. Cal. 2014).

10                                             3

11        The unlawful prong must be premised on some separate predicate unlawful

12   offense.  Only claims which were sufficiently plead may serve as a predicate claim.

13   *Rivera v. BAC Home Loans Servicing, L.P.*, 756 F. Supp. 2d 1193, 1200–01 (N.D. Cal.

14   2010).  Because the Court has not found any of Plaintiff's other claims to be sufficiently

15   pled, this claim must also fail.

16                                           ***

17        The Court GRANTS Defendant's Motion to Dismiss as to Count Three.  Plaintiff

18   will be granted leave to amend this claim to establish a plausible theory of unfairness

19   or unlawfulness.

20              **C. Request for Judicial Notice and Motion to Strike**

21        At the motion to dismiss stage, the Court may only take notice of facts outside

22   the complaint if either (1) the documents are incorporated by reference in the

23   complaint or (2) they are appropriate for judicial notice under the Federal Rule of

24   Evidence 201.  *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018).

25        As the Court indicated at the outset of the July 13, 2023 hearing, the North

26   Carolina study (Exhibit I (ECF No. 30-10)) and Google's terms of service, and by

27   extension its program policy (Exhibits K and L (ECF Nos. 30-12 and 30-13)) are

28   referenced sufficiently to be considered part of the Complaint, and the Court grants

judicial notice of those documents.  *See Khoja*, 899 F.3d at 1002; *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005).  The other documents are not appropriate for judicial notice at this stage.

Accordingly, the Court GRANTS Defendant's Request for Judicial Notice as to Exhibits I, K, and L, and DENIES Plaintiff's Motion to Strike (ECF 34).

**IV.   Conclusion**

For the above reasons, IT IS HEREBY ORDERED that Defendant's Motion to Dismiss is GRANTED with leave to amend to establish that section 230 does not apply to this action, and to amend Counts Three and Four.  Plaintiff must file any amended complaint within thirty days of the entry of this order.

IT IS SO ORDERED.

Dated:   **August 24, 2023**

Hon. Daniel J. Calabretta
UNITED STATES DISTRICT JUDGE