HARMEET K. DHILLON (SBN: 207873)
harmeet@dhillonlaw.com
MICHAEL A. COLUMBO (SBN: 271283)
mcolumbo@dhillonlaw.com
JEREMIAH D. GRAHAM (SBN: 313206)
jgraham@dhillonlaw.com
ANTHONY J. FUSARO, JR. (SBN: 345017)
afusaro@dhillonlaw.com
DHILLON LAW GROUP INC.
177 Post Street, Suite 700
San Francisco, California 94108
Telephone: (415) 433-1700
Facsimile: (415) 520-6593
*Counsel of Record for Plaintiff Republican National Committee*

THOMAS R. MCCARTHY (admitted pro hac vice)
tom@consovoymccarthy.com
THOMAS S. VASELIOU (admitted pro hac vice)
tvaseliou@consovoymccarthy.com
CONOR D. WOODFIN (admitted pro hac vice)
conor@consovoymccarthy.com
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Suite 700
Arlington, VA 22209
(703) 243-9423
*Counsel for Plaintiff Republican National Committee*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| REPUBLICAN NATIONAL COMMITTEE, <br><br> Plaintiff, <br><br> v. <br><br> GOOGLE LLC, <br><br> Defendant. | Case Number: 2:22-cv-01904 <br><br><br> VERIFIED FIRST AMENDED COMPLAINT FOR INJUNCTIVE RELIEF, DECLARATORY JUDGMENT, AND DAMAGES |



**INTRODUCTION**

1.      This case is about a market-dominant communications firm unlawfully discriminating against the Republican National Committee (RNC) by relegating its email messages to subscribers' spam folders because of the RNC's political affiliation and views. Email is an indispensable means of communication to send important information and to build communities. The RNC also relies on this crucial conduit as it engages in its core mission of conducting political activity in support of the Republican Party. This includes communicating political messaging and important Get-Out-The-Vote information to supporters, as well as maintaining relationships with individuals who have and will continue to financially support the RNC, so that the RNC can fund its political activities. To effectively reach and grow its community, the RNC takes great pains to ensure that not only every email it sends is to someone who requested it but also the subscriber has shown recent active engagement with RNC content.[1]

2.      Nevertheless, Google relegated millions of RNC emails *en masse* to potential donors' and supporters' spam folders during pivotal points in election fundraising and community building. The timing of Google's most egregious filtering is particularly damning. For most of each month, nearly all of the RNC's emails make it into Gmail users' inboxes. At approximately the same time at the end of each month, Google sends to spam *nearly all* of the RNC's emails. Critically, and suspiciously, this end of the month period is historically when the RNC's fundraising is most successful. It doesn't matter whether the email is about donating, voting, or community outreach. And it doesn't matter whether the emails are sent to people who requested them or to subscribers who recently actively engaged with RNC content. This discrimination went on for about ten months—despite the RNC's best efforts to work with Google.

3.      Throughout 2022, the RNC engaged with Google month after month to obtain an explanation and a solution. But at every turn, the RNC was met with empty excuses and useless solutions. Google continued to suppress the RNC's emails, and then Google fell silent, refusing to

---

[1] As further alleged below, the RNC sends almost all its emails from the domain name campaigns.rnchq.com, and it is from this domain name that the RNC sends every email exclusively to those who request them and who has shown recent active engagement with RNC content. Thus, when referring to "nearly all RNC emails," subscribers, and active engagement (and similar phrases), it is referring to emails sent from the campaigns.rnchq.com domain name.

Verified First Amended Complaint                                        Case No. 2:22-cv-01904

discuss the issue further. The only reasonable inference is that Google was intentionally sending critical RNC emails to the spam folder because it's the RNC sending them. Google's bad-faith discrimination has already caused the RNC to lose valuable revenue in California and the rest of the country, and Google's conduct will continue to cost the RNC further revenue. Perhaps worse, Google's conduct caused the RNC to lose its ability to communicate voting information and other political messaging to its supporters during the critical midterm elections. This harm is irreparable.

4.      Google's conduct changed after October 21, 2022, when the RNC filed this suit. Since then, Google has stopped the mass relegation of RNC emails to subscribers' spam folders. The RNC has experienced its usual high inboxing rates consistently throughout the entire year without any *en masse* diversion to recipients' spam folders.[2] But it's not because the RNC has done anything materially different. The RNC has continued to use leading email-marketing services (like Validity and Salesforce) and to adhere to the best practices set out by email platforms (like Google). In fact, in November 2022, the RNC *increased* its email send volume and frequency to Gmail users. If Google's explanations were legitimate, the RNC's emails should have continued going to spam towards the end of the month. Yet no *en masse* diversion occurred then or thereafter. The post-lawsuit, post-election timing of Google's ceasefire in discrimination is damning. And it shows that Google was feigning misunderstanding the problem when it actually knew how to stop relegating the RNC's email to spam the whole time.



---

[2] To be clear, it is not the case that Google has *turned off* its spam filter *in toto* for the RNC specifically. After all, some RNC emails are still being sent to spam. But the emails are being sent to spam at rates along the lines RNC emails were sent to spam *outside* the cyclical *en masse* relegation of emails to spam that occurred during the period when the RNC's fundraising is historically most successful. In other words, since filing this suit, Google's spam filter is acting how it would for any other bulk sender that diligently follows email platforms' best practices.



Verified First Amended Complaint                                 Case No. 2:22-cv-01904

5.     Unfortunately, this is not the first time a communications company has discriminated against people based on their political views and affiliation. But fortunately, there are laws ready to combat this harm. In the 1800s, a pivotal form of communication was the telegraph and Western Union had a dominate market share across the country. By the late 1800s, "legislators grew 'concern[ed] about the possibility that the private entities that controlled this amazing new technology would use that power to manipulate the flow of information to the public when doing so served their economic or political self-interest.'" *NetChoice, LLC v. Paxton*, 49 F.4th 439, 470 (5th Cir. 2022) (opinion of Oldham, J.) (quoting Genevieve Lakier, *The Non-First Amendment Law of Freedom of Speech*, 134 Harv. L. Rev. 2299, 2321 (2021)).

6.     "These fears proved well-founded." *NetChoice*, 49 F.4th at 470. Even though Western Union offered to serve any member of the public, it repeatedly discriminated against messages based on the message's political views or on the person's political affiliation. It, for example, "discriminated against certain political speech, like strike-related telegraphs." *Id.*; *see also* Lakier, *supra*, at 2322. It was also "widely believed that Western Union … 'influenc[ed] the reporting of political elections in an effort to promote the election of candidates their directors favored.'" *NetChoice*, 49 F.4th at 470 (quoting Lakier, *supra*, at 2322); *see also* The Blaine Men Bluffing, N.Y. Times, Nov. 6, 1884, at 5. And it was not the only time Western Union was accused of discriminating based on political views or affiliation: "Similar accusations were made about Western Union's role in the presidential contest[] eight years earlier." Lakier, *supra*, at 2322 n.114 (citing David Hochfelder, The Telegraph in America, 1832-1920, at 176 (2013)).

7.     In response to these discriminatory practices, States across the country enacted nondiscrimination laws that prohibited businesses from "manipulating the flow of information to the public." Lakier, *supra*, at 2322; *see also NetChoice*, 49 F.4th at 471. One such State was California. It passed laws requiring "common carriers" to timely transmit messages in a nondiscriminatory manner. *See* Cal. Civ. Code §2168 *et seq.*

8.     States took other measures to ban businesses from discriminating against the public. States, for example, passed civil rights acts (also called public-accommodation provisions) barring businesses from discriminating based on certain classes, including political affiliation and beliefs.



Verified First Amended Complaint

Case No. 2:22-cv-01904

*See, e.g.*, Eugene Volokh, *Bans on Political Discrimination in Places of Public Accommodation and Housing*, 15 N.Y.U. J.L. & Liberty 490 (2022). California again is one such State. *See* Cal. Civ. Code §§51, 51.5; *see also, e.g.*, *Marina Point, Ltd. v. Wolfson*, 640 P.2d 115, 117 (Cal. 1982) ("political affiliation"); *In re Cox*, 474 P.2d 992, 1000 (Cal. 1970) ("members of the John Birch Society, or who belong to the American Civil Liberties Union").

9.      Despite these efforts by States (and the federal government), history has repeated itself. Once again, a dominant communications company is discriminating based on political affiliation and views and unlawfully controlling the flow of information to the public. At bottom, Google's email service is a modern-day Western Union: Google offers to carry messages in the form of electronic mail. Google allows any adult to make a Gmail account and transmit and receive communications after agreeing to the same boilerplate terms of service. Google possesses a significant market share of the email industry with at least 53% of Americans having Gmail accounts. Google's email service is an indispensable form of communication for the public to access information and to achieve vocational success. And Americans expect that when they email someone who has requested it, the email will be reasonably sent and delivered in the recipient's inbox.

10.      Although Google's tools for discriminating might be more sophisticated than Western Union's, that doesn't make it any less of a business in violation of the longstanding nondiscrimination obligations States like California have enacted. Indeed, nondiscrimination provisions have repeatedly been applied to technology more sophisticated than the telegraph. They apply to the telephone. *See, e.g.*, *Goldin v. Pub. Utilities Comm'n*, 592 P.2d 289, 304 (Cal. 1979). They apply to internet service providers. *See, e.g.*, Cal. Civ. Code §3101 *et seq.*; *ACA Connects v. Bonta*, 24 F.4th 1233 (9th Cir. 2022) (detailing the history of net-neutrality rules). And they apply to social media and other websites. *See, e.g.*, *NetChoice*, 49 F.4th at 473-80, 493-94 (social media like Twitter, Facebook, YouTube); *Candelore v. Tinder, Inc.*, 228 Cal. Rptr. 3d 336 (Ct. App. 2018) (dating application); *White v. Square, Inc.*, 446 P.3d 276 (Cal. 2019) (finance website and application); *cf. State v. Google LLC*, 2022 WL 1818648 (Ohio Com. Pl. May 24) (Google's search engine). Email is not "the point where the underlying technology is … so complicated that the government may no longer regulate it to prevent invidious discrimination." *NetChoice*, 49 F.4th at 479.

11. The Court should thus make clear that California's nondiscrimination provisions apply to Google's Gmail. Whether Google is categorized as a common carrier, public accommodation, or a business providing a service, California law prohibits Google's spam filtration of RNC emails based on political affiliation and views. To conclude otherwise would mean that "email providers, mobile phone companies, and banks could cancel the accounts of anyone who sends an email, makes a phone call, or spends money in support of a disfavored political party, candidate, or business." *Id.* at 445.

12. Google's spam filtering need not be intentional. But the most reasonable inference is that it is intentional. Regardless, Google's conduct at the very least lacks good faith and is negligent and unreasonable. California law forbids that too. Common-carrier law doesn't require intentional discrimination. Neither do common-law claims like negligent interference with prospective relations. Neither does California's unfair-practices law. In the end, Google has violated the law, cost the RNC numerous donations and substantial revenue, and irreparably injured the RNC's relationship with its community.

13. The RNC therefore seeks an order of this court declaring unlawful and enjoining Google's diversion of the RNC's communications to its supporters that use Google's Gmail service, and ordering all other appropriate remedies authorized by law, including compensatory, statutory, and punitive damages and attorneys' fees.

**PARTIES**

14. Plaintiff RNC is the national committee of the Republican Party as defined by 52 U.S.C. §30101(14). The RNC is incorporated in Washington D.C. and has its principal place of business there. The RNC manages the business of the Republican Party throughout the United States at the national level, including by: developing and promoting the party's national platform; supporting Republican candidates for public office at all levels of government; developing and implementing electoral strategies; educating, assisting, and mobilizing voters; raising funds to support the party's operations and candidates; and recognizing and coordinating with the various territorial and state-level party organizations and their officers who serve as RNC members. From January 1, 2021, through September 30, 2022, the RNC has raised approximately $296 million. The RNC uses the

Verified First Amended Complaint                                      Case No. 2:22-cv-01904

1   funds provided by its supporters to engage in interstate commerce by purchasing services in numerous

2   States to fulfill its mission. The RNC's total disbursements in the same period were approximately

3   $349 million.

4       15.   Defendant Google is a Delaware limited liability company whose principal place of

5   business is at 1600 Amphitheatre Parkway, Mountain View, County of Santa Clara, State of

6   California. As the leading internet search engine provider, Google conducts business in all 50 States.

7   Google also provides a variety of other internet-based products, including Gmail, the leading email

8   service provider. *See, e.g.*, N. Gilbert, *Number of Active Gmail Users 2022/2023: Statistics,*

9   *Demographics, & Usage*, FinancesOnline (updated Jan. 14, 2022), perma.cc/6ZBA-N8P2.

10       16.   Google profits significantly from Gmail through advertising, among other

11   things. *See How our business works*, About Google (last visited Sept. 19, 2023), perma.cc/VQ6V-

12   YZ92 ("Because of advertising, we're able to offer our products to users around the world free of

13   charge...."); *cf. NetChoice*, 49 F.4th at 476 ("[T]he Platforms, which earn almost all their revenue

14   through advertising, are among the world's most valuable corporations."). As a general matter,

15   Google does not charge a user monetary fees to use Gmail. Any person can get a Gmail account if

16   they meet the age requirement to create a Google Account and agree to Google's terms of services.

17   *See, e.g.*, Terms of Service, Google, perma.cc/M4CV-3TJ4 ("If you meet these age requirements[,]

18   you can create a Google Account for your convenience. Some services require that you have a Google

19   Account in order to work—for example, to use Gmail, you need a Google Account so that you have

20   a place to send and receive your email."); *cf. NetChoice*, 49 F.4th at 474 (Platforms like Google have

21   "represented a willingness to carry anyone on the same terms and conditions," *i.e.*, without

22   individualized bargaining.).

23       17.   In return for its service, Google collects valuable information from the user. In other

24   words, a user's personal information is the compensation for Google's Gmail services. Google then

25   uses that data or sells it to third parties to use. Google also sells to third parties the ability to post or

26   send a targeted, personalized advertisement in the user's inbox. One example is called a "banner ad."

27   Through a service called "Google Ads," Google sells to third parties the ability to post a banner ad in

28   a user's inbox (among other places), and thus, Google profits in part on the popularity of Gmail. *See*

7



Verified First Amended Complaint            Case No. 2:22-cv-01904

*Reach the right audience with Display Ads*, Google Ads (last visited Oct. 20, 2022), bit.ly/3ZS6dl9 ("Display ads can help you promote your business when people are browsing online, watching YouTube videos, *checking Gmail*, or using mobile devices and apps. The Google Display Network reaches 90% of Internet users worldwide, across millions of websites, news pages, blogs, and Google sites like *Gmail* and YouTube." (emphases added)). These banner ads generally appear at the top of the "Promotions" and "Social" tabs of a Gmail user's inbox.

## JURISDICTION AND VENUE

18.     This court has subject-matter jurisdiction over this matter under 28 U.S.C. §1331, 28 U.S.C. §1367(a), and 28 U.S.C. §1332(a).

19.     Venue is proper in this district under 28 U.S.C. §1391(b) and 31 U.S.C. §3732(a).

## GENERAL ALLEGATIONS

**I.  Email is an indispensable means of communication for the RNC.**

**A. The RNC uses email to fund campaigns and build a community, especially in California.**

20.     The RNC purchases millions of dollars in goods and services each election cycle to pay for its operations, support the campaigns of numerous Republican candidates nationwide, advocate for laws and policies consistent with its members' interests, and litigate on related issues. To get the funds to fulfill its purpose and pay for these activities, it is essential that the RNC cultivate and maintain relationships with and mobilize its supporters. Many RNC supporters repeatedly fund its efforts through election cycles, necessitating and creating an ongoing financial relationship maintained through communications about the RNC's efforts and needs. The ability of the RNC to reach its supporters through email is indispensable to its basic operations.

21.     The RNC's ability to reach supporters through email is indispensable in today's digital world, where landlines and postal mail are rapidly fading in use. And for many RNC supporters, the means of communication through which the RNC can engage with them, and can solicit their support, is Gmail.

22.     This is true in California, specifically. California has the most registered Republicans of the 50 States. And in California, the RNC has eight offices and three community outreach centers:



Verified First Amended Complaint                                Case No. 2:22-cv-01904

Half of the RNC's offices and a third of its community centers are in the Eastern District of California. As in other States, the RNC has sent numerous emails to Gmail users in California who agreed to receive them and who recently engaged with RNC content. As in other States, the RNC's emails have been sent to spam. California has ranked first in donations and money raised in 2022.

23.     From February 2022 to October 2022, the RNC has held approximately 349 events in the Eastern District of California. These events are critical to the RNC's efforts to raise funds, engage voters, and support campaigns. The RNC relies on email to inform its supporters of these events. When the RNC sends emails regarding these events, it expects that those emails will reach their recipients' inboxes. And so do the RNC's subscribers, especially those who recently actively engaged with RNC content. But Google at critical moments was sending those emails to the recipients' spam folders, hindering the RNC's communication with those supporters. Google's actions have impeded RNC's efforts to raise funds, engage voters, and support campaigns in the Eastern District of California, resulting in severe economic and reputational damage to the RNC.

24.     The RNC maintains numerous distinct domains used for email sending. These domains are organized and delineated based on purpose and use case. For example, the RNC operates sender domains dedicated to press releases, staff emails, and mass-marketing emails, among others. At issue here is campaigns.rnchq.com. This domain is used for the RNC's mass-marketing emails, such as fundraising, get-out-the-vote (GOTV), volunteer recruitment, etc. And this domain accounts for nearly all email sends—about 98.8% of the RNC's total send volume across all its domains. All other RNC send domains are designed to be wholly separate and unrelated, as per guidance from Google and other email providers, to avoid domain reputation issues when sending staff emails because of mass-marketing email performance.

25.     Google has pointed to only one other email domain once to justify its discriminatory filtering: team.gop.com. This, however, is a completely separate domain whose purpose and use case fundamentally differs from campaigns.rnchq.com. Team.gop.com is used to send press releases to press lists as well as rapid-response emails, among other things, and accounts for much less than 0.03% of the RNC's total send volume. It is well-known in the industry that email addresses with separate root domains do not affect each other for purposes of email platforms spam filtration. Google

9

confirmed this to be the case in a phone call with the RNC as early as April 2021. Per Google's guidance, this completely separate domain (*i.e.*, team.gop.com) could not affect campaigns.rnchq.com. And in any event, given the domain's minuscule send volume and the audience that receives the emails, this domain could not affect campaigns.rnchq.com in any way.

26. Again, the *en masse* diversion of RNC emails at the end of each month implicated only the domain name campaigns.rnchq.com. That means, however, that Google's mass relegation of RNC emails to spam implicates nearly all of the RNC's emails. And Google was well aware that the RNC uses many different domains, that the domains are completely separate, and that the RNC's complaints about the *en masse* relegation of emails concerned only the domain name campaigns.rnchq.com. Google knew this as early as December 2021, at least because of various emails from the RNC to Google employees, which state that the RNC uses several completely separate domains but also that the only domain the RNC was asking about was campaigns.rnchq.com. For example, on December 13, 2021, when the RNC first detected the issue, the RNC told Google, "The following is our domain address that we are sending from[:] contact@campaigns.rnchq.com." Moreover, each time the RNC submitted headers of emails improperly sent to spam Google was informed of the domain at issue (campaigns.rnchq.com).

**B. The RNC uses industry-standard tools and methods to optimize engagement with RNC emails and content.**

**1. With the relevant domain, the RNC sends emails only to those that request them and tailors its email frequency to the activity of the recipient.**

27. With campaigns.rnchq.com, the RNC sends emails only to those who request them. The RNC maintains a list of people who have requested to receive emails from the RNC. The emails the RNC sends via campaigns.rnchq.com domain are sent only to people on this list, and thus everyone who receives an email from the RNC asked to receive the email. The RNC actively updates the list, so that anyone who no longer wants to receive emails (or a certain type of email) will no longer do so. If the RNC receives a request to no longer receive a particular type of email, it removes the person from receiving the type of emails they unsubscribed from in approximately 24 hours. If the RNC receives a request to no longer receive any emails, then the person is removed from the



Verified First Amended Complaint                                        Case No. 2:22-cv-01904

email list and, within approximately 24 hours, will no longer receive any emails. Thus, the emails sent to spam at issue here were solicited—the Gmail user asked the RNC to send him or her emails.

28.   Not only does the RNC maintain a list of people who have requested emails from the RNC, but the RNC also uses a sophisticated process to determine what segments of the subscriber audience should be sent which emails and how frequently.[3] This is called "audience segmentation," and it is an industry-standard method to optimize engagement with a sender's content.

29.   As a general matter, "[e]mail segmentation identifies and groups your subscribers based on one or more characteristics, including demographics, behavioral data, location, interests, survey results, and changes in engagement." V. Kyle, *Email Segmentation, Simplified*, Validity (June 5, 2023), perma.cc/G46Y-9MLQ; *see also About Audience Segments*, Salesforce Help, perma.cc/YB5X-LH32. The audience segments can be "broad," such as the last activity of the subscriber being within a certain number of days, or "very refined," such as level of education, age, residence, and whether the person has attended a certain event. Kyle, *supra*. "Every business will have unique ways of segmenting and will require different data sets for best results." *Id.*

30.   The RNC is no exception. The RNC's audience segmentation process is highly sophisticated, has been in place for many years, and changes continually to improve performance of email sends. To give an example of basic segmentation the RNC uses: The RNC has at one point limited all emails not only to subscribers, but also to subscribers who have been active within a certain amount of time (*e.g.*, 120 days). Activity can be assessed based on opening RNC emails, clicking on RNC links, signing petitions, donating to the RNC, and other forms of engagement. The RNC's email sends are further stratified: For example, the RNC sends emails more frequently to those who are active within the last 90 days than to subscribers active within the last 120 days. The same is true for those active within the last 60 days compared to those active within the last 90 days. And so on. The RNC's process gets increasingly complex for specific sends or sub-segments of audiences. This segmentation ensures that recently active subscribers receive the emails and that the emails are relevant to the subscriber.

---

[3] There is a critical difference between email *volume* and *frequency*. Email *volume* is the number of emails sent from a particular domain on a given period of time (*e.g.*, daily, weekly, monthly); email *frequency* is the number of emails sent to a particular subscriber's email address in a given period of time.



31.     Google is familiar with established principles of audience segmentation. For example, when Google markets its Google Ads service, it explains at length audience segments and how companies can optimize their businesses, including their marketing and ad "campaigns," using audience segmentation.

32.     Google is thus well aware that audience segmentation enables companies to target their most engaged audiences, tailoring their email frequency to that recipients' engagement with the companies' services. In fact, prioritizing email volume to the most engaged users is a Google Gmail best practice. *See Prevent mail to Gmail users from being blocked or sent to spam*, Google Help, perma.cc/95SX-5HJM ("[s]end email to engaged users only" and "[o]nly send email to people who want to get messages from you" because "[t]hey're less likely to report messages from your domain as spam"); *see also Email Marketing*, Validity, perma.cc/E4LT-WDEL ("Follow best practices to maintain a good sender reputation and high deliverability rates," including "[s]end[ing] to an active audience" by "[a]void[ing] spam traps and disengaged subscribers by segmenting your audience and sending only to people who have been active within a specified time frame").

33.     The RNC also uses other industry-standard techniques to improve engagement with emails. One example is "A/B Tests." An email A/B test is a method where the sender "create[s] two versions of an email … and send[s] them" to two different groups of a sender's audience. D. Cadet, *Mastering Email A/B Testing: Strategies, Tools, and Tips*, Validity (July 20, 2023), perma.cc/CNH8-RRRN. "The goal is to determine which version performs better and yields higher engagement, whether in the form of click-through rates, conversions, or any other metrics that matter to you." *Id.*; *see also Email Testing*, Validity, perma.cc/W73D-KW85; *Email Marketing*, Validity, perma.cc/E4LT-WDEL ("A/B testing … is the best way to make data-driven campaign decisions."). The basic idea is to "focus on just one variable within your email" to see how changing that one variable affects a certain "metric." *Id.* For example, "if improving open rates is your goal, A/B testing subject lines can help you discover what [gets] your audience to open" an email. *Id.* "You can objectively measure the impact of each variable on your email performance and make informed decisions based on concrete evidence rather than assumptions." Cadet, *supra*. This helps "email optimization" and "drives better results over time." *Id.* The RNC has long used A/B testing, well



1    before Google's discriminatory filtering. But A/B testing and its benefits are undermined when

2    arbitrary and discriminatory filtering occurs. Moreover, a market-strong email service provider whose

3    spam filtering tool repeatedly foils the industry-standard process of A/B testing would be surprising,

4    to say the least. For example, the RNC can more effectively use A/B testing when the recipient uses

5    other email service providers, such as Microsoft and Yahoo, because no *en masse* arbitrary and

6    discriminatory filtering has occurred with those service providers.

7          **2.   The RNC uses industry-standard tools and contracts with leading email-marketing**

8                **companies to ensure that RNC emails follow email platforms' best practices.**

9          34.   The RNC contracts with leading companies in the field of email marketing to ensure

10   that the RNC's email practices adhere to service providers' best practices and to maximize how often

11   its emails reach a recipient's inbox rather than its spam folder.

12         35.   One reason the RNC uses these companies is to evaluate and maximize its "inboxing

13   rate." How often a sender's emails reach a user's inbox is called the "inboxing rate." The "inboxing

14   rate" is a critical metric to diagnose and fix issues that cause emails to go to spam. And the RNC

15   strives to keep its inboxing rate high.

16         36.   Google does not provide data on whether an email reaches a Gmail user's inbox. So to

17   optimize email inboxing, the RNC contracts with a leading company in the field called Validity to

18   use its email-deliverability platform Everest. According to Validity, "Everest is the absolute pinnacle

19   of email marketing" and is one of the few programs "that gives you full control of all critical stages

20   of email marketing." Together, the RNC can essentially monitor whether its emails reach a user's

21   inbox or are filtered into spam using an industry-accepted method. At a general, simplified level, the

22   RNC, with Everest, has created hundreds of email addresses used specifically to determine whether

23   an email sent by the RNC reaches an inbox or is sent to spam. When the RNC sends an email, it

24   generally sends the email to (1) a subset of its self-created email addresses and (2) a subset of people

25   on its email list. Because the RNC has control over its self-created addresses, the RNC can collect

26   data on an email's performance. With help from Everest, a statistical analysis is performed to estimate

27   the inboxing rate of the email the RNC sent.

28         37.   Thus, if Everest and the RNC calculate an inboxing rate of nearly 0%, it means that



13

Gmail hid nearly every email sent by the RNC during the relevant period of time.

38.     Here is an example of an RNC email sent to Californians who requested emails (and met the relevant audience segmentation) and that Google sent almost completely to spam:



39.     The RNC also contracts with Salesforce, an email service provider (ESP) and "the world's leading email marketing platform." *Meet Email Studio*, Salesforce, perma.cc/AVM2-Z5C5. Specifically, the RNC contracts with Salesforce for two services relevant here: Salesforce Marketing Cloud and Salesforce Deliverability Services. The Marketing Cloud provides the RNC with access to the Marketing Cloud Email Service Provider, which is an email send platform that users use to, among other things, send email campaigns, manage subscriber lists, segment audience data, and run sophisticated A/B tests. *See, e.g.*, *Make every moment count with Marketing Cloud*, Salesforce, perma.cc/UU46-UVE4; *Meet Email Studio*, *supra*. The RNC also contracts with Salesforce for Salesforce Deliverability Services. That service provides the RNC advice and expertise on deliverability and inboxing. The RNC regularly communicates with its account representative for deliverability at Salesforce. Salesforce has established relationships directly with all the major internet service providers' Postmaster Tools, which enables Salesforce to escalate certain issues quickly.

Verified First Amended Complaint                                     Case No. 2:22-cv-01904

40.     For example, Salesforce ensures that the RNC meets certain policies, such as authentication policies. Common authentication policies include Domain-based Message Authentication, Reporting, and Conformance (DMARC), Sender Policy Framework (SPF), and DomainKeys Identified Mail (DKIM). These policies help ensure the person sending an email is legitimate (*e.g.*, not spam or someone impersonating the sender). These rules can be edited only by the person who owns a domain name (*e.g.*, campaigns.rnchq.com) and are then communicated between the ESP (*e.g.*, Salesforce) and the recipient (*e.g.*, Gmail). When Salesforce audits the RNC's records and verifies them, they are letting the RNC know these policies are aligned, the rules are being followed, and that these records are passing correctly. Just before, during, and right after each of the *en masse* diversions to requestors' spam folders, the RNC's domain was authenticated and verified, according to industry-standard tools.

41.     The RNC also takes advantage of "Postmaster Tools." Each internet service provider (ISP) has its own "Postmaster Tools." In general, ISPs direct marketers to their tools to evaluate reputation of the sender's domain reputation. Google Postmaster is a program by Google that Google claims allows senders, like the RNC, to look at email delivery, user complaints, spam traps, authentication, domain reputation, and how the RNC's subscribers engage with its emails. *See Postmaster Tools by Gmail*, Google, perma.cc/N4G2-2JSG. It provides data on email performance, including delivery rates (not inboxing rates) and spam complaints. *See Get Started with Postmaster Tools*, Gmail Help, perma.cc/33FE-ZRPA. The RNC uses Google Postmaster to keep a close eye on its email performance and domain reputation (in Google's eyes at least).

42.     For example, Google Postmaster provides the user reported spam rate for a particular domain. According to Google, the spam rate is the percentage of emails marked as spam by users versus emails sent to the inbox for active users. Before filing this suit, the RNC's median spam rate was approximately 0.1%, and its average spam rate was approximately 0.14%. The RNC had no sustained periods of time of a 0.3% spam rate or higher. In fact, the RNC had only one instance of a 0.3% spam rate for a single day. The RNC's spam rate has not meaningfully changed since filing this suit.

43.     The RNC strives to maintain low user complaints, avoid spam traps, stay authenticated, and keep high reputations. Validity and Salesforce helps ensure the RNC minimizes its spam rate and



1    maintain a high domain reputation.

2          44.    In addition to Postmaster Tools, Google forms a distinct relationship with bulk

3    emailers. Google also offers a "Sender Contact Form," so that bulk senders have a way to "contact"

4    Google's "Gmail Team" for improperly marking the senders' emails as spam. *Sender Contact Form*,

5    Gmail Help, perma.cc/7WGJ-HB2Y; *see also Submit the Google Bulk Sender Form*, Salesforce Help

6    (Oct. 13, 2022), sforce.co/46sL1ox ("While Gmail does not offer up a contact path to discuss

7    deliverability issues directly with a Google representative, there is a way for clients to reach out to

8    Google to ask them to reconsider spam folder delivery."). Google says that it will "use the information

9    … provide[d] to investigate and improve [its] spam and abuse detection systems." Sender Contact

10   Form, *supra*. It "may take up to 15 days to see … improvement." Submit the Google Bulk Sender Form,

11   *supra*. Google also sometimes will perform best-practices training to bulk senders who do not use

12   Gmail but send to Gmail users.

13         45.    Google also has a distinct relationship with politically oriented email senders. For

14   example, Google has a "Civics Outreach team." This team helps "build[] products and programs to

15   help people across the globe engage with the democratic process," including by helping the "use [of]

16   specific tools," such as Gmail. *Learn How To Use Google Tools*, Google Civics, perma.cc/2GCN-

17   YWXS. This team also provides an email address (civics-outreach@google.com) "for questions and

18   support." The team is also "focused on helping campaigns and elected officials effectively use Google

19   and YouTube products to reach voters and on helping them enhance their election security." *See, e.g.*,

20   A. Storey, *Our work on the 2020 U.S. election*, Google Civics (Dec. 9, 2020), perma.cc/D7GH-3HEY;

21   L. Richardson, *Our ongoing work to support the 2022 U.S. midterm elections*, Google Civics (Sept. 1,

22   2022), perma.cc/MC2J-ABDK. Google has told the RNC that its "Civics Outreach team (civics-

23   outreach@google.com) is always here to assist" the RNC.

24   **II.   Google unreasonably and in bad faith sent RNC emails to the spam folder during critical**

25        **moments in election fundraising and community building.**

26         46.    Google repeatedly sent RNC emails to spam contrary to the spam folder's purpose. As

27   a service to its users, and to increase its own profits, Google intercepted certain messages intended for

28   its users that comprise unsolicited and unwanted bulk-emailed messages and placed them in a separate

Verified First Amended Complaint                                    Case No. 2:22-cv-01904

folder, called the spam folder. But the spam folder's purpose is to conceal from users unrequested and unwanted messages from unknown senders. *See, e.g.*, *Spam*, Black's Law Dictionary (11th ed. 2019) ("Unsolicited commercial e-mail."). This obviously does not apply to the RNC's emails to its subscribers, who have requested to receive the emails and who recently actively engaged with RNC content. Yet Google sent these emails to spam anyway.

47.     And Google's most egregious discrimination began in at least February 2022. That month, while the RNC was working on matters related to the 2022 midterm election, the RNC detected that its Gmail "inboxing" rate suddenly dropped from rates consistently above 90% to nearly 0% on certain days during the last week of the month. This inboxing rate of nearly 0% means that Gmail hid nearly every campaign email sent by the RNC from the Gmail users on whom the RNC financially relies. Google's mass diversion of RNC emails has reoccurred every subsequent month of 2022, at least until the filing of this lawsuit. Google has provided a series of false explanations for its spam filtering.



48.     Significantly, Google's most egregious spam filtering has repeatedly occurred towards the end of the month—the most effective and important period for these transactions between the RNC and its supporters. And Google was aware of this fact before suddenly diverting the RNC's emails in December 2021 because it is common knowledge and well-known in the email mass-marketing

Verified First Amended Complaint                                    Case No. 2:22-cv-01904

1  industry that the end-of-the-month and the end-of-the-quarter are critical periods for email campaigns

2  by political organizations. In any event, Google continued to divert the RNC's emails towards the end

3  of each month even after the RNC repeatedly informed Google that the periods were critical to its

4  fundraising, community building, and GOTV messaging as early as at least March 2023.

5        49.    And tellingly, the *en masse* spam filtering stopped just after the RNC filed this suit,

6  even though the RNC has not meaningfully changed its email sends.

7        50.    Since the 2020 election, the RNC has dramatically reduced both email volume and

8  frequency. For example, at some points during the 2020 election, the RNC would send requesters

9  hourly emails, yet there was no *en masse* diversion to spam. In 2021, the RNC sent one fourth the

10  number of emails than in 2020, yet except for the end of 2021 (December 2021), the RNC detected no

11  *en masse* relegation of emails to spam. During 2022, the RNC further reduced email volume and

12  frequency, yet the RNC experienced clockwork diversion of emails towards the end of each month

13  from January 2022 to October 2022 (when the RNC filed this suit).

14        51.    In November 2022, after this suit was filed, the RNC increased its email volume and

15  frequency; this time, however, there was no *en masse* relegation. The only relevant differences are that

16  the RNC filed this lawsuit and the midterm elections are over. Both facts tend to show that Google had

17  control over the RNC's inboxing, and it suppressed those emails because it was the RNC sending them.

18        52.    For nearly a year, the RNC has engaged with Google, urging it to stop its interference

19  with the RNC's relationship with its financial supporters. In that time, the RNC has refuted each of the

20  serial excuses Google has offered for why it persists in blocking the RNC's emails to its supporters.

21  Google fell silent as the RNC approached the pivotal 2022 election.

22        53.    Upon noticing that Google was diverting nearly all of its emails to users' spam folders

23  in December 2021, the RNC contacted Google to discuss the issue:

24        I wanted to see if you had time today or tomorrow to discuss an urgent issue,
          we are experiencing regarding our Gmail inboxing.

25

26        We have now had 5 full days of 0 inboxing on Gmail. It appears to have
          come out of nowhere, as we are following best practices prescribed by
          Google, and have not changed our segmenting or opt-in criteria recently.

27

28        Typically, we only send to those who have opened an email from us within
          the last 120 days (we add frequency to our cadence if they have opened



18

more recently). However, for the last several days we have segmented down to only email those who have opened an email from us within the last 30 days but have seen no forward progress.

As of today, we are only emailing those Gmail users who are donors to us and have also opened within the last 15 days. We will see if this provides us any upward lift, but as this is a significant hit to our voter contact and fundraising programs, I wanted to connect with you to see if there was any way to get eyes and ears on what is going wrong here and how we can mitigate it.

We are in contact with our representatives at Salesforce and at Validity Return Path [now called Validity Everest], though they do not seem to be able to identify any cause or resolution to the issue.

Please let me know what our best next steps should be here.

54.    Google responded by suggesting that the RNC reduce the volume and frequency of emails that it sends. Google also asked the RNC to submit the headers for the emails in question, so that Google could identify the email traffic in question. *See generally What is an Email Header?*, What Is My IP Address, bit.ly/3PwFXYC. The RNC did, and did so for each subsequent *en masse* relegation of emails to spam. The RNC and Google also agreed to stay in regular communication to address the issue.

55.    From January 28, 2022, to January 30, 2022, the RNC again noticed a sharp decline in its Gmail inboxing rate. It again contacted Google, which did not provide any additional advice.

56.    On February 14, the RNC conducted an internal test called the "A/B test." Unsurprisingly, the RNC, like others in the industry, runs multiple A/B tests every day. The purpose of this particular A/B test was to assess whether making the cellphone-number field required on the donation form affected engagement by a certain audience segment. For this test, the RNC created two versions of an email whose contents were identical—except that Version *A* and Version *B* had links to different variants of an RNC donation page. Both donation pages were freshly created, and the links were RNC WinRed links, which the RNC uses in many of the emails it sends that reach Gmail users' inboxes. The only difference between the two pages is that one requires the donor to provide a cellphone number, while the other makes the cellphone-number field optional.[4] The RNC then selected two

---

[4]    Here are the two links: (1) https://secure.winred.com/rnc/trump-valentine-card and (2) https://secure.winred.com/rnc/trump-valentine-card-mr.



Verified First Amended Complaint                                      Case No. 2:22-cv-01904

1   groups of different individuals from the RNC's active donor audience—Group $X$ and Group $Y$—to send

2   the emails to; there was no overlap between the groups. At the same time, the RNC sent Version $A$ to

3   Group $X$ and sent Version $B$ to Group $Y$. Even though no recipient received two emails, Version $A$

4   inboxed at the normal rate, while Version $B$ inboxed at a rate of approximately 0% (*i.e.*, Version $B$ went

5   entirely to spam, while Version $A$ didn't).



Verified First Amended Complaint                                          Case No. 2:22-cv-01904

Erin from the GOP <contact@campaigns.rnchq.com>
Fri 10/6/2023 9:11 AM
To:Benyamin Anjomshoaa - Digital <BAnjomshoaa@gop.com>

christian

I just wanted to make sure that you saw this email and knew this is your LAST CHANCE to sign President Trump and Melania's SURPRISE Valentine's Day Card.

Don't wait any longer. Sign in the next 60 MINUTES to make sure President Trump and Melania see your Valentine's Day message! >>

Thank you,

GOP HQ

ADD YOUR NAME NOW >>

--------- Forwarded Message ---------
From: Wish President Trump & Melania a Happy Valentine's Day
Subject: FWD: Sign before it's too late
To: cwschaeffer8@gmail.com



Wish President Trump and Melania a Happy Valentine's Day

SIGN THE SURPRISE VALENTINE'S DAY CARD

ADD YOUR NAME NOW >>>

Thank you,

GOP Headquarters

ADD YOUR NAME NOW >>

Paid for by the Republican National Committee
Not authorized by any candidate or candidate's committee.
www.GOP.com

You are receiving this email at cwschaeffer8@gmail.com
Republican National Committee (RNC), 310 1st Street SE Washington, DC, 20003-1885, US

We believe this is an important way to reach our grassroots supporters with the most up-to-date information regarding the efforts of the Republican Party.

Thank you for joining our movement. It's because of Patriots, like YOU, that we will take back the Senate and the House in 2022. Reaching grassroots supporters directly is CRITICAL if we're going to succeed, and in order to do that, we need to provide them with the most up-to-date information on all of our efforts.

If you want to be one of the FIRST Patriots to get the latest updates on efforts directly from the Republican Party, please make sure to follow us on Facebook and Twitter, and TEXT MAGA22 to 80810.

If you would like to opt-out of important updates like this, please click here. If you'd like to stay up and activate your 2022 Sustaining Membership, click here. It's because of the commitment and support from true Patriots, like YOU Christian that we will WIN BIG in 2022!

Privacy Policy

Erin from the GOP <contact@campaigns.rnchq.com>
Fri 10/6/2023 9:11 AM
To:Benyamin Anjomshoaa - Digital <BAnjomshoaa@gop.com>

christian

I just wanted to make sure that you saw this email and knew this is your LAST CHANCE to sign President Trump and Melania's SURPRISE Valentine's Day Card.

Don't wait any longer. Sign in the next 60 MINUTES to make sure President Trump and Melania see your Valentine's Day message! >>

Thank you,

GOP HQ

ADD YOUR NAME NOW >>

--------- Forwarded Message ---------
From: Wish President Trump & Melania a Happy Valentine's Day
Subject: FWD: Sign before it's too late
To: cwschaeffer8@gmail.com

Wish President Trump and Melania a Happy Valentine's Day

SIGN THE SURPRISE VALENTINE'S DAY CARD

ADD YOUR NAME NOW >>>

Thank you,

GOP Headquarters

ADD YOUR NAME NOW >>

Paid for by the Republican National Committee
Not authorized by any candidate or candidate's committee.
www.GOP.com

You are receiving this email at cwschaeffer8@gmail.com
Republican National Committee (RNC), 310 1st Street SE Washington, DC, 20003-1885, US

We believe this is an important way to reach our grassroots supporters with the most up-to-date information regarding the efforts of the Republican Party.

Thank you for joining our movement. It's because of Patriots, like YOU, that we will take back the Senate and the House in 2022. Reaching grassroots supporters directly is CRITICAL if we're going to succeed, and in order to do that, we need to provide them with the most up-to-date information on all of our efforts.

If you want to be one of the FIRST Patriots to get the latest updates on efforts directly from the Republican Party, please make sure to follow us on Facebook and Twitter, and TEXT MAGA22 to 80810.

If you would like to opt-out of important updates like this, please click here. If you'd like to stay up and activate your 2022 Sustaining Membership, click here. It's because of the commitment and support from true Patriots, like YOU Christian that we will WIN BIG in 2022!

Privacy Policy

Verified First Amended Complaint                                    Case No. 2:22-cv-01904

57.     The RNC replicated the test using a new email send (*i.e.*, not the same email as the first A/B test), with an identical Version *A* and Version *B* that again only differed in the variant of the donation pages they linked to. These emails again were sent to two groups that did not overlap. The RNC observed the same result: An entire batch of one version of the email went to spam, while the other did not. This test suggests that Google is not suppressing RNC emails based on their communicative content.

58.     The RNC immediately informed Google of the results of its February 14 test and provided the emails used in that test, which clearly showed the domain the RNC was using as well. The RNC also stressed with Google that it "need[ed] to move quickly on solving the issue so that [the RNC] can continue to plan email content and testing." Although Google initially told the RNC that it would check with its product team and provide an explanation as soon as it could, Google did not respond for the rest of the month. To this day, Google has never responded to the RNC's findings.

59.     From February 1 to 2, and on February 21, Gmail diverted the RNC's emails to spam folders, causing its inboxing rate to fall to approximately 0%.

60.     Shortly after this diversion, the RNC contacted Google and asked whether there was "any movement and if there is anything [the RNC] can do to escalate the situation. The inboxing issues are … just as inconsistent and arbitrary, and they are severely impacting [the RNC's] ability to communicate with voters. Hence [the RNC's] urgency…. [U]ltimately this is causing [the RNC] major issues."

61.     On March 4, Google responded that the monthly crashing of the RNC's inboxing rate was due to a high number of user complaints (specifically, "a lot of Gmail users are marking [RNC] messages as spam"). It also sent the RNC a list of best practices to avoid having emails labeled as spam, such as monitoring their "Postmaster's Tools" or checking their Email Service Provider for any irregularities.

62.     But Google's explanation was not true. As the RNC informed Google, it already had been actively monitoring its Postmaster Tools, and those tools showed that there were no reputational issues. Indeed, the "complaint rate [wa]s incredibly low at .02% over the past several months." The RNC also had been told by its ESP, Salesforce, that there were no irregularities causing the issue. There



Verified First Amended Complaint                                                                    Case No. 2:22-cv-01904

was also no increase in user complaints preceding periods when its inboxing rate fell to nearly 0%. In addition, the RNC reiterated the A/B tests it ran and that Google had yet to address it. At bottom, the RNC had "provided a lot of detail and specific examples that should give [the relevant Google] team everything they need. There's got to be a better answer here" than no meaningful answer at all.

63.    From March 25 to 26, the RNC's inboxing rate again fell to approximately 0%.

64.    On March 25, the RNC again contacted Google to notify them that the issue was reoccurring, even though the RNC's "IP reputation and domain reputation remain[ed] in the same [strong] levels" as before the discriminatory spamming ever began. If anything, stated the RNC, its reputation improved. The RNC also reminded Google that the RNC previously submitted information to Google, such as the email address from which its emails were sent, the displayed name of the sender, the subject line, and preview text using a Google form designed to collect this information to avoid mislabeling a sender's email as spam. The RNC also expressed "frustrat[ion]" that each month the RNC appears to start back at "square one." The RNC "continuously raise[s] flags about [the *en masse* diversion] issue at the beginning of the month and never receive[] any guidance from [Google]." Yet the RNC does not "even get a follow-up meeting scheduled," as the RNC has "requested several times." Nor did the RNC get any new explanation for the near complete relegation of its emails.

65.    Eventually, Google agreed to meet again with the RNC to discuss these issues.

66.    To provide context ahead of the meeting, the RNC, on March 28, sent Google an email that documented the RNC's recent efforts to adopt Google's suggestions:

> For your awareness, we had more significant inboxing issues pop up after I emailed on Friday [March 25] and throughout the weekend. [An employee at the RNC] submitted multiple tickets and included all headers, so the product team should have those.
>
> Starting on Friday [March 25], we saw our deliverability drop-off and become unstable. We sent a total of 15 emails across different audience segments that day and each of them hit spam at 100%.... Volume was almost identical across all days and there was no change in our sending strategy. We have also not seen any rise in spam reports in ReturnPath [now called Everest] and our domains all look healthy.
>
> We've noticed that these issues tend to arise most frequently on weekends [at the end of the month] that include key events for our fundraising and voter contact: for example, weekends with Trump rallies and weekends



before end-of-month and end-of-quarter deadlines. Multiple emails sent over the weekend were expected to be top-performers but all hit spam. We are also going from 100% inboxing to 0% inboxing; there is not much in-between.

We are hoping to quickly find solutions before EOQ on Wednesday and Thursday of this week.

67.     On March 29, the RNC met with Google as planned. Google did not present the RNC with any new actionable suggestions, but Google offered to have weekly calls with the RNC to discuss the issue. The RNC accepted this offer and met with Google representatives twice. Then, Google's representative informed the RNC that she could not meet with the RNC because she had been informed that she was not legally permitted to do so.

68.     The RNC once again experienced inboxing problems towards the end of April and May. On April 25 to 27, and again on May 27 to 28, the RNC's emails to its supporters who use Gmail were predictably relegated to the users' spam folders. The RNC continued to contact Google employees and submit reports to Google, but the RNC received no answers and no solutions in return.

69.     For example, on April 25, the RNC contacted Google and explained that it has "run into deliverability issues once again," "including several GOTV sends." But "[b]ecause two political emails that did not include any type of monetary solicitation also faced this issue, we're concerned about our ability to properly deploy our GOTV messaging, which would be an extreme hinderance to our organization and the Party as a whole." The RNC also included "screenshots of the deliverability issues [it was] seeing on Everest, along with screenshots from [Google's own] Postmaster [Tools] showing that [the RNC's] domain reputation remains high and spam complaints remain low." The RNC also had "not made any significant changes to [its] volume" that day. Importantly, the RNC again stressed that "[t]he date this is happening seems significant as well. We've mentioned before that we continue to see a[] spike in this issue[] around EOM; the last time we saw this was at EOQ at the end of March." And as the RNC explained several times, the end-of-month and end-of-quarter time period is critical for the RNC. Moreover, to aid Google in identifying the relevant emails, the RNC (per usual) "submitted cases with headers for each of the effected emails" and asked what "mitigation efforts [Google] suggest[ed]."

Verified First Amended Complaint                                              Case No. 2:22-cv-01904

70.    And on April 28, the RNC informed Google of "another day of poor delivery on April 27th" but noted that things "bounced back today." The RNC provided "a bar graph showing that [the] deliverability [or inboxing rate] is trending down at the end of the month." The RNC also emphasized that it was "following best practices and [is] not changing [its] sending volume or strategy at the times of these downturns."

71.    The RNC received no material response from Google concerning the April 28 email.

72.    From May 27 to 28, the RNC's emails to its supporters who use Gmail were once again predictably relegated to the users' spam folders. Yet on the days leading up to May 27, the RNC's user reported spam rate was approximately 0.1%; then, on May 27 and 28, the rate was approximately 0.0%; and the days after, the rate was approximately 0.1%.

73.    On May 27, the RNC messaged Google that the RNC was "once again seeing the same downward trend in deliverability that [its] been seeing every month this year." The RNC, per usual, "already submitted headers." The RNC also "attached screenshots of what [its] seeing on inboxing and a graph that clearly shows the EOM trend. [The] volume remains steady and we have still been consistently monitoring our content to ensure it follows best practices to avoid spam filters."

74.    Google responded three days later noting that it "[s]ound[ed] like you are following the right process."

75.    On June 14, the RNC internally communicated:

> The graph below shows the RNC's deliverability on Gmail. It is consistently in the 80-100 range; however, there is a concerning trend where each month, 5-7 days before the end of the month, we go to 0% deliverability for a few days, and then rebound.
>
> We've had numerous conversations with the Google team about this. Originally, their explanation was that it was our end of month ramp in volume that caused the drop in deliverability (this was back in December of last year). However, it is important to note, that as we have continued to see this trend consistently for the past 5 months, it consistently happens DAYS BEFORE any end of month ramp. In fact, there is no operational change (content, audience, send volume, timing) on the RNC's end that would account for this drop in deliverability.
>
> In April, Google's team informed us that the drop was the result of an increase in user reported spam (user reported spam increased from 0.2% to 0.3%). However, in May, user reported spam decreased to 0.1% and we still saw the same drop in deliverability.



The rhythm of the deliverability issues has become so predictable that on May 26th our email director came to me and said "based on the calendar, I expect we're going to start spamming today, since there's an extra day in May, the spamming will start later." Sure enough, he predicted it just a few hours before we began spamming on Gmail.

76.     Here is the graph included in the email:



77.     Soon after, another RNC employee emailed Google with a subject line "RNC Gmail Deliverability Issues - Monthly Trend," highlighted the above internal communication in full, and stressed that as the included communication explains, Google is "tanking the RNC's deliverability during the EOM period when fundraising and donations go up." The RNC asked if Google could "stop this from happening in June."

78.     The same day, an employee at Google responded that he was "[e]scalating now."

79.     Later that day, Google said that "a subdomain issue" was "causing" the mass diversion of emails. Specifically, Google blamed the RNC's press releases sent from team.gop.com for why it was diverting the RNC's emails at the end of each month to Gmail users' spam folders. Again, Google's explanation made no sense. After all, the RNC's press releases are issued from an entirely different email domain (specifically, team.gop.com) and that, comparatively, has a minuscule email volume from the RNC's main marketing domain (campaigns.rnchq.com). There was thus no "subdomain issue causing" the erroneous filtering.

80.     On June 17, the RNC emailed Google rebutting Google's new explanation that a



Verified First Amended Complaint                                              Case No. 2:22-cv-01904

separate domain (team.gop.com) was causing an entirely different domain to go to spam (campaigns.rnchq.com):

> Our team has investigated Google's explanation that you laid out on our call the other day (that team.gop.com is causing an increase in spam complaints).

> This explanation does not make sense for several reasons:

> 1. Team.gop.com is a subdomain of GOP.com, which is responsible for the RNC's staff emails. **The RNC's marketing emails are sent from a completely separate domain (campaigns.rnchq.com).** The RNC's marketing program is structured this way explicitly to keep these two systems separate, as per recommendations and guidance of ISPs, as we know that Gmail associates a domain's reputation with that of its subdomains.

> The RNC team has reported dozens of email headers via Google's reporting form (which provides no confirmation number), and done calls and zooms with [two Google employees] every month this year, so the google team should be well aware that this inexplicable monthly issue that we are experiencing is with campaigns.rnchq.com. Nevertheless, each time we bring these issues to Google's attention, we start at square one, getting explanations that have been repeatedly debunked or have no logical bearing on the situation.

> 2. Team.gop.com is the domain used for the RNC's press releases. The domain is only used to send to lists of reporters, and on any given day the maximum send volume is ~45,000 emails. This is less than 0.3% of the daily send volume of campaigns.rnchq.com. If Gmail, contrary to its own guidance, was associating the two domains, team.gop.com could not have the volume to cause the issue described.

> Notably, during the May period in question, volume remained below 20,000 emails per day, and there was no change in sending strategy that would account for a change in deliverability.

> 3. Looking at team.gop.com, the RNC team can identify only 5 unique complaints (127 total complaints) across all ISPs in the full month of May with a monthly send volume of over 400,000. In full, this amounts to an average complaint rate of 0.2% across all ISPs. Due to limitations in the data and reporting provided by Google, we do not have any visibility into anything further that could cause an issue.

> This issue has been going on for far too long without resolution or explanation. It has been over 5 months and we are still effectively at square one, working through the basic facts of the case here.

> Thank you for your assurance that you will help us to prevent this



Verified First Amended Complaint                    Case No. 2:22-cv-01904

issue in June. Our team is ready and available to assist however we can to identify the source of the issue.

81.     Moreover, on June 24, Google told the RNC that its "Civics Outreach team (civics-outreach@google.com) is always here to assist."

82.     The Google employee's "assurance[] that [he] will help [the RNC] to prevent this issue in June" did not pan out, however. Two weeks later, on June 27, the RNC's inboxing rate for Gmail users again dropped to approximately 0%. Yet on the days leading up to June 27, June 27 itself, and the days after, the RNC's user reported spam rate was approximately 0.1%.

83.     The RNC immediately reached out to Google again and emphasized that Google "need[ed] to fix this asap," that the RNC "predicted this would happen, like it has happened the exact same way the past several months," and that the RNC still has not received any adequate "answers whatsoever on why." And the RNC noted that user spam complaints were particularly low leading up to and when the *en masse* filtering occurred, as these reports from Postmaster Tools showed (and which the RNC sent to Google):



28

Verified First Amended Complaint                                    Case No. 2:22-cv-01904



| Date ⌃ | User reported spam rate |
|--------|-------------------------|
| Jun 22, 2022 | 0.1% |
| Jun 23, 2022 | 0.1% |
| Jun 24, 2022 | 0.1% |
| Jun 25, 2022 | 0.1% |
| Jun 26, 2022 | 0.1% |
| Jun 27, 2022 | 0.1% |

84.     On June 28, the RNC and Google had a call, where a Google employee confirmed that Google saw the same inboxing pattern the RNC did—consistent drops towards the end of each month. The Google employee asked the RNC to submit headers (the RNC already did) and suggested that the consistent drop could be because the RNC increased its volume. The RNC responded that increased volume could not conceivably be the issue because the RNC's volume was *lower* than the day before, and the *en masse* relegation of emails to spam always occurred *before* the RNC ever increased send volume at the end of the month.

85.     Around the same time, Google provided two new suggestions for its discriminatory spam filtering: (1) that the RNC's domain authentication (a system ensuring an email comes from the purported sender) was possibly at fault; and (2) that the issue could be a result of Google's algorithmic spamming system, which collects spam reports over the course of the month and eventually causes a sender's email to be diverted to Gmail users' spam folders. But again, this was no comfort to the RNC. As the RNC immediately notified Google on June 28, it "checked DMARC, SPF and SKIM on Google Postmaster and it shows that [the RNC's] domain is authenticated and verified," and the RNC checked with Salesforce, which had already confirmed that its authentications were in proper working order.



Verified First Amended Complaint                                    Case No. 2:22-cv-01904

86.     Here is the evidence the RNC provided Google:

| Date ▲ | DKIM success rate | SPF success rate | DMARC success rate |
|---|---|---|---|
| Jun 21, 2022 | 100.0% | 100.0% | 100.0% |
| Jun 22, 2022 | 100.0% | 100.0% | 100.0% |
| Jun 23, 2022 | 100.0% | 100.0% | 100.0% |
| Jun 24, 2022 | 100.0% | 100.0% | 100.0% |
| Jun 25, 2022 | 100.0% | 100.0% | 100.0% |
| Jun 26, 2022 | 100.0% | 100.0% | 100.0% |



| | | |
|---|---|---|
| ✅ dmarc | message.gop.com | DMARC Record found |
| ✅ dmarc | message.gop.com | The record is valid |
| ✅ dmarc | message.gop.com | All external domains in your DMARC record are giving permission to send them DMARC reports. |
| ✅ dmarc | message.gop.com | Multiple DMARC records corrected to a single record. |

87.     The RNC also explained that data contradicted the algorithmic spamming explanation because in Google's own Postmaster tools, the RNC emails only received spam complaints at 0.1%.





Verified First Amended Complaint                                        Case No. 2:22-cv-01904

88.     On July 14, the RNC preemptively reached out to Google to see how it could best prepare for the end of the month to avoid the pattern of sending nearly all RNC emails to spam towards the end of the month. The RNC also suggested that Google hold a meeting with the RNC on its best practices (even though the RNC was already following them). Google did not provide a substantive response to the RNC's end-of-month question but did start setting up a meeting in August to go over best practices.

89.     On July 25, the RNC contacted Google, as it was anticipating yet another *en masse* relegation of emails to Gmail users' spam folders towards the end of the month:

> I just spoke with [a Google employee]. I am concerned as we approach the period of the month where we have consistently seen Google send us to spam that we have made no headway on identifying the issue.
>
> In speaking with [a Google employee], it was largely the same as we have heard (and debunked) in previous months, that there is a threshold of user spam complaints that we teeter on, and then somehow crossover at the same time each month.
>
> As we've discussed, we do not see this anywhere in the data, including in Google's own Postmaster tools.
>
> Bottom line – should we expect Google to choose to block the RNC's emails at end of month again this week?
>
> Please let us know what information we can provide to ensure that this month is not a repeat of previous months.

90.     Google acknowledged receipt of the RNC's inquiry but did not provide any meaningful substantive response.

91.     On July 29, the RNC's inboxing rate fell to nearly 0%. Yet on the days leading up to July 29, July 29 itself, and the days after, the RNC's user reported spam rate was approximately 0.1%.

92.     That same day, the RNC contacted Google again. It stressed that it "ha[s] seen no data to indicate that volume could be the cause of this issue," that "the end of month timing here is absurd," and that the RNC's "biggest priority is getting off that end of month cadence" because that period is critical to the RNC's fundraising and community building.

93.     Google provided no meaningful substantive response to the RNC's concerns.

94.     On August 11, Google came to the RNC to give a training on "Email Best Practices" to the RNC's digital department. In the training, Google highlighted six "[c]ommon reasons links can



Verified First Amended Complaint                                    Case No. 2:22-cv-01904

cause an email to be classified as spam": (1) "[i]f the link details on spam content including asking for personal/confidential information of the user, or get rich scheme"; (2) "[i]f the link includes any phishing information that asks for usernames/passwords/social security numbers/credit card details"; (3) "[i]f the link has also been sent from accounts or IP addresses that have sent other spam messages"; (4) "[i]f the URL of the link doesn't match the description of the link, it might be triggered as a phishing site"; (5) "[i]f the 'from' header is showing an incorrect name"; and (6) "[i]f the email/domain is unauthenticated."

95.     The training included a Q&A. Notably, Google in the meeting appeared to state that Google's algorithm does not scan emails for political content; rather, it scans only for illegal or obvious indicators in the content that the email is unsolicited (*e.g.*, "get rich fast," "free money fast," and "asking for personal/confidential information of the user"). And according to Google, it has not generally seen political emails get flagged as spam for content.

96.     Despite the RNC following Google's best practices, the filtering reoccurred. On August 29, the RNC's inboxing rate fell to nearly 0%. Yet on the days leading up to August 29, the RNC's user reported spam rate was approximately 0.1%; then, on August 29, the rate was approximately 0.0%; and the days after, the rate was approximately 0.1%.

97.     As the 2022 midterm elections drew closer, so too did the urgency with which the RNC needed to address its ongoing issues with Gmail inboxing.

98.     From September 28 to October 2, the RNC's inboxing rate fell to nearly 0%. Yet once again, the user reported spam rate was low before, during, and after the discriminatory filtering.

99.     On September 29, over nine months after it first contacted Google to seek a solution, the RNC emailed Google stating:

> Last night around 11pm we [experienced] spamming once again on Gmail, right during our EOQ period which are two of the most critical days of the year.
>
> Beyond fundraising, we have key get out the vote emails today in PA, IL, and MI that are being suppressed as a result of this issue.
>
> We have already flagged the headers via Google's form, but what can we do in the immediate term to prevent this suppression. We're 40 days out from Election Day, **we do not have any new transparency from Google**, and we need a resolution. Can Google mitigate this spamming immediately?



\*\*\*

Further, we have also increased our overall volume significantly as we approach Election Day, which would theoretically change the time frame in which we hit this magical threshold… but of course, Google must suppress our emails the day before our FEC deadline, so that did not change.

Please let me know what we can do to resolve this unacceptable voter suppression issue today.

100.     The next day, September 30, Google responded that it would "be in touch." The RNC followed up several times, including to ask if Google had "[a]ny insights or resolutions," to stress that it was "still hitting spam" but has "continued to submit headers throughout the day" and to emphasize that the RNC was approaching its "FEC deadline and get out the vote emails for Virginia early voting and Minnesota absentee voting slated for" that day.

101.     But Google never substantively responded. During the approximately three weeks between September 30 and October 21 (the date this suit was filed), the RNC heard nothing from Google.

102.     After October 21, the RNC has not experienced any *en masse* relegation of RNC emails to the spam folder of Gmail users. In other words, the RNC has had a steady inboxing rate since filing this suit.

103.     In sum, Google has repeatedly diverted the RNC's essential communications to the financial supporters on which it relies and has done so in the most critical period in the election cycle. Specifically, Google diverted and concealed as "spam" nearly all of the RNC's emails to Gmail users during the following periods: February 2 to 3, and 21; March 25 to 26; April 25 to 27; May 27 to 28; June 28; July 29; August 29; and September 28 through October 2. User reported spam did not correlate with these mass relegations. As the RNC pointed out to Google several times, the RNC's user reported spam rate was incredibly low leading up to, during, and after these cyclical diversions. For example, the RNC's spam rate before, during, and after the *en masse* filtering in May, June, July, and August were approximately either 0.1% or 0.0%.

Verified First Amended Complaint                              Case No. 2:22-cv-01904

104.     Tellingly, since filing this suit, the RNC has not experienced any *en masse* relegation of emails to spam.





105.     The RNC also tracks its inboxing rate for other popular email platforms, such as Yahoo! Mail and Microsoft's Outlook Mail. Although those platforms have an identical interest to Google in limiting "spam" to their users, they did not conceal all (or nearly all) of the RNC's emails from its supporters at any point. Indeed, the inboxing rates on these platforms did not reflect *any* dramatic cyclical decreases in inboxing rates, let alone to the rate of nearly 0%, that Google imposed on the RNC's emails at the close of every month in 2022.



1



2

3

4

5

6

7

8

9

10

11

12

13

14

15

16        106.      Inboxing rates for these other email platforms have stayed the same since filing this

17   suit.

18        107.      Moreover, a recent study by researchers at North Carolina State University (N.C. State

19   Study) found that Google's Gmail labels significantly more campaign emails from Republican political

20   candidates as spam than campaign emails from Democratic political candidates. Specifically, the study

21   found that Gmail labeled only 8.2% of Democratic campaign emails as spam, compared with 67.6% of

22   Republican campaign emails. This amounts to Gmail labeling Republican campaign emails as spam at

23   more than eight times (8x) the rate of Democratic emails.[5]

24        108.      Google is also aware of, and has responded to, a public study establishing that it is

25   intercepting Republican organizations' emails at eight times the rate of similarly situated Democratic

26

27   [5] Iqbal, et al., *A Peek into the Political Biases in Email Spam Filtering Algorithms During the US Election 2020 (Pre-Print Version), Association for Computing Machinery: World Wide Web Conference*, (Mar. 31, 2022),

28   https://arxiv.org/pdf/2203.16743.pdf; for full version, see https://dl.acm.org/doi/10.1145/3485447.3512121.



Verified First Amended Complaint                                                    Case No. 2:22-cv-01904

1  party groups.[6] And in response to the RNC's repeated requests for an explanation and to cease its

2  interference, Google has offered only a serial litany of false reasons before going silent.

3       109.    With its other services, Google has also exhibited bias against individuals and entities

4  that affiliate with the RNC or its viewpoints. For example, with its YouTube service, Google has been

5  found to "remove[] or downgrade[]" content associated with conservative viewpoints and affiliated

6  with the RNC, including Republican state officials' content. *See generally, e.g.*, *Missouri v. Biden*, ---

7  F.4th ----, No. 23-30445, 2023 WL 6425697 (5th Cir. Oct. 3); *Missouri v. Biden*, 2023 WL 4335270,

8  at *59 (W.D. La. July 4) ("Louisiana's Department of Justice, which encompasses the office of its

9  Attorney General, faced direct censorship on YouTube [owned by Google] for sharing video footage

10  wherein Louisianans criticized mask mandates and COVID-19 lockdown measures on August 18,

11  2021."); *id.* ("Similarly, during public meetings concerning proposed county-wide mask mandates held

12  by St. Louis County, a political subdivision of Missouri, certain citizens openly expressed their

13  opposition to mask mandates. However, YouTube censored the entire videos of four public meetings,

14  removing the content because some citizens expressed the view that masks are ineffective."); C.

15  Siemaszko, *YouTube pulls Florida governor's video, says his panel spread Covid-19 misinformation*,

16  NBC News (Apr. 9, 2021), perma.cc/WF5N-K8RY; J. Stossel, *The Media and Politicians Keep Trying*

17  *To Censor Things That Turn Out To Be True*, Reason (Apr. 12, 2022), perma.cc/LV7E-XA93 (noting,

18  *e.g.*, that "YouTube suspended Sen. Rand Paul (R–Ky.) for saying, 'Most of the masks you get over

19  the counter don't work.' But what they said is true. The Centers for Disease Control and Prevention

20  updated its guidance to say cloth masks are not very effective. And now a big study failed to find

21  evidence that wearing even good masks stops the spread of viruses."); *YouTube Censors Heritage*

22  *Foundation Video on Gender Dysphoria*, Heritage (June 19, 2020), perma.cc/S63N-5YMS; *cf.*

23  *Missouri v. Biden*, 2023 WL 4335270, at *59 ("[A] Louisiana state legislator experienced censorship

24  on Facebook when he posted content addressing the vaccination of children against COVID-19.").

25       110.    Google also has a history of telling its employees not to put in writing certain

26  statements that might show an appearance of impropriety. *See, e.g.*, D. McCabe & C. Kang, *'A*

27

---

28  [6] *See supra*; M. Binder, *Gmail isn't biased against Republicans. They're just bad at sending emails.*, Mashable (May 11, 2022), perma.cc/AW99-6B4B.



Verified First Amended Complaint                                              Case No. 2:22-cv-01904

*Monopolist Flexing': U.S. Blasts Google's Tactics as Antitrust Trial Opens*, N.Y. Times (Sept. 12, 2023), perma.cc/53QP-RVQJ; *cf.* T. Giles & D. Alba, *Googlers Told to Avoid Words Like 'Share' and 'Bundle,' US Says*, Bloomberg (Sept. 14, 2023), perma.cc/KDZ3-AN2R.

111.    Accordingly, the available evidence establishes that Google's interception and diversion of the RNC's emails, and the harm it is causing to the RNC, was intentional, deliberate, and in bad faith. Google was relegating RNC emails *en masse* to spam because it was the RNC sending them.

**III.   The RNC is suffering ongoing and permanent harm by Google's bad-faith spam filtering.**

112.    Google's conduct hindered the RNC's ability to communicate with its constituents on important issues and impeded its community from learning about vital information on community outreach, getting out to vote, and the election and of taking advantage of those opportunities.

113.    As a direct and proximate result of Googles' conduct, the RNC has and continues to suffer cognizable damages amounting well over $75,000.00. On information and belief, Google has caused hundreds of thousands of dollars, if not more, in damages to the RNC to date, and the long-term consequential losses likely total in the millions of dollars. This loss of funding has caused the permanent loss of opportunities for the RNC that those funds could have supported, in addition to harming its relationships with its supporters at a time when they are particularly attuned to politics and expect the RNC to be communicating with them.

**IV.   Congress in 47 U.S.C. §230 did not condone platforms discriminating based on political affiliation or viewpoint.**

114.    One critical legislation implicating the internet is 47 U.S.C. §230. Section 230 "was not meant to create a lawless no-man's-land on the Internet." *Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1164 (9th Cir. 2008) (en banc). It merely "provides internet platforms with limited legal protections." *Henderson v. Source for Pub. Data, L.P.*, 53 F.4th 110, 119 (4th Cir. 2022). And this limited protection does not bear "an expansive reading … that would render unlawful conduct magically lawful when conducted online." *HomeAway.com, Inc. v. City of Santa Monica*, 918 F.3d 676, 683 (9th Cir. 2019) (cleaned up).

115.    Section 230 was an amendment to the Telecommunication Act of 1996, specifically

Title V, which is called the Communications Decency Act (CDA). Pub. L. 104-104, §509, 110 Stat. 56, 56, 137-39; *Reno v. ACLU*, 521 U.S. 844, 857 (1997). In §230, Congress "tackled only one [problem]: the ease with which the Internet delivers indecent or offensive material, especially to minors." *Force v. Facebook, Inc.*, 934 F.3d 53, 78 (2d Cir. 2019) (Katzmann, C.J., concurring in part and dissenting in part). And Congress did so by empowering ISPs "to self-regulate" certain offensive content and providing "tools for parents to regulate[] children's access to inappropriate material." *Id.* at 78-79; *see also Reno*, 521 U.S. at 858 n.24.

116.     First, "history illustrates that in passing §230[,] Congress was focused squarely on protecting minors from offensive online material, and that it sought to do so by 'empowering parents to determine the content of communications their children receive through interactive computer services.'" *Force*, 934 F.3d at 79-80 (quoting S. Rep. No. 104-230, at 194). Indeed, "every legislator who spoke substantively about §230 focused on freeing platforms to block material that was seen as not 'family-friendly.'" A. Candeub & E. Volokh, *Interpreting 47 U.S.C. §230(c)(2)*, 1 J. Free Speech L. 175, 185 (2021); *see also* A. Candeub, *Reading Section 230 As Written*, 1 J. Free Speech L. 139, 144-45 & n.19 (2021) ( "In fact, the comments in the Congressional record from every supporting legislator—and it received strong bipartisan support—reveal an understanding that the Online Family Empowerment amendment, now codified as section 230, was a non-regulatory approach to protecting children from pornography and other material perceived to be harmful that the federal government *already* regulated." (collecting congressional record sources)).

117.     What history establishes, Congress's enacted findings confirm. Congress found that its policy was to "maximize user control over what information is received by individuals, families, and schools," "to remove disincentives for the development and utilization of blocking and filtering technologies that empower parents to restrict their children's access to objectionable or inappropriate online material," and "to ensure vigorous enforcement of Federal criminal laws to deter and punish trafficking in obscenity, stalking, and harassment by means of computer." 47 U.S.C. §230(b)(3)-(5).

118.     Second, Congress in §230 also sought to overrule *Stratton Oakmont, Inc. v. Prodigy Servs. Co.*, 1995 WL 323710 (N.Y. Sup. Ct. May 24). *See* H.R. Rep. No. 104-458, at 194 (1996) ("One of the specific purposes of [§230] is to overrule *Stratton-Oakmont v. Prodigy* and any other similar

38

decisions which have treated such providers and users as publishers or speakers of content that is not their own because they have restricted access to objectionable material."); *see also, e.g.*, *Malwarebytes, Inc. v. Enigma Software Grp. USA, LLC*, 141 S. Ct. 13, 14-15 (2020) (statement of Thomas, J.) (same); *NetChoice*, 49 F.4th at 467-68 (same); *Roommates.com*, 521 F.3d at 1170 (same). In *Stratton Oakmont*, an early Internet company (Prodigy) was sued for failing to take down defamatory content posted by an unidentified commenter on a message board. 1995 WL 323710, at *1. Prodigy asserted that it merely distributed the defamatory statement, even though the company had also held itself out as a family-friendly service provider that moderated and took down offensive content. Indeed, Prodigy had "content guidelines" prohibiting certain obscene and offensive conduct and also used an "automatic software screening program" as well as manual review "to delete notes from its computer bulletin boards that violated the guidelines. *Id.* at *2, *4. The court concluded that the company's decision "constitue[d] editorial control" over some content, "render[ing] it a publisher" even for content it merely distributed. *Id.* at *3-4. In other words, the court determined that Prodigy could be liable for merely distributing the defamatory statement because it chose to police offensive and harassing content from its platform.

119.    Section 230(c) addresses *Stratton Oakmont* and provides:

(c) Protection for "Good Samaritan" blocking and screening of offensive material

(1) Treatment of publisher or speaker

No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider.

(2) Civil liability

No provider or user of an interactive computer service shall be held liable on account of—

(A) any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected; or

(B) any action taken to enable or make available to information content providers or others the technical



Verified First Amended Complaint                                    Case No. 2:22-cv-01904

means to restrict access to material described in [subparagraph (A)].

120.     "These two subsections tackle, in overlapping fashion, the two jurisprudential moves of the *Stratton-Oakmont* court: first, that Prodigy's decision to screen posts for offensiveness rendered it 'a publisher rather than a distributor,' and second, that by making good-faith efforts to remove offensive material Prodigy became liable for any actionable material it did *not* remove." *Force*, 934 F.3d at 79 (quoting *Stratton-Oakmont*, 1995 WL 323710, at *4); *see also Malwarebytes*, 141 S. Ct. at 14-15 (explaining how "§230(c) alters the *Stratton Oakmont* rule in two respects"). Put differently, "Congress sought to spare interactive computer services th[e] grim choice" that Prodigy faced "by allowing them to perform some editing on user-generated content without thereby becoming liable for all defamatory or otherwise unlawful messages that they didn't edit or delete." *Roommates.com*, 521 F.3d at 1163.

121.     Section 230(c)(1) provides that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." This provision remedied the blurring of publisher and distributor liability. It "prohibits treating an interactive computer service as a publisher or speaker of any information provided by a third party." *Henderson*, 53 F.4th at 119. "A claim treats the defendant 'as the publisher or speaker of any information' when it (1) makes the defendant liable for publishing certain information to third parties, and (2) seeks to impose liability *based on that information's improper content*." *Henderson*, 53 F.4th at 120-21 (emphasis added). "Online platforms are thus immune from defamation liability for the content they host, unless they play a part in the 'creation or development' of that content." *NetChoice*, 49 F.4th at 466 (quoting §230(f)(3)).

122.     Section 230(c)(2) "clarifies that censoring limited categories of content does not remove the immunity conferred by §230(c)(1)." *NetChoice*, 49 F.4th at 468. It does so through two subparagraphs:

(2) Civil liability

No provider or user of an interactive computer service shall be held liable on account of—

(A) any action voluntarily taken in good faith to restrict

40



access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected; or

(B) any action taken to enable or make available to information content providers or others the technical means to restrict access to material described in [subparagraph (A)].

123.    As a general matter, subparagraph (A) protects good-faith censorship *by the platform*, while subparagraph (B) protects handing the censorship tools over to *users*. This division is consistent with Congress's purpose of (A) permitting platforms to enforce in good faith its guidelines against certain content harmful to children and (B) empowering parents to use tools to protect children from obscene content.

124.    Congress also specified the type of content it found permissible to censor—*i.e.*, "obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable." *Compare* §230(c)(2)(A) (stating the list), *with* §230(c)(2)(B) ("material described in [subparagraph (A)]"). Each listed category "refer[s] to speech that was regulated by the rest of the CDA, and indeed that had historically been seen by Congress as particularly regulable when distributed via electronic communications." Candeub & Volokh, *supra*, at 176. It's "clear" that "providers do not have unfettered discretion to declare online content 'objectionable.'" *Enigma Software Grp. USA, LLC v. Malwarebytes, Inc.*, 946 F.3d 1040, 1047 (9th Cir. 2019); *see also NetChoice*, 49 F.4th at 468 & n.23.

125.    The objectionable-materials clause, and thus §230(c)(2), "says nothing about viewpoint-based" or political-affiliation-based "censorship." *NetChoice*, 49 F.4th at 468; *see also West v. Shea*, 500 F. Supp. 3d 1079, 1088 (C.D. Cal. 2020) (rejecting that "Congress intended CDA immunity to immunize viewpoint discrimination"). To the contrary, Congress found that "[t]he Internet and other interactive computer services offer a forum for a *true diversity of political discourse*, unique opportunities for cultural development, and myriad avenues for intellectual activity." 47 U.S.C. §230(a)(3) (emphasis added). And "when Congress gave specific examples in §230(c)(2) of 'objectionable' material that platforms could block with immunity, it offered examples of material that was objectionable for reasons unrelated to 'political ... content.'" Candeub & Volokh, *supra*, at 185

(alteration in original). Other parts of the Telecommunication Act reinforce that sentiment. Section 551(b)(1) provides that the Federal Communications Commission (FCC) must "[p]rescribe" "guidelines and recommend[] procedures for the identification and rating of video programming that contains sexual, violent, or other indecent material about which parents should be informed before it is displayed to children: Provided, That nothing in this paragraph shall be construed to authorize any rating of video programming *on the basis of its political* or religious *content*." (Emphases added.) Taken together, §230(a)(3)'s "extolling the Internet as 'offer[ing] a forum for a true diversity of political discourse' is consistent with §551's distinction between filtering of 'sexual' or 'violent' material (which Congress sought to encourage) and filtering of 'political or religious content' (as to which Congress expressly renounced an intent to encourage)." Candeub & Volokh, *supra*, at 185.

**COUNT I**[7]
**VIOLATION OF CALIFORNIA COMMON CARRIER LAW**
**Cal. Civ. Code §2168 *et seq.***

126.    Plaintiff realleges all allegations made in paragraphs 1 through 125.

127.    Under Cal. Civ. Code §2168, Google is a common carrier because it "offers to the public to carry … messages" through its Gmail service.

128.    As a common carrier, Google must as far as it is able "accept and carry" any email messages offered to it at a reasonable time and place. Cal. Civ. Code. §2169.

129.    As a common carrier, Google is obligated to deliver messages without preference in time, price, or otherwise, in the order they are received. Cal. Civ. Code §§2170 and 2208.

130.    Google violated Cal. Civ. Code §2169 by refusing to accept and carry email messages from the RNC to Gmail users' inboxes in the final days of each month.

---

[7] The RNC preserves its claims that were dismissed without leave to amend, including the California state-law common-carrier claims (Counts I and VII), the California Unruh Civil Rights Act claim (Count II), the California state-law negligent-interference claim (Count V), and the federal common-carrier claim (Count VI). *See, e.g.*, Complaint (ECF 1) at 17-18 ¶¶59-74, 21-25 ¶¶91-114, No. 2:22-cv-01904 (E.D. Cal. Oct. 21, 2022); *Republican Nat'l Comm. v. Google, Inc.*, 2023 WL 5487311, at *20 (E.D. Cal. Aug. 24) ("IT IS HEREBY ORDERED that Defendant's Motion to Dismiss is GRANTED with leave to amend to establish that section 230 does not apply to this action, and to amend Counts Three and Four."). Under Ninth Circuit precedent, the RNC need not replead claims that were dismissed with prejudice and without leave to amend. *See, e.g.*, *Lacey v. Maricopa Cnty.*, 693 F.3d 896, 928 (9th Cir. 2012) ("For claims dismissed with prejudice and without leave to amend, we will not require that they be repled in a subsequent amended complaint to preserve them for appeal."); *Barnes v. Sea Hawaii Rafting, LLC*, 889 F.3d 517, 531 (9th Cir. 2018). The RNC includes these claims here in an abundance of caution to make clear it is not abandoning them and to preserve its rights to appeal. Moreover, the amendments are also appropriate for any 42 U.S.C. §230 defense to any claim.



131.    Google violated Cal. Civ. Code §§2170 and 2208 by failing to deliver the RNC's messages to users' inboxes at the end of each month because they were being sent by the RNC.

132.    Repeatedly, Google has unreasonably delayed or refused to carry the RNC's messages to Gmail users' inboxes during substantial periods at the end of each month and continues to do so.

133.    The RNC has suffered damages, because its members who opted to receive communications via email service were prevented from participating in the RNC's fundraising campaigns and other events. On information and belief, this likely resulted in well over $75,000 in lost donations and has caused irreparable injury to the RNC's reputation, goodwill, recruitment efforts, community outreach, and control over its communications. On information and belief, Google has caused hundreds of thousands of dollars, if not more, in damages to the RNC to date, and the long-term consequential losses likely total in the millions of dollars.

134.    Under Cal. Civ. Code §2209, the RNC is entitled to recover from Google its actual damages, plus $50, for the refusal and postponement of its messages.

**COUNT II**
**UNRUH CIVIL RIGHTS ACT**
**Cal. Civ. Code §51 *et seq.***

135.    Plaintiff realleges all allegations made in paragraphs 1 through 134.

136.    The Unruh Civil Rights Act guarantees that all persons are entitled to "full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever." *See* Cal. Civ. Code §51. Any exclusionary policy that is based on "political affiliation," "member[ship]" in a political organization, or "personal beliefs" is arbitrary discrimination proscribed by Unruh. *Marina Point, Ltd. v. Wolfson*, 30 Cal.3d 721, 726 (Cal. 1982) ("political affiliation"); *In re Cox*, 474 P.2d 992, 1000 (Cal. 1970) ("member[ship]"); *Harris v. Cap. Growth Invs. XIV*, 805 P.2d 873, 883 (Cal. 1991) ("personal beliefs").

137.    Google intentionally (or willfully) denied the RNC full and equal access to Gmail during critical end-of-month fundraising windows, when it refused to carry RNC emails to its users' inboxes.

138.    Google has violated the Unruh Act by denying, or aiding or inciting the denial of, the RNC's right to full and equal use of the advantages, facilities, privileges, or services Google offers to



Verified First Amended Complaint                                    Case No. 2:22-cv-01904

the public.

139.    This exclusionary policy was based on the political affiliation of the RNC, to which Google is antagonistic.

140.    Google has intentionally discriminated against the RNC because of its political affiliation.

141.    Plaintiff prays for judgment under Cal. Civ. Code §52, including issuance of an injunction, actual damages, statutory damages of at least $4,000 "for each and every offense," and attorney's fees.

### COUNT III
### UNFAIR COMPETITION LAW
### Cal. Bus. & Pro. Code §17200, *et seq.*

142.    Plaintiff realleges all allegations made in paragraphs 1 through 141.

143.    California's Unfair Competition Law prohibits "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by [California's False Advertising Law]." Cal. Bus. & Prof. Code §17200. "Each of these three adjectives captures a separate and distinct theory of liability." *Doe v. CVS Pharmacy, Inc.*, 982 F.3d 1204, 1214 (9th Cir. 2020) (cleaned up). Google's acts and practices violate this statute because they are unlawful and unfair.

144.    First, Google's conduct is unlawful because its business acts and practices violate other laws, including California's common-carrier laws, the Unruh Act, and common-law prohibitions against negligence and interference with prospective economic relations.

145.    Second, and independently, Google's conduct is unfair. "Unfair" conduct is framed broadly "to enable judicial tribunals to deal with the innumerable new schemes which the fertility of man's invention would contrive." *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 973 P.2d 527, 540 (Cal. 1999) (cleaned up). A business practice may be unfair without being "proscribed by some other law." *In re Adobe Sys., Inc. Privay Litig.*, 66 F. Supp. 3d 1197, 1226 (N.D. Cal. 2014) (citing *Korea Supply Co. v. Lockheed Martin Corp.*, 63 P.3d 937, 943 (Cal. 2003)); *see also In re Zoom Video Commc'ns Inc. Priv. Litig.*, 525 F. Supp. 3d 1017, 1047 (N.D. Cal. 2021). This standard is "intentionally

broad." *Candelore v. Tinder, Inc.*, 228 Cal. Rptr. 3d 336, 351 (Ct. App. 2018) (cleaned up). California courts have stated three tests: (1) "whether the challenged conduct is tethered to any underlying constitutional, statutory or regulatory provision, or that it threatens an incipient violation of an antitrust law, or violates the policy or spirit of an antitrust law"; (2) "whether the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers"; or (3) "whether the practice's impact on the victim outweighs the reasons, justifications and motives of the alleged wrongdoer." *Doe*, 982 F.3d at 1214-15. Although Google need flunk only one test, it flunks all three.

146.    For example, under the first test, "[p]laintiffs do not need to plead any direct violations of a statute. Instead, [p]laintiffs need merely to show that the effects of [Google]'s conduct are comparable to or the same as a violation of the law." *Zoom*, 525 F. Supp. 3d at 1047 (cleaned up). Google's conduct is at least "comparable" to violations of the other asserted laws. For example, the Unruh Civil Rights Act reflects the public policy that discrimination against personal characteristics by public accommodations is harmful and against the public interest. *See, e.g.*, Cal. Civ. Code §51(b) ("All persons within the jurisdiction of this state are free and equal, and no matter what their [personal characteristics] are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever."); *Harris v. Cap. Growth Invs. XIV*, 52 Cal. 3d 1142, 1150 (1991) ("Enacted in 1959, the Unruh Act secures equal access to public accommodations and prohibits discrimination by business establishments."). Even assuming Unruh does not prohibit political-affiliation discrimination, such discrimination is akin to the harm Unruh protects because such discrimination is based on a trait that is fundamental to a person's identity, beliefs, core values, and self-definition. *See, e.g.*, *Divino Grp. LLC v. Google LLC*, 2022 WL 4625076, at *12 (N.D. Cal. Sept. 30) (finding "'tethering' test" met based on "alleged discriminatory conduct violates the policy concerns underlying [Unruh]"); *Nia v. Bank of Am., N.A.*, 603 F. Supp. 3d 894, 908 (S.D. Cal. 2022) (concluding that "intentional discrimination … amounts to immoral, unethical, oppressive, or unscrupulous conduct"); *Candelore*, 228 Cal. Rptr. 3d at 351 ("Further, in view of our conclusion that Tinder's alleged discriminatory pricing model violates the public policy embodied in the Act, the UCL's 'unfair' prong provides an independent basis for relief on the facts alleged."). Indeed, many other States have barred such discrimination by private businesses because such



45

1   discrimination is comparable to other invidious discrimination. *See, e.g.*, Volokh, *Bans on Political*

2   *Discrimination*, *supra*.

3         147.    And California's common-carrier law reflects the public policy that messages should

4   be delivered to and received by the designated recipient reasonably and without discrimination. *See,*

5   *e.g.*, *Huang v. The Bicycle Casino, Inc.*, 208 Cal. Rptr. 3d 591, 597-99 (Ct. App. 2016). So too with

6   longstanding common-law doctrine. *See, e.g.*, *NetChoice*, 49 F.4th at 471-73 (explaining that the

7   "common law" supports nondiscrimination obligations for "communications firms" that "hold

8   themselves out to serve the public without individualized bargaining, and are affected with a public

9   interest"); *Biden v. Knight First Amend. Inst. at Columbia Univ.*, 141 S. Ct. 1220, 1222-23 (2021)

10  (Thomas, J., concurring) (similar) (citing A. Candeub, *Bargaining for Free Speech: Common Carriage,*

11  *Network Neutrality, and Section 230*, 22 Yale J. L. & Tech. 391, 398-403 (2020), and C. Burdick, *The*

12  *Origin of the Peculiar Duties of Public Service Companies, Pt. 1*, 11 Colum. L. Rev. 514 (1911));

13  *Candelore*, 228 Cal. Rptr. 3d at 350 ("Virtually any law or regulation—federal or state, statutory or

14  common law—can serve as a predicate for an unlawful prong violation." (cleaned up)). That is

15  especially true for political communications near elections. *See, e.g.*, *NetChoice*, 49 F.4th at 470-71.

16  Regardless of whether California common-carrier law applies to emails, bad-faith delivering and

17  receiving of emails is akin to the bad-faith delivery by telegraph and telephone companies. Like the

18  telegraph and telephony (at least once was), email is an indispensable means of communication. The

19  RNC relies on this crucial conduit to engage in its core mission of conducting political activity in

20  support of the Republican Party. This includes communicating political messaging and important

21  voting information to supporters, as well as maintaining relationships with individuals who financially

22  support the RNC.

23        148.    Moreover, California law states a policy of promoting free-speech principles and the

24  marketplace of ideas, including neutrality on the internet. For example, the California constitution

25  provides: "Every person may freely speak, write and publish his or her sentiments on all subjects, being

26  responsible for the abuse of this right." Cal. Const. art. I, §2. "The California Supreme Court has long

27  recognized that this provision confers broader free speech rights than those provided by the First

28  Amendment." *hiQ Labs, Inc. v. LinkedIn Corp.*, 273 F. Supp. 3d 1099, 1115 (N.D. Cal. 2017) (citing

46

*Dailey v. Superior Court of City & Cty. of San Francisco*, 44 P. 458 (Cal. 1896)). "In particular, unlike the First Amendment, California's provision is not limited to restraining state entities." *hiQ Labs*, 273 F. Supp. 3d at 1115 (citing *Robins v. Pruneyard Shopping Ctr.*, 592 P.2d 341 (Cal. 1979)). Further, California has clearly stated a public policy for net neutrality. *See* Cal. Civ. Code §3100 *et seq.* Bad-faith discrimination based on political affiliation by an ISP or ESP violates these principles.

149.     Second, and for many of the same reasons as above, Google's practice challenged here is "immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *Doe*, 982 F.3d at 1214 (cleaned up). Discrimination based on political affiliation or views is immoral, unethical, and unscrupulous. *See, e.g.*, *Nia*, 603 F. Supp. 3d at 908 (concluding that "intentional discrimination … amounts to immoral, unethical, oppressive, or unscrupulous conduct"); *Divino*, 2022 WL 4625076, at *12; *Candelore*, 228 Cal. Rptr. 3d at 351. Further, discriminating based on the sender's political affiliation or views is also substantially harmful to the recipient, as the receiver is trying to associate itself with the sender and receive the information about politics, among other things.

150.     Bad-faith delivery of critical messages is also immoral, unethical, and unscrupulous. Moreover, the danger of permitting corporate interference in the communications of political organizations cannot be overstated. History reflects that negatively affecting political communications is harmful to the public, especially when the communication is through a crucial conduit (as is the case here).

151.     Third, and for many of the same reasons as above, the harm caused by Google's business practices to the RNC, its community, and the public far outweighs any "reasons, justifications [or] motives" Google could have for its conduct. *Doe*, 982 F.3d at 1215. Google has no legitimate reason to discriminate based on political affiliation or views. There is no "business interest"—especially not from the market-dominant communications firm—in systematically choking off one major national political party's ability to communicate with the millions of Gmail users who requested the emails. It does not legitimately help business reputation or investment. Regardless of whether the RNC's email is in the requestor's inbox or spam folder, Google still gets full and timely payment for its services (*i.e.*, the user's data, which Google uses to make money). Moreover, Google presents Gmail as an email service provider that delivers emails in a fair and good-faith manner in exchange for the

user's information, which Google uses or sells to third parties. And yet Google is preventing the RNC's messages from reaching its supporters' Gmail inboxes, even though the supporters requested the RNC's emails and actively engaged with RNC content recently. The RNC and its supporters are severely harmed when its messages are hidden in spam folders arbitrarily and in bad faith.

152.   Google's actions in violation of Cal. Bus. & Prof. Code §17200 prevented its users from participating in the RNC's fundraising campaigns resulting in lost revenue to RNC. On information and belief, these immediately lost donations total well over $75,000. On information and belief, Google has caused hundreds of thousands of dollars, if not more, in damages to the RNC to date, and the long-term consequential losses likely total in the millions of dollars. The RNC has suffered and will continue to suffer irreparable injury to its reputation, goodwill, recruitment efforts, community outreach, and control over its communications.

153.   Plaintiff prays that Google's conduct be enjoined by this court under Cal. Bus. & Prof. Code §17203.

**COUNT IV**
**INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS**

154.   Plaintiff realleges the allegations made in paragraphs 1 through 153.

155.   To state a claim for intentional interference with prospective economic relations, a plaintiff must show: (1) "the existence, between the plaintiff and some third party, of an economic relationship that contains the probability of future economic benefit to the plaintiff"; (2) "the defendant's knowledge of the relationship"; (3) "intentionally wrongful acts designed to disrupt the relationship"; (4) "actual disruption of the relationship"; and (5) "economic harm proximately caused by the defendant's action." *Roy Allan Slurry Seal, Inc. v. Am. Asphalt S., Inc.*, 388 P.3d 800, 803 (Cal. 2017).

156.   Under California law, the defendant's intentionally wrongful acts designed to disrupt the relationship need not be directed towards the plaintiff but may be "independently tortious only as to a third party." *Korea Supply Co. v. Lockheed Martin Corp.*, 63 P.3d 937, 956 (Cal. 2003) (quoting *Della Penna v. Toyota Motor Sales, USA, Inc.*, 902 P.2d 740, 761 (Cal. 1995)).

157.   Here, the RNC has existing economic relationships with its financial supporters, which



1    entail a high probability of future economic benefit to the RNC in the form of repeat donations.

2    158.    Among other reasons, Google's conduct is independently wrongful to the extent that

3    any asserted count (*e.g.*, Unruh, common carrier, UCL) states a claim. Google's conduct is also

4    independently wrongful because it violates established industry, trade or professional rules or

5    standards, such as Google's own terms of service and implied warranties. *See, e.g.*, *Stevenson Real Est.*

6    *Servs., Inc. v. CB Richard Ellis Real Est. Servs., Inc.*, 42 Cal. Rptr. 3d 235, 241-43 (Ct. App. 2006).

7    159.    As alleged above, Google has actual knowledge of the RNC's existing economic

8    relationships with its financial supporters. The RNC has repeatedly informed Google of the economic

9    value of these relationships, that the end-of-month and end-of-quarter periods are vital times in to

10   communicate in these relationships, and that Google's wrongful acts are causing significant harm to

11   the relationships and resulting financial harm to the RNC.

12   160.    Google offered the RNC a series of varying "explanations" as to how the RNC might

13   prevent Google from intercepting the RNC's emails and diverting them to Gmail users' spam folders.

14   The RNC addressed every one of Google's proffered explanations. Still, despite the RNC's diligent

15   and targeted efforts following Google's directions, Google intercepted and diverted to its users' spam

16   folders nearly all of the RNC's emails towards the end of each month in 2022 leading up to this suit.

17   Google stopped only after the RNC filed this suit. The complete absence of reasonable alternative

18   explanations for why Google intercepted and diverted RNC emails *en masse* to spam indicates that

19   Google engaged in intentionally wrongful acts designed to disrupt the existing economic relationship

20   between the RNC and its donors.

21   161.    As a direct and proximate result of Google's intentional wrongful acts, there has been

22   an actual disruption of the RNC's existing economic relationship with supporters who are past, current,

23   and future donors. Google repeatedly intercepting and diverting the RNC's communications with its

24   financial supporters, in fact caused (and continues to cause) a measurable decrease in their donations

25   to the RNC.

26   162.    Accordingly, Google is liable to the RNC for intentional interference with a prospective

27   economic relationship. On information and belief, Google has caused hundreds of thousands of

28   dollars, if not more, in damages to the RNC to date, and the long-term consequential losses likely total



in the millions of dollars.

163.   The RNC prays for damages according to proof at trial under this claim, pursuant to Cal. Civ. Code §3333, and other applicable California laws, and for injunctive relief under Cal. Civ. Code §525 *et seq.*

**COUNT V**
**NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS**

164.   Plaintiff realleges the allegations made in paragraphs 1 through 163.

165.   California law recognizes the tort of negligent interference with prospective economic relations. *J'Aire Corp. v. Gregory*, 598 P.2d 60, 63 (Cal. 1979).

166.   A claim for negligent interference with prospective economic relations requires that the plaintiff establish: "(1) an economic relationship existed between the plaintiff and a third party which contained a reasonably probable future economic benefit or advantage to plaintiff; (2) the defendant knew of the existence of the relationship and was aware or should have been aware that if it did not act with due care its actions would interfere with this relationship and cause plaintiff to lose in whole or in part the probable future economic benefit or advantage of the relationship; (3) the defendant was negligent; and (4) such negligence caused damage to plaintiff in that the relationship was actually interfered with or disrupted and plaintiff lost in whole or in part the economic benefits or advantage reasonably expected from the relationship." *N. Am. Chem. Co. v. Superior Ct.*, 69 Cal. Rptr. 2d 466, 479 (Cal. App. 1997).

167.   To establish negligence, "the plaintiff must show that the defendant had a duty to use due care, that he breached that duty, and that the breach was the proximate or legal cause of the resulting injury." *Brown v. USA Taekwondo*, 483 P.3d 159, 164 (Cal. 2021) (internal quotation marks omitted).

168.   In the context of a claim for negligent interference with prospective economic relations, California courts assess whether the defendant owed the plaintiff a duty by applying the six factors outlined in *Biakanja v. Irving*, 49 320 P.2d 16 (Cal. 1958). *See J'Aire*, 598 P.2d at 63. These factors include: "(1) the extent to which the transaction was intended to affect the plaintiff, (2) the foreseeability of harm to the plaintiff, (3) the degree of certainty that the plaintiff suffered injury, (4) the closeness of the connection between the defendant's conduct and the injury suffered, (5) the moral blame attached to the defendant's conduct, and (6) the policy of preventing future harm." *Id.*

Verified First Amended Complaint                                    Case No. 2:22-cv-01904

169.    As stated above, the RNC is in existing economic relationships with supporters who are past, current, and future donors that subscribe to receive RNC emails, establishing a high probability of future economic benefit to the RNC in the form of repeat political donations.

170.    As also stated above, Google knew of these existing economic relationships, as the RNC directly informed Defendant about them.

171.    Further, Google owed the RNC a duty to not falsely or arbitrarily label the RNC's emails to its supporters as spam for several reasons: (1) Defendant Google's interception and diversion of the RNC's emails with Gmail users is necessarily a transaction intended to affect the RNC; (2) it is highly foreseeable that by engaging in such conduct, Defendant would cause harm to the RNC and in fact the RNC informed Google it was harming the RNC; (3) Defendant knew with a high degree of certainty that intercepting and diverting RNC emails to its supporters would harm to the RNC, if for no other reason than the RNC told Google that it harmed the RNC, and continues to do so; (4) Defendant's conduct is directly connected to the injury suffered by the RNC, namely, the loss of funds from RNC supporters because Defendant prevented them from receiving crucial RNC emails; (5) Defendant's interception and diversion of the RNC's emails is morally blameworthy because it baselessly and secretly suppresses the political speech and income of one major political party and Google has concealed its true purpose with months of false explanations; and (6) public policy strongly supports the prevention of Google's arbitrary and self-serving interference in the economic relationships of its users and groups like the RNC with which it is apparently antagonistic due to Google's dominance of the email market, the national interest in protecting freedom of political expression and association, the need for Americans to stay informed and provide financial support for candidates of their preferred political ideology, and the freedom of the American people to engage in the electoral process with and through political organizations free from corporate manipulation.

172.    Defendant Google thus breached its duty to the RNC by intercepting and diverting to spam folders nearly all RNC emails to its supporters at the end of each month.

173.    By breaching its duty, Defendant Google proximately caused substantial financial harm to the RNC in the form of cognizable lost donations. On information and belief, Google has caused hundreds of thousands of dollars, if not more, in damages to the RNC to date, and the long-term

Verified First Amended Complaint                                    Case No. 2:22-cv-01904

consequential losses likely total in the millions of dollars.

174.     The RNC prays for damages according to proof at trial under this claim, pursuant to Cal. Civ. Code §3333, and other applicable California laws, and for injunctive relief pursuant to Cal. Civ. Code §525 *et seq.*

### COUNT VI
### UNLAWFUL DISCRIMINATION
### 47 U.S.C. §202

175.     Plaintiff realleges all allegations made in paragraphs 1 through 174.

176.     The Telecommunications Act defines "common carrier" as "any person engaged as a common carrier for hire, in interstate or foreign communication by wire or radio or interstate or foreign radio transmission of energy, except where reference is made to common carriers not subject to this chapter; but a person engaged in radio broadcasting shall not, insofar as such person is so engaged, be deemed a common carrier." 47 U.S.C. §153(11).

177.     The Act subjects certain common carriers to various nondiscrimination obligations. *See, e.g.*, 47 U.S.C. §201(b).

178.     Governing precedent requires courts to defer to the Federal Communications Commission's reasonable classification of services. *See Howard v. Am. Online Inc.*, 208 F.3d 741, 752 (9th Cir. 2000); *see also Mozilla Corp. v. FCC*, 940 F.3d 1 (D.C. Cir. 2019) (explaining that lower courts are still bound by *National Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967 (2005)); *ACA Connects v. Bonta*, 24 F.4th 1233 (9th Cir. 2022).

179.     The FCC does not classify email providers as common carriers subject to nondiscrimination obligations. The D.C. Circuit has upheld the classification as reasonable. *See Mozilla*, 940 F.3d at 18. The Ninth Circuit has adopted, if not strongly suggested, agreement with the D.C. Circuit's conclusions. *See ACA Connects*, 24 F.4th at 1241 ("We are guided by the D.C. Circuit's decision in Mozilla as to the scope of the FCC's regulatory and preemptive authority after the 2018 reclassification.").

180.     The RNC brings this claim under 47 U.S.C. §§206 and 207. The RNC also acknowledges that this claim is foreclosed by binding precedent and is alleging it to preserve the issue for further review or intervening Supreme Court precedent.



### COUNT VII
### NEGLIGENCE
### Cal. Civ. Code §2162

181.    Plaintiff realleges the allegations made in paragraphs 1 through 180.

182.    Google has a duty to the public to receive, to the extent of their capacity, all messages clearly and intelligibly written, and to transmit them upon reasonable terms. *C.f. Primrose v. Western Union Tel. Co.* 154 U.S. 1, 14 (1894) (holding that telegraph companies bore this same duty). In California, a carrier of messages for reward also has a statutory duty to "use great care and diligence in the transmission and delivery of messages." Cal. Civ. Code §2162.

183.    Google thus has a duty to receive emails sent by the RNC, and to transmit them to Gmail users' inboxes upon reasonable terms.

184.    Google also has a duty to transmit and deliver messages sent by the RNC to Gmail users with great care and diligence.

185.    Google did not transmit the RNC's emails to its users' inboxes on reasonable terms, or exercise care and diligence in the transmission and delivery of the RNC's emails to Gmail users because it has in bad faith, and for no accurate or reasonable reason it can explain, intercepted and diverted the RNC's emails to Gmail users' spam folders. Google's political bias or hostility to the RNC is not a reasonable basis for refusing to transmit the emails to its users' inbox and, in the alternative, its arbitrary or incompetent failure to deliver the RNC's emails to Gmail users' inboxes does not constitute great care and diligence.

186.    As a result of Google's breach of its duties, the RNC was unable to communicate with its financial supporters who were Gmail users during the most critical periods of fundraising. This prevented RNC financial supporters from learning about the RNC's efforts and opportunities to support those efforts, and the RNC was harmed by not receiving donations it would have otherwise received. On information and belief, these immediately lost donations likely amount to hundreds of thousands of dollars, if not more, and the long-term consequential losses likely total in the millions of dollars.

187.    The RNC prays for damages according to proof at trial under this claim, pursuant to Cal. Civ. Code §3333, and other applicable California laws, and for injunctive relief pursuant to Cal. Civ. Code §525 *et seq.*



Verified First Amended Complaint                                    Case No. 2:22-cv-01904

WHEREFORE, Plaintiff requests that judgment be entered against Defendant, ordering:

    (a)  a decision that the policies and practices complained of are unlawful under state and federal law;

    (b)  preliminary and permanent injunctive relief to remedy Google's violations of state and federal law;

    (c)  an award of actual, statutory, and exemplary damages to be paid by Google;

    (d)  an award of reasonable attorneys' fees and costs incurred in filing this action under Cal. Civ. Code §52 and other applicable laws;

    (e)  an award of pre- and post-judgment interest; and

    (f)  such further relief as the court deems appropriate.



Verified First Amended Complaint      Case No. 2:22-cv-01904

Date: October 10, 2023                    **DHILLON LAW GROUP INC.**

                                          By: /s/ Harmeet K. Dhillon
                                              Harmeet K. Dhillon
                                              Michael A. Columbo
                                              Jeremiah D. Graham
                                              Anthony J. Fusaro, Jr.
                                              DHILLON LAW GROUP INC.
                                              177 Post Street, Suite 700
                                              San Francisco, California 94108
                                              Telephone: (415) 433-1700
                                              *Counsel of Record for Plaintiff Republican National Committee*

                                          **CONSOVOY MCCARTHY PLLC**

                                              Thomas R. McCarthy (admitted pro hac vice)
                                              Thomas S. Vaseliou (admitted pro hac vice)
                                              Conor D. Woodfin (admitted pro hac vice)
                                              CONSOVOY MCCARTHY PLLC
                                              1600 Wilson Blvd., Suite 700
                                              Arlington, VA 22209
                                              (703) 243-9423
                                              *Counsel for Plaintiff Republican National Committee*

**DEMAND FOR JURY TRIAL**

Under Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury on all claims in this action of all issues so triable.

Date: October 10, 2023                    **DHILLON LAW GROUP INC.**

                                          By: /s/ Harmeet K. Dhillon
                                              Harmeet K. Dhillon
                                              Michael A. Columbo
                                              Jeremiah D. Graham
                                              Anthony J. Fusaro, Jr.
                                              DHILLON LAW GROUP INC.
                                              177 Post Street, Suite 700
                                              San Francisco, California 94108
                                              Telephone: (415) 433-1700
                                              *Counsel for the Republican National Committee*

55



**CONSOVOY MCCARTHY PLLC**

Thomas R. McCarthy (admitted pro hac vice)
Thomas S. Vaseliou (admitted pro hac vice)
Conor D. Woodfin (admitted pro hac vice)
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Suite 700
Arlington, VA 22209
(703) 243-9423
*Counsel for Plaintiff Republican National Committee*


<u>**VERIFICATION ON FOLLOWING PAGE**</u>



Verified First Amended Complaint                    Case No. 2:22-cv-01904

**VERIFICATION**

I, Christian Schaeffer, declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. 28 U.S.C. §1746.

Date: October 10, 2023

Christian Schaeffer, on behalf of the
REPUBLICAN NATIONAL COMMITTEE

