HARMEET K. DHILLON (SBN: 207873)
harmeet@dhillonlaw.com
MICHAEL A. COLUMBO (SBN: 271283)
mcolumbo@dhillonlaw.com
JEREMIAH D. GRAHAM (SBN: 313206)
jgraham@dhillonlaw.com
DHILLON LAW GROUP INC.
177 Post Street, Suite 700
San Francisco, California 94108
Telephone: (415) 433-1700
Facsimile: (415) 520-6593
*Counsel for Plaintiff Republican National Committee*

THOMAS R. MCCARTHY (pro hac vice)
tom@consovoymccarthy.com
THOMAS S. VASELIOU (pro hac vice)
tvaseliou@consovoymccarthy.com
CONOR D. WOODFIN (pro hac vice)
conor@consovoymccarthy.com
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Suite 700
Arlington, VA 22209
(703) 243-9423
*Counsel for Plaintiff Republican National Committee*

## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| REPUBLICAN NATIONAL COMMITTEE,<br><br>                    Plaintiff,<br><br>    v.<br><br>GOOGLE LLC,<br><br>                    Defendant. | Case Number: 2:22-cv-01904-DJC-JDP<br><br>**PLAINTIFF REPUBLICAN NATIONAL COMMITTEE'S RESPONSE IN OPPOSITION TO DEFENDANT GOOGLE LLC'S MOTION TO DISMISS FIRST AMENDED COMPLAINT**<br><br>Date:        March 14, 2024<br>Time:        1:30 p.m.<br>Dept:        Courtroom 10, 13th Floor<br>Judge:      Hon. Daniel J. Calabretta |

1

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

BACKGROUND ........................................................................................................... 2

     A.    Email is indispensable to the RNC and others, and the RNC emails only those who request them and who actively engaged with RNC content recently. ......................... 2

     B.    For about nine months, Google relegates nearly all RNC emails to spam during critical times of the month. ........................................................................................................... 2

     C.    Google promptly stops relegating RNC emails *en masse* to spam. ............................... 3

ARGUMENT ........................................................................................................... 4

  I.    The RNC plausibly alleges that Google discriminated based on political affiliation. ..................... 4

     A.    The most plausible inference from the RNC's many precautions ensuring compliance with best practices, Google's pattern of conduct, Google's refuted excuses, and Google's knowledge of how the timing of the mass diversions would particularly harm the RNC is that Google discriminated based on political affiliation. ............................... 4

     B.    Google's post-filing cessation of diverting RNC emails *en masse* to subscribers' spam folders further supports the RNC's plausible allegations that Google discriminated based on political affiliation. ................................................................................................... 7

     C.    Google's hodgepodge of counterarguments fails. ........................................................ 8

  II.    The RNC states a claim under California's unfair practice law. ......................................... 12

     A.    Google's conduct is unfair. ......................................................................................... 12

        1.    The RNC plausibly alleges all three unfairness tests. ......................................... 13

        2.    Rule 9(b) either does not apply or is met here. ................................................... 15

     B.    Google's standing argument is meritless. ................................................................. 17

  III.  The RNC states a claim for intentional interference with prospective economic relations. .......... 18

  IV.  Google's last resort to 47 U.S.C. §230 fails. .................................................................. 21

     A.    Section 230(c)(2) does not immunize Google. ......................................................... 21

        1.    Subparagraph (A) does not shield Google's conduct. ....................................... 21

        2.    Subparagraph (B) also does not shield Google's conduct. ................................. 22

        3.    Four other considerations defeat Google's broad immunity arguments. ............. 24

     B.    Section 230(c)(1) has no application here and thus does not preempt the RNC's claims. ... 25

CONCLUSION ........................................................................................................... 25

1

<strong>TABLE OF AUTHORITIES</strong>

2

**CASES**

3

*Adarand Constructors, Inc. v. Slater*,
  528 U.S. 216 (2000) ......................................................................................... 17

4

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ......................................................................................... 16

5

*Bechtel Const. Co. v. Sec'y of Lab.*,
  50 F.3d 926 (11th Cir. 1995) ........................................................................... 10

6

*Biden v. Knight First Amend. Inst. at Columbia Univ.*,
  141 S. Ct. 1220 (2021) ..................................................................................... 24

7

8

*Candelore v. Tinder, Inc.*,
  228 Cal. Rptr. 3d 336 (Ct. App. 2018) ........................................... 12, 13, 14, 15

9

*Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*,
  973 P.2d 527 (Cal. 1999) ................................................................................. 12

10

*Code Rebel, LLC v. Aqua Connect, Inc.*,
  2013 WL 5405706 (C.D. Cal. Sept. 24) .......................................................... 18

11

12

*CRST Van Expedited, Inc. v. Werner Enters.*,
  479 F.3d 1099 (9th Cir. 2007) ......................................................................... 20

13

*Davidson v. Kimberly-Clark Corp.*,
  889 F.3d 956 (9th Cir. 2018) ........................................................................... 16

14

*Depot, Inc. v. Caring for Montanans, Inc.*,
  915 F.3d 643 (9th Cir. 2019) ........................................................................... 16

15

16

*Divino Grp. LLC v. Google LLC*,
  2022 WL 4625076 (N.D. Cal. Sept. 30) .......................................................... 14

17

*Doe v. CVS Pharmacy, Inc.*,
  982 F.3d 1204 (9th Cir. 2020) ......................................................................... 13

18

*Doe v. Regents of Univ. of Cal.*,
  23 F.4th 930 (9th Cir. 2022) ....................................................................... 11, 12

19

20

*Dreamstime.com, LLC v. Google LLC*,
  2022 WL 17427039 (9th Cir. Dec. 6) ............................................................... 8

21

*e360Insight, LLC v. Comcast Corp.*,
  546 F. Supp. 2d 605 (N.D. Ill. 2008) .............................................................. 21

22

23

*EEOC v. Goodyear Aerospace Corp.*,
  813 F.2d 1539 (9th Cir. 1987) ......................................................................... 17

24

*Enhanced Athlete Inc. v. Google LLC*,
  479 F. Supp. 3d 824 (N.D. Cal. 2020) ............................................................ 21

25

26

*Enigma Software Grp. USA v. Malwarebytes, Inc.*,
  946 F.3d 1040 (9th Cir. 2019) .................................................................... 23, 24

27

*e-ventures Worldwide, LLC v. Google, Inc.*,
  188 F. Supp. 3d 1265 (M.D. Fla. 2016) .......................................................... 21

28

*Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC,*
    521 F.3d 1157 (9th Cir. 2008) ................................................................. 24

*Fikre v. FBI,*
    904 F.3d 1033 (9th Cir. 2018) ................................................................. 18

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.,*
    528 U.S. 167 (2000) ............................................................................... 17

*Garland v. USAir, Inc.,*
    767 F. Supp. 715 (W.D. Pa. 1991) ......................................................... 10

*Gordon v. Virtumundo, Inc.,*
    575 F.3d 1040 (9th Cir. 2009) ................................................................. 15

*Grundy v. Walmart Inc.,*
    2018 WL 5880914 (C.D. Cal. June 22) ..................................................... 7

*Harris v. Cap. Growth Invs. XIV,*
    805 P.2d 873 (Cal. 1991) ................................................................... 7, 14

*Healy v. N.Y. Life Ins.,*
    860 F.2d 1209 (3d Cir. 1988) ................................................................. 10

*Henderson v. Source for Pub. Data, L.P.,*
    53 F.4th 110 (4th Cir. 2022) ................................................................... 25

*HomeAway.com, Inc. v. City of Santa Monica,*
    918 F.3d 676 (9th Cir. 2019) ................................................................... 25

*Howe v. City of Akron,*
    801 F.3d 718 (6th Cir. 2015) ................................................................... 17

*In re Adobe Sys., Inc. Privacy Litig.,*
    66 F. Supp. 3d 1197 (N.D. Cal. 2014) .................................................... 12

*In re Countrywide Fin. Corp. Sec. Litig.,*
    588 F. Supp. 2d 1132 (C.D. Cal. 2008) .................................................. 20

*In re Zoom Video Commc'ns Inc. Priv. Litig.,*
    525 F. Supp. 3d 1017 (N.D. Cal. 2021) .................................................. 14

*Jones v. Hendrix,*
    599 U.S. 465 (2023) ............................................................................... 11

*Knox v. SEIU,*
    567 U.S. 298 (2012) ............................................................................... 17

*Lemmon v. Snap, Inc.,*
    995 F.3d 1085 (9th Cir. 2021) ................................................................. 25

*Linear Tech. Corp. v. Applied Materials, Inc.,*
    61 Cal. Rptr. 3d 221 (Ct. App. 2007) ..................................................... 12

*Logistick, Inc. v. AB Airbags, Inc.,*
    543 F. Supp. 3d 881 (S.D. Cal. 2021) .................................................... 19

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) ............................................................................... 19

*Lunney v. Prodigy Servs. Co.,*
94 N.Y.2d 242 (1999)........................................................................................................15

*Malwarebytes, Inc. v. Enigma Software Grp. USA,*
141 S. Ct. 13 (2020)..........................................................................................................24

*Moore v. Mars Petcare US, Inc.,*
966 F.3d 1007 (9th Cir. 2020).....................................................................................15, 16

*Navigant Consulting, Inc. v. Wilkinson,*
508 F.3d 277 (5th Cir. 2007)...............................................................................................8

*NetChoice, LLC v. Paxton,*
49 F.4th 439 (5th Cir. 2022).........................................................................................14, 20

*Nia v. Bank of Am., N.A.,*
603 F. Supp. 3d 894 (S.D. Cal. 2022) ............................................................................7, 13

*Phillips ex rel. Ests. of Byrd v. Gen. Motors Corp.,*
307 F.3d 1206 (9th Cir. 2002)...........................................................................................22

*Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.,*
631 F.3d 436 (7th Cir. 2011).............................................................................................15

*R.W. v. Columbia Basin Coll.,*
77 F.4th 1214 (9th Cir. 2023)............................................................................................17

*Rogers v. Interstate Nat'l Dealer Servs. Inc.,*
2020 WL 4582689 (N.D. Ohio Aug. 10) ............................................................................9

*Rosemere Neighborhood Ass'n v. EPA,*
581 F.3d 1169 (9th Cir. 2009)...........................................................................................17

*Roy Allan Slurry Seal, Inc. v. Am. Asphalt S., Inc.,*
388 P.3d 800 (Cal. 2017) ............................................................................................18, 19

*Rubenstein v. Neiman Marcus Grp.,*
687 F. App'x 564 (9th Cir. 2017) ......................................................................................12

*Schwake v. Ariz. Bd. of Regents,*
967 F.3d 940 (9th Cir. 2020).......................................................................................11, 12

*SFFA v. President & Fellows of Harvard Coll.,*
600 U.S. 181 (2023) ..........................................................................................................12

*Song fi Inc. v. Google, Inc.,*
108 F. Supp. 3d 876 (N.D. Cal. 2015) ..............................................................................24

*Speech First, Inc. v. Fenves,*
979 F.3d 319 (5th Cir. 2020).............................................................................................17

*Speech First, Inc. v. Schlissel,*
939 F.3d 756 (6th Cir. 2019).............................................................................................17

*Starr v. Baca,*
652 F.3d 1202 (9th Cir. 2011).......................................................................................1, 12

*State of Ill. ex rel. Hartigan v. Panhandle E. Pipe Line Co.,*
730 F. Supp. 826 (C.D. Ill. 1990) .....................................................................................10

*Stevenson Real Est. Servs. v. CB Richard Ellis Real Est. Servs.*,
    42 Cal. Rptr. 3d 235 (Ct. App. 2006) ...................................................................... 20

*Swartz v. KPMG LLP*,
    476 F.3d 756 (9th Cir. 2007) ..................................................................................... 16

*Sybersound Recs., Inc. v. UAV Corp.*,
    517 F.3d 1137 (9th Cir. 2008) ................................................................................... 20

*U.S. ex rel. Perry v. Hooker Creek Asphalt & Paving, LLC*,
    565 F. App'x 669 (9th Cir. 2014) .............................................................................. 16

*Vess v. Ciba-Geigy Corp. USA*,
    317 F.3d 1097 (9th Cir. 2003) ................................................................................... 16

*Waln v. Dysart Sch. Dist.*,
    54 F.4th 1152 (9th Cir. 2022) .................................................................................... 12

*Wang v. OCZ Tech. Grp.*,
    276 F.R.D. 618 (N.D. Cal. 2011) .............................................................................. 20

*Westside Center Assocs. v. Safeway Stores 23, Inc.*,
    49 Cal. Rptr. 2d 793 (Ct. App. 1996) ....................................................................... 19

*White v. Lee*,
    227 F.3d 1214 (9th Cir. 2000) ................................................................................... 17

*Williams v. Gerber Prod. Co.*,
    552 F.3d 934 (9th Cir. 2008) ..................................................................................... 12

*Yellen v. Confederated Tribes*,
    141 S. Ct. 2434 (2021) .............................................................................................. 24

*Zadvydas v. Davis*,
    533 U.S. 678 (2001) .................................................................................................. 24

*Zango, Inc. v. Kaspersky Lab, Inc.*,
    568 F.3d 1169 (9th Cir. 2009) ................................................................................... 22

**STATUTES**

15 U.S.C. §7701(1) ............................................................................................................ 15

42 U.S.C. §230(c)(2)(B) .............................................................................................. 22, 23

47 U.S.C. §230 .................................................................................................................... 4

47 U.S.C. §230(a)(3) ........................................................................................................ 24

47 U.S.C. §230(c)(1) ........................................................................................................ 25

47 U.S.C. §230(c)(2) ........................................................................................................ 23

47 U.S.C. §230(c)(2)(A) ................................................................................................... 21

Cal. Civ. Code §3100 ....................................................................................................... 15

Cal. Civ. Code §51 ........................................................................................................... 14

**OTHER AUTHORITIES**

5A Wright & Miller §1297 (4th ed.) ................................................................................ 16

5A Wright & Miller §1300 (4th ed.) ................................................................................ 16

Black's Law Dictionary (11th ed. 2019) ....................................................................... 24

Candeub & Volokh, *Interpreting 47 U.S.C. §230(c)(2)*,
    1 J. Free Speech L. 175 (2021) ........................................................................... 23, 24

Candeub, *Reading Section 230 As Written*,
    1 J. Free Speech L. 139 (2021) ................................................................................. 24

Hamburger, *The Constitution Can Crack Section 230*,
    Wall St. J. (Jan. 29, 2021), perma.cc/D455-HD5K .................................................. 24

Prevent Mail to Gmail Users from Being Blocked or Sent to Spam,
    Google Help, perma.cc/95SX-5HJM ......................................................................... 9

Volokh, *Bans on Political Discrimination in Places of Public Accommodation and Housing*,
    15 N.Y.U. J.L. & Liberty 490 (2022) ....................................................................... 14

### INTRODUCTION

When considering the prior version of the complaint, this Court called this a "close case" and allowed the RNC to amend its complaint to add factual details to move this case from "speculative" to "plausible." Op. (Dkt. 53) 2, 9-10. The RNC did so. Among other things, the RNC added that it not only sends emails solely to those who requested them but also solely to those who recently actively engaged with RNC content. First Am. Compl. (Dkt. 58) ¶¶28-32. As the Court recommended, the RNC added details on how Salesforce, Validity, and industry-standard tools ensure the RNC meets the email service provider's specifications—which is why shortly before, during, and right after each mass diversion, the RNC's domain was authenticated, was verified, and had received a strong reputation. FAC ¶¶36-43. The RNC added that according to Google's own tools, the RNC's spam rate is extremely low, with a median of 0.1%, and that shortly before, during, and after many of the *en masse* relegations the RNC's spam rate was either 0.1% or 0.0%—ratings that Google endorses. FAC ¶¶42, 72, 86-87, 91, 96, 103. And most significantly, the RNC added that Google voluntarily ceased its discriminatory relegation of RNC emails to subscribers' spam folders *promptly after this suit was filed*—even though the RNC has not meaningfully changed its email sends and its spam rate has remained the same. FAC ¶¶4, 42, 160 & Fig. 1.

Given these additional details, Google agrees this case is no longer "close." MTD 23. But not in the direction that it should. Rather, it claims that it's now "more clear" Google did nothing wrong. MTD 1.

Google is wrong. As plausibly alleged, Google's conduct violates California law. It violates the unfair competition law because political-affiliation discrimination significantly harms the RNC and by Google's own concession, it has no legitimate justification for such discrimination; it independently violates the UCL because Google's conduct is comparable to violations of other California laws. Google violates tortious-interference law because it intentionally interfered with the RNC's relationship with its supporters, relationships Google knew about. And §230 does not countenance such unlawful discrimination.

In arguing otherwise, Google improperly disputes the complaint's factual allegations and repeatedly ignores that the RNC's theory of liability need not be the *most* plausible one: "If there are two alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6)." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). This Court should reject Google's attempt to transform 12(b)(6)'s plausibility standard into

a post-discovery, post-trial preponderance-of-the-evidence standard and deny Google's motion.

## BACKGROUND

### A.  Email is indispensable to the RNC and others, and the RNC emails only those who request them and who actively engaged with RNC content recently.

The RNC's ability to reach its supporters through email is indispensable to its basic operations. FAC ¶¶20-21. The RNC uses email to fund campaigns, encourage voting, and build a community. *Id.* For this reason, the RNC takes great pains to optimize email performance. It sends emails only to those who request them and recently actively engaged with RNC content.[1] FAC ¶27. Anyone who no longer wants to receive emails (or a type of email) will no longer do so within about 24 hours of unsubscribing. *Id.* The RNC also uses "audience segmentation" to determine what segments of the subscriber audience should be sent which emails and how often. *See* FAC ¶¶28-32. This process is an industry-standard method; it's what responsible bulk emailers do to optimize engagement with their content, and it's a best practice according to Google. FAC ¶¶30-32.

### B.  For about nine months, Google relegates nearly all RNC emails to spam during critical times of the month.

Google's most serious diversions to spam began at least as early as February 2022. That month the RNC began "working on matters related to the 2022 midterm election," and it "detected that its Gmail 'inboxing' rate suddenly dropped from rates consistently above 90% to nearly 0% on certain days" toward the end of the month. FAC ¶47. An "inboxing rate of nearly 0% means that Gmail hid nearly every campaign email sent by the RNC from the Gmail users on whom the RNC financially relies." *Id.*

The RNC immediately began investigating the issue and contacted Google. Google then offered the first of many shifting excuses for why nearly every email was relegated to spam. For example, Google initially "responded that the monthly crashing of the RNC's inboxing rate was due to a high number of user complaints." FAC ¶61. But as the RNC told Google, this was not true. The RNC had been monitoring its industry standard tools, which showed that the RNC's "complaint rate [wa]s incredibly low," "there were no reputational issues" at all (let alone from user complaints), and that there were "no [other] irregularities

---

[1] The RNC sends almost all its emails from the domain name campaigns.rnchq.com, and it is from this domain name that the RNC sends every email exclusively to those who request them and recently actively engaged with RNC content. *See* FAC ¶1 n.1 & ¶¶24-27. Google knew that this domain name was the one in question. *E.g.*, FAC ¶¶25-26, 79. Thus, when this brief refers to "nearly all RNC emails" (and similar phrases), it is mainly referring to emails sent from the campaigns.rnchq.com domain name.

---

1    causing the issue." FAC ¶62 (first alteration in original).

2       Toward the end of the next month, Google again relegated nearly all RNC emails to spam. FAC

3    ¶63. Once again, the RNC employed the industry standard tools to try to assess the cause. But all the tools

4    suggested that it was not the RNC or Gmail-user complaints causing the problem. FAC ¶¶63-67.

5    Unsurprisingly, no other major email service provider was consigning RNC emails to spam *en masse*, let

6    alone cyclically. *See, e.g.*, FAC ¶105, Fig. 13 (graphing RNC's inboxing rates for four major email service

7    providers). The RNC again contacted Google. FAC ¶¶63-67. But Google never identified the problem or

8    provided a concrete plan to remedy the wholesale relegation of RNC emails to spam during critical periods

9    of the month. *Id.*

10       The problems with Gmail continued. Each time the RNC contacted Google, the RNC explained

11    how it was following Google's "best practices" and submitted reports showing that it had a high email

12    reputation and that user complaints could not be the problem. FAC ¶¶68-99. Specifically, "the RNC's spam

13    rate before, during, and after the *en masse* [diversions] in May, June, July, and August were approximately

14    either 0.1% or 0.0%." FAC ¶103. (As a comparator, at the time this suit was filed and Google quit spamming

15    the RNC's email cold turkey, "the RNC's median spam rate was approximately 0.1%, and its average spam

16    rate was approximately 0.14%." FAC ¶42.) Indeed, during these nine months, the RNC's performance

17    metrics were shown as strong according to industry standard tools. And shortly "before, during, and right

18    after each of the *en masse* diversions to requestors' spam folders, the RNC's domain was authenticated and

19    verified." FAC ¶40.

20       Eventually Google stopped responding to the RNC's good-faith attempts to discuss these issues

21    and diagnose the problem, forcing the RNC to file this suit. FAC ¶¶100-01.

22      **C.  Google promptly stops relegating RNC emails *en masse* to spam.**

23       After the RNC sued, Google voluntarily ceased the mass relegation of RNC emails to subscribers'

24    spam folders. *E.g.*, FAC ¶4. Since this time, the RNC has experienced its usual high inboxing rates

25    consistently throughout the year without any *en masse* diversion to subscribers' spam folders. But the RNC

26    has done nothing materially different. Its spam rate and other metrics have not "meaningfully changed since

27    filing this suit." FAC ¶42. If Google's explanations were legitimate, then nearly all of the RNC's emails

28    should have continued to go to spam toward the end of the month. FAC ¶4. Yet no *en masse* diversion

occurred then or after. The only relevant differences are that the RNC filed this lawsuit and the midterm elections are over. FAC ¶50. The post-lawsuit, post-election timing of Google's cessation of its mistreatment of the RNC's emails promptly after the RNC shined a light on Google's conduct at least plausibly indicates that Google had control over the RNC's inboxing; that Google was feigning misunderstanding the problem when it knew how to stop relegating the RNC's email to spam the whole time; and that Google suppressed those emails because it was the RNC sending them.

## ARGUMENT

The RNC states a claim under the UCL and California's intentional-tortious-interference law.[2] And neither claim is barred by 47 U.S.C. §230.

### I.   The RNC plausibly alleges that Google discriminated based on political affiliation.

After this Court said this was a "close case," Op. 2, 9, the RNC plausibly alleged in the amended complaint the very factual details this Court said it was looking for. The new factual allegations plausibly show that Google discriminated against the RNC based on political affiliation by relegating *en masse* millions of RNC emails to potential donors' and supporters' spam folders.

### A.   The most plausible inference from the RNC's many precautions ensuring compliance with best practices, Google's pattern of conduct, Google's refuted excuses, and Google's knowledge of how the timing of the mass diversions would particularly harm the RNC is that Google discriminated based on political affiliation.

Since long before the mass diversion of RNC emails, as now, the RNC takes great pains to ensure that every email it sends is to someone who requested it and who recently actively engaged with RNC content. FAC ¶¶27-32. The efforts include contracting with email-deliverability platforms (Salesforce and Validity) that allow the RNC to optimize its email engagement and inboxing rate by ensuring that the RNC follows best practices, including those by email service providers like Google. FAC ¶¶39-44. And the RNC has always run many internal tests to improve email inboxing and engagement, including to assess what could be causing Google to relegate nearly all its emails to spam. *See, e.g.*, FAC ¶¶55-56.

Despite these precautions, Google, for nearly a year, relegated millions of RNC emails *en masse* to donors' and supporters' spam folders during pivotal points in election fundraising and community building. Indeed, Google did so even when the RNC was "only emailing those Gmail users who are [subscribers,]

---

[2] "The RNC preserves its claims that were dismissed without leave to amend." FAC page 42 n.7; *see* MTD 8 n.1 (agreeing these claims are preserved). The RNC also preserves for appeal all arguments related to the Court's prior decision.

*donors* to [the RNC,] and have also *opened [an RNC email] within the last 15 days.*" FAC ¶53 (emphases added). And Google did so even though no industry-standard tool (including Google's) showed anything wrong with the RNC's domain or email sends. At all relevant times, the RNC's domain was authenticated and verified and its spam rate was extremely low. *See, e.g.,* FAC ¶¶40, 103.

From the beginning, the RNC has used its best efforts to work with Google to resolve the problem. For example, after each period of mass relegation, the RNC contacted Google and explained how the RNC was following Google's "best practices" and submitted reports showing that it had a high email reputation and that user complaints could not be the problem. FAC ¶¶68-99. The RNC also always promptly "submitted information to Google, such as the email address from which its emails were sent, the displayed name of the sender, the subject line, and preview text using a Google form designed to collect this information to avoid mislabeling a sender's email as spam," as Google suggested. FAC ¶63.

Although Google sometimes responded with shifting excuses for the mass diversions, the RNC would promptly explain why each excuse failed. For example, at one point Google claimed "the RNC's domain authentication … was possibly at fault." FAC ¶85. But the RNC "immediately" refuted that claim, informing Google that "it 'checked DMARC, SPF and [D]KIM on Google Postmaster and it shows that [the RNC's] domain is authenticated and verified,' and the RNC checked with Salesforce, which had already confirmed that its authentications were in proper working order." *Id.* (quoting RNC email to Google); FAC ¶86 (evidence emailed). Google also claimed the RNC's "press releases" were to blame. FAC ¶¶25, 79. But the RNC debunked that claim, explaining to Google that the domain at issue does not send press releases; press releases are sent from an "entirely different email domain (specifically, team.gop.com)" that is unaffiliated to and "comparatively, has a minuscule email volume from the RNC's main marketing domain (campaigns.rnchq.com)," so the press releases could not be the problem. FAC ¶¶79-80. Google also claimed the RNC's email volume and frequency were to blame. *E.g.,* FAC ¶54. But as the RNC explained, that could not be the reason: "Since the 2020 election, the RNC has dramatically reduced both email volume and frequency[,] … yet there was no *en masse* diversion to spam [during the 2020 election]." FAC ¶50. "During 2022, the RNC further reduced email volume and frequency, yet the RNC experienced clockwork diversion of emails towards the end of each month from January 2022 to October 2022 (when the RNC filed this suit)." *Id.* Moreover, the *en masse* diversions would occur *before* the RNC's ramp up in email volume and

1   frequency, so the diverting obviously could not be in response to an increase in volume or frequency. *See,*

2   *e.g.,* FAC ¶75.

3        Over nearly a year, all of Google's shifting explanations were disproved with industry-standard

4   tools, and no solution it offered worked—not even following Google's "training on 'Email Best Practices.'"

5   FAC ¶¶93-95. Eventually, Google stopped offering any explanation or any meaningful solution and fell

6   silent altogether. FAC ¶52. Google's shifting and debunked explanations strongly suggests that Google's

7   conduct was based on invidious discrimination.

8        During this time, Google was well-aware that the end-of-month, end-of-quarter period was vital to

9   the RNC. Google no longer argues that it lacked knowledge of this fact. *See* MTD Reply (Dkt. 38) 1; *see also*

10  Op. 33 ("[T]he RNC made Google aware of the potential harm."). Google knew that the emails being

11  diverted to spam were "expected to be top-performers" during key election fundraising and voting times.

12  FAC ¶66; *see, e.g.,* FAC ¶77 (informing Google that it was "'tanking the RNC's deliverability during the

13  EOM period when fundraising and donations go up'"). Google knew that diverting end-of-month, end-of-

14  quarter emails would hamper fundraising and hinder the RNC's "'ability to properly deploy [its] GOTV

15  messaging, which would be an extreme hinderance to [the] organization and the Party as a whole.'" FAC

16  ¶69 (quoting RNC email to Google). And Google was aware of the upcoming midterm election, yet Google

17  relegated the RNC's emails *en masse* to spam "'the day before [the RNC's] FEC [Federal Election

18  Commission] deadline'" during the RNC's "'EOQ period which are two of the most critical days of the

19  year'" and when the RNC had "'key get out the vote emails … in PA, IL, and MI.'" FAC ¶99 (quoting RNC

20  email to Google). Google knew all this—and more—and yet it continued to relegate virtually all of the

21  RNC's emails to subscribers' spam folders during key periods and without providing any legitimate reason.

22  Google's knowledge strongly suggests that it engaged in intentional political-affiliation discrimination.

23       That the same type of *en masse* relegation to spam does not happen with other popular email

24  platforms, such as Yahoo! Mail and Microsoft's Outlook Mail, reinforces the plausibility of the RNC's

25  allegations. "Although those platforms have an identical interest to Google in limiting 'spam' to their users,

26  they did not conceal all (or nearly all) of the RNC's emails from its supporters at any point." FAC ¶105. In

27  fact, "the inboxing rates on these platforms did not reflect *any* dramatic cyclical decreases in inboxing rates,

28  let alone to the rate of nearly 0%." *Id.*

From the well-pleaded allegations, the most reasonable inference from Google's pattern of conduct is that Google is intentionally relegating critical RNC emails to the spam folder because it's the RNC sending them. *See Grundy v. Walmart Inc.*, 2018 WL 5880914, at *4 (C.D. Cal. June 22) ("[C]ourts routinely consider patterns of conduct in drawing plausible inferences of intentional racial discrimination."). The RNC need only "include some factual context that gives rise to a plausible inference of discriminatory intent." *Nia v. Bank of Am., N.A.*, 603 F. Supp. 3d 894, 906 (S.D. Cal. 2022) (cleaned up). It has done far more.

Evidence of disparate impact also "may be probative of intentional discrimination." *Harris v. Cap. Growth Invs. XIV*, 805 P.2d 873, 893 (Cal. 1991). This is one of those cases. For example, "a recent study by researchers at North Carolina State University … found that Google's Gmail labels *significantly* more campaign emails from Republican political candidates as spam than campaign emails from Democratic political candidates." FAC ¶107 (emphasis added). And the study found no similar disparity in other major email providers. *E.g.*, FAC ¶¶106-07. This reinforces that Google is intentionally relegating RNC emails to spam because it's the RNC sending them.[3]

**B. Google's post-filing cessation of diverting RNC emails *en masse* to subscribers' spam folders further supports the RNC's plausible allegations that Google discriminated based on political affiliation.**

If any doubt remained that the RNC met the plausibility standard, Google's post-filing conduct extinguishes it. Since this suit's filing on October 21, 2022, Google ceased its discriminatory treatment of the RNC. In other words, the RNC has experienced high inboxing rates consistently for over 14 months without any *en masse* diversion to subscribers' spam folders. But it's not because the RNC has done anything materially different. The RNC has continued to use leading email-marketing services (such as Validity and Salesforce) and to adhere to the best practices set out by email platforms (including Google). In fact, in November 2022, the RNC *increased* its email send volume and frequency to Gmail users. FAC ¶4. If Google's explanations were legitimate, the RNC's emails should have continued going to spam toward the end of the month. Yet no mass diversion occurred then or after. The only relevant differences were that the RNC filed this lawsuit and the midterm elections had ended. FAC ¶50. Both facts tend to show that Google had the

---

[3] This Court explained that "[w]hile this study does provide some evidence that Google could be acting without good faith, the Court finds that this study is insufficient, standing alone, to meet the pleading requirements." Op. 10. This time, however, the study is not "standing alone" and thus bolsters the other well-pleaded allegations of political-affiliation discrimination.

1    ability to stop the mass relegation of the RNC's email to spam at any time and stopped only when this suit

2    shined a little on Google's discriminatory conduct.

3         In short, the post-lawsuit, post-election timing of Google's cessation in discrimination is damning.

4    It at least plausibly indicates that Google had control over the RNC's inboxing, that Google was feigning

5    misunderstanding the problem when it actually knew how to stop relegating the RNC's email to spam the

6    whole time, and that Google suppressed those emails because it was the RNC sending them.

7         **C.  Google's hodgepodge of counterarguments fails.**

8         **1.** Google argues that the RNC invokes a "logical fallacy" of "*post hoc ergo propter hoc*" to allege that

9    Google stopped relegating RNC emails *en masse* to subscribers' spam folders because the RNC sued. MTD

10   21. But it is Google that clings to a logical fallacy. The RNC is not relying on "the sole fact" that Google

11   stopped discriminating when it sued; it has about a year of corroborating facts and allegations that point

12   the same way. MTD 21; *see Dreamstime.com, LLC v. Google LLC*, 2022 WL 17427039, at *2 n.4 (9th Cir. Dec.

13   6) (relied on at MTD 21) (making clear "*post hoc ergo propter hoc*" was relevant only "[a]bsent other evidence").

14   "'Alert avoidance of the classical fallacy of *post hoc, ergo propter hoc* does not require rejection of common

15   sense inferences.'" *Navigant Consulting, Inc. v. Wilkinson*, 508 F.3d 277, 291 (5th Cir. 2007).

16        Google's backup argument, which it claims is "[e]qually important," is that it's "equally *plausible* that

17   the inboxing issue was resolved *before* this case was filed." MTD 21-22 (first emphasis added). But that is a

18   concession that the RNC's allegations are "plausible." MTD 22. The law doesn't require the RNC's theory

19   of liability be the most plausible; that Google admits "equal[] plausib[ility]" is enough.

20        **2.** In Google's first motion to dismiss, it tried to identify "*six* alternative explanations," First MTD

21   (Dkt. 30) 7, but Google now abandons *all but two* of these possible explanations, both having to do with

22   spam rate. *See* MTD 16-17. These excuses still fail to undermine the plausibility of the RNC's allegations.

23        **a.** Google argues that the "obvious alternative" reason for every *en masse* diversion is that the RNC's

24   spam rate was above Google's purported thresholds of 0.1% and 0.3%. MTD 17. That argument is wrong

25   and deceptive.

26        ***First,*** the argument is wrong. If it were right, then the RNC should still be experiencing these *en*

27   *masse* diversions. After all, "[t]he RNC's spam rate has not meaningfully changed since filing this suit." FAC

28   ¶42. But the argument also fails on its own terms. "User reported spam did not correlate with these mass

relegations." FAC ¶103. From the first mass diversion in December 2021 to the filing of this suit, "the RNC's median spam rate was approximately 0.1%." FAC ¶42. "For example, the RNC's spam rate before, during, and after the *en masse* [diversions] in May, June, July, and August were approximately either 0.1% or 0.0%." FAC ¶102; *see* FAC ¶71 (May); ¶¶81-82 (June); ¶90 (July); ¶95 (August); ¶97 (material identical for September). The RNC thus met Google's spam-rate suggestion when it was relegated *en masse* to spam.[4]

Google responds that the RNC's spam rate was "sometimes as high as '0.3%.'" MTD 3. That response is fallacious. As Google even recognizes later in its motion, the RNC hit 0.3% only for a single day. *See* MTD 17 ("hit '0.3%' at one point"); FAC ¶42 ("only one instance of a 0.3% spam rate for a single day"). A single day at 0.3% is quite obviously not the reason for the two months of mass relegations *before the rate even occurred*; nor is it a plausible reason for the six months of mass diversions after it. *See* Prevent Mail to Gmail Users from Being Blocked or Sent to Spam, Google Help, perma.cc/95SX-5HJM ("a spam rate of 0.30% or higher should be avoided, *especially for any sustained period of time*" (emphasis added)).

**Second,** Google's sole support for its contention that it advised bulk emailers that they must not reach a 0.1% (or perhaps Google means 0.3%) spam rate is its own website. But that page does not support Google's contention because the supposed advisement is from a *post-filing* change on its website. Exhibit N to Google's first motion to dismiss is the same page (from three months earlier), but it lacks the spam-rate numbers. *See* Dkt. 30-15 (Jan. 23, 2023); *compare* bit.ly/3t6OyKK (Oct. 6, 2022, lacks spam-rate suggestion); bit.ly/47Ue9FB (Mar. 12, 2023, lacks spam-rate suggestion), *with* bit.ly/4afVlSO (Mar. 23, 2023, has it). That's why Google did not mention these "magic numbers" in its first motion, even though the RNC highlighted its low spam rate in the original complaint. *E.g.*, Orig. Compl. (Dkt. 1) ¶29; ¶44. This Court should disregard Google's self-serving, post-filing alteration. *Cf. Rogers v. Interstate Nat'l Dealer Servs. Inc.*, 2020 WL 4582689, at *6 (N.D. Ohio Aug. 10) ("The Court will not consider self-serving statements Dealer Services has made about itself on [a] website when considering a Motion to Dismiss.").

---

[4] Moreover, Google's 0.1% is merely what senders should "'aim'" for. MTD 3. At most, being above 0.1% explains why the RNC's inboxing rate is not always 100% but around 80-90%. Besides, if anything, the RNC's spam rate should have been better without Google's interference. Google's diversions of emails occurred during the most critical times of the month when the most engagement by subscribers happen—and in turn, the least amount of user-reported spam. It is far more plausible that barely ticking above 0.1% explains why the RNC's inboxing rate is not 100% and not why the inboxing rate was nearly 0% at critical times. Indeed, since Google stopped discriminating, Google's spam filter is still sending some RNC emails to spam, at rates along the lines RNC emails were sent to spam *outside* the cyclical mass diversions. In other words, since the RNC filed this suit, Google's spam filter is acting how it would for any other bulk sender that diligently follows email platforms' best practices. FAC ¶4 n.2.

Plus, if the cause of the mass diversions was actually the spam-rate percentage being above 0.1% at some point, Google would have said so at the time. (For example, there would have been emails saying something like, "This end-of-month diversion will stop when you get your spam rate at or below 0.1%.") If the spam rate is such an "obvious" and "simple" explanation, it would not have taken two years to come up with it and only in litigation. *See Garland v. US Air, Inc.*, 767 F. Supp. 715, 724 (W.D. Pa. 1991) ("Reasons which are first articulated after initiation of the lawsuit are suspect and considered by the court to be self serving." (citing *Healy v. N.Y. Life Ins.*, 860 F.2d 1209, 1215 (3d Cir. 1988)); *State of Ill. ex rel. Hartigan v. Panhandle E. Pipe Line Co.*, 730 F. Supp. 826, 932 (C.D. Ill. 1990) ("[P]urported business justifications asserted at the time of trial should not be taken at simple face value. 'A monopolist's self-serving, *ex post facto* business justifications must be examined with care.'"). Nor would Google have needed to proffer various other erroneous excuses for the relegations. *See Bechtel Const. Co. v. Sec'y of Lab.*, 50 F.3d 926, 935 (11th Cir. 1995) ("shifting explanations" show "pretextual nature of" defendant's "actions"). Google's months of stonewalling the RNC with other erroneous excuses are only further evidence of discrimination.

**b.** Google's backup argument is that the RNC's low spam rate is irrelevant because its "algorithmic spamming system collects spam reports over the course of the month." MTD 17 (cleaned up). But this monthly collection argument does not explain why mass diversions no longer happen to the RNC, given that the RNC's spam rate is materially identical to the rate before this suit's filing. FAC ¶42. Moreover, if the system works on a monthly basis and this was really the problem, then during the nine months of back-and-forth, Google would have identified the problem, the spam-rate average threshold the RNC should avoid, and the remedy to avoid this issue. (For example, Google would have said something like, "keep your *monthly average* below X% and the mass consigning will not happen.") Google didn't.

Google's contention appears to be that a bulk emailer can send as much spam as it wants for 28 consecutive days, be trashed completely for two days, and then be able to again send as much spam as it wants for 28 days. That makes no sense. It also can't be the reason here. Take June 2022. From June 22 through the end of the month, the RNC's spam rate was 0.1%, but the *en masse* diversion occurred on June 27 and 28 anyway. FAC ¶¶81-83. Or take August 2022. The days before the *en masse* diversion was 0.1% (what Google wants), the day of the spamming was 0.0% percent (what Google wants), and the days after were 0.1% (again, what Google wants). FAC ¶94. It would be perverse to punish the very spam rate Google

1   suggests senders should strive for. (Never mind that the RNC's median is 0.1%, and the mean is 0.14%, so

2   it's implausible that the RNC hit any imaginary threshold, a threshold Google has never stated. FAC ¶42.[5])

3      **3.**  Google again insists the A/B test undermines the RNC's plausible allegations of intentional

discrimination. It first argues that the test shows Google wasn't discriminating based on the email's "political

5   content." MTD 18-19.[6] The test was done to see if there was a content-based reason for Google's relegation

6   of email to spam. It showed there wasn't. *See* FAC ¶¶33, 56-57. The A/B test also tends to disprove Google's

7   shifting spam-rate theory, which would have sent both test emails to spam because both emails were sent

8   nearly contemporaneous, such that the RNC's spam rate would have been the same for both sends. *Id.* And

9   given that discriminators don't necessarily discriminate every chance they get, the disparate treatment of the

10  test emails does not negate the RNC's plausible allegations of political-affiliation discrimination.[7]

11     **4.**  Google reasserts that because it appeared to be trying to "help" the RNC for nine months and

12  has been inboxing the vast majority of the RNC's emails, it is "obvious" it did not discriminate against the

13  RNC. MTD 17-18. But stringing along the RNC with shifting explanations, empty assurances, and

14  diminished service cannot defeat the RNC's claims. Indeed, "'a page of history is worth a volume of logic.'"

15  *Jones v. Hendrix*, 599 U.S. 465, 473 (2023). "History has repeatedly shown that … discriminators may go to

16  great lengths to hide and perpetuate their unlawful conduct." *SFFA v. President & Fellows of Harvard Coll.*,

17

---

18  [5] Google fails to mention that its Postmaster Tools round to the nearest tenth. In other words, the only spam rates the RNC
19  could get is 0.0%, 0.1%, 0.2%, and 0.3%, etc. Given the rate's imprecision, it's unlikely that Google is fixated on the exact spam-
    rate percentage. And although Google likely has more precise data, it does not provide it to senders in the Postmaster Tools. But
20  that is precisely why the RNC passes the motion-to-dismiss phase. *See Schwake v. Ariz. Bd. of Regents*, 967 F.3d 940, 949 (9th Cir.
    2020) ("It may be difficult for a plaintiff to know the full extent of alleged discrimination in decisionmaking before discovery
    allows a plaintiff to unearth information controlled by the defendant."); *Doe v. Regents of Univ. of Cal.*, 23 F.4th 930, 938-39 (9th
21  Cir. 2022) (finding allegations sufficient because "any purported non-biased explanation for the enforcement statistics alleged by
    Doe would necessarily be maintained by the Regents").

22  [6] The RNC respectfully contends that there was no concession that the A/B test "does not support a finding that emails are
    being filtered because the RNC is sending them." Op. 12. At most, counsel indicated that the A/B test "refut[es] one of the
23  possibilities that Google had set forth" and not necessarily direct "proof that there was political discrimination." Hearing Tr.
    15:2-10; Hearing Tr. 41:23-24 (The A/B test is "certainly consistent with the idea that it was not a content-based restriction going
24  on."). But in any event, the amended complaint has additional allegations with more context about A/B tests and the actual
    emails and links used, which should remove any purported concession.

25  [7] Google also suggests that the A/B test "bolsters the obvious alternative explanation that 'it was not the substantive content or
    sender of the email, but rather some other factor, such as the different links contained with the email or some other technical
26  feature of the email.'" MTD 18. In the amended complaint, the RNC provides the emails, the links, and background on A/B
    tests in the industry. FAC ¶¶33, 39, 56-58. The emails and links are materially identical. "The only difference between the two
27  pages is that one requires the donor to provide a cellphone number, while the other makes the cellphone-number field optional."
    FAC ¶56. It's unclear how Google still maintains its inference, let alone how the opposite inference is unreasonable. It's not the
28  RNC's burden at the motion-to-dismiss phase to fathom the precise method that Google is discriminating against the RNC.

---

600 U.S. 181, 257 (2023) (Thomas, J., concurring). Just as Harvard could not avoid liability for discrimination by admitting some Asian applicants, neither can Google evade allegations of discrimination by sending some of the RNC's emails. Feigning "good-faith" conduct is no defense to discrimination.

**5.** At bottom, Google argues that there might be other reasons for its apparent discrimination. But as explained, the most plausible inference from Google's refuted explanations, its failed suggested solutions, and its post-filing cessation is that Google intentionally relegated critical RNC emails to subscribers' spam folders because it's the RNC sending them. At the very least, the inference is *plausible*—which is all that's required at the motion-to-dismiss phase. *See, e.g.*, *Starr*, 652 F.3d at 1216 ("If there are two alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6). Plaintiff's complaint may be dismissed only when defendant's plausible alternative explanation is so convincing that plaintiff's explanation is *implausible*." (cleaned up)); *Waln v. Dysart Sch. Dist.*, 54 F.4th 1152, 1159-60 (9th Cir. 2022) (same); *Schwake*, 967 F.3d at 948 ("[D]iscrimination need not be the only plausible explanation or even the most plausible explanation for a Title IX claim to proceed."); *Doe*, 23 F.4th at 936 (same).

## II.  The RNC states a claim under California's unfair practice law.

### A.  Google's conduct is unfair.

Google's conduct is unfair.[8] "Unfair" conduct is framed broadly "to enable judicial tribunals to deal with the innumerable new schemes which the fertility of man's invention would contrive." *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 973 P.2d 527, 540 (Cal. 1999) (cleaned up). A business practice may be unfair without being "proscribed by some other law." *In re Adobe Sys., Inc. Privacy Litig.*, 66 F. Supp. 3d 1197, 1226 (N.D. Cal. 2014). This standard is "intentionally broad." *Candelore v. Tinder, Inc.*, 228 Cal. Rptr. 3d 336, 351 (Ct. App. 2018) (cleaned up). Whether a practice is unfair is "usually … a question of fact not appropriate for decision on a motion to dismiss." *Rubenstein v. Neiman Marcus Grp.*, 687 F. App'x 564, 566 (9th Cir. 2017) (cleaned up); *see Williams v. Gerber Prod. Co.*, 552 F.3d 934, 938 (9th Cir. 2008) (same); *Linear Tech. Corp. v. Applied Materials, Inc.*, 61 Cal. Rptr. 3d 221, 236-37 (Ct. App. 2007) (same).

California courts have stated three tests: (1) "whether the practice's impact on the victim outweighs 'the reasons, justifications and motives of the alleged wrongdoer'"; (2) "whether the practice is 'immoral,

---

[8] If the RNC has stated its other claims, including the interference claim discussed below, the RNC plausibly alleges unlawfulness.

1   unethical, oppressive, unscrupulous or substantially injurious to consumers'"; or (3) "whether the

2   challenged conduct is 'tethered to any underlying constitutional, statutory or regulatory provision.'" *Doe v.*

3   *CVS Pharmacy, Inc.*, 982 F.3d 1204, 1214-15 (9th Cir. 2020). Tellingly, Google never mentions these three

4   standards or engages with California precedent. Although the RNC need state only one unfairness test, it

5   states all three.

6           **1. The RNC plausibly alleges all three unfairness tests.**

7           **a.** The first test is easily met because Google's discriminatory relegation of RNC email to spam

8   significantly harmed the RNC and its supporters and "outweighs 'the reasons, justifications and motives

9   of'" Google. *Id.* at 1215. Google conceded that it has no legitimate reason or justification for discriminating

10  based on political affiliation. *See* Hearing Tr. 56:7-11 (Q: "So what, what are the legitimate business interests

11  that Google has, theoretically, in discriminating against people on the basis of political belief?" A: "Well,

12  we don't, your Honor."). That concession makes sense. There is no business interest—especially not from

13  *the* market-dominant communications firm—in systematically choking off one major national political

14  party's ability to communicate with its supporters. Such discrimination also significantly harmed the RNC

15  by obstructing the RNC's relationship with its supporters, reducing revenue from donations, decreasing

16  event turnout, and hampering voter turnout. *E.g.*, FAC ¶¶3, 68, 76. While such discrimination significantly

17  harms the RNC, there's no legitimate "reasons, justifications and motives" for this Court to weigh against

18  such harm—by Google's own concession. *Doe*, 982 F.3d at 1215. The RNC's harm easily outweighs no

19  justification at all.

20          **b.** For substantially the same reasons, Google's practice challenged here is "immoral, unethical,

21  oppressive, unscrupulous or substantially injurious to consumers." *Id.* at 1214. Discrimination based on

22  political affiliation or views is immoral, unethical, and unscrupulous. *See, e.g., Nia*, 603 F. Supp. 3d at 908

23  (concluding that "intentional discrimination … amounts to immoral, unethical, oppressive, or unscrupulous

24  conduct"); *Candelore*, 228 Cal. Rptr. 3d at 351; *supra* 4-13. As explained, it significantly harms the RNC. But

25  it also substantially harms the intended recipient, as the RNC subscriber is trying to associate itself with the

26  sender and receive the information about politics, among other things. The practice is particularly immoral

27  because regardless of whether the RNC's email is in the requestor's inbox or spam folder, Google still

28  receives the same payment for its services (*i.e.*, the user's data, which Google uses to make money). FAC

---

1    ¶¶16-17. Moreover, the danger of permitting corporate interference in the communications of political

2    organizations cannot be overstated. History reflects that bad-faith handling of political communications

3    harms the public, especially when the communication is through a crucial conduit (as is the case here). *See*

4    FAC ¶¶5-11; *NetChoice, LLC v. Paxton*, 49 F.4th 439, 471-73 (5th Cir. 2022) (op. of Oldham, J.).

5         **c.** Finally, the third test is met. "Plaintiffs do not need to plead any direct violations of a statute.

6    Instead, plaintiffs need merely to show that the effects of [Google]'s conduct are comparable to or the same

7    as a violation of the law." *In re Zoom Video Commc'ns Inc. Priv. Litig.*, 525 F. Supp. 3d 1017, 1047 (N.D. Cal.

8    2021) (cleaned up). Google's conduct is at least "comparable" to actual violations of the other laws.

9         ***First,*** Google's actions are comparable to a violation of the Unruh Civil Rights Act. Unruh reflects

10   the public policy that discrimination against personal characteristics by public accommodations is harmful

11   and against the public interest. *See, e.g.*, Cal. Civ. Code §51(b) (Unruh); *Harris*, 805 P.2d at 875 ("[T]he Unruh

12   Act secures equal access to public accommodations and prohibits discrimination by business

13   establishments."). Even assuming Unruh does not prohibit political-affiliation discrimination, such

14   discrimination is comparable to the harm Unruh protects against because such discrimination is based on a

15   trait that is fundamental to a person's identity, beliefs, core values, and self-definition. *See, e.g.*, *Divino Grp.*

16   *LLC v. Google LLC*, 2022 WL 4625076, at *12 (N.D. Cal. Sept. 30) ("'tethering' test" met based on "alleged

17   discriminatory conduct violates the policy concerns underlying [Unruh]"); *Candelore*, 228 Cal. Rptr. 3d at

18   351 ("Further, in view of our conclusion that Tinder's alleged discriminatory pricing model violates the

19   public policy embodied in the Act, the UCL's 'unfair' prong provides an independent basis for relief on the

20   facts alleged."). One's political affiliation is substantially intertwined with one's "deeply held personal beliefs

21   and core values." *Koebke v. Bernardo Heights Country Club*, 115 P.3d 1212, 1221 (Cal. 2005); *see* First MTD

22   Opp. (Dkt. 35) 11-15. That's why many States protect against political-affiliation discrimination. *See* Volokh,

23   *Bans on Political Discrimination in Places of Public Accommodation and Housing*, 15 N.Y.U. J.L. & Liberty 490 (2022).

24        ***Second,*** California's common-carrier law reflects the public policy that messages should be

25   delivered to and received by the designated recipient reasonably and without discrimination. *See, e.g.*, *Huang*

26   *v. The Bicycle Casino, Inc.*, 208 Cal. Rptr. 3d 591, 597-99 (Ct. App. 2016). So too with longstanding common-

27   law doctrine. *See, e.g.*, *NetChoice*, 49 F.4th at 471-73 (explaining that the "common law" supports

28   nondiscrimination obligations for "communications firms" that "hold themselves out to serve the public

1  without individualized bargaining, and are affected with a public interest"); *Candelore*, 228 Cal. Rptr. 3d at

2  350 ("Virtually any law or regulation—federal or state, statutory or common law—can serve as a predicate

3  for an unlawful prong violation." (cleaned up)). As history shows, that is all the more true for political

4  communications near elections. *See, e.g.*, *NetChoice*, 49 F.4th at 470-71; FAC ¶¶5-10. Regardless of whether

5  California common-carrier law applies to emails, bad-faith delivering and receiving of emails is like the bad-

6  faith delivery by telegraph and telephone companies. Like the telegraph and telephone, email is an

7  indispensable means of communication. *See, e.g.*, *Lunney v. Prodigy Servs. Co.*, 94 N.Y.2d 242, 249 (1999)

8  (viewing the "role in transmitting e-mail [to be] akin to that of a telephone company, which one neither

9  wants nor expects to superintend the content of its subscribers' conversations"); *id.* at 248 ("E-mail is the

10  day's evolutionary hybrid of traditional telephone line communications and regular postal service mail.");

11  *see also* First MTD Opp. 4-11. "Both consumers and Congress have come to view e-mail, when fairly

12  employed, as an established and worthwhile device in the toolbox of accepted marketing practices." *Gordon*

13  *v. Virtumundo, Inc.*, 575 F.3d 1040, 1045 (9th Cir. 2009); *see, e.g.*, 15 U.S.C. §7701(1) (congressional finding).

14  Regardless of whether Google formally "carr[ies]" emails, its intentional hindering of the delivery of key

15  communications because of the sender's political affiliation is comparable to violations of California's

16  common-carrier law (or its net-neutrality law). Cal. Civ. Code §3100 *et seq.*; *see* First MTD Opp. 4-11.

17        **2.  Rule 9(b) either does not apply or is met here.**

18        In one paragraph, Google argues that the heightened pleading standard from Federal Rule of Civil

19  Procedure 9(b) applies because "much of the RNC's unfairness theory still 'sounds in fraud.'" MTD 15.

20  This argument fails. For starters, Google's argument is self-contradictory. In the same part of the motion,

21  Google asserts that the RNC is not relying on fraud. *See* MTD 14 n.3 ("The Court granted the RNC leave

22  to amend only its arguments under the UCL's 'unlawful' and 'unfairness' prongs, not the 'fraudulent' prong.

23  As a result, the Amended Complaint alleges only that Google engaged in 'unlawful' or 'unfair' conduct.").

24        The argument is a loser anyway. Unfair practice claims seldom implicate Rule 9. *See Pirelli Armstrong*

25  *Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 446 (7th Cir. 2011) ("When a claim alleges an

26  unfair practice, the relaxed pleading standards of Rule 8 do indeed govern."); *Moore v. Mars Petcare US, Inc.*,

27  966 F.3d 1007, 1019 n.11 (9th Cir. 2020) (doubting Rule 9(b) applies for unfair practice claims). The main

28  grounding for the claims here is *intentional discrimination*, not fraud. *See Ashcroft v. Iqbal*, 556 U.S. 662, 686

1   (2009). "Because the rule is a special pleading requirement …, its scope of application should be construed

2   narrowly." 5A Wright & Miller §1297 (4th ed.) (footnote omitted). Rule 9(b) simply does not apply here.

3       Regardless, Google's Rule 9(b) argument at most matters only for the specific allegations of fraud

4   and not to all allegations. *See, e.g., Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103 (9th Cir. 2003) ("[I]n

5   cases in which fraud is not an essential element of the claim, Rule 9(b) applies, but only to particular

6   averments of fraud."). Google has failed to do the averment-by-averment analysis the Rule requires. The

7   one sentence it points out, even if subject to Rule 9(b) and violates the Rule, does not undercut any of the

8   many allegations plausibly showing political-affiliation discrimination.

9       The RNC met the particularity requirement in any event. "To satisfy Rule 9(b)'s particularity

10  requirement, the complaint must include an account of the time, place, and specific content of the false

11  representations as well as the identities of the parties to the misrepresentations." *Depot, Inc. v. Caring for*

12  *Montanans, Inc.*, 915 F.3d 643, 668 (9th Cir. 2019) (cleaned up). The RNC alleges that the communications

13  occurred between RNC and Google employees, provides the approximate date, quotes the email

14  communications, and explained why Google's excuse for the diversion is incorrect. The RNC's "complaint

15  satisfies the Rule 9(b) heightened pleading standard in alleging the basic premise of 'what is false or

16  misleading about a statement, and why it is false.'" *Moore*, 966 F.3d at 1019. Google can find the

17  communications in its records and defend itself. *See Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 965 (9th

18  Cir. 2018) ("A pleading satisfies the particularity requirement of Rule 9(b) if it identifies the circumstances

19  constituting fraud so that the defendant can prepare an adequate answer from the allegations." (cleaned

20  up)); *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007). If Google wishes the RNC to put its

21  employees' names in the complaint for all the world to see, the RNC would be happy to amend the

22  complaint to add those irrelevant details. *See* 5A Wright & Miller §1300 ("[F]ailure to satisfy Rule 9(b) will

23  not automatically lead to a dismissal of the action but, rather, to an opportunity for the pleader to cure the

24  defect."); *U.S. ex rel. Perry v. Hooker Creek Asphalt & Paving, LLC*, 565 F. App'x 669, 670 (9th Cir. 2014)

25  (granting leave to amend second amended complaint after Rule 9(b) dismissal).

26      Finally, even if some allegations do not pass Rule 9(b), the remaining allegations suffice to plausibly

27  allege bad faith and discrimination based on political affiliation.

28

### B.  Google's standing argument is meritless.

Google argues that the RNC lacks "Article III standing to seek injunctive relief" because after this suit was filed, Google stopped discriminating against the RNC. MTD 12-14. That is a remarkable argument—remarkably wrong. Google's voluntary cessation after this suit was filed has absolutely nothing to do with standing and everything to do with mootness. *See, e.g.*, *White v. Lee*, 227 F.3d 1214, 1243 (9th Cir. 2000) ("Standing is examined at 'the commencement of the litigation.'"). This matters because "[t]he heavy burden of persuading the court that the challenged conduct cannot reasonably be expected to start up again lies with the party asserting mootness." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (cleaned up); *see, e.g.*, *R.W. v. Columbia Basin Coll.*, 77 F.4th 1214, 1225-26 (9th Cir. 2023) (same). Even if the defendant's likelihood of resuming the illegal conduct is "'too speculative to support standing,'" a speculative possibility can still "'overcome mootness.'" *Adarand Constructors, Inc. v. Slater*, 528 U.S. 216, 224 (2000).

Google's "bare assertion" that this "situation" is not occurring now "is not sufficient to deprive this Court of its constitutional power to adjudicate this case." *Rosemere Neighborhood Ass'n v. EPA*, 581 F.3d 1169, 1174 (9th Cir. 2009) (cleaned up). But even if Google did try, it would fail. "The voluntary cessation of challenged conduct moots a case 'only if it is absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.'" *R.W.*, 77 F.4th at 1225-26. That is not the case here. Quite the opposite, Google's discrimination is likely to recur. A company "that takes curative actions only after it has been sued fails to provide sufficient assurances that it will not repeat the violation to justify denying an injunction." *EEOC v. Goodyear Aerospace Corp.*, 813 F.2d 1539, 1544 (9th Cir. 1987); *see, e.g.*, *Howe v. City of Akron*, 801 F.3d 718, 754 (6th Cir. 2015) (same). That's all the more true here because many other considerations suggest Google will pick up right where it left off. Google's timing is suspicious, to put it mildly. *Cf. Knox v. SEIU*, 567 U.S. 298, 307 (2012). Google has never said its conduct was unlawful; to the contrary, Google "'vigorously defends'" its conduct. *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 770 (6th Cir. 2019). It has submitted no statement, let alone a "controlling" one, that it will not relapse. *Speech First, Inc. v. Fenves*, 979 F.3d 319, 328-29 (5th Cir. 2020). The RNC plans to continue to send emails much like it has before and during the suit. And more elections are inbound. Nothing prevents Google from picking up where it left off. Google's decision to cease shunting RNC email to spam "'could be easily abandoned.'" *Fikre v. FBI*,

1   904 F.3d 1033, 1038 (9th Cir. 2018). In short, no matter what Google wants to call this argument, it fails

2   because Google is very likely to repeat its discrimination without an injunction.

**III.   The RNC states a claim for intentional interference with prospective economic relations.**

4   The RNC has plausibly alleged all five elements of intentional tortious interference: (1) an economic

5   relationship between the plaintiff and a third party that has a probability of future economic benefit to the

6   plaintiff; (2) the defendant's knowledge of the relationship; (3) intentionally wrongful acts designed to

7   disrupt the relationship; (4) the actual disruption of the relationship; and (5) economic harm proximately

8   caused by the defendant's acts. *Roy Allan Slurry Seal, Inc. v. Am. Asphalt S., Inc.*, 388 P.3d 800, 803 (Cal. 2017).

9   Google argues that the RNC failed to plausibly allege all five. MTD 8-12. It is wrong across the board.

10   **1.** The first element "has two parts: (1) an existing economic relationship that (2) contains the

11   probability of an economic benefit to the plaintiff." *Roy Allan*, 388 P.3d at 804. The RNC has plausibly

12   alleged both parts. First, the RNC's relationship with its supporters pre-existed Google's interference

13   because the supporters subscribed to receive the RNC's email communications before Google's

14   discrimination and many were already donors to the RNC before the discrimination. *E.g.*, FAC ¶¶27-28.

15   Second, these relationships have a high probability of economic benefit. Many of these subscribers are past

16   and current donors, and all are potential future donors. FAC ¶¶27-32, 53, 56. These donors subscribed to

17   receive emails from the RNC, including emails asking for donations, and recently actively engaged with

18   RNC content. *Id.* The RNC's frequent communications with Google only underscore that Google's actions

19   were disrupting real relationships with real people. *Supra* 2, 4-6. This shows that there's a high probably of

20   economic benefit to the RNC from these relationships and that the RNC's "expectancy … precede[d] the

21   interfering conduct." *Roy Allan*, 388 P.3d at 808 (quotation marks omitted). But for Google diverting the

22   RNC's emails, some of the RNC's many subscribers would have interacted with the emails, as they do every

23   month, including by donating to the RNC's cause. *E.g.*, FAC ¶3 (Google's discrimination "caused the RNC

24   to lose valuable revenue in California and the rest of the county").

25   Contra Google's contention, the RNC need not name "'*specific*'" individuals; it only needs to allege

26   an ascertainable relationship. *See, e.g.*, *Code Rebel, LLC v. Aqua Connect, Inc.*, 2013 WL 5405706, at *6 (C.D.

27   Cal. Sept. 24) ("Although Plaintiff does not specifically identify existing third parties with whom there was

28   an existing economic or business relationship, Plaintiff's allegation of interference with 'actual and potential

customers' is sufficient to satisfy federal pleading requirements."). At this stage, there need only be "specific facts putting the defendant on notice that a third-party, indeed, existed." *Logistick, Inc. v. AB Airbags, Inc.*, 543 F. Supp. 3d 881, 890 (S.D. Cal. 2021). The RNC keeps a list of its subscribers, who are donors, when they donated, when they otherwise actively engaged with RNC content, and so on. *E.g.*, FAC ¶¶27-32, 53, 56. Given that Google routinely relegates to spam nearly all emails the RNC sends its Gmail-user supporters, the RNC has an ascertainable relationship with identifiable supporters.

Google (at 10) cites *Westside Center Assocs. v. Safeway Stores 23, Inc.*, 49 Cal. Rptr. 2d 793 (Ct. App. 1996). But Google ignores that the court's core conclusion was that the tort "protects the expectation that the relationship eventually will yield the desired benefit, not necessarily the more speculative expectation that a potentially beneficial relationship will eventually arise." *Id.* at 804. The RNC's complaint alleges "an existing relationship with an identifiable buyer" in the many thousands of existing supporters who have asked to receive the RNC's emails, recently actively engaged with RNC content, including by donating. *Id.* at 806. The RNC is not merely hoping for future relationships; it is trying to protect the relationships it has already built. True, those relationships must be "identifi*able*," but nothing in *Westside Center* (or any other case Google cites) requires the RNC to disclose the names of its subscribers in a public complaint at the motion-to-dismiss phase. *Id.* (emphasis added).[9] In any event, the element covers even speculative expectancies when, as here, important public policies, such as "favoring fair elections," are implicated—as they are here. *Id.* at 804.

**2.** Google knew about the RNC's relationship with its email subscribers. *See* Op. 33 ("the RNC made Google aware of the potential harm"); *supra* 2, 4-6. Google does not dispute that it knew about the monthly *en masse* email diversions, that the end-of-month period was vital for the RNC's donations, or that the mass relegations were harming the RNC's ability to fundraise, communicate with, and mobilize its supporters. *E.g.*, FAC ¶¶48-53, 66-69. Google's only retort is that this element isn't met because the first element isn't. MTD 11. As explained, that argument fails.

**3.** Google's conduct is independently wrongful. The RNC "merely must allege that [Google's] acts

---

[9] *Westside Center* was also decided long after the state-court equivalent of the motion-to-dismiss phase. *See Roy Allan*, 388 P.3d at 806 n.6. So even if *Westside Center* created a name-a-specific-individual requirement, it does not apply at the pleading phase, where courts must "presume that general allegations embrace those specific facts that are necessary to support the claim." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (cleaned up).

1 were unlawful for a reason other than that they interfered with [the RNC's] prospective economic

2 advantage." *CRST Van Expedited, Inc. v. Werner Enters.*, 479 F.3d 1099, 1110 (9th Cir. 2007). The RNC has

3 done so because it plausibly alleges that Google's conduct violates the UCL. *See id.* at 1110-11 (UCL counts);

4 *supra* 12-15. Google's conduct is also independently wrongful at least because it violated the common law's

5 established common-carrier doctrine. *See Stevenson Real Est. Servs. v. CB Richard Ellis Real Est. Servs.*, 42 Cal.

6 Rptr. 3d 235, 241-43 (Ct. App. 2006). Under the common law, a communication firm qualifies as a common

7 carrier if the firm (1) "hold[s] itself out to serve any member of the public without individualized bargaining"

8 and (2) is "affected with a public interest." *NetChoice*, 49 F.4th at 470-72. This Court already concluded that

9 the first element is satisfied by Google. *See* Op. 16-17. The second is also met because Google's "service

10 play[s] a central economic and social role in society." *NetChoice*, 49 F.4th at 471; *see* First MTD Opp. 4-11;

11 *supra* 2-13. And by hiding messages in users' spam folders based on political-affiliation discrimination,

12 Google violated its common-carrier obligation to provide its service reasonably without discrimination.

13    **4 & 5.** The RNC has plausibly alleged actual disruption of the relationship and causation. Google

14 mainly argues that a single excerpted portion of paragraph 159 of the amended complaint is a conclusory

15 allegation that cannot support actual disruption. MTD 11. That is neither true nor relevant. Contra Google's

16 contention, "nothing requires" that the RNC "allege [its] exact damages." *In re Countrywide Fin. Corp. Sec.

17 Litig.*, 588 F. Supp. 2d 1132, 1199 (C.D. Cal. 2008); *see Wang v. OCZ Tech. Grp.*, 276 F.R.D. 618, 625 (N.D.

18 Cal. 2011) ("The precise dollar value of losses is not required at pleading, so long as the plaintiff alleges a

19 tangible loss that can be proved or disproved upon discovery." (cleaned up)). And even if Google were

20 correct, Google ignores the rest of the complaint, which alleges that the RNC's relationships with

21 supporters and donors were disrupted in several ways, including that the mass relegations were harming the

22 RNC's ability to fundraise, communicate with, and mobilize its supporters. *See, e.g.*, FAC ¶¶69, 77, 92, 99-

23 100, 112-13. The RNC also alleged, among other things, that these disruptions occurred during "the EOM

24 period when fundraising and donations go up," during "the most effective and important period for these

25 transactions between the RNC and its supporters," and at "a time when they are particularly attuned to

26 politics and expect the RNC to be communicating with them." FAC ¶¶48, 77, 113. These well-pleaded

27 "facts either sho[w] or allo[w] the inference of actual disruption to its relationship with" the RNC's

28 subscribers. *Sybersound Recs., Inc. v. UAV Corp.*, 517 F.3d 1137, 1151 (9th Cir. 2008) (relied on at MTD 12).

---

For similar reasons, the RNC has plausibly alleged that Google's conduct proximately caused the economic harm. The loss of donations would not have occurred without Google's *en masse* relegations. *See* Op. 34 ("The RNC alleges that it experienced a 'measurable decrease' in end-of-month donations around the same time that its emails were being filtered at the highest rate…. [T]he RNC likely lost donations as a result of Google's spam filter."); Op. 33 ("Plaintiff has alleged sufficient facts to show some degree of certainty that they suffered injury because of Defendant's conduct."); FAC ¶¶53, 77, 113, 161; *supra* 2, 4-7.

## IV.   Google's last resort to 47 U.S.C. §230 fails.

### A.   Section 230(c)(2) does not immunize Google.

#### 1.   Subparagraph (A) does not shield Google's conduct.

As this Court explained, and as Google agrees, if the RNC plausibly alleged that Google did not "in good faith … consider[]" the RNC's emails to be "harassing[] or otherwise objectionable," §230(c)(2)(A), then subparagraph (A) does not bar the RNC's claims, *see* MTD 16-23; Op. 7-8. The RNC met its burden.

**a.** As this Court indicated, political-affiliation discrimination constitutes bad faith. *See* Hearing Tr. 35:13-15 ("[I]f you've sufficiently alleged that Google was putting e-mails in the spam filter because of political affiliation, I think that's an absence of good faith and 230 doesn't apply."). Google does not contest this either. Because the RNC plausibly alleged political-affiliation discrimination, Google's §230(c)(2)(A) defense fails. *Supra* 4-12.[10]

**b.** Google preemptively raises various policy arguments. Even if relevant, they are unpersuasive.

First, Google briefly claims that allowing the RNC to move past the motion-to-dismiss phase would make "'§230(c)(2) nearly meaningless.'" MTD 22. Not so. This is not a case about "a mistaken choice to block" a few marginal emails. *e360Insight, LLC v. Comcast Corp.*, 546 F. Supp. 2d 605, 609 (N.D. Ill. 2008). Rather, this case is about Google's consistent blocking of millions of emails from the same sender. Where, as here, the plaintiff adequately alleges bad faith, "the Court cannot dismiss [the claims] on the basis of Section 230(c)(2)" at the pleading stage. *Enhanced Athlete Inc. v. Google LLC*, 479 F. Supp. 3d 824, 831 (N.D. Cal. 2020); *see e-ventures Worldwide, LLC v. Google, Inc.*, 188 F. Supp. 3d 1265, 1273 (M.D. Fla. 2016) (same).

---

[10] The RNC also maintains that its email sends cannot reasonably be considered "harassing" or "otherwise objectionable" even under this Court's prior understanding of the terms in §230. *See* First MTD Opp. 24-26; Op. 7-9. Given the additional allegations in the amended complaint of the RNC's significant precautions in sending emails, including that it sends emails only to those who solicited them and recently actively engaged with RNC content, and that all reasonable inferences must be taken in the RNC's favor, the emails the RNC sends cannot reasonably be considered "spam" colloquially or otherwise, and it is not plausible that "Google could reasonably consider these mass mailings to be objectionable." Op. 9.

1   Besides, this case does not involve mere "artful" pleading, MTD 22; it involves detailed allegations of a
2   damning pattern of conduct.

3          Second, Google complains that this Court must grant its motion because discovery here means that
4   plaintiffs "would force providers to routinely reveal proprietary information about their filtering
5   technologies." MTD 22. This Court should reject Google's sky-will-fall argument. This case is hardly
6   "routin[e]." MTD 22. And Google has no basis to suggest that the RNC would "jeopardiz[e] users' safety,"
7   let alone misuse Google's "proprietary information." MTD 22. This Court also has many tools at its disposal
8   to minimize Google's (unfounded) concerns during discovery, such as protective orders. *See Phillips ex rel.*
9   *Ests. of Byrd v. Gen. Motors Corp.*, 307 F.3d 1206, 1211 (9th Cir. 2002). Allowing this case to proceed like
10  other cases enables this Court to deal with discovery objections in context and case-by-case.

11          **2.  Subparagraph (B) also does not shield Google's conduct.**

12          **a.** While subparagraph (A) protects good-faith censorship *by the platform*, subparagraph (B) protects
13  handing the censorship tools over to *users*. *See* Hearing Tr. at 66:10-21 (suggesting that this is "more properly
14  [a] 230(c)(2)(A)" case because the RNC is not "focused on what the users are marking as spam" but
15  "targeting Google's actions"). This division is consistent with Congress's purpose of (A) permitting
16  platforms to enforce in good faith the platform's guidelines against certain content harmful to children and
17  (B) empowering parents to use tools to protect children from obscene content.

18          Here, however, Google is the one unilaterally relegating the emails to spam, not its users. Though
19  Google notes that a user can mark certain emails as spam, the RNC is not contesting Google's "technical
20  means" that "enable" users to mark emails as spam, §230(c)(2)(B), so the argument is misplaced. Rather,
21  the complaint focuses on Google's unilateral blocking of emails that users have requested to receive.

22          First, Google relies on *Zango*, but the Ninth Circuit did not confront this interpretation issue. MTD
23  24. Instead, the panel accepted that, at least "[t]heoretically …, the user of the … software then has the
24  option whether to allow or reject the download of the potential malware-carrying program." *Zango, Inc. v.*
25  *Kaspersky Lab, Inc.*, 568 F.3d 1169, 1171 (9th Cir. 2009). Google, by contrast, does not give the user the
26  option to view the email before it is marked as spam. Google is thus not being held liable for taking actions
27  "to enable or make available to [users] the technical means to restrict access to material." §230(c)(2)(B).
28  Google itself is restricting access.

Second, Google contends that because its diversions are "informed especially by *users'* spam designations," its diversions are immunized by §230(c)(2)(B). MTD 23-24. But the RNC's principal allegation is that Google is *not* diverting RNC emails based on users' spam designations. And textually, Google's reading makes no sense because Google's algorithm is not giving *users* "the technical *means* to restrict access"; rather, Google's *algorithm* restricts a user's access to email without that user's designation. §230(c)(2)(B) (emphasis added). Google might send an email to spam because a different user designated a different email as spam. Section 230(c)(2)(B)'s text requires far more of a connection than Google's choice to divert to be vaguely "informed" by users generally.

**b.** Regardless, §230(c)(2) does not immunize censoring based on political-affiliation discrimination. Section 230(c)(2) at most "immuniz[es] Internet companies' enforcement of private rules analogous to restrictions on 'obscene, lewd, lascivious, filthy, excessively violent, [or] harassing' communications—not of completely different rules that the companies might make up." Candeub & Volokh, *Interpreting 47 U.S.C. §230(c)(2)*, 1 J. Free Speech L. 175, 183 (2021). The text makes clear that the provided "technical means" must be *for the purpose of* restricting access to subparagraph (A) materials. The word "to" between "the technical means" and "restrict access" equals the phrase "in order to." That phrase, in turn, is synonymous with the phrase "for purposes of." Thus, the text requires the platform to provide tools for a specific purpose—"restrict[ing] access to [subparagraph (A)] material"—and not some other illegitimate purpose. The provider cannot create a new category of materials to restrict access to. Allowing "block[ing] [of] online content for improper reasons"—*i.e.*, reasons not in the objectionable-materials clause—would render the clause meaningless. *Enigma Software Grp. USA v. Malwarebytes, Inc.*, 946 F.3d 1040, 1049 (9th Cir. 2019).

*Malwarebytes* is consistent with this reading of §230(c)(2). There, the Ninth Circuit held that "§230[(c)(2)] does not provide immunity for blocking a competitor's program for anticompetitive reasons." *Id.* at 1052. If without user input the provider is restricting access to materials under the "guise [of] anticompetitive animus" rather than because they are covered by the objectionable-materials clause, then (1) the technical means were not "enable[d] or ma[d]e available" for the statutorily protected purpose and (2) neither the user nor the provider actually "consider[ed]" the materials to be "harassing[] or otherwise objectionable" but a new category of material (*e.g.*, competition). Thus, the provider is not enforcing a private rule like restrictions to "harassing" material but enforcing a made-up rule—anticompetition.

Here, the RNC plausibly alleges that Google's diversions have an impermissibly discriminatory purpose and that neither Google nor the relevant users actually "consider[ed]" the censored emails to be "harassing[] or otherwise objectionable." Contra Google's contention, MTD 24 n.6, if "allegations of anticompetitive animus are sufficient to withstand dismissal," then plausible allegations of bad-faith conduct, including political-affiliation discrimination, are also sufficient. *Malwarebytes*, 946 F.3d at 1045.

### 3. Four other considerations defeat Google's broad immunity arguments.

**a.** Congress found that "[t]he Internet and other interactive computer services offer a forum for a true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity." 47 U.S.C. §230(a)(3). That finding supports denying immunity to "filtering of 'political or religious content.'" Candeub & Volokh, *supra*, at 185; *see* FAC ¶¶124-25 (mentioning other evidence).

**b.** Section 230(c)'s title reinforces the RNC's reading. The "section is titled 'Protection for "*good samaritan*" blocking and screening of *offensive* material' and … the substance of section 230(c) can and should be interpreted consistent with its caption." *Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1163-64 (9th Cir. 2008) (en banc) (emphases added). This is "yet another indication that Congress was focused on potentially offensive materials, not simply any materials undesirable to a content provider or user." *Song fi Inc. v. Google, Inc.*, 108 F. Supp. 3d 876, 883 (N.D. Cal. 2015). Plus, the crux of the RNC's claims is that Google's censoring is not "accidental damage caused by a good-faith attempt to protect another." *Good-Samaritan Law*, Black's Law Dictionary (11th ed. 2019).

**c.** Under Google's reading, §230 would protect companies who racially discriminate in removing content. *Cf. Malwarebytes, Inc. v. Enigma Software Grp. USA*, 141 S. Ct. 13, 17-18 (2020) (statement of Thomas, J.). The Court should reject this "highly counterintuitive result." *Yellen v. Confederated Tribes*, 141 S. Ct. 2434, 2448 (2021).

**d.** Finally, the constitutional-doubt canon cements the RNC's reading. Google's reading raises several serious constitutional questions. *See, e.g.*, Hamburger, *The Constitution Can Crack Section 230*, Wall St. J. (Jan. 29, 2021), perma.cc/D455-HD5K; Candeub, *Reading Section 230 As Written*, 1 J. Free Speech L. 139, 160-72 (2021); *Biden v. Knight First Amend. Inst. at Columbia Univ.*, 141 S. Ct. 1220, 1227 n.5 (2021) (Thomas, J., concurring). The RNC's reading is "fairly possible" and avoids many constitutionality questions, so the Court should adopt it. *Zadvydas v. Davis*, 533 U.S. 678, 689 (2001) (cleaned up).

**B.  Section 230(c)(1) has no application here and thus does not preempt the RNC's claims.**

As this Court suggested, this case is not a §230(c)(1) case but a §230(c)(2) case. *See* Hearing Tr. 34:3-15 (RNC Counsel: "Now while your Honor probably recognizes that sometimes (c)(1) and (c)(2) are a bit conflated in the case law, cases where the defendant is alleged to have employed a technical means, as here, to broadly restrict access to or the availability of material are properly considered under the (c)(2) side of 230…." The Court: "No. I, I agree with all that."). And for good reason: The RNC does not try "to treat [Google], under a state law cause of action, as a publisher or speaker." *Lemmon v. Snap, Inc.*, 995 F.3d 1085, 1091 (9th Cir. 2021) (cleaned up). For a claim to "treat[] the defendant as the publisher or speaker of any information," the claim must "seek[] to impose liability based on [the published] information's improper content." *Henderson v. Source for Pub. Data, L.P.*, 53 F.4th 110, 120-21 (4th Cir. 2022); *see* Oral Arg. Tr. 144:22-145:8 in *Gonzalez v. Google LLC*, No. 21-1333 (Feb. 21, 2023) (Q: "[Y]ou're happy with the *Henderson* test, the Fourth Circuit test?" Google's Counsel: "Yes…. [The *Henderson*] test is correct, and *it's also the Ninth Circuit's test*." (emphasis added)). None of the RNC's claims seek to fault Google for the content of the censored emails, and none of the legal duties Google violated "turn on the content of" the RNC's emails. *Lemmon*, 995 F.3d at 1094. And "[e]ven if [Google's] decision to not provide the [RNC's emails] could be described as a publisher's decision," §230(c)(1) still does not preempt the RNC's claims because the RNC's emails are "proper and lawful content." *Henderson*, 53 F.4th at 125.

Concluding that §230(c)(1) does not bar the claims here fits with the Ninth Circuit "consistently eschew[ing] an expansive reading of the statute that would render unlawful conduct magically lawful when [conducted] online." *HomeAway.com, Inc. v. City of Santa Monica*, 918 F.3d 676, 683 (9th Cir. 2019) (cleaned up). For example, unlawful discrimination should not magically be immune because it occurs via the internet. *See Gonzalez* Oral Arg. Tr. 140:9-18 (Q: "[W]hat about [the] dating hypothetical? The discrimination [that the company is] not going to match black people and white people, et cetera, what about that? Is that given 230's shield?" Google's Counsel: "Absolutely not, because any disparate treatment claim or race discrimination is saying you're treating people different regardless of the content.").

## CONCLUSION

For these reasons, the RNC respectfully asks that this Court deny Google's motion to dismiss. Alternatively, the RNC should be given leave to amend to cure any defect.

Date: January 9, 2024      **DHILLON LAW GROUP INC.**

By: <u>/s/ *Harmeet K. Dhillon*</u>

Harmeet K. Dhillon
Michael A. Columbo
Jeremiah D. Graham
DHILLON LAW GROUP INC.
177 Post Street, Suite 700
San Francisco, California 94108
Telephone: (415) 433-1700
*Counsel of Record for Plaintiff Republican National Committee*

**CONSOVOY MCCARTHY PLLC**

Thomas R. McCarthy (pro hac vice)
Thomas S. Vaseliou (pro hac vice)
Conor D. Woodfin (pro hac vice)
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Suite 700
Arlington, VA 22209
(703) 243-9423
*Counsel for Plaintiff Republican National Committee*

1

**CERTIFICATE OF SERVICE**

2        This is to certify that a true and correct copy of the above and foregoing has been served on all

3   counsel of record, via the Court's CM/ECF system on January 9, 2024.

4

5                                                            /s/ Harmeet K. Dhillon
                                                             Harmeet K. Dhillon
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28