UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| REPUBLICAN NATIONAL COMMITTEE,<br><br>Plaintiff,<br><br>v.<br><br>GOOGLE LLC,<br><br>Defendant. | No. 2:22-cv-01904-DJC-JDP<br><br>ORDER |

In response to the Court's prior Order dismissing its complaint, Plaintiff, the Republican National Committee ("RNC"), has filed an amended complaint based on Defendant Google LLC's alleged practice of diverting the RNC's emails to Gmail users' spam folders.  Google again argues that it is immune from suit under section 230 of the Communications Decency Act, which prohibits civil liability for restricting access to objectional communications – including spam – in good faith.  Now, though, the RNC has alleged additional facts that, if proven at trial, would show that Google was not acting in good faith such that section 230's immunity does not apply.  Specifically, the RNC alleges that once it filed this lawsuit in October 2022, the email diversions ceased, despite the RNC sending even *more* emails leading up to and during the November 2022 election.  Moreover, the RNC emphasizes that it targeted its emails to users that had engaged with RNC emails more recently and more frequently, and that

1

1    Google's own data showed that the RNC's spam rate was within the limits suggested

2    by Google.

3        Turning to the merits, however, the Court concludes that the RNC has not

4    stated a claim under California's Unfair Competition Law ("UCL") or for intentional

5    interference with economic relations.  While the RNC may be correct that Google's

6    alleged conduct (if proven) is "unfair" in a colloquial sense, the RNC is unable to point

7    to any legislative policy that is implicated by the alleged conduct.  Nor can it point to a

8    sufficient harm to *users* of Gmail – which is the focus of the UCL – that would suggest

9    Google's practices are unfair.  And the RNC has not shown Google's alleged conduct

10   has violated any other law, which is a necessary element of intentional interference

11   with economic relations.  Accordingly, the Court GRANTS Google's Motion to Dismiss,

12   this time with prejudice.

13   **I.    Background**

14       **A.    Factual Background**

15       In its previous Order dismissing the RNC's first Complaint, the Court discussed

16   the factual allegations of this case which it will not repeat in detail here.  (*See* Order

17   (ECF No. 53).)  Briefly, the RNC, which oversees the Republican Party's political

18   operations, alleges that for a period of seven months leading up to the 2022 midterm

19   elections, Google intentionally diverted nearly all of the RNC's fundraising emails to

20   Gmail users' spam folders for a few days toward the end of every month.  (First Am.

21   Compl. ("FAC") (ECF No. 58) ¶¶ 1–4, 20.)  The email diversions have allegedly cost the

22   RNC numerous potential donations.  (*Id.*)  The RNC contends that Google was

23   motivated by political animus, and targeted the end of the month because that is

24   historically when the RNC's fundraising is most successful.  (*Id.* ¶¶ 2–3, 48.)

25       In response to the Court's previous Order holding that the RNC had not

26   plausibly alleged that Google acted without good faith sufficient to overcome the

27   jurisdictional bar of section 230 of the Communications Decency Act, 47 U.S.C. § 230,

28   the RNC includes additional factual allegations in the operative FAC.  First, following

the initiation of this lawsuit on October 21, 2022, the end-of-month spam diversions ceased despite the RNC's email volume and user-reported spam rates remaining essentially unchanged.  (*Id.* ¶ 49.)  Second, the RNC alleges that despite Google's explanation that the RNC's user-reported spam rates were high, the rates were actually within the industry limit during the relevant period.  (*Id.* ¶¶ 42, 72, 82, 9-98, 103.)  Third, the RNC provides information about its efforts to comply with industry best practices and reduce user-reported spam rates by targeting the bulk of its email volume to only the most engaged users through a process called audience segmentation, and by engaging with email marketing platforms to monitor email performance.  (*Id.* ¶¶ 27–32.)

As in the original complaint, the RNC also includes allegations that Google's conduct is unfair under the UCL, and that because it violates the UCL and industry standards, Google's conduct constitutes intentional interference with economic relations.  (*Id.* ¶¶ 144–151, 158.)

### B.   Procedural Background

The RNC filed its initial Complaint on October 21, 2022.  (Compl. (ECF No. 1).)  The Court granted Google's Motion to Dismiss the Complaint, finding that section 230 of the Communication Decency Act barred Plaintiff's claims.  (Order (ECF No. 53).)  The Court also found that Counts One, Two, and Five through Seven failed as a matter of law, and that Counts Three and Four were not sufficiently alleged.  The Court granted leave to amend to establish that Google's conduct fell within the lack of good faith exception to section 230, and to plead additional facts to support Counts Three and Four, the intentional interference with economic relations and UCL claims.  (*Id.* at 15, 30, 37.)

In response to the filing of the FAC, Google filed the present Motion to Dismiss.  (Mot. to Dismiss ("MTD") (ECF No. 60).)  The matter is fully briefed with the filing of an Opposition, (Opp'n (ECF No. 64)), Reply (Reply (ECF No. 65)), and Defendant's Letter Brief (ECF No. 70).  The Court held oral argument on March 14, 2024 with Thomas

Vaseliou, Thomas McCarthy, and Michael Columbo appearing for Plaintiff and Michael Huston and Sunita Bali appearing for Defendant.  The matter was submitted following the hearing.

## II.   Legal Standard for Motion to Dismiss

A party may move to dismiss for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).  The motion may be granted if the complaint lacks a "cognizable legal theory" or if its factual allegations do not support a cognizable legal theory.  *Godecke v. Kinetic Concepts, Inc.*, 937 F.3d 1201, 1208 (9th Cir. 2019) (quoting *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988)).  The court assumes all factual allegations are true and construes "them in the light most favorable to the nonmoving party."  *Steinle v. City & County of San Francisco*, 919 F.3d 1154, 1160 (9th Cir. 2019) (quoting *Parks Sch. of Bus., Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995)).  If the complaint's allegations do not "plausibly give rise to an entitlement to relief," the motion must be granted.  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

A complaint need contain only a "short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), not "detailed factual allegations," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  But this rule demands more than unadorned accusations; "sufficient factual matter" must make the claim at least plausible.  *Iqbal*, 556 U.S. at 678.  In the same vein, conclusory or formulaic recitations of elements do not alone suffice.  *Id.* (citing *Twombly*, 550 U.S. at 555).  This evaluation of plausibility is a context-specific task drawing on "judicial experience and common sense."  *Id.* at 679.

## III.   Discussion

### A.   Section 230 Immunity

#### i.   Section 230(c)(2)(A)

Section 230 of the Communications Decency Act affords interactive computer service providers immunity from liability for decisions related to blocking and

4

screening of offensive material.  47 U.S.C. § 230(c)(2)(A).  "To assert an affirmative defense under section 230(c)(2)(A), a moving party must qualify as an 'interactive computer service,' that voluntarily blocked or filtered material it considers 'to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable,' and did so in 'good faith.'"  *Holomaxx Techs. v. Microsoft Corp.*, 783 F. Supp. 2d 1097, 1104 (N.D. Cal. 2011) (quoting 47 U.S.C. § 230(c)(2)(A)).  Section 230 must be construed to protect defendants "not merely from ultimate liability, but from having to fight costly and protracted legal battles."  *Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*, 521 F.3d 1157, 1175 (9th Cir. 2008) (*en banc*).  In "close cases" section 230 claims "must be resolved in favor of immunity." *Id.* at 1174.

Based on the allegations in the prior Complaint, this Court previously found this to be such a "close case" and ultimately decided in favor of immunity for Google.  The Court found that Google had established the first two elements of section 230(c)(2)(A): *first,* it is an interactive computer service, and *second,* the RNC's emails, as mass marketing emails, could reasonably be considered spam, which falls under the "harassing, or otherwise objectionable" umbrella.  The sticking point was whether the RNC had alleged enough facts to make it plausible that Google had not filtered the emails in "good faith."  In its previous Complaint, the RNC did not provide sufficient facts specific to Google's treatment of the RNC's emails to elevate the RNC's allegations above the level of speculation.  In the FAC, though, the RNC has met its burden by pleading additional facts to make it at least plausible that Google acted without good faith.

Perhaps the strongest allegation that Google acted without good faith is that the RNC's emails were not relegated to spam after the RNC filed this lawsuit.  As the RNC alleges, the drop in inboxing typically occurred at the end of each month, but, after filing suit in October 21, 2022 and following the midterm election, the RNC experienced no mass diversion at the end of October or any month thereafter.

1  (FAC ¶¶ 4, 49, 51.)  The RNC alleges that it did not make any substantive changes to

2  its email practices which would account for the change, and in fact sent more emails in

3  November 2022 than during any other month in which it had experienced the end of

4  month drop.  (*Id.* ¶¶ 49, 51.)

5        The RNC has also provided facts to refute Google's explanations for the

6  monthly drop in inboxing, making the RNC's claims that Google was intentionally

7  diverting the emails more plausible.  Google's primary explanation is that users had

8  been marking the RNC's emails as spam at a high rate, which the algorithm compiled

9  over the month and which led the algorithm to divert emails at a higher rate toward

10  the end of the month.  (MTD at 16–17.)  In response the RNC provides facts that call

11  that explanation into question.  First, the RNC alleges that it engages in "audience

12  segmentation" that allows the RNC to send more targeted emails to certain users.

13  (FAC ¶¶ 27–32.)  Essentially, the RNC sends more emails to users who had engaged

14  with RNC emails more frequently and more recently, and so would ostensibly be

15  much less likely to report those emails as spam.  In contrast, the RNC sends fewer and

16  less frequent emails to users who are less likely to engage and may be more likely to

17  view the emails as spam.  (*Id.*)  Second, the RNC alleges that according to data

18  provided by Google, the RNC's user-reported spam metric was low and within the

19  limits suggested by Google.  (*Id.* ¶¶ 82 –87.)  There was no significant change in the

20  spam rate each month which would account for the monthly drop; and, notably, there

21  was no significant change in user reported spam, either.

22        Google has also argued that the monthly spam diversion may have been

23  because of the greater volume and frequency of emails sent towards the end of each

24  month.  The RNC has acknowledged that it sent more emails at the end of each

25  month, but now alleges that the drop in inboxing would occur even *before* the RNC

26  increased the volume of emails, meaning that the diversion was not responding to

27  such an increase.  (FAC ¶ 75.)  In other words, according to the RNC, the mass

28  diversion would occur despite the RNC's email practices remaining relatively the same

in the weeks prior to the mass diversions.  (*Id.* ¶¶ 70, 75.)  To further refute Google's argument, the RNC also alleges that in 2020 it sent four times as many emails with more frequency, sometimes hourly, but did not experience the same type of mass spam diversion.  (*Id.* ¶ 50.)

Overall, while there may be technical reasons to account for the abrupt end to the months-long inboxing pattern, the timing and the lack of a clear reason for the monthly diversions makes the RNC's allegation that Google acted without good faith in diverting the RNC's emails to spam sufficiently plausible at this early stage of the proceedings.  Accordingly, Google is not entitled to immunity under section 230(c)(2)(A).

### ii.    Applicability of subsections (c)(1) and (c)(2)(B)

Google has reprised its argument that it is also immune from liability under section 230 subsections (c)(1) and (c)(2)(B).  As the court previously determined, subsection 230(c)(2)(A) is the most applicable for the claims at issue because it applies where a service provider has taken steps to "restrict access to," among other material, "harassing, or otherwise objectionable" content, which is precisely what the RNC has alleged Google did by filtering its emails to spam.  Subsection (c)(1), in contrast, provides that no service provider "shall be treated as the publisher or speaker of any information provided by another information content provider."

Although Google claims it is carrying out a traditional publishing function by choosing *not* to publish certain emails to inboxes, subsection (c)(1) turns on whether the asserted claim "inherently requires the court to treat the defendant as the 'publisher or speaker' of content provided by another."  *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1102 (9th Cir. 2009), *as amended* (Sept. 28, 2009); *accord Dyroff v. Ultimate Software Grp., Inc.*, 934 F.3d 1093, 1098 (9th Cir. 2019).  Such is the case for claims that the service provider should be held liable for the injuries that arise from publishing allegedly harmful content produced by another user or failing to remove harmful content.  *See, e.g.*, *Barnes*, 570 F.3d at 1101 (collecting cases where section

230(c)(1) has been applied to claims of defamation, violation of anti-discrimination laws, fraud, negligent misrepresentation, false light, and ordinary negligence).  For example, in *Dyroff v. Ultimate Software Group, Inc.*, the Ninth Circuit found that the defendant was immune from suit under subsection (c)(1) for publishing a third-party's posts about heroin use which ultimately led to the deceased's death because the plaintiff was attempting to hold the defendant liable for the harm caused by that content.  934 F.3d at 1097–98.[1]  In this case, by contrast, there is no allegation that Google published or failed to remove some potentially harmful content that caused an injury leading to the RNC's claims; rather, the challenge is to Google's decision to restrict the availability of, or to *not* publish, the RNC's emails.

Further, if, as Google claims, subsection (c)(1) applied to the decision to *remove* content (as opposed to publishing it), subsection (c)(2) would be rendered superfluous.  Rather, it is subsections (c)(2)(A) and (B) that explicitly provide protection for the act of filtering, or not publishing, content provided by third parties.  *Compare Barnes*, 570 F.3d at 1103 (holding that allegations that service provider failed to take down injurious content was barred by section 230(c)(1) because plaintiff effectively sought to hold provider liable for publishing the content) *with Holomaxx Techs. v. Microsoft Corp.*, 783 F. Supp. 2d 1097, 1104 (N.D. Cal. 2011) (holding email service provider was immune from suit for filtering spam emails under section 230(c)(2)(A)).  Subsections (c)(2)(A) and (B) provide protection for actions that restrict access to or availability of content, or enable a user to do the same, respectively.

Finally, subsection (c)(2)(B) is not at issue in this case because the RNC is specifically alleging that Google took unilateral action that was "*not* based on users'

---

[1] In its Motion to Dismiss, Google takes out of context the fact that *Dyroff* involved "features and functions" to organize and display content.  (MTD at 25 (quoting *Dyroff*, 934 F.3d at 1098).)  The Ninth Circuit discussed those features to rebut the argument that the interactive computer service at issue there was creating content by the use of those features and functions.  There is no such argument here. And unlike in *Dyroff*, where the causes of action were based on the *content* of the messages and thus were an attempt to treat the computer service as a publisher, none of the RNC's causes of action in this case seek to treat Google as a publisher.

spam designations." (Opp'n at 23.)  Google concedes that it filters emails that its

algorithm designates as spam, not necessarily just those emails that users themselves

designate as spam.  (MTD at 4–5.)  If Google can show that the decisions to filter were

in fact based on a user's individualized feedback such that Google was effectively just

providing the user with the means to filter the RNC's emails, Google may then be

entitled to immunity under subsection (c)(2)(B).  But, taking the RNC's allegations as

true, it was Google making the filtering decisions, at least in part, not Google merely

providing the technical means for filtering to its users.

Accordingly, section 230 subsections (c)(1) and (c)(2)(B) do not apply in this

case.  And section 230(c)(2)(A) – which could potentially apply – does not bar this suit

given the RNC's allegations that Google was not operating in good faith.

### B.     Plaintiff's Claims

The Court previously dismissed many of the RNC's claims with prejudice after

finding that, as a matter of law, the claims were not cognizable.  The Court granted

leave to amend only two causes of action: Count Three, alleging violation of

California's Unfair Competition Law, and Count Four, alleging Intentional Interference

with Prospective Economic Relations.  (Order at 30, 37.)  The RNC has included each

of the other causes of action in its FAC "to make clear it is not abandoning them and

to preserve its right to appeal." (FAC at 42, n.7.)  For the same reasons stated in its

prior Order dismissing those causes of action, the Court dismisses them here, too.

Accordingly, the Court will proceed with addressing only the Third and Fourth Causes

of Action.

### i.     UCL

The California Unfair Competition Law prohibits "any unlawful, unfair or

fraudulent business act or practice and unfair, deceptive, untrue or misleading

advertising." Cal. Bus. & Pro. Code §17200, *et seq*.  The UCL is an expansive law

which encompasses "anything that can properly be called a business practice and that

at the same time is forbidden by law." *Cel-Tech Commc'ns, Inc. v. Los Angeles*

1   *Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999).  The purpose of the UCL is to prevent

2   unfair competitive conduct which harms both business competitors and the public.

3   *Rubin v. Green*, 4 Cal. 4th 1187, 1200 (1993).  A plaintiff may prove a UCL violation by

4   establishing any one of the "unlawful," "unfair," or "fraudulent" prongs.  *See Cel-Tech.*,

5   20 Cal. 4th at 180.

6        At the outset, Google has asserted that the RNC has not alleged cognizable

7   relief under the UCL.  The UCL is an equitable statute with limited remedies and allows

8   only for restitution and injunctive relief.  *Korea Supply Co. v. Lockheed Martin Corp.*,

9   29 Cal. 4th 1134, 1150 (2003).  "Compensation for a lost business opportunity is a

10  measure of damages and not restitution to the alleged victims."  *Id.* (quoting *MAI Sys.*

11  *Corp. v. UIPS*, 856 F. Supp. 538, 542 (N.D.Cal.1994)).  While the RNC has pled

12  damages, it has not articulated a theory of restitution and thus only has standing to

13  pursue relief if it can seek an injunction.  The RNC appears to recognize this point,

14  arguing in its Opposition only that it has standing due to its request for injunctive

15  relief.[2]  (Opp'n at 17–18.)  Google argues that because the conduct has ceased, the

16  RNC no longer has standing to see injunctive relief such that the UCL claim should be

17  dismissed.

18       In order to possess standing under Article III of the Constitution, "a plaintiff

19  must show (1) that it has suffered an 'injury in fact' that is (a) concrete and

20

21  _____

    [2] At oral argument, the RNC argued for the first time that the UCL permits declaratory relief as well.  The

22  Court's review of the cited cases and other relevant caselaw proves otherwise.  In *Weizman v.
    Talkspace, Inc.*, the Northern District of California did state that UCL remedies are limited to "restitution

23  and prospective declaratory or injunctive relief."  --- F. Supp. 3d ----, ----, No. 23-cv-00912-PCP, 2023 WL
    8461173, at *3 (N.D. Cal. Dec. 6, 2023).  However, the court relied on two California cases, including a

24  decision of the California Supreme Court, which clearly state that the only available relief is restitution
    and injunctive relief.  *See id.* (first citing *Korea Supply*, 29 Cal. 4th at 1144 and then citing *In re Vioxx*

25  *Class Cases*, 180 Cal. App. 4th 116, 130 (2009)).  District Courts are bound by the decisions of the
    state's highest court.  *Armstrong v. Reynolds*, 22 F.4th 1058, 1073 (9th Cir. 2022).  Thus, even if the

26  *Weizman* decision's characterization of UCL remedies is not an unintentional error, that decision is not
    controlling.  *Colopy v. Uber Technologies Inc.*, on the other hand, merely stands for the position that a

27  UCL claim can serve as the predicate for a claim under the Declaratory Judgement Act, not that
    declaratory relief can support a UCL claim.  *See* No. 19-CV-06462-EMC, 2020 WL 3544982, at *3 (N.D.

28  Cal. June 30, 2020) ("[T]he Court can see no reason why, if relief is available under the UCL, a plaintiff
    would not be able to seek declaratory relief under the DJA.")

particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000))  The UCL has a similar standing requirement.  *See* Cal. Bus. & Prof. Code § 17204; *see also California Med. Assn. v. Aetna Health of California Inc.*, 14 Cal. 5th 1075, 1087 (2023) (noting that "the phrase 'injury in fact' [in the UCL] is borrowed from, and was intended to incorporate aspects of, the federal constitutional law of standing.").

Under both Article III and the UCL, the RNC has standing to seek injunctive relief under the voluntary cessation doctrine.  "It is well settled that 'a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice.'"  *Friends of the Earth,* 528 U.S. at 189 (quoting *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982)).[3] Although Google appears to have stopped the allegedly illegal conduct for now, "a case should not be considered moot if the defendant voluntarily ceases the allegedly improper behavior in response to a suit, but is free to return to it at any time."  *Native Village of Noatak v. Blatchford*, 38 F.3d 1505, 1510 (9th Cir. 1994), *overruled on other grounds by Bd. of Trs. of Glazing Health and Welfare Tr. v. Chambers*, 941 F.3d 1195, 1199 (9th Cir. 2019) (*en banc*).  Here, the allegations suggest that the events at issue are likely to be repeated, such that injunctive relief remains viable.  The RNC continues to send the same type of emails to Gmail users at the same volume, and there has been no clear explanation for why the filtering has stopped or a binding assurance from Google that it will not begin again.  The fact that a party "takes curative actions

---

[3] At oral argument, Defendant suggested that the voluntary cessation doctrine did not apply to the UCL, citing to *Madrid v. Perot Sys. Corp.*, 130 Cal. App. 4th 440, 463 (2005).  However, the defendant in *Madrid* had not voluntarily ceased the activity, but, rather, the circumstances had changed such that the defendant would have been unable to carry out the same conduct in the future.  Similar to the inquiry under Article III, *Madrid* clearly states that a plaintiff may seek injunctive relief under the UCL for misconduct which is "likely to recur."  *Id.* at 464.

1    only after it has been sued fails to provide sufficient assurances that it will not repeat

2    the violation to justify denying an injunction." *E.E.O.C. v. Goodyear Aerospace Corp.*,

3    813 F.2d 1539, 1544 (9th Cir. 1987).  The Court concludes that the RNC has

4    sufficiently plead entitlement to injunctive relief, and therefore has standing to pursue

5    its UCL claim.  The Court now proceeds to the merits of the UCL claim.

**1.      Unlawful Prong**

7          The unlawful prong of the UCL requires that the plaintiff sufficiently plead some

8    separate unlawful offense.  *See Rivera v. BAC Home Loans Servicing, L.P.*, 756 F. Supp.

9    2d 1193, 1200–01 (N.D. Cal. 2010).  As discussed above, the Court has previously

10   dismissed most of the RNC's claims with prejudice.  The only other potentially viable

11   claim, intentional interference with prospective economic relations, is itself dependent

12   on establishing an independently wrongful act which is "wrongful apart from the

13   interference itself." *Korea Supply*, 29 Cal. 4th at 1154.[4]  While the RNC is correct that a

14   UCL violation may support an intentional interference with economic relations claim,

15   the UCL needs to have been violated for "reasons other than that [defendant]

16   interfered with a prospective economic advantage." *CRST Van Expedited, Inc. v.*

17   *Werner Enterprises, Inc.*, 479 F.3d 1099, 1110 (9th Cir. 2007) (quoting *Stevenson Real*

18   *Est. Servs., Inc. v. CB Richard Ellis Real Est. Servs., Inc.*, 138 Cal. App. 4th 1215, 1224

19   (2006)).  In other words, the RNC may not "bootstrap" its claims on one another by

20   asserting that the intentional interference violates the UCL, and then relying on that

21   UCL violation to support its intentional interference claim.  Although the RNC pleads

22   this theory in the FAC (*See* FAC ¶ 144), it seems to have abandoned it, having not

23   raised the argument in opposition.  (*See* Opp'n at 12 –16 (arguing only that the

24   ////

---

26   [4] *See infra* Section III.B.ii.  The tort of intentional interference with prospective economic relations
     requires an intentional act on the part of the defendant designed to disrupt the relationship.  *Korea*
27   *Supply*, 29 Cal. 4th at 1153.  The California Supreme Court has clarified that such an act must be
     "wrongful apart from the interference itself" and that "an act is independently wrongful if it is unlawful,
     that is, if it is proscribed by some constitutional, statutory, regulatory, common law, or other
28   determinable legal standard." *Id.* at 1154, 1159.

"unfair" prong is met.)  Accordingly, the Court does not find a violation of the UCL under the unlawful prong.

### 2.    Unfair Prong

"The unfair prong of the UCL 'creates a cause of action for a business practice that is unfair even if not proscribed by some other law.'"  *Day v. GEICO Cas. Co.*, 580 F. Supp. 3d 830, 844 (N.D. Cal. 2022) (quoting *Cappello v. Walmart Inc.*, 394 F. Supp. 3d 1015, 1023 (N.D. Cal. 2019)).  Whether conduct is unfair can be determined in one of two ways: (1) by establishing that the conduct offends "some legislatively declared policy" (the "tethering" test), or (2) by weighing the utility of the conduct against the harm to the consumer (the "balancing" test).[5]  *Id.* at 844–45 (citing *Lozano v. AT & T Wireless Servs., Inc.*, 504 F.3d 718, 735 (9th Cir. 2007) and *Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1169 (9th Cir. 2012)).  While the California Supreme Court has rejected the balancing test in favor of the tethering test for competitor suits under the UCL, it has failed to clarify whether the tethering test is the sole test that should apply to consumer suits as well.  *Cel-Tech*, 20 Cal. 4th at 186–87; *see Nationwide Biweekly Admin., Inc. v. Superior Ct. of Alameda Cnty.*, 9 Cal. 5th 279, 304 (2020) (acknowledging split in California appellate courts but declining to address

---

[5] While some courts have stated there is a third test for determining unfairness, looking to whether the practice is "immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers," *see Doe v. CVS Pharmacy, Inc.*, 982 F.3d 1204, 1214 (9th Cir. 2020), these factors appear to be part of the balancing test and do not constitute a distinct basis for finding unfairness.  *See Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1169–70 (9th Cir. 2012) (discussing the balancing test as that articulated by *S. Bay Chevrolet v. Gen. Motors Acceptance Corp.*, 72 Cal. App. 4th 861 886–87 (1999) and *Smith v. State Farm Mut. Auto. Ins. Co.*, 93 Cal. App. 4th 700, 718 (2001), *as modified* (Nov. 20, 2001) in which the nature of the practice is part of the balancing test).  In a recent opinion, *Nationwide Biweekly Administration, Inc. v. Superior Court of Alameda County*, the California Supreme Court acknowledged that in the absence of guidance from that court, California appellate courts have adopted three different test: the tethering test, the *South Bay/State Farm* balancing test, and the more recent *Camacho*/FTC balancing test, articulated in *Camacho v. Automobile Club of Southern California*, 142 Cal. App. 4th 1394, 1403 (2006).  9 Cal. 5th 279, 304, n. 10 (2020).  California's high court, however, declined to resolve which was the appropriate test.  The Ninth Circuit has recognized the tethering and *South Bay/State Farm* tests, but rejected the *Camacho*/FTC test "in the absence of a clear holding from the California Supreme Court."  *Lozano v. AT & T Wireless Servs., Inc.*, 504 F.3d 718, 736 (9th Cir. 2007).  Because the California Supreme Court did not make such a clear holding about the viability of the FTC in *Nationwide*, the only two tests applicable in this Circuit are the tethering test and the *South Bay/State Farm* balancing test.

1    whether the tethering test also applies to consumer suits).  In the absence of such

2    guidance, the Ninth Circuit has endorsed the use of the balancing test for consumer

3    suits, but has in practice reviewed unfairness under both the balancing and tethering

4    tests.  *See Lozano*, 504 F.3d at 735 (stating that the two tests are not mutually

5    exclusive); *Davis*, 691 F.3d at 1170 (finding that plaintiff failed to state a claim under

6    either the balancing or tethering test); *see also Doe v. CVS Pharmacy, Inc.*, 982 F.3d

7    1204, 1215 (9th Cir. 2020).  The RNC argues that it meets the unfair prong under

8    either of these tests, which the Court will consider in turn.[6]

9                              **a.    Tethering test**

10         The tethering test requires that the alleged conduct be "tethered to some

11    legislatively declared policy or proof of some actual or threatened impact on

12    competition."  *Cel-Tech*, 20 Cal. 4th at 186–87.  The UCL is intended to provide a

13    remedy for such conduct where the law may not otherwise provide one.  *See, e.g.*,

14    *Stop Youth Addiction, Inc. v. Lucky Stores, Inc.*, 17 Cal. 4th 553, 566 (1998), *abrogated*

15    *by statute on other grounds* (finding a civil right of action under the UCL for violating a

16    criminal law prohibiting the sale of tobacco to minors); *In re Zoom Video Commc'ns*

17    *Inc. Priv. Litig.*, 525 F. Supp. 3d 1017, 1047 (N.D. Cal. 2021) (gathering video and

18    audio of minors without parental consent violated the public policy of protecting

19    minors' personal information online).  While the conduct does not need to be a direct

20    violation of the law (which would otherwise collapse the unlawful prong into the unfair

21    prong), "[t]o determine whether something is sufficiently 'tethered' to a legislative

22    policy for the purposes of the unfair prong, California courts require a close nexus

23    between the challenged act and the legislative policy."  *Hodsdon v. Mars, Inc.*, 891

24    F.3d 857, 866 (9th Cir. 2018).  "Although the unfair competition law's scope is

25

26    _____

      [6] The determination of whether a practice is unfair under the UCL is a legal question decided by the
27    court, not a factual question decided by a jury.  *Nationwide Biweekly*, 9 Cal. 5th at 304.  Nevertheless, at
      this stage, the Court still presumes the truth of the allegations in the FAC, as weighing evidence is not
28    appropriate in assessing a motion to dismiss.  *Steinle*, 919 F.3d at 1160; *Rubenstein v. Neiman Marcus*
      *Grp. LLC*, 687 F. App'x 564, 566 (9th Cir. 2017).

                                         14

1  sweeping, it is not unlimited." *Cel-Tech*, 20 Cal. 4th at 182.  Under the tethering test,

2  the RNC argues that Google's conduct is similar enough to causes of action that this

3  Court has already dismissed to make the conduct at least tethered to those laws even

4  if the conduct is not a direct violation of the laws.

5      *First*, the RNC argues that discrimination based on political affiliation violates

6  the public policy espoused in the Unruh Act despite the Court's finding that the Unruh

7  Act contains no such policy.  As the Court discussed in its previous Order, the

8  California Legislature has so far declined to protect political affiliation under the Unruh

9  Act.  While the RNC is correct that the UCL is intended to combat "new schemes" that

10  the legislature has not yet explicitly addressed, "[i]f the Legislature has permitted

11  certain conduct or considered a situation and concluded no action should lie, courts

12  may not override that determination." *Cel-Tech*, 20 Cal. 4th at 182.  There is nothing

13  novel about political affiliation discrimination.  The Court discussed in its prior Order

14  that California courts have in the past suggested that political affiliation discrimination

15  might violate the Unruh Act.  *See, e.g.*, *Harris v. Cap. Growth Invs. XIV*, 52 Cal. 3d 1142,

16  1161 n.10 (1991).  But since the *Harris* case, the California Legislature has amended

17  the Unruh Act at least six times to add other protected categories, and yet has not

18  added political affiliation.  (Order at 26.)  "We generally presume the Legislature is

19  aware of appellate court decisions," *Therolf v. Superior Court. of Madera County.*, 80

20  Cal. App. 5th 308, 335 (2022), and so "its inaction on this subject . . . is significant."

21  *Beverage v. Apple, Inc.*, 101 Cal. App. 5th 736 (2024).  The California Legislature's

22  inaction in this area is far from establishing a "legislatively declared policy" of

23  prohibiting discrimination based on political affiliation.

24      The RNC attempts to analogize to *Candelore v. Tinder, Inc.*, which held that in

25  addition to violating the Unruh Act, age discrimination in pricing also violated the

26  unfair prong of the UCL.  The age discrimination analyzed in *Candelore* differs from

27  political affiliation discrimination in several key respects.  First, the *Candelore* court

28  determined that age discrimination in pricing was actually violative of the Unruh Act,

1    and was not just tethered to it.  19 Cal. App. 5th 1138, 1145 (2018).  Consistent with

2    the California Supreme Court's decision in *Marina Point, Ltd. v. Wolfson*, the

3    *Candelore* court held that age discrimination violates the Unruh Act when age is used

4    as an arbitrary proxy for generalized characteristics.[7]  *Id.* at 1145, 1151–52; *Marina*

5    *Point, Ltd. v. Wolfson*, 30 Cal. 3d 721, 740 (1982).  No court has similarly held that

6    political affiliation discrimination directly violates the Unruh Act, and, important here,

7    the Legislature has never indicated a policy against political affiliation discrimination,

8    either.

9         Notably, California has recognized a public policy against age discrimination in

10   several other contexts.  The California Legislature has explicitly codified the *Marina*

11   *Point* decision by prohibiting age discrimination in housing.  *See* Cal. Civ. Code

12   § 51.2(a)-(b).  The California Fair Employment and Housing Act also prohibits age

13   discrimination in employment.  *See* Cal. Gov't Code § 12940.  These specific statutes

14   evince a legislatively declared policy against age discrimination, at least in select

15   contexts.  In contrast, there is no evidence of California public policy against political

16   affiliation discrimination.  The closest the Legislature has come is to prohibit violence

17   or threats of violence based on political affiliation under the Ralph Civil Rights Act,

18   which is meaningfully different from prohibiting discrimination on the basis of political

19   affiliation as a general matter.  Cal. Civ. Code § 51.7; *see, e.g.*, *Black Lives Matter-*

20   *Stockton Chapter v. San Joaquin Cnty. Sheriff's Off.*, 398 F. Supp. 3d 660, 679 (E.D.

21   Cal. 2019) (threats of violence based on association with Black Lives Matter would

22   violate the Ralph Civil Rights Act); *Campbell v. Feld Ent., Inc.*, 75 F. Supp. 3d 1193

23

24   [7] Specifically, in *Marina Point*, the Court held that a landlord could not discriminate against children based on the arbitrary generalization that all children are noisy and disruptive, and in *Candelore*, the
25   court held that Tinder could not base its pricing structure on a generalization about younger users' income.  Other California courts have found that age discrimination is acceptable in certain
26   circumstances and does not violate the Unruh Act.  For instance, providing a discount to senior citizens who are likely on a fixed income, or making a fitness club more financially accessible to younger
27   members are socially desirable practices and not "arbitrary discrimination."  *See Starkman v. Mann Theatres Corp.*, 227 Cal. App. 3d 1491, 1499 (1991); *Javorsky v. W. Athletic Clubs, Inc.*, 242 Cal. App.
28   4th 1386, 1405 (2015).

16

1  (N.D. Cal. 2014) (same based on association with animals rights activist group).

2  Accordingly, the many statements of legislative policy against age discrimination from

3  which the *Candelore* court drew are absent in the political affiliation context.

4        As the Court previously determined, "had the California Legislature intended to

5  give broader protections to individuals on the basis of their political affiliation . . . it

6  would have done so." (Order at 26). The Court declines to judicially extend the

7  protections of the Unruh Act to political affiliation through the UCL by declaring it

8  "tethered" to the Unruh Act. To do so would be to circumvent what the Court has

9  already observed is a conscious legislative decision to not provide such protection.

10  (*See* Order 24–27.) "[The Court] decline[s] the invitation to do that which the

11  Legislature has left undone." *Korens v. R. W. Zukin Corp.*, 212 Cal. App. 3d 1054, 1059

12  (1989), *reh'g denied and opinion modified* (Aug. 28, 1989).

13        *Second*, the RNC argues that the conduct is tethered to the policy underlying

14  California's common carrier law, specifically that California law "reflects the public

15  policy that messages should be delivered to and received by the designated recipient

16  reasonably and without discrimination," and that Google's conduct is "comparable" to

17  a violation of the California common carrier law, despite the Court's prior finding that

18  the California common carrier law does not apply to email or email carriers. (Opp'n at

19  14–15). As the Court has discussed in the prior Order, California's common carrier law

20  has historically been applied to services that physically carry persons or goods, like

21  stagecoaches, busses, and ski lifts. (Order at 16.) While the California Supreme Court

22  did interpret the law to include telephone services, *see Goldin v. Pub. Utilities*

23  *Comm'n*, 23 Cal. 3d 638, 662 (1979), there is no *legislatively declared* policy that

24  electronic means of communication like email should be subject to common carrier

25  standards. *See Cel-Tech*, 20 Cal. 4th at 186–87.

26        Reading email into the common carrier law would implicate significant policy

27  and Constitutional considerations that the California Legislature has not addressed.

28  As the Court previously discussed, "if email providers are common carriers, they

1   would have an obligation to deliver each of the messages that were entrusted to

2   them" including unwanted and spam emails that could be harmful and disruptive to

3   email users and providers.  (Order at 22.)  And such a regulation would impose on

4   email providers' First Amendment rights.  As the Supreme Court recently recognized:

> [d]eciding on the third-party speech that will be included in or excluded from a compilation – and then organizing and presenting the included items – is expressive activity of its own . . . . When the government interferes with such editorial choices – say, by ordering the excluded to be included – it alters the content of the compilation.

9   *Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 2402 (2024).  Under this standard, a law

10  that would require email providers to treat political content in a certain manner at

11  least implicates the First Amendment.[8]  Although a legislature may determine that

12  such a regulation is nonetheless justified, the UCL is not intended to grant courts the

13  authority to make these kinds of complex policy determinations under the guise of

14  judicial decisionmaking.  *See Wolfe v. State Farm Fire & Cas. Ins. Co.*, 46 Cal. App. 4th

15  554, 565 (1996) (warning against judicial intervention in complex areas of policy via

16  the UCL); *Klein v. Chevron U.S.A., Inc.*, 202 Cal. App. 4th 1342, 1362 (2012) (collecting

17  cases where California courts have declined to rule on UCL claims implicating

18  complex policy decisions), *as modified on denial of reh'g* (Feb. 24, 2012).  The

19  California Legislature is properly in a position to balance these concerns, and without

20  the necessary legislatively declared policy required under the tethering test, this Court

21  may not do so in its stead.

22          **b.      Balancing test**

23          The UCL balancing test is less clearly defined than the tethering test.  *See Cel-*

24  *Tech*, 20 Cal. 4th at 185 (criticizing the balancing test for being "amorphous" and

25  "provid[ing] too little guidance to courts").  The balancing test "involves an

26  examination of [the business practice's] impact on its alleged victim, balanced against

---

27  [8] The Court is in no way offering an opinion on whether such a law would in fact be unconstitutional but

28  is rather observing a significant policy and Constitutional issue that the California Legislature would likely consider if it were to regulate email providers as common carriers.

1    the reasons, justifications and motives of the alleged wrongdoer.  In brief, the court

2    must weigh the utility of the defendant's conduct against the gravity of the harm to the

3    alleged victim . . . ."  *S. Bay Chevrolet v. Gen. Motors Acceptance Corp.*, 72 Cal. App.

4    4th 861, 886–87 (1999) (quoting *State Farm Fire & Cas. Co. v. Superior Ct.*, 45 Cal.

5    App. 4th 1093, 1103–04 (1996), *abrogated on other grounds by Cel-Tech*, 20 Cal. 4th).

6    In assessing whether and to what extent a business practice is harmful, the court will

7    look to whether it is "immoral, unethical, oppressive, unscrupulous or substantially

8    injurious to consumers."  *Davis*, 691 F.3d at 1169 (quoting *S. Bay*, 72 Cal. App. 4th at

9    887).

10        As this description of the balancing test indicates, when assessing the harm, the

11    Court must look only at the harm suffered by the *consumers*, that is, Gmail users, not

12    by the RNC.  *See Hodsdon v. Mars, Inc.*, 891 F.3d 857, 867 (9th Cir. 2018).  "The UCL's

13    purpose is to protect both consumers and competitors by promoting fair competition

14    in commercial markets for goods and services," not necessarily to address any

15    conduct that might be viewed as unfair.  *Kasky v. Nike, Inc.*, 27 Cal. 4th 939, 949

16    (2002), *as modified* (May 22, 2002); *see also Bank of the W. v. Superior Ct.*, 2 Cal. 4th

17    1254, 1264 (1992) (describing the history of the UCL).  Because the RNC is not a Gmail

18    user or Google competitor, the harms it has allegedly suffered are not properly

19    considered under the UCL.  *See, e.g., Hodsdon*, 891 F.3d at 867 (declining to look to

20    the *practice* of utilizing child and slave labor, but rather only examining the conduct

21    which affected the *consumer* of the chocolate products, namely the failure to disclose

22    these labor practices).  The RNC has not cited, and the Court cannot find, any case

23    where an unfair practice claim was based on a harm not suffered by either a consumer

24    or competitor.[9]  *See, e.g., California Med. Assn.*, 14 Cal. 5th at 1090 (finding standing

---

[9] A plaintiff may still bring a claim under the UCL even if it has not suffered harm as a consumer or
competitor.  "[A] private plaintiff has standing to bring a claim under the UCL . . . if he or she has
'suffered injury in fact and has lost money or property as a result of [the] unfair competition.'"  *Morgan v.
AT&T Wireless Servs., Inc.*, 177 Cal. App. 4th 1235, 1253 (2009) (quoting Cal. Bus. & Prof. Code
§ 17204, as amended by Prop. 64, § 3).  In a recent opinion, the California Supreme Court determined

1    to sue under the UCL based on the plaintiff's separate economic injury despite the fact

2    that plaintiff was neither a consumer or competitor of the defendant, but noting the

3    alleged harm under the UCL was to participating physicians).

4            Focusing on the injury to consumer, the RNC asserts that Google's alleged

5    practice of diverting emails to spam harms Gmail users by making it more difficult for

6    them to access their emails and engage with politics.  Taking all the RNC's allegations

7    as true and in the light most favorable to it, at its worst Google's alleged conduct, as it

8    applies to consumers, consists of delivering nearly all of the RNC's emails to users'

9    inboxes without issue, save for one or two days over the course of seven months when

10   the messages were delivered to users' spam folders as opposed to their inboxes.[10]

11           While there is no case that clearly defines what constitutes conduct that is

12   "immoral, unethical, oppressive, unscrupulous or substantially injurious to

13   consumers," a review of the caselaw reveals several themes.  A common unfair

14   practice is a scheme that seek to exploit consumers.  For example, having a product

15   fail is not substantially injurious, but "charging customers exorbitant sums of money"

16   to remediate the harm of the inevitable failure is.  *In re Seagate Tech. LLC Litig.*, 233 F.

17   Supp. 3d 776, 798 (N.D. Cal. 2017).  Similarly, hiding no-parking signs, then arranging

18   for a towing company to remove the cars while receiving a kickback from the towing

19   company is an unfair practice.  *People v. James*, 122 Cal. App. 3d 25, 36 (1981).  In

20   _____

21   that a plaintiff may assert a violation of the law on behalf of consumers, so long as the plaintiff has also
     been harmed in some, but not necessarily the same, way.  *California Med. Assn. v. Aetna Health of*

22   *California Inc.*, 14 Cal. 5th 1075, 1090 (2023) ("UCL standing can be based on an organization's
     diversion of resources in response to a threat to its mission.")  However, the allegedly unfair practice

23   must still harm *consumers or competitors* in order to violate the UCL.  *See id.* (despite resting its own
     standing on a diversion of resources theory, the plaintiffs argued that the insurer's policy harmed

24   participating physicians and interfered with their medical judgement); *Lagrisola v. N. Am. Fin. Corp.*, 96
     Cal. App. 5th 1178, 1192–95 (2023), *review denied* (Feb. 14, 2024) (finding that while the plaintiffs had

25   established a sufficient economic injury, they had not sufficiently alleged an actionable unfair business
     practice where they could not show that the defendant had any obligation to have a lender license and
     did not misrepresent its license status to consumers).

26   [10] The RNC has also claimed that Google misrepresents the nature of its services to users.  (FAC ¶ 151.)
     However, this is fundamentally an allegation of fraud and the RNC has failed to plead facts sufficient to

27   meet the Rule 9 fraud pleading standard, nor has it alleged that the users relied on these
     misrepresentations in choosing to set up a Gmail account, as the Court noted in its prior Order.  (Order

28   at 36–37.)  *See O'Connor v. Uber Techs., Inc.*, 58 F. Supp. 3d 989, 1003 (N.D. Cal. 2014).

contrast, a practice that minimally harms some consumers but does not provide a clear benefit to the defendant is not an unfair practice.  In *Puentes v. Wells Fargo Home Mortgage, Inc.* the court found that the practice of using a standard month for mortgage payments, which resulted in the plaintiffs being charged for two additional days of interest because they paid off their loan February – but provided defendant with no net monetary benefit overall – was not immoral, unethical, oppressive or unscrupulous, or substantially injurious. 160 Cal. App. 4th 638, 649 (2008).  And, most applicable here, declining to advertise another business's services but not excluding those services from the market is not an unfair practice.  In *Drum v. San Fernando Valley Bar Assn.*, the court found that the bar association's refusal to sell its membership mailing list to a mediator not in good standing with the bar was not immoral, unethical or unscrupulous because the association did not otherwise prevent the consumers from being able to find or engage the mediator's services.  182 Cal. App. 4th 247, 257 (2010); *cf. Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1133 (9th Cir. 2014) (withholding positive business reviews was not extortion under the UCL because Yelp had no obligation to provide positive reviews).

Here, the alleged conduct does not rise to the level of being "immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers."  While political discrimination may fall under the umbrella of these terms, the Court must, again, focus on the business practice and the harms to the consumer.  *See Hodsdon*, 891 F.3d at 867.  Having a small number of wanted emails diverted to spam on occasion is not "substantially injurious" to Gmail users.  Google is not alleged to have diverted the emails to force users to pay large sums of money to get their emails back; the users could access those emails at any time.  Nor did Google realize any monetary benefit from diverting the RNC's emails.  While the practice did allegedly cause substantial monetary injury to the RNC, the Gmail users were not harmed in a similar way.

////

1    The allegations of political discrimination, if true, are certainly concerning and

2    may have wide and severe implications for the future of political discourse.  It may

3    even be that Google's conduct is "unfair" in a colloquial, as opposed to a legal, sense.

4    But it is not the role of this Court to decide these significant policy issues that must be

5    addressed by a legislative body in the first instance.  As broad as it is, California's

6    Unfair Competition Law does not cover the conduct alleged by the RNC.  Accordingly,

7    the Court GRANTS the Motion to Dismiss as to the Third Cause of Action.

8                    **ii.    Intentional Interference with Prospective Economic Relations**

9    To plead the tort of intentional interference with prospective economic

10   relations, a plaintiff must plead: "(1) an economic relationship between the plaintiff

11   and some third party, with the probability of future economic benefit to the plaintiff;

12   (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of

13   the defendant designed to disrupt the relationship; (4) actual disruption of the

14   relationship; and (5) economic harm to the plaintiff proximately caused by the acts of

15   the defendant." *Korea Supply*, 29 Cal. 4th at 1153.  The California Supreme Court has

16   clarified that to meet the third element, "a plaintiff must plead and prove that the

17   defendant's acts are wrongful apart from the interference itself." *Id.* at 1154; *see Della*

18   *Penna v. Toyota Motor Sales, U.S.A., Inc.*, 11 Cal. 4th 376, 393 (1995).

19                    **1.    Independently Wrongful Act**

20   The Court previously dismissed the RNC's claim of intentional interference with

21   prospective economic relations on the basis that the RNC had not plead some

22   independent unlawful conduct to support this claim.  "[A] plaintiff seeking to recover

23   for an alleged interference with prospective contractual or economic relations must

24   plead and prove as part of its case-in-chief that the defendant not only knowingly

25   interfered with the plaintiff's expectancy, but engaged in conduct that was wrongful

26   by some legal measure other than the fact of interference itself." *Della Penna*, 11 Cal.

27   4th at 393.  "[A]n act is independently wrongful if it is unlawful, that is, if it is proscribed

28   ////

                                        22

1    by some constitutional, statutory, regulatory, common law, or other determinable

2    legal standard." *Korea Supply*, 29 Cal. 4th at 1159.

3         The RNC argues that Google's conduct is independently wrongful because it

4    violates the UCL and "the common law's established common-carrier doctrine."

5    (Opp'n at 20.)  As determined above, the RNC has not established a violation of the

6    UCL and so it cannot form the basis of the intentional interference claim.  The

7    common carrier argument similarly fails.  The supposed common-law common carrier

8    doctrine is derived from a – now vacated – out of circuit opinion assessing a different

9    state's statutory common carrier law.  In the opinion, the Fifth Circuit explicitly states

10   that the historical common carrier doctrine "vests *States* with the power to impose

11   nondiscrimination obligations on communication and transportation providers," and

12   then surveys how some States have enacted various common carrier laws defining

13   and regulating common carriers in different ways.  *NetChoice, L.L.C. v. Paxton*, 49

14   F.4th 439, 470-72 (5th Cir. 2022) (emphasis added), *cert. granted in part sub nom.*

15   *NetChoice, LLC v. Paxton*, 147 S. Ct. 447 (2023), and *vacated and remanded sub nom.*

16   *Moody v. NetChoice, LLC*, 144 S. Ct. 2383 (2024).  The Court has already discussed at

17   length in its prior Order why under California law – the law applicable here – Google

18   is not a common carrier and thus not subject to any duties of a common carrier.

19   (Order at 16–22.)

20        Additionally, the RNC briefly alleges that Google's conduct is independently

21   wrongful because Google violated "established industry, trade or professional rules or

22   standards, such as Google's own terms of service and implied warranties."

23   (FAC ¶ 158.)  While industry standards and professional rules may satisfy the

24   requirement that a plaintiff prove an independently wrongful act, the conduct must be

25   proscribed by some "determinable legal standard" that "provides for, or gives rise to,

26   a sanction or means of enforcement for a violation."  *Stevenson Real Est. Servs., Inc. v.*

27   *CB Richard Ellis Real Est. Servs., Inc.*, 138 Cal. App. 4th 1215, 1223 (2006).  That a

28   defendant's conduct may be "unethical" or may have violated industry standards is

1     insufficient without a determinable means by which to enforce the industry standard

2     or rule.  *Gemini Aluminum Corp. v. California Custom Shapes, Inc.*, 95 Cal. App. 4th

3     1249, 1259 (2002).  For example, in *Stevenson Real Estate Services, Inc. v. CB Richard*

4     *Ellis Real Estate Services, Inc.*, the court held that despite the American Industrial Real

5     Estate Association's Rules of Professional Conduct establishing a well-defined

6     standard for what was "permitted, required and prohibited" within the industry, a

7     violation of the rules could not be considered independently wrongful under *Korea*

8     *Supply* because there was no way for an aggrieved member to enforce the rules

9     through, for example, a sanction, right of arbitration, or other internal remedy.

10    *Stevenson Real Estate*, 138 Cal. App. 4th at 1222–24.  Here, the RNC fails to explain

11    either in the FAC or its Opposition what the industry, trade, or professional rules or

12    standards are, how or where those standards and rules are clearly established, or how

13    they are enforceable.  Accordingly, this allegation is not enough to establish an

14    independently wrongful act.

15         The RNC has therefore failed to plead any independently wrongful conduct to

16    support its claim.

### 2.    Probability of an Economic Benefit

18         The RNC's claim also fails for the independent reason that the RNC has not

19    adequately pled the probability of an economic benefit.  *See Roy Allan Slurry Seal, Inc.*

20    *v. Am. Asphalt S., Inc.*, 2 Cal. 5th 505, 511 (2017).  As stated above, a plaintiff must

21    allege an economic relationship between the plaintiff and some third party, with the

22    probability of future economic benefit to the plaintiff.

23         While Google is correct that an intentional interference claim requires the

24    plaintiff "to identify a particular relationship or opportunity with which the defendant's

25    conduct is alleged to have interfered," this requirement does not require a plaintiff to

26    *name* an individual.  *Damabeh v. 7-Eleven, Inc.,* No. 5:12-CV-1739-LHK, 2013 WL

27    1915867, at *10 (N.D. Cal. May 8, 2013); *see Soil Retention Prod., Inc. v. Brentwood*

28    *Indus., Inc.*, 521 F. Supp. 3d 929, 961 (S.D. Cal. 2021).  Rather, the purpose of the

1   requirement is to distinguish between established and speculative relationships.

2   *Westside Ctr. Assocs. v. Safeway Stores 23, Inc.*, 42 Cal. App. 4th 507, 524 (1996).  The

3   requirement "does not mean the party must [be] identified by name; it [i]s enough that

4   the defendant was aware its actions would frustrate the legitimate expectations of a

5   *specific*, albeit unnamed, [party]."  *Id.* (citing *Ramona Manor Convalescent Hosp. v.*

6   *Care Enterprises*, 177 Cal. App. 3d 1120 (1986), *as modified on denial of reh'g* (Mar. 5,

7   1986)); *see also Weintraub Fin. Servs., Inc. v. Boeing Co.*, No. CV-20-3484-MWF-GJSx,

8   2020 WL 6162801, at *8 (C.D. Cal. Aug. 7, 2020) (holding that the plaintiffs had

9   "alleged a 'particular relationship or opportunity with which the defendant's

10   conduct . . . interfered' rather than vague allegations regarding a relationship with an

11   'as yet unidentified' customer" despite not naming the buyer).  With these principles in

12   mind, the RNC has sufficiently alleged a pre-existing relationship with a class of Gmail

13   users who had donated to the RNC in the past.

14         Despite pleading the requisite relationships, the RNC has failed to plead the

15   reasonable probability of an economic benefit stemming from these relationships.

16   Overall, courts have narrowly construed this element, requiring specific facts to show

17   that a benefit was almost certain.  *See Roy Allan Slurry Seal, Inc.*, 2 Cal. 5th at 518; *Pac.*

18   *Gas & Elec. Co. v. Bear Stearns & Co.* 50 Cal. 3d 1118, 1136–1137 (1990) (noting that

19   courts "have been cautious in defining the interference torts, to avoid promoting

20   speculative claims.").  The fact that a plaintiff has a preexisting business relationship

21   with a party is not sufficient; the plaintiff must provide details about the impending

22   contract or other economic benefit.  *See Soil Retention*, 521 F. Supp. 3d at 961

23   (requiring a plaintiff to allege "not just 'an economic relationship between the plaintiff

24   and some third party' but also the [']probability of future economic benefit to the

25   plaintiff.'" (quoting *Korea Supply*, 29 Cal. 4th at 1153)).  For example, the failure to

26   specify "what the terms were, when the contracts were being negotiated (*e.g.*,

27   whether those contracts fell through before, during, or after Defendant's

28   ////

1   alleged . . . acts), and how much money, if any, Plaintiff lost as a result" dooms a claim.

2   *Id.* at 962.

3         Here, the RNC has alleged only that the users requested RNC emails, engaged

4   with the emails, and have donated in the past without any other facts to establish that

5   these users would donate in the future.  (*See* FAC ¶¶ 2, 27-32, 53, 56; Opp'n at 18).

6   The RNC has failed to point to any case where a past economic relationship standing

7   alone was enough to show the reasonable probability of a future benefit, and the

8   Court has been unable to find one in its own review.  *See, e.g.*, *Putian Authentic Enter.*

9   *Mgmt. Co., Ltd v. Meta Platforms, Inc.*, No. 5:22-CV-01901-EJD, 2022 WL 1171034, at

10  *5 (N.D. Cal. Apr. 19, 2022) (finding that description of "past customers, not future

11  customers" did not suffice to establish interference with a future business benefit).

12  Similarly, the fact that users request and "engage" with emails does not support the

13  conclusion that a user would have also donated.  Without more facts about the nature

14  or frequency of the past donations to bolster the probability of a recurrence, the RNC

15  has established "at most a hope for . . . future benefit."  *Blank v. Kirwan* 39 Cal. 3d 311,

16  331 (1985).

17        Thus, the RNC has failed to allege the elements necessary for its intentional

18  interference with prospective economic relations claim.  Accordingly, the Court

19  GRANTS the Motion to Dismiss as to the Fourth Cause of Action.

20          **iii.   Leave to Amend**

21        Despite being given leave to amend to establish "a plausible theory of

22  unfairness or unlawfulness" for its UCL claim, and to allege an independently wrongful

23  act to support its intentional interference claim, the RNC has failed to do either.  The

24  RNC has not provided any indication that there are additional facts it could allege to

25  establish these elements of its claims.  Therefore, the Court finds that amendment

26  would be futile.  *See Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1007 (9th

27  Cir. 2009), *as amended* (Feb. 10, 2009) (denial of leave to amend appropriate where

28  amendment would be futile because the plaintiff had no additional facts to plead).

**IV.    Conclusion**

For the above reasons, IT IS HEREBY ORDERED that Google's Motion to Dismiss (ECF No. 60) is GRANTED.  The RNC's claims are hereby DISMISSED WITH PREJUDICE.

The Clerk of Court is directed to close this case.

Dated:  July 31, 2024

THE HONORABLE DANIEL J. CALABRETTA
UNITED STATES DISTRICT JUDGE